# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                 No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup,"
CHRISTOPHER GARCIA,
SERGIO LOYA RORDIGUEZ, a.k.a
"Churro,"
MANUEL BENITO, a.k.a. "Panther,"
VINCENT GARDUÑO a.k.a. "Fatal,"
MANDEL LON PARKER, a.k.a.
"Chuco,"
DANIEL ARCHULETA, a.k.a. "Smurf,"
DANIEL SANCHEZ, a.k.a. "Dan Dan,"
ANTHONY CORDOVA, a.k.a. "Antone,"
and ARTURO ARNULFO GARCIA,
a.k.a. "Shotgun,"

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Anthony Cordova's Motion to Suppress Out-Of-Court and In-Court Identifications and Request for Evidentiary Hearing, filed April 7, 2018 (Doc. 563)("Motion"). The Court held an evidentiary hearing on June 15, 2018. The primary issues are (i) whether the Federal Bureau of Investigation's ("FBI") process for witness Mario Montoya's out-of-court identification of Defendant Anthony Cordova was so impermissibly suggestive that admitting it into evidence will violate Cordova's right to due process; and (ii) whether the Court should exclude evidence of Montoya's identification from trial under rule 403 of the Federal Rules of Evidence. The Court concludes that: (i) admitting into evidence at trial Montoya's identifications of Cordova will not violate Cordova's right to due process, because the identification process was not impermissibly suggestive or unnecessary;

and (ii) the Court will not exclude Montoya's identification evidence from trial under rule 403, because the evidence's probative value is substantial and the risk of misleading the jury is low. Accordingly, the Court grants the Motion in part and denies in part. The Court grants the Motion insofar as it requests an evidentiary hearing and denies the Motion insofar as it requests the Court to suppress evidence of Montoya's identifications of Cordova.

## FACTUAL BACKGROUND

The Court takes its background facts from the Superseding Indictment, filed March 9, 2017 (Doc. 372)("Indictment"). The Court does not set forth these facts as findings or for their truth. The Court recognizes that the factual background is largely the Plaintiff United States of America's version of events and that the Defendants who have not pled guilty are all presumed innocent.

This case deals with the crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. See Indictment ¶¶ 1, 3, at 1-2. The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment ¶ 1, at 2. The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected interstate and foreign commerce." Indictment ¶ 2, at 2. The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2.

The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Indictment ¶ 3, at 2. During the riot, thirty-three inmates were killed, and over 200 were injured. See Indictment ¶ 3, at 2. After the PNM riot, the SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment ¶ 4, at 2. The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment ¶ 4, at 2-3. The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment ¶¶ 3, 5, at 2-3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and the profit from narcotics trafficking. See Indictment ¶ 5, at 3. The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment ¶ 6, at 3. If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show its power. See Indictment ¶ 6, at 3. The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment ¶ 7, at 4. The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment ¶ 7, at 4. "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], homosexuals, or sex offenders." Indictment ¶ 8, at 4. To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and murder. See Indictment ¶¶ 6-8, at 3-4. The SNM as an enterprise generates income by

having its members and associates traffic controlled substances and extort narcotic traffickers.

See Indictment ¶ 7, at 4.  The SNM's recent activities in a conspiracy to murder high ranking New Mexico Corrections Department officials inspired the Federal Bureau of Investigation's present investigation.  See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

### 1.    The Shane Dix Murder.

In February, 2005, a 28-year-old man named Shane Dix was shot to death in his vehicle late at night in Albuquerque, New Mexico's south valley area.  See Man's Death Investigated as Homicide, Albuquerque Journal (February 7, 2005), available at http://www.koat.com/article/man-s-death-investigated-as-homicide/5019737.    The Bernalillo County Sheriff Office investigated the murder, see Man's Death Investigated as Homicide, supra, but did not solve the case, see Tr. at 11:16-19 (Armijo, Acee)(stating that, in 2015, the FBI was interested in solving the Dix murder).  After the FBI began investigating the SNM in 2015, FBI Special Agent Bryan Acee suspected that the SNM may have been involved in the Dix murder.  See Tr. at 11:22-24 (Acee).

### 2.    Montoya's FBI Interview.

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a  motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a

search or seizure, and the voluntariness of an individual's confession or consent to a search.  See

United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary

questions, the other rules of evidence, except those with respect to privileges, do not bind the

Court.  See Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay in ruling on a motion to

suppress.  See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression

hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly

obtained in violation of defendant's rights under the Fourth and Fifth Amendments.  In this type

of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States

v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)("We need not resolve whether

Crawford [v. Washington, 541 U.S. 36 (2004)]'s[1] protection of an accused's Sixth Amendment

confrontation right applies to suppression hearings, because even if we were to assume this

protection does apply, we would conclude that the district court's error cannot be adjudged

'plain.'")[2]; United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is

---

[1]Crawford v. Washington holds that testimonial hearsay is inadmissible at a criminal trial when offered against a defendant unless the hearsay declarant is unavailable and the defendant had a previous opportunity to cross examine the declarant.  See 541 U.S. at 53-54.

[2]United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266 (10th Cir. 2005).  The Court concludes that United States v. Garcia, United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010) and United States v.

beyond reasonable debate that Ramirez' counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."). Cf. United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").

1.      Sometime before September 11, 2015, the FBI targeted Montoya as part of its investigation into the SNM for drug and firearm charges. See Tr. at 9:2-4 (Armjio, Acee); id. at 10:20-25 (Armijo, Acee).

2.      Sometime before September 11, 2015, Montoya purchased heroin from an FBI confidential informant. See Tr. at 8:25-9:1 (Acee).

3.      Acee arrested Montoya on September 11, 2015. See Tr. at 8:14-21 (Armijo, Acee).

4.      Shortly after Acee arrested Montoya, Montoya indicated to Acee that he had information to share with the FBI, but that he would need an attorney before proceeding. See Tr. at 10:11-19 (Armijo, Acee).

5.      Montoya faced charges for distributing heroin and being a felon in possession of a firearm. See Tr. at 9:5-9 (Armijo, Acee).

6.      On October 6, 2015, the FBI interviewed Montoya ("Kastigar Debrief"). See 302 Report at 1, filed May 14, 2018 (Doc. 625-1)("First 302 Report"); 302 Report at 1, filed April 7, 2018 (Doc. 563-2)("Second 302 Report").

---

Natalini, 42 F. App'x 122, 127 (10th Cir. 2002) have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

7.      At the October 6, 2015, interview, a public defender represented Montoya, and Montoya had <u>Kastigar</u> protection.[3]  <u>See</u> Tr. at 9:10-22 (Armijo, Acee); First 302 Report at 1 (stating that Montoya signed a <u>Kastigar</u> letter at 2:49 P.M.).

8.      "<u>Kastigar</u> letters" or "<u>Kastigar</u> agreements" are "offers only of conditional, or limited, immunity."[4]  <u>United States v. Darwich</u>, No. 10-20705, 2011 WL 1336671, at *2 (E.D. Mich. Apr. 7, 2011)(Cleland, J.).

9.      Before the <u>Kastigar</u> Debrief, Acee suspected that SNM members Defendants Chris Garcia and Montoya were involved in the 2005, murder of Dix.  <u>See</u> Tr. at 11:22-24 (Acee).

10.     Garcia and Dix got into an altercation in which Dix shot Garcia in the leg, and Garcia wanted to pay to have Dix killed.  <u>See</u> First 302 Report at 2.

11.     Garcia hired Montoya and someone named "Antone" to kill Dix.  Tr. at 12:15-13:4 (Acee).

---

[3]Both the United States and the Defendants have repeatedly referred to the letters immunizing the United States' witnesses as <u>Kastigar</u> letters, named from <u>Kastigar v. United States</u>, 406 U.S. 441 (1972).  That term is apparently a misnomer, because, if the <u>United States v. DeLeon</u>, CR 15-4268 JB, Letter from Maria Armijo to John Samore (dated June 9, 2016), filed May 10, 2018 (Doc. 2246)(Clerk's Exhibit 15)("Cordova Letter"), is representative, <u>Kastigar</u> letters do not afford the United States' witnesses the immunity that <u>Kastigar</u> requires.  Calling those documents <u>Kastigar</u> letters is accurate in a limited sense, however; those documents explain that permitting the United States to make derivative use of information and pursue investigative leads is necessary "to eliminate the necessity for a <u>Kastigar</u> hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted." Cordova Letter ¶ 2, at 1.  <u>See</u> <u>Kastigar</u> Hearing, <u>Black's Law Dictionary</u> (10th ed. 2014)("A hearing at which the prosecution must establish by a preponderance of the evidence that the government's evidence derives from proper, nonimmunized sources.).

[4]<u>See</u> <u>supra</u> note 1.

12.     Montoya knew Antone, because he had served prison time with him and had seen Antone at Garcia's house, but he did not know Antone's full name.  <u>See</u> Tr. at 13:6-19 (Armijo, Acee).

13.     Montoya and Antone found Dix at a gas station in Albuquerque's south valley where Dix was known to sell drugs.  <u>See</u> First 302 Report at 2.

14.     Montoya and Antone made a deal with Dix to purchase drugs and when Dix drove to retrieve drugs, Montoya and Antone followed him in their car.  <u>See</u> First 302 Report at 2.

15.     Montoya and Antone caught up with Dix in his van as he was pulling out of a driveway and, from the passenger seat, Antone fired at Dix several times with a handgun.  <u>See</u> First 302 Report at 2.

16.     Montoya gave Acee a description of Antone: "An older Hispanic male adult from Albuquerque" who was a heroin user and was of average height and weight.  Tr. at 27:22-24 (Acee).

17.     Acee thought "heroin user" meant "a little bit on the thin side."  Tr. at 28:19-20 (Acee).

18.     Acee contacted the Metropolitan Detention Center and the Department of Corrections, and had them send Acee booking photographs of anyone known by the name "Antone" matching Montoya's description for Antone.  Tr. at 14:8-19 (Acee).

19.     Acee received about fifteen photographs, but ruled out roughly six photos, because they were black men who did not match Montoya's description of Antone.  <u>See</u> Tr. at 14:8-19 (Acee).

20.     Acee took nine photographs and compiled them into a "photo array."  Tr. at 14:17-19 (Acee).

21.     When the FBI shows a "photo array," the FBI typically prints each photograph on to a full sheet of paper, places those photographs in a manila folder and presents the folder to the witness, and tells the witness there is no significance to the photographs' order and that the person they are discussing may not be depicted in the photographs.  See Tr. at 15:3-11 (Acee).

22.     Acee showed Montoya a photographic array of nine photographs.  See Tr. at 17:9-12 (Armijo, Acee).

23.     All the photographs were of "Antones."  Tr. at 17:6-8 (Acee).

24.     Acee was "taking a stab in the dark" on booking photographs of people known as Antone, because none of the photographs "were significant to [Acee] other than that they were all Antons."  Tr. at 17:6-8 (Acee).

25.     All the photographs are booking photographs, although the backgrounds and lighting differ.  See generally Photo Array, filed May 14, 2018 (Doc. 625-2).

26.     The booking photographs are not dated.  See generally Photo Array.

27.     Among the photos was a booking photograph of Cordova.  See Tr. at 16:21-24 (Armijo, Acee); Photo Array at 1.

28.     One booking photograph is of a black man.  See Photo Array at 7.

29.     Two booking photographs show people who could not reasonably be considered "older" than they were ten years before the photograph was taken.  See Photo Array at 3, 4.

30.     One photograph shows someone who likely weighs more than average.  See Photo Array at 2.

31.     Montoya looked through the photographs several times.  See Tr. at 17:9-12 (Armijo, Acee).

32.     Montoya picked Cordova's photograph and said: "This looks like Anton, he just looks older." Tr. at 17:17-19 (Acee).

33.     After the <u>Kastigar</u> Briefing, Acee emailed Montoya twenty-one photographs of Cordova, and Montoya confirmed that Cordova was the man he knew as Antone. <u>See</u> Tr. at 18:17-21 (Acee, Armijo); Email from Bryan Acee to Mario Montoya (dated October 14, 2015), entered into evidence on June 15, 2018 (Govt. Tr. Exh. 2)("Is this the guy we discussed? All the photographs are of the same guy, but from different years to help you see what he looked like over time.").

34.     Acee did not document the showing of the photographic array. Tr. at 27:4-14 (Acton, Acee).

35.     Montoya "confirmed CORDOVA was the subject [to whom Montoya] had referred during [Montoya's] previous interview with agents regarding]the murder of Shane DIX." Second 302 Report at 1.

   **3.     Indictment.**

On March 9, 2018, a Grand Jury returned the Indictment[5] in this case. <u>See</u> Indictment at 1. Count I charges eleven Defendants -- Anthony Ray Baca, Chris Garcia, Manuel Jacob Armijo, Frederico Munoz, Sergio Loya Rodriguez, Manuel Benito, Vincent Garduño, Mandel Lon Parker, Daniel Archuleta, Daniel Sanchez, and Arturo Arnulfo Garcia -- with engaging in a racketeering conspiracy contrary to 18 U.S.C. § 1962(d). <u>See</u> Indictment at 8-9. Count 2 alleges that Chris Garcia and Cordova committed murder on or about February 4, 2005, in violation of the Violent Crimes in Aid of Racketeering statute, 18 U.S.C. § 1959 ("VICAR"). <u>See</u> Indictment

---

[5]The Indictment superseded the original Indictment, filed April 21, 2016 (Doc. 2).

at 53. Court 3 charges Cordova with using and carrying a firearm in relation to the crime charged in Count 2, in violation of 18 US.C. §§ 924(c), (j)(1), respectively, using a firearm during a violent crime and using a firearm to cause a person's death. See Indictment at 53-54.[6]

## PROCEDURAL BACKGROUND

In October, 2015, the FBI interviewed Mario Montoya. See First 302 Report at 1; Second 302 Report at 1. Montoya signed a Kastigar letter[7] and a public defender represented him. See First 302 Report at 1. According to the United States,

> Montoya described the murder and the person who shot Dix as a Hispanic male by the name of "Antone". Agent Bryan Acee pulled a photo array of Hispanic males that had been housed at New Mexico Department of Corrections and Bernalillo County Metropolitan Detention Center by the name of "Antone." Montoya was shown nine photos by Agent Acee. These photos were all booking photos taken at the same distance and with each person standing in a similar posture. Montoya picked Anthony Cordova but indicated that he looked different. Agent Acee then [compiled] more than twenty different booking photos of Cordova and showed them to Montoya on October 14, 2015. Montoya confirmed that Anthony Cordova was the "Antone" that shot Dix. Also in the October 6, 2015 interview, Montoya described the extensive amount of time he spent with Anthony Cordova. Montoya also described that most of that time was spent in very close proximity to Anthony Cordova.

---

[6]The Court has dismissed the charges against Defendants Baca, Sanchez, and Arturo Garcia without prejudice. See Stipulated Order of Dismissal at 1, filed June 14, 2018 (Doc. 727); Order Dismissing Richard Gallegos Without Prejudice, filed January 30, 2017 (Doc. 317)(granting the United States' Motion to Dismiss Richard Gallegos Without Prejudice, filed November 22, 2016 (Doc. 260)). The Defendants who were convicted in United States v. DeLeon, No. CR 15-4268 JB, have executed waivers of the statute of limitations on the charges in this case. Other Defendants made plea agreements with the United States. See Plea Agreement, filed June 14, 2018 (Doc. 726)(Rodriguez); Plea Agreement, filed June 13, 2018 (Doc. 720)(Benito); Plea Agreement, filed June 7, 2018 (Doc. 700)(Parker); Plea Agreement, filed June 7, 2018 (Doc. 698)(Archuleta); Plea Agreement, filed January 25, 2018 (Doc. 503)(Chris Garcia); Plea Agreement, filed March 1, 2017 (Doc. 368)(Armijo); Plea Agreement, filed September 22, 2016 (Doc. 229)(Munoz). Cordova is, thus, the only Defendant in this case whose charges have not been dismissed and who has not made a plea agreement with the United States.

[7]See supra note 1.

United States' Response to Defendant Anthony Cordova's Motion to Suppress Out-Of-Court and In-Court Identifications and Request for Evidentiary Hearing [Doc. 563] at 1-2, filed April 30, 2018 (Doc. 601)("Response"). <u>See</u> Second 302 Report at 1 (stating that the FBI showed Montoya "more than 20 booking photographs of Anthony Manuel CORDOVA that spanned the past several years," and Montoya "confirmed CORDOVA was the subject [to whom Montoya] had referred during [Montoya's] previous interview with agents regarding the murder of Shane DIX").

1.      **The Motion.**

In the Motion, Cordova asks that the Court suppress Montoya's evidence and testimony relating to pretrial identifications and in-court identifications. <u>See</u> Motion at 1. First, Cordova argues that admitting Montoya's identifications of Cordova would violate Cordova's right to due process. <u>See</u> Motion at 6. According to Cordova, showing an identifying witness "numerous photographs of just the defendant is necessarily suggestive," and by showing Montoya booking photographs only of Cordova, "the FBI effectively told Mr. Montoya, 'this is what Anthony Cordova looks like.'" Motion at 8. Cordova contends, furthermore, that showing Montoya many photographs of Cordova -- an approach known as a "show up" -- was unnecessary, because the FBI could have asked Montoya to provide a physical description of Cordova and then shown Montoya photographs of many individuals who match Montoya's proffered physical description. Motion at 9. Additionally, Cordova argues that the Court should suppress Montoya's identification of Cordova, because the identification is unreliable. <u>See</u> Motion at 10 (citing <u>Neil v. Biggers</u>, 409 U.S. 188, 199 (1972)). It follows, according to Cordova, that, because Montoya's out-of-court identification is tainted, the Court should not permit Montoya to make an in-court identification of Cordova. <u>See</u> Motion at 12-13.

Second, Cordova argues that the Court should exclude Montoya's out-of-court identification and any in-court identification under rule 403. <u>See</u> Motion at 14-15. According to Cordova, Montoya's out-of-court identification's probative value is low, because the process that the FBI took to obtain it is so flawed and because permitting the evidence to reach the jury would be misleading. <u>See</u> Motion at 14-15.

### 2. **The Response**.

In its Response, the United States asserts that, after Montoya said that a man named Antone shot Dix, Acee showed Montoya nine photographs of "Hispanic males that had been housed at New Mexico Department of Corrections and Bernalillo County Metropolitan Detention by the name of 'Antone.'" Response at 1. According to the United States, after Montoya picked Cordova's photograph, Acee showed Montoya twenty booking photographs of Cordova, and Cordova confirmed that Cordova was the man who shot Dix. <u>See</u> Response at 2.

The United States contends that, in the United States Court of Appeals for the Tenth Circuit, a photographic array violates due process if (i) the photographic array is "impermissibly suggestive," and (ii) the "totality of the circumstances" indicates that the identification is not reliable. Response at 2 (quoting <u>United States v. Sanchez</u>, 24 F.3d 1259, 1261-62 (10th Cir. 1994)). The United States argues that the "sheer size of this array" -- nine photographs -- "is sufficient to find that this photograph lineup was not impermissibly suggestive." Response at 3. The United States also contends that there is "nothing in this case to suggest this array was not done in a neutral fashion." Response at 3. The United States also contends that Acee did not do anything to highlight Cordova among the nine photographs, because the array "contained filler photographs that resembled Cordova in [a] manner in which they were taken," and each featured

Hispanic males without visible piercings, or "distinctive facial features or other identifying marks." Response at 4.

### 3. **The Reply.**

Cordova replies. <u>See</u> Reply to Government's Response to Anthony Cordova's Motion to Suppress Out-of-Court and in-Court Identifications and Request for a Hearing, filed May 14, 2018 (Doc. 625)("Reply"). Cordova contends that neither the First 302 Report nor Second 302 Report indicates that Acee showed Montoya an initial photograph array of nine different people. <u>See</u> Reply at 2. Cordova asserts that there is nothing in the record describing the "manner in which the photo array was presented," such as whether Acee told Montoya that Cordova's photograph was among the nine photographs or whether Acee took steps to avoid emphasizing Cordova's photograph. Reply at 2. Also missing from the record, according to Cordova, is what description Montoya gave of Dix's murder that led the United States to compile the initial photograph array. <u>See</u> Reply at 2-3. Cordova also notes that, contrary to the United States' assertion that Acee showed Montoya nine photographs of Hispanic males with similar physical features, one of the photographs is of an African American man, "so the number of photos [in the initial array] is actually eight." Reply at 2 n.1.

Cordova argues that Montoya's identification of Cordova is unreliable, because there is no evidence of Montoya providing a physical description of Dix's killer, and so the array is based only on Montoya recalling the name "Antone." Reply at 3. Cordova also contends that Montoya's identification is unreliable, because many years passed between Dix's murder and Montoya's identification, and because Montoya stated that Cordova looked different than the person in the photograph that Acee showed him. <u>See</u> Reply at 3. Cordova notes that the United States has "not provided any information regarding when the photo of Mr. Cordova was taken."

Reply at 3.  Cordova concludes that the Court should "convene an evidentiary hearing to consider any evidence that Mr. Montoya was able to positively identify Mr. Cordova prior to being shown the booking photos."  Reply at 4.

       **4.**      <u>**The Hearing**</u>.

The Court held a hearing.  <u>See</u> Transcript of Hearing (taken June 15, 2018), filed July 3, 2018 (Doc. 772)("Tr.").  Cordova noted that he did not have a 302 report about the initial photographic array, which Acee performed before showing Montoya the twenty photographs, <u>see</u> Transcript of Hearing at 123:22-25 (taken June 14, 2018), filed July 3, 2018 (Doc. 771)("June 14 Tr.")(Morrissey), and that he had only recently learned about that report.  June 14 Tr. at 124:3-4 (Morrissey).  Cordova explained that what he learned about the photographic array, he learned from a 302 report, documenting the meeting.  Tr. at 5:6-8 (Acton).  Acee testified about the FBI's standard practice for presenting photographic arrays:

> We obtain[] similar photos.  By that I mean the depiction of the individual in the photo is similar.  We print them on a full sheet of paper.  We place them in a manila folder and we present it that way with an admonishment before the presentation which is, "I'm going to show you a series of photos.  There is no significance to the order they're in, and the subject we're discussing may or may not be in there."

Tr. at 15:3-11 (Acee).  Acee explained that, after Montoya gave him a description -- older Hispanic male of average height and weight -- and a nickname -- Antone -- Acee asked the Bernalillo County Metropolitan Detention Center and the Department of Corrections for booking photographs of people nicknamed Antone.  <u>See</u> Tr. at 14:8-19 (Acee).  Acee stated that, when he presented the photograph array of people nicknamed Antone to Montoya, "none of them were significant to me other than that they were all Antons. . . .  We were just taking a stab in the dark on Antons."  Tr. at 17:1-8 (Acee).  According to Acee, Montoya picked Cordova's photograph

and said that the photograph looked like Antone, except that he looked older in the photograph. See Tr. at 17:17-19 (Acee). Acee said that he later emailed Montoya twenty-one photographs of Cordova and that Montoya confirmed that Cordova was the man he knew as Antone. See Tr. at 18:17-21 (Acee, Armijo).

Cordova began to cross examine Acee. See Tr. at 22:10 (Acton). Cordova asked Acee if he had "carefully document[ed] the actual showing of the photo array," and Acee answered that he had not documented the photograph array. Tr. at 27:4-14 (Acton, Acee). Acee stated that Montoya described Antone as an "older Hispanic male adult from Albuquerque . . . [of] average height and weight, and a heroin user." Tr. at 27:22-24 (Acee). Acee said that he thought "heroin user" probably meant "a little bit on the thin side." Tr. at 28:19-20 (Acee). Cordova showed Acee the photographs Acee used in the photograph array, and Acee acknowledged that one man does not appear to be thin, two men do not look "older," and one is black. Tr. at 29:10-30:2 (Acton, Acee).

After Acee left the stand, Cordova asked the Court for leave to supplement his Motion: "we need to be able to examine [the 302 Report for the initial Montoya meeting] . . . and see if there isn't something else in there that may have contaminated this [identification process] or otherwise be of use to this Motion." Tr. at 73:11-19 (Acton). Cordova argued that the initial nine-photograph array is more like a five-photograph array, because four of the photographs do not match Montoya's description of Antone. See Tr. at 72:9-10 (Acton). Cordova criticized the initial photographic array for gathering photographs of people nicknamed Antone rather than focusing on Montoya's physical description:

> [T]rying to test whether or not [Montoya] could identify Mr. Cordova, considering that the photographs aren't going to say what the name is, it was kind of an artificial limitation, in terms of just looking at it, and can this person

identify him physically. And that's why the physical matters. Okay, what does he look like, and then, okay, these are people that look like him. This is just standard -- the way these things are done. What does he look like? There's a bunch of people that roughly fit that description. Can you pick him out? And that's what I'm saying is that you need to do that, and you're doing it to test whether somebody who is going to have credibility issues can't pick him out.

Tr. at 79:16-80:3 (Acton). Cordova added that Acee "could have had another 12, 15 [photographs] that weren't Anthony's because as far as him being able to pick him out, the name wasn't going to be shown anyway." Tr. at 80:18-22 (Acton). Cordova criticized the second photographic array:

[A]t this point he either can identify [Cordova] or he can[']t. Because once you show him 20 photographs, you're basically telling him, "This is the guy." So if he . . . wasn't able to identify him positively before that, there's no question that he's going to say, "Yeah, that's the guy," even if he's just trying to come up with some guy.

Tr. at 81:8-16 (Acton).

The Court stated:

I'm not going to grant the motion at this time. I'm going to study this area of law a little bit more. It's not one that I am extremely familiar with. But my impression is that what Mr. Acee did was not unduly suggestive, and it doesn't violate the constitutional standard. So I'll take a look at it a little bit more, and y'all get the 302 and see if there's something else you want to say on it, but I'm not inclined to grant that motion.

Tr. at 87:7-16 (Court). Cordova since contacted the Court about the First 302 report.

The Court indicated that it has not often addressed challenges concerning photographic arrays, see Tr. at 7:10-13 (Court), and the United States agreed, citing its research, see Tr. at 7:15-16 (Armijo). The Court wrote once previously on this issue. See United States v. Shirley, No. CR 15-1285 JB, 2016 WL 9021832 (D.N.M. Dec. 21, 2016)(Browning, J.).

**LAW REGARDING DUE PROCESS AND EYEWITNESS IDENTIFICATION**

Admitting into evidence a witness' out-of-court identification can violate a defendant's due process rights under the Fifth Amendment to the United States Constitution when the identification process "was so unnecessarily suggestive and conducive to irreparable mistaken identification." Stovall v. Denno, 388 U.S. 293, 302 (1967). "[D]ue process concerns arise when law enforcement officers 'use an identification procedure that is both suggestive and unnecessary.'" Perry v. New Hampshire, 565 U.S. 228, 238-39 (2012). When it comes to photographic arrays -- asking a witness to identify a person from several photographs of different people -- courts "use a number of factors" to determine whether the photographic array is impermissibly suggestive, "including the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves." United States v. Sanchez, 24 F.3d at 1262 (citing United States v. Rosa, 11 F.3d 315, 330 (2d Cir. 1993)).

If law enforcement officers' identification process is suggestive and unnecessary, suppressing the identification is appropriate only when the process creates a "substantial likelihood of misidentification." Perry v. New Hampshire, 565 U.S. at 239 (internal quotation marks omitted)(quoting Neil v. Biggers, 409 U.S. at 201). See Neil v. Biggers, 409 U.S. at 198 (stating that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification'" (quoting Simmons v. United States, 390 U.S. 377 (1968))). Determining whether the identification process creates a substantial likelihood of misidentification requires a case-by-case assessment of the facts; where the "'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." Perry v. New Hampshire, 565 U.S. at 239 (alteration in Perry v. New Hampshire)(quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)). See Manson v. Brathwaite, 432 U.S. at 114 (stating that the identification's reliability "is the linchpin in

determining the admissibility of identification testimony"). The Supreme Court of the United

States states:

> [T]he central question [is], whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. at 199-200.

The Court applied these principles in United States v. Shirley, 2016 WL 9021832, at *7, to determine whether to admit into evidence the defendant's alleged statement: "Stay back, lady, or else I'm going to stab you." 2016 WL 9021832, at *7. The defendant contended that, although the assailant may have said those words, the Court should not admit the statement into evidence as the defendant's statement, because the victim's out-of-court identification of the defendant was not reliable. See 2016 WL 9021832, at *6-7. The Court disagreed with the defendant's argument:

> Here, P. BlueEyes allegedly saw Maynard Shirley up close during the altercation on March 21, 2015. P. BlueEyes subsequently described his attacker with some detail, relaying characteristics that resemble Maynard Shirley's description. That P. BlueEyes was shortly thereafter shown a photograph of Maynard Shirley was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. at 384. P. BlueEyes' prior statements already indicated, with some reliability, that Maynard Shirley was his attacker.

United States v. Shirley, 2016 WL 9021832, at *6-7. Cardova since contacted the Court about the 302 report, and the Court proceeds with its Memorandum Opinion and Order.

### **LAW REGARDING RULE 403 OF THE FEDERAL RULES OF EVIDENCE**

Under rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant

evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)). The Tenth Circuit has admonished district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered

evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  Old Chief v. United States, 519 U.S. 172, 180 (1997).  "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged."  Old Chief v. United States, 519 U.S. at 180-81.  In light of rule 404(b)'s prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence."  Old Chief v. United States, 519 U.S. at 182.

## LAW REGARDING RULE 401 OF THE FEDERAL RULES OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402 & 403). "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")). "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note). Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible. See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 404(B)

Under rule 404(b) of the Federal Rules of Evidence, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). A court can admit that sort of evidence, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "In other words, one cannot present evidence the relevance of which is based on the forbidden inference: the person did X in the past, therefore he probably

has a propensity for doing X, and therefore he probably did X this time, too." Wilson v. Jara, No. CIV 10-0797, 2011 WL 6739166, at *5 (D.N.M. Nov. 1, 2011)(Browning, J.).

The Supreme Court has enunciated a four-part process to determine whether evidence is admissible under rule 404(b). See Huddleston v. United States, 485 U.S. 681, 691-92 (1988). The Tenth Circuit has consistently applied that test:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(citing United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999)). See United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir. 2002); United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing Huddleston v. United States, 485 U.S. at 691-92).

When bad-act evidence is both relevant and admissible for a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the bad act." United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(alterations omitted). The Tenth Circuit has also stated that district courts must "identify specifically the permissible purpose for which such evidence is offered and the inferences to be drawn therefrom." United States v. Youts, 229 F.3d 1312, 1317 (10th Cir. 2000)(citing United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir. 1985)). "[A] broad statement merely invoking or restating Rule 404(b) will not suffice." United States v. Youts, 229 F.3d at 1317. Rules 401-403 and the conditional relevancy rules in rule 104(b) govern the applicable burden the government must meet to successfully offer

evidence under rule 404(b).  See Huddleston v. United States, 485 U.S. at 686-91.

## ANALYSIS

Admitting evidence of Montoya's out-of-court identifications and allowing Montoya to make an in-court identification, will not violate Cordova's rights to due process, because the process by which Montoya identified Cordova did not create a substantial likelihood of irreparable misidentification.  Admitting that evidence will also not create a risk of misleading the jury that substantially outweighs the evidence's probative value, because the probative value of Montoya's identifications are high, and the risk of misleading the jury is low.  Consequently, the Court will not exclude evidence of Montoya's out-of-court identifications of Cordova, nor will it preclude Montoya from making an identification at trial.

I. **THE PROCESS BY WHICH MONTOYA MADE HIS OUT-OF-COURT IDENTIFICATIONS DOES NOT CREATE A SUBSTANTIAL RISK OF IRREPARABLE MISIDENTIFICATION.**

Montoya's initial identification of Cordova was not impermissibly suggestive or unnecessary.  Here, Montoya told Acee that a man named Antone killed Dix, and described Antone as an "older Hispanic male adult" with average height and weight who used heroin.  Tr. at 27:22-24 (Acee).  Acee secured nine photographs from New Mexico correctional facilities of people nicknamed Antone.  See Tr. at 14:8-19 (Acee).  Acee handed Montoya an envelope containing the nine photographs and said: "I'm going to show you a series of photos.  There is no significance to the order they're in, and the subject we're discussing may or may not be in there."  Tr. at 15:3-11 (Acee).  According to Acee, Montoya identified Cordova's photograph and said "This looks like Anton.  He just looks older."  Tr. at 17:18-19 (Acee).

The Court concludes that Acee's photographic array is not impermissibly suggestive, because the photographic array's size and content, coupled with the overall circumstances, do

not impermissibly direct a witness to identify Cordova.  The Tenth Circuit has found that a photographic array has been impermissibly suggestive when the defendant's photograph stands out from the others.  See, e.g., United States v. Wiseman, 172 F.3d 1196, 1209 (10th Cir. 1999)(concluding that a photographic array was suggestive, because the other photographs were taken under similar conditions to each other, and the defendant's photograph was the only one that looked different from the others); abrogated on other grounds by Rosemond v. United States, 572 U.S. 65 (2014).  Here, although not all the photographs were taken with identical backgrounds or lighting conditions, each photograph is of a similar type -- a booking photograph -- and so there is nothing about Cordova's picture in particular that distinguishes it from the other pictures.  There are, to be sure, several ways in which the photographs differ from Montoya's description of an "older Hispanic male" of average height and weight.  One photograph is of a black man.  See Photo Array at 7.  Two photographs show people who could not reasonably be considered "older" than they were ten years before the photograph was taken. See Photo Array at 3, 4.  One photograph shows someone who likely weighs more than average. See Photo Array at 2.  The photograph of the black man can be discounted, but the others cannot. Montoya was asked whether any of the photographs were of the Antone he recalls being an older Hispanic male of average height and weight ten years ago; a heavier man is a possible candidate, because people's weights can change over time; a young man is also a possible candidate, because the photographs do not indicate when the photographs were taken.[8]  Cf. Grubbs v.

---

[8]To be sure, Acee could have presented Montoya with an array of more photographs than he did, and could have included people matching Montoya's description but not nicknamed Antone, but the number of photographs is merely one factor in determining whether differences between the photographs are more or less likely to be suggestive.  See United States v. Sanchez, 24 F.3d at 1262-63 ("The larger the number of pictures used in an array, the less likely it is that a minor difference . . . will have a prejudicial effect on selection. . . . [A] photo array with as few

Hannigan, 982 F.2d 1483, 1490 (10th Cir. 1993)(stating that "a photo-lineup is not necessarily suggestive merely because the individuals in the lineup differ in facial characteristics," but concluding that "here the differences were either strikingly apparent, such as a swollen eye, or they related to an important component of [the witness'] description of her assailant, his hair style").

The Tenth Circuit has also found it suggestive for a law enforcement officer to show a witness a photographic array after telling the witness that they had a suspect in mind. See, e.g., United States v. Wiseman, 172 F.3d at 1209 (stating that telling a witness that the photographic array contained a photo of a suspect in custody is "highly suggestive"); Grubbs v. Hannigan, 982 F.2d at 1490 (concluding that it was suggestive when law enforcement informed the witness that they "had a suspect" and noting that the witness assumed that "one of the individuals in the lineup was the suspect"). Here, by contrast, Acee told Montoya that Acee did not know whether the man of whom Montoya was thinking was in the photographic array.[9]

Even if the Court determined that the photographic array was impermissibly suggestive, it would not conclude that the photographic array created a substantial likelihood of irreparable

---

as six pictures is not per se unconstitutional," but a six photograph array "is sufficiently small to weigh heavily in the balance of factors to be considered.").

[9]Moreover, Acee apparently did not know anything about Cordova before Montoya identified him, and so he did not conduct the photographic array with Cordova in mind. See United States v. Flores, 149 F.3d 1272, 1279 (10th Cir. 1998). The Tent Circuit explained:

> [T]he officer providing . . . the file of photographs had no idea who Agent Thomasson might be looking for, outside the fact that the suspect might be a member of the Banditos gang. Thus, there was no risk that these pictures were assembled to direct Agent Thomasson's attention toward any one particular individual.

United States v. Flores, 149 F.3d at 1279.

misidentification.  Applying the Neil v. Biggers factors and other considerations, the Court concludes that, in the totality of the circumstances, Montoya's identification is reliable.  See Neil v. Biggers, 409 U.S. at 199-200.   The first and second Neil v. Biggers factors -- the witness' opportunity to view the defendant at the time of the crime and the witness' degree of attention -- weigh toward reliability, because Montoya states that he and Cordova spent time driving around Albuquerque and committed a murder together.  See First 302 Report at 2-3.  The third Neil v. Biggers factor -- the accuracy of the witness' prior description of the criminal -- does not weigh in either direction, because Montoya's initial description was vague -- a Hispanic male of average height and weight -- and Acee created a photographic array based in part on that description.  The physical description is of some help -- it excludes non-Hispanics, tall people, females, short people, heavy people, and very thin people -- but photographs of thousands of New Mexican Hispanic men could still be at play.  The fourth Neil v. Biggers factor -- the witness' level of certainty -- weighs toward reliability, because Montoya's only reservation to his identification was that Cordova looked older than Montoya remembered.  See Tr. at 17:17-19 (Acee).   The fifth Neil v. Biggers factor -- the length of time between the crime and confrontation -- weighs towards unreliability, because ten years elapsed between the murder and Montoya's identification of Cordova.  In addition to the Neil v. Biggers factors, the Court also considers the context in which Cordova made the identification -- i.e., after the FBI had arrested Montoya, and while counsel represented Montoya and while Montoya spoke under Kastigar protection.  See First 302 Report at 1.  That factor cuts both ways.  On one hand, Montoya would have an incentive to lie, because he has something to gain by providing information that might lead the FBI to believe it could solve a cold case.  On the other hand, Montoya told the FBI about more crimes than only the Dix murder, see First 302 Report at 1-4 (providing information on five

other homicides), so his interests were not entirely reliant on the FBI buying his story about Cordova. Moreover, Montoya would have something to lose by being caught in a lie, because lying would undermine Montoya's credibility relating to everything else. On balance, the Court concludes that Montoya's identification is reliable, and that any "corrupting effect" that the photograph array may have created does not outweigh the identification's reliability. Perry v. New Hampshire, 565 U.S. at 239 (stating that a witness' identification should be suppressed where the "'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion" (alteration in Perry v. New Hampshire)(quoting Manson v. Brathwaite, 432 U.S. at 114). Although Montoya identified Cordova ten years after the crime, Montoya got more than a quick glimpse of Cordova during that crime, having driven around Albuquerque with him to commit the murder. Additionally, Montoya's incentives to maintain his credibility on other matters counteract whatever incentives Montoya had to lie to Acee.

The Court concludes that the subsequent show up -- where Acee emailed twenty photographs of Cordova to Montoya -- is suggestive, but the Court will not suppress that identification, because the process does not create a "substantial likelihood of misidentification." Perry v. New Hampshire, 565 U.S. at 239 (quoting Neil v. Biggers, 409 U.S. at 201). The show up is suggestive, because Montoya had already identified Cordova, Acee showed Montoya photographs only of Cordova, and Acee asked Montoya whether the twenty photographs of Cordova confirmed his earlier identification of Cordova. See Email from Bryan Acee to Mario Montoya (dated October 14, 2015), entered into evidence on June 15, 2018 (Govt. Tr. Ex. 2)("Is this the guy we discussed? All the photos are of the same guy, but from different years to help you see what he looked like over time."). Showing Montoya twenty photographs of Cordova

and asking whether Cordova is the guy is suggestive, because Montoya has no one else to identify, and the context conveys that Acee was taking Cordova seriously as a suspect. See United States v. Natalini, 42 F. App'x 122, 127 (10th Cir. 2002)(unpublished)(stating that, "[w]ith respect to the suggestiveness of the identification, we note that, in general, show-up identifications (those involving the identification of a single individual) are less than ideal," and stating that show ups are appropriate only in extraordinary circumstances); United States v. Silva, No. 14-CR-4067, 2016 WL 10587962, at *7 (D.N.M. March 4, 2016)(Parker, J.)(concluding that a witness' identification was tainted, because a law enforcement officer asked the witness to identify a person in a photograph after implying to the witness that the police had evidence tying the man in the photograph to the crime scene).

Having determined that the show up was suggestive, the Court next considers whether the show up created a "'substantial likelihood of misidentification.'" Perry v. New Hampshire, 565 U.S. at 239 (quoting Neil v. Biggers, 409 U.S. at 201). The Tenth Circuit has stated:

> [A] photo array consisting of only one photo may be acceptable if the witness has had a clear opportunity to positively identify the suspect prior to the array, the witness expresses a great deal of certainty with regard to the identification, and the circumstances of the identification show a lack of coercive pressure on the identifying witness to make an identification from that photo.

United States v. Flores, 149 F.3d 1272, 1279 (10th Cir. 1998). Given that Montoya had already identified Cordova in a photographic array, and because -- as the Court determines above -- that identification was reliable, the show up did not create a substantial likelihood of misidentification.

The Court will also not preclude Montoya from identifying Cordova in court. Cordova argues that, because Montoya's out-of-court identification is tainted, the Court should not permit Montoya to make an in-court identification of Cordova. See Motion at 12-13. The Supreme

Court has concluded that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. at 384. As the Court concludes above, Montoya's out-of-court identifications were not so impermissibly suggestive that they created a substantial likelihood of irreparable misidentification. Consequently, there is no sound basis to prevent Montoya from identifying Cordova before a jury. In the end, Acee's two photographic arrays were not suggestive, because Montoya did not know Cordova's full name. The most valuable lead that he had was the name "Antone." While Acee could have gone through a lot of pictures of average height and weight Hispanic men, to not use the valuable lead that Montoya called the man "Antone" would have omitted the most narrowing factor. What Acee did was a good, genuine attempt to get an identification of someone he did not know. And with the first array, the second array was useful to confirm what he now almost knew. The police work does not and should not violate the Constitution.

## II. THE COURT WILL NOT EXCLUDE EVIDENCE OF MONTOYA'S IDENTIFICATIONS UNDER RULE 403.

The Court will also not exclude Montoya's identifications under rule 403. Cordova argues that "permitting the identifications to reach the jury would imply some degree of probative value that . . . they do not have, thereby misleading the jury." Motion at 14. Cordova also argues that the probative value of Montoya's identifications' is "nil" in light of the "substantial likelihood of Mr. Montoya's identification of Mr. Cordova being actually based upon the booking photos and not upon any independent knowledge of Mr. Cordova's appearance." Motion at 14. As the Court concludes above, the photographic array and the show

up do not create a substantial likelihood of misidentification. Consequently, the identifications' probative value is substantial, and the Court sees little risk that the identifications would mislead the jury for any reason. Consequently, the Court will not use rule 403 to exclude Montoya's out-of-court or potential in-court identification.

**IT IS ORDERED** that Defendant Anthony Cordova's Motion to Suppress Out-Of-Court and In-Court Identifications and Request for Evidentiary Hearing, filed April 7, 2018 (Doc. 563)("Motion") is granted in part and denied in part. The Court will hold an evidentiary hearing. The motion is otherwise denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 USC § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for the Plaintiff*

Theresa M. Duncan
Duncan Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

*Attorneys for Defendant Anthony Ray Baca*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

*Attorney for Defendant Manuel Jacob Armijo*

Louis E. Lopez, Jr.
El Paso, Texas

*Attorney for Defendant Frederico Munoz*

Donald F. Kochersberger, III
Business Law Southwest, LLC
Albuquerque, New MExico

*Attorney for Defendant Sergio Loya Rodriguez*

Susan Burgess-Farrell
Barry G. Porter
Burgess & Porter Law, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm

Albuquerque, New Mexico

--and--

R. Scott Reisch
Reisch Law Firm, LLC
Denver, Colorado

     *Attorneys for Defendant Vincent Garduno*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

     *Attorney for Defendant Mandel Lon Parker*

James Baiamonte
Albuquerque, New Mexico

--and--

Ahmad Assed
Ahmad Assed & Associates
Albuquerque, New Mexico

     *Attorneys for Defendant Daniel Archuleta*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

     *Attorneys for Defendant Daniel Sanchez*

Marcia A. Morrissey
Santa Monica, California

--and--

Gregory M. Acton

Albuquerque, New Mexico

*Attorneys for Defendant Anthony Cordova*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Laura E. Udall
Cooper & Udall, PC
Tucson, Arizona

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*