# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup";
CHRISTOPHER GARCIA; MANUEL
JACOB ARMIJO, a.k.a. "Big Jake";
FREDERICO MUNOZ, a.k.a. "Playboy";
SERGIO LOYA RORDIGUEZ, a.k.a
"Churro";
MANUEL BENITO, a.k.a. "Panther";
VINCENT GARDUÑO a.k.a. "Fatal";
MANDEL LON PARKER, a.k.a.
"Chuco";
DANIEL ARCHULETA, a.k.a. "Smurf";
DANIEL SANCHEZ, a.k.a. "Dan Dan";
ANTHONY CORDOVA, a.k.a. "Antone";
RICHARD GALLEGOS, a.k.a. "Dopey";
and ARTURO ARNULFO GARCIA,
a.k.a. "Shotgun,"

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Anthony Cordova's Motion to Compel the Government to Comply with Rule 16 in Noting Its Intent to Rely on Gang Expert Witness Testimony, for a <u>Daubert</u> Hearing to Determine the Admissibility of Gang Expert Witnesses, Or, in the Alternative, to Exclude Testimony of Gang Expert Witnesses, filed April 5, 2018 (Doc. 561)("Motion"). The Court held a hearing on June 14, 2018. The primary issues are: (i) whether the Court should order Plaintiff United States of America to give notice of its proposed expert witnesses on gangs ("Gang Experts") -- Chris Cupit and Sergio Sapien "of the New Mexico Corrections Department Security Threat Intelligence Unit" ("STIU"), Motion at 1; (ii) whether the

Court should hold a hearing pursuant to <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993)("<u>Daubert</u>"), to determine the admissibility of the Gang Experts' testimony; and (iii) whether the Court should limit the Gang Experts' testimony. Because the parties agreed to limitations on the Gang Experts' testimony at the June 14, 2018, hearing, the Court will not order the United States to provide further notice about notice its Gang Experts, and the Court will not hold a <u>Daubert</u> hearing. In accord with the parties' agreement, the Court will admit the Gang Experts' testimony to the extent that the Gang Experts describe gangs generally but will preclude testimony about SNM specifically. Accordingly, the Court grants the Motion in part and denies it in part.

## **FACTUAL BACKGROUND**

The Court recounted the factual background and early procedural history in its Memorandum Opinion and Order at 2-4, 2018 WL 5980443, at *1-2, filed November 14, 2018 (Doc. 932)("MOO").[1] The Court incorporates that recitation here. The Court includes footnotes from the MOO with the quotation.

> The Court takes its background facts from the Superseding Indictment, filed March 9, 2017 (Doc. 372)("Indictment"). The Court does not set forth these facts as findings or for their truth. The Court recognizes that the factual background is largely the Plaintiff United States of America's version of events and that the Defendants who have not pled guilty are all presumed innocent.
>
> This case deals with the crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. <u>See</u> Indictment ¶¶ 1, 3, at 1-2. The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment ¶ 1, at 2. The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact

---

[1] The MOO has not yet been assigned a Westlaw reference number, but the MOO will be published on Westlaw and such an assignment is expected.

that engaged in, and the activities of which affected interstate and foreign commerce." Indictment ¶ 2, at 2. The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2.

The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Indictment ¶ 3, at 2. During the riot, thirty-three inmates were killed, and over 200 were injured. See Indictment ¶ 3, at 2. After the PNM riot, the SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment ¶ 4, at 2. The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment ¶ 4, at 2-3. The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment ¶¶ 3, 5, at 2-3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and the profit from narcotics trafficking. See Indictment ¶ 5, at 3. The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment ¶ 6, at 3. If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show its power. See Indictment ¶ 6, at 3. The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment ¶ 7, at 4. The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment ¶ 7, at 4. "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], homosexuals, or sex offenders." Indictment ¶ 8, at 4. To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and murder. See Indictment ¶¶ 6-8, at 3-4. The SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment ¶ 7, at 4. The SNM's recent activities in a conspiracy to murder high ranking New Mexico Corrections Department ["Corrections Department"] officials inspired the Federal Bureau of Investigation's present investigation. See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

MOO at 2-4; 2018 WL 5980443, at *1.

# PROCEDURAL BACKGROUND

The FBI's SNM investigation resulted in this case as well as three other cases before the

Court.  See United States v. DeLeon, No. CR 15-4268; United States v. Varela, No. CR 15-4269;

United States v. Garcia, No. CR 15-4275.

> On March 9, 2018, a Grand Jury returned the Indictment[2] in this case.  See
> Indictment at 1.  Count I charges eleven Defendants -- Anthony Ray Baca, Chris
> Garcia, Manuel Jacob Armijo, Frederico Munoz, Sergio Loya Rodriguez, Manuel
> Benito, Vincent Garduño, Mandel Lon Parker, Daniel Archuleta, Daniel Sanchez,
> and Arturo Arnulfo Garcia -- with engaging in a racketeering conspiracy contrary
> to 18 U.S.C. § 1962(d) [("RICO")].  See Indictment at 8-9.  Count 2 alleges that
> Chris Garcia and [Defendant Anthony] Cordova committed murder on or about
> February 4, 2005, in violation of the Violent Crimes in Aid of Racketeering statute,
> 18 U.S.C. § 1959 ("VICAR").  See Indictment at 53.  Court 3 charges Cordova with
> using and carrying a firearm in relation to the crime charged in Count 2, in violation
> of 18 US.C. §§ 924(c), (j)(1), respectively, using a firearm during a violent crime
> and using a firearm to cause a person's death.  See Indictment at 53-54.[3]

MOO at 10; 2018 WL 5980443, at *5.  The parties agreed to start trial on July 9, 2018.

See Unopposed Motion for Third Scheduling Order and in Support of Unopposed Motion

to Continue at 2, filed June 9, 2017 (Doc. 435).

---

[2]The Indictment superseded the original Indictment, filed April 21, 2016
(Doc. 2).

[3]By or on June 14, 2018, the date that the Court held a hearing on the Motion, the Court
dismissed the charges against Defendants Baca, Sanchez, and Arturo Garcia without prejudice.
See Stipulated Order of Dismissal at 1, filed June 14, 2018 (Doc. 727); Order Dismissing Richard
Gallegos Without Prejudice, filed January 30, 2017 (Doc. 317)(granting the United States' Motion
to Dismiss Richard Gallegos Without Prejudice, filed November 22, 2016 (Doc. 260)).  By that
date, the Defendants who were convicted in United States v. DeLeon, No. CR 15-4268 JB,
likewise, executed waivers of the statute of limitations on the charges in this case, and other
Defendants entered plea agreements with the United States.  See Plea Agreement, filed June 14,
2018 (Doc. 726)(Rodriguez); Plea Agreement, filed June 13, 2018 (Doc. 720)(Benito); Plea
Agreement, filed June 7, 2018 (Doc. 700)(Parker); Plea Agreement, filed June 7, 2018
(Doc. 698)(Archuleta); Plea Agreement, filed January 25, 2018 (Doc. 503)(Chris Garcia); Plea
Agreement, filed March 1, 2017 (Doc. 368)(Armijo); Plea Agreement, filed September 22, 2016
(Doc. 229)(Munoz).

Of the other cases resulting from the FBI investigation, United States v. Varela and United States v. Garcia did not go to trial, but the Court held two trials in United States v. DeLeon. The Court held one four-defendant trial and one seven-defendant trial. Across the two trials, the juries found eight of the eleven defendants guilty of violating the VICAR. See United States v. DeLeon, No. CR 15-4268, Jury Verdict at 1-3, filed March 12, 2018 (Doc. 1947); United States v. DeLeon, No. CR 15-4268, Jury Verdict at 1-5, filed May 25, 2018 (Doc. 2332). Five United States v. DeLeon defendants are charged in this case. Compare Indictment at 1, with United States v. DeLeon, No. CR 15-4268, Second Superseding Indictment at 1, filed March 9, 2017 (Doc. 947).

1. **The Expert Notice.**

On March 26, 2018, the United States filed its United States' Notice of, and Motion in Limine to Admit, Gang Expert Witnesses Testimony, filed March 26, 2018 (Doc. 545)("Expert Notice"). Expert Notice at 6. The United States notes that it will call the Gang Experts at trial, and that their proposed testimony is included in the Memorandum on Prison Gang Information from Sergio Sapien and Chris Cupit (dated January 18, 2018), filed March 26, 2018 (Doc. 545-1)("Gang Memo."). See Expert Notice at 1.

The United States explains that the Corrections Department has employed Sapien for around seventeen and a half years, and that Sapien "has worked at the Southern New Mexico Correctional Facility in Las Cruces, New Mexico, Central New Mexico Correctional Facility in Los Lunas, New Mexico, and the Penitentiary of New Mexico in Santa Fe, New Mexico." Expert Notice at 3. According to the United States, Sapien has worked with "the STIU for over three years as the STIU Captain/Institutional Investigator." Expert Notice at 3. In this position, Sapien identifies gangs, identifies gang threats, and investigates gangs' criminal activity. See Expert Notice at 3. Sapien, the United States notes, has provided training on prison gangs and "is a

recognized expert in his field of prison gangs." Expert Notice at 3. The United States concludes that Sapien's employment and knowledge qualify him as an expert on an issue essential to the trial. See Expert Notice at 3.

The United States explains that Cupit worked for the Corrections Department for eleven and a half years. See Expert Notice at 2. The United States notes that, while working for the Corrections Department, Cupit worked at "the Penitentiary of New Mexico in Santa Fe, New Mexico." Expert Notice at 2. According to the United States, Cupit also worked for the Federal Bureau of Prisons United States Penitentiary, Atwater in Atwater, California for one and a half years, and has "served with the STIU for approximately six and a half years as an Institutional Investigator." Expert Notice at 2. The United States lists Cupit's tasks as including identifying gangs, identifying gang threats to "staff, inmates and the public," and investigating gangs' criminal activity. Expert Notice at 2. According to the United States, Cupit has provided training on prison gangs and "is a recognized expert in his field of prison gangs." Expert Notice at 2. The United States concludes that Cupit's service demonstrate that he is qualified to serve as an expert on information vital to the case. See Expert Notice at 2-3.

The United States argues that the Gang Experts' "training, experience, and qualifications" "demonstrates that the testimony of th[ese] witness[es] is both relevant and reliable." Expert Notice at 4. The United States asks that the Court permit the Gang Experts to testify. See Expert Notice at 4. The United States asks that the Court treat the Expert Notice "as a proffer on the training, background and education of the witness" if the Defendants challenge the Gang Experts' testimony. Expert Notice at 5. The United States contends that, because "no novel scientific principles" are "at play," the Court should not require a hearing if the Gang Experts are challenged, or, alternatively, that the Court should "reserve ruling on the testimony's admissibility until it is

offered at trial." Expert Notice at 5 (citing <u>United States v. Nichols</u>, 169 F.3d 1255, 1262-63 (10th Cir. 1999)).

In the Gang Memo., the Gang Experts explain that gangs pose problems for correctional staff. <u>See</u> Gang Memo. at 1. The Gang Experts state that "Gang ideologies exemplify intimidation, secrecy, and strong arm tactics," "exhibit the potential for disruptive, violent, and destructive activity, and are recognized by most corrections officials." Gang Memo. at 1. The Gang Experts explain that the Corrections Department developed a program to identify, monitor, and control gangs and their threats. <u>See</u> Gang Memo. at 1. According to the Gang Experts, prison gangs seek to develop power, to be a support group, to control drugs and, through the drugs, the prison, and to develop "[s]treet [c]red" through violent acts. Gang Memo. at 2. The Gang Experts divide the gangs within the Corrections Department into the "Security Threat Groups," which have military organizational structures, and the Disruptive Groups, which are "more democratic." Gang Memo. at 2. The Gang Experts note that the Security Threat Groups elect an individual known as an "Ilavero" to lead the institution's gang, and the Disruptive Groups use the term "Big Homie" to refer to individual "veteran inmates," but are willing to consider various members' opinions when making decisions. Gang Memo. at 2. The Gang Experts enumerate rules that the gangs follow: never inform on gang members; respect yourself and others; never back down, lie, or steal; assault child molesters; "produce your paperwork[4] when asked;" and do not "allow yourself to be disrespected." Gang Memo. at 2. According to the Gang Experts, the different gangs may have

---

[4]"Paperwork" refers to "[c]ourt documents revealing what a prisoner's charges, criminal history, downward departures, etc. are. This is used to determine whether a person is a snitch, child molester, or other kind of person considered undesirable by other prisoners." <u>Paperwork</u>, Urban Dictionary, https://www.urbandictionary.com/define.php?term=paperwork (last visited Dec. 13, 2018).

and enforce their own rules, and the Gang Experts note that violating the rules may lead to dissociation from the gang, ", assault, group assault," or "murder." Gang Memo. at 2. The Gang Experts explain that the gangs communicate through messages or letters known as "kites[5] or weelas[6]," sign language, and code. Gang Memo. at 2. Gang members, the Gang Experts note, may communicate through members with access to other facilities, recreation areas, and telephone calls to people outside the institution. See Gang Memo. at 2-3. According to the Gang Experts, gang members' tattoos identify their affiliations -- including their prison gang and street gang affiliations and their beliefs. See Gang Memo. at 3. Tattoos "usually include the name, initials, or symbols of the gang, and in some instances, could include the area to which the gang member belongs." Gang Memo. at 3.

The Gang Experts explain that, for Security Threat Groups, a potential gang member must have a sponsor with good standing within the gang. See Gang Memo. at 9. According to the Gang Experts, a potential gang member in a Security Threat Group must not have informed on a gang previously or have "bad charges." Gang Memo. at 3. The Gang Experts state that, to enter a Security Threat Group, a member must "spill blood" and, to leave the gang, a member must die. Gang Memo. at 3. The Gang Experts further explain that entering such a gang requires a "vote from 3 or more actual members" and that remaining in the gang requires participating in often violent and drug-related activities. Gang Memo. at 3. The Disruptive Group, the Gang Experts

---

[5]"Kite" refers to "[a] contraband note written on a small piece of paper that's folded and passed to others through underground methods." Prison Slang Glossary, Prison Diaries, https://prison-diaries.com/prison-slang-glossary-2/ (last visited Dec. 13, 2018).

[6]The Court could not find a relevant definition for "weela," but the Court assumes the word carries a meaning similar to "kite." Cf. Weela, Urban Dictionary, https://www.urbandictionary.com/define.php?term=weela (last visited Dec. 13, 2018)(defining "weela" "as a secret note passed around by wards in the california [sic] youth authority juvenile prison.").

state, recruit gang members based on their geographic origin and, according to the Gang Experts, the potential members must have no "bad charges" and must not have previously informed on a gang. Gang Memo. at 3. The Gang Experts explain that such gangs often admit potential gang members who meet these qualifications, and request that the gang members commit activities for the gang, including violent and drug-related activities. See Gang Memo. at 3. According to the Gang Experts, Disruptive Group do not require that potential gang members spill blood to enter or that they remain gang members until they die. See Gang Memo. at 3.

2.    **The Motion**.

Cordova filed the Motion on April 5, 2018, in response to the Expert Notice. See Motion at 1, 8. Sanchez, C. Garcia, Garduño, Baca, Parker, Benito, Archuleta, and Rodriguez joined the Motion. See Motion at 1. The Defendants first aver:

> The government's notice of its intent to call expert witnesses as to gangs (Doc. 545) fails to comply with the requirements of Rule 16 of the Federal Rules of Criminal Procedure because it does not state the specific opinion(s) to be offered by each witness, the bases and reasoning for each such opinion, and the qualifications of the experts to reliably form such opinions.

Motion at 2. According to the Defendants, they require such information to challenge the opinions pretrial under rule 702 of the Federal Rules of Evidence, and, according to the Defendants, the Court requires the information to analyze the experts' testimony. See Motion at 2. The Defendants indicate that the United States has provided no information on the Gang Experts' testimony. See Motion at 3. Second, the Defendants request a Daubert hearing to ensure the relevance and reliability of the Gang Experts' testimony, pursuant to Daubert, 509 U.S. at 592-93 and Kumho Tire Co. v. Carmichael, 562 U.S. 137, 141 (1999). See Motion at 3-4. Last, the Defendants ask the Court to limit the Gang Experts' testimony they do not exceed their expertise. Motion at 5. According to the Defendants, gang expert testimony carries risks of "a law enforcement officer

substituting his expert opinion for facts derived from a criminal investigation," Motion at 5, and of "Confrontation Clause[7] issues," Motion at 6. Gang Experts may interview "known gang members," Motion at 6, and "become a conduit for the admission of" evidence violative of the Confrontation Clause, see Motion at 6. For the Defendants, that the United States also identified the Gang Experts as potential fact witnesses heightens the risks that Gang Experts pose. See Motion at 6. Accordingly, the Defendants request that the Court take eight actions to limit the Gang Experts' testimony:

(1) Determine the scope of the witness's expertise and how the expertise was acquired, which involves a consideration of education, training and actual experience;

(2) Assess whether the expert is arriving at an independent judgment, applying the expert's training and experience to the facts of the case;

(3) Limit the expert's testimony to the scope of the expert's experience;

(4) Prohibit any testimony about the meeting or substance of conversations with witnesses who are not available for cross-examination;

(5) Prohibit the interpretation of ambiguous slang terms or other words unique to the particular case;

(6) Require the government to identify any out-of-court statements it expects to be part of an expert's testimony[;]

(7) Prohibit testimony about out-of-court statements that are offered only for their truth without any synthesis or analysis in the form of expert opinion[;]

(8) Not allow an expert to base an opinion solely on an out-of-court statement.

Motion at 6-7.

---

[7]The Confrontation Clause of theSixth Amendment to the Constitution of United States provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

3.      **The Response**.

The United States responded on May 17, 2018. <u>See</u> United States' Response to Defendant Anthony Cordova's Motion to Compel [Doc. 561] at 1, filed May 17, 2018 (Doc. 645)("Response").  The United States notes that, while the Expert Notice does not provide the Defendants "specific opinions of the witness, bases and reasoning for the opinion, and qualifications," it reveals the "information by way of the memo and curricula vitae for both these expert witnesses."  Response at 5.  According to the United States, the disclosure through the Gang Memo. and summary of the Gang Experts' qualifications satisfy rule 16(a)(1)(G) of the Federal Rules of Civil Procedure, which requires the disclosure of information only and does not require the form that the Defendants allege it to require.  <u>See</u> Response at 5-6 (citing Fed. R. Evid. 16(a)(1)(G); <u>United States v. Nacchio</u>, 555 F.3d 1231, 1262 (10th Cir. 2009)(McConnell, J., dissenting)).  The United States contends that its Expert Notice meets rule 16's requirements, because the Expert Notice describes the Gang Experts' backgrounds and the opinions that they may offer at trial.  <u>See</u> Response at 6.  The Defendants state: "The Expert Notice's summary that each of these expert witnesses has had multiple years of employment with the New Mexico Corrections Department, and especially the STIU, provides them bases for the opinions they intend to offer."  Response at 7.  Likewise, the Expert Notice's enumeration of the Gang Experts' qualifications, which include "investigations, intelligence-gathering, and threat assessment experience," qualifies them as experts, and meets the standard that the Court has upheld for such summaries for law enforcement experts.  Response at 7 (citing <u>United States v. Jackson</u>, 51 F.3d 646, 651 (7th Cir. 1995); <u>United States v. Goxcon-Chagal</u>, 886 F. Supp. 2d 1222, 1253 (D.N.M. 2012)(Browning, J.)).  The United States asks that the Court order the United States to rewrite the Expert Notice if the Court finds the Expert Notice insufficient rather than exclude the Gang

Experts' testimony, as the Defendants have "substantial notice about what the United States' experts intend to testify." Response at 8 (citing <u>United States v. Sarracino</u>, 340 F.3d 1148, 1170 (10th Cir. 2003); <u>United States v. Jackson</u>, 51 F.3d at 651; <u>United States v. Goxcon-Chagal</u>, 886 F. Supp. 2d at 1253). Regarding the Defendants' request for a <u>Daubert</u> hearing, the United States indicates that the "Court has heard extensive evidence and motion hearings as to this issue in <u>United States v. DeLeon</u>, No. CR 15-4268 JB and <u>United States v. Varela</u>, No. 15-4269 JB." Response at 1. The United States requests "the Court to take judicial notice of the argument and objects made in those proceedings," in which the Court "found that gang expert witnesses would be able to testify as to gangs generally." Response at 1-2 (citing Transcript of Hearing at 68-70 (taken November 27, 2017), filed December 6, 2017 (Doc. 1545)("Nov. 27 Tr.")). Further, the Defendants argue that a <u>Daubert</u> hearing "is not specifically mandated," Response at 2 (citing <u>United States v. Nacchio</u>, 555 F.3d at 1261), and that "there should be no concern about implications of scientific certainty or expertise," because the Gang Experts will not offer scientific testimony, Response at 2.

### 4. The Reply.

In response, the Defendants filed the Reply to Government's Response in Opposition to Anthony Cordova's Motion to Compel Compliance with Rule 16, For a <u>Daubert</u> Hearing and Alternative Motion to Exclude Testimony of Gang Expert Witnesses, filed May 31, 2018 (Doc. 668)("Reply"). Replying to the United States' arguments about Rule 16 disclosure, the Defendants aver:

> [T]hat a statutory scheme that imposes stringent disclosure requirements in civil cases, which involve disputes over money or injury to personal rights, but fails to require equally expansive disclosure in this criminal case, where Mr. Cordova is subject to a mandatory sentence of life in prison without possibility of release, violates the Fifth Amendment [to the Constitution of the United States] right to due

process of law, the Fourteenth Amendment [to the Constitution of the United States] right to equal protection under the law and the Sixth Amendment [to the Constitution of the United States] rights to the effective assistance of counsel and a fair trial.

Reply at 2. The Defendants, citing the advisory committee's notes to rule 16, further contend that a written summary of the Gang Experts' testimony, including "written and oral reports, tests, reports and investigations and any information that might be recognized as a legitimate basis for an opinion," Reply at 3, is required, although, according to the Defendants, such a statement is not "equivalent," Reply at 2, to the "complete statement required of litigants in civil cases," Reply at 1 (quoting Response at 6). The Court, the Defendants argue, should exclude the Gang Experts' testimony and not allow the United States to correct the Expert Notice. See Reply at 3-4. According to the Defendants, the United States' "refusal to make Jencks Act [18 U.S.C. § 3500] disclosures until June 24, 2018," means that the Defendants have "two weeks before trial to review critical Jencks material," and adding to that task, preparing objections to the Gang Expert's testimony and for Daubert litigation, "is fundamentally unfair." Reply at 3.

    **5.    The United States v. DeLeon, CR 15-4268 JB, November 27, 2018, Hearing.**

    In the Response, the Defendants reference the Court's oral order at the November 27, 2018, hearing in United States v. DeLeon, CR 15-4268 JB. See Response at 1-2. At the November 27, 2018, hearing, the Court indicated that it would draw the line delineating admissible gang expert testimony where the United States Court of Appeals for the Second Circuit, in an opinion that the Honorable Peter W. Hall, United States Circuit Judge for the Second Circuit, wrote, and that the Honorable Barrington D. Parker, United States Circuit Judge for the Second Circuit, and the Honorable Dennis Jacobs, United States Circuit Judge for the Second Circuit, drew the line in United States v. Mejia, 545 F.3d 179, 190-91 (2d Cir. 2008)("Mejia"), on which the Honorable

Harris L. Hartz, United States Circuit Judge for the United States Court of Appeals for the Tenth

Circuit, relied in United States v. Garcia, 793 F.3d 1194, 1213-14 (10th Cir. 2015), an opinion that

Judge Hartz wrote and that the Honorable Timothy M. Tymkovich, United States Circuit Judge

for the Tenth Circuit, and the Honorable Gregory A. Phillips, United States Circuit Judge for the

Tenth Circuit, joined. See Nov. 27 Tr. at 69:11-17 (Court). The Court specified:

> [T]he experts are not going to be able to really talk about the SNM . . . gang
> specifically. They can talk generally about gangs. The fact that SNM comes out
> of their mouth as they talk about other gang [sic] I don't think is important, but they
> can't specifically talk about the SNM gang . . . .

Nov. 27 Tr. at 69:20-25 (Court). The Court noted that, if the United States in United States v.

DeLeon wanted to introduce specific evidence about tattoos, the Court would "have a hearing,"

Nov. 27 Tr. at 70:8 (Court), with those experts and "listen to what the basis of their opinion is, and

then make balls and strikes calls on an individual basis," Nov. 27 Tr. at 70:9-11 (Court).

> **6.      The June 14, 2018, Hearing.**

The Court held a hearing on the Motion on June 14, 2018. See Minute Order, filed June

11, 2018 (Doc. 714). At the hearing, the Defendants opined that if the Court and the parties agreed

to follow the Court's prior rulings on gang expert testimony, the Court and the parties would not

"need to proceed with a Daubert hearing." Draft Transcript of Hearing at 223:16-17 (taken June

14, 2018)(Morrissey)("June 14 Tr.").[8]  See id. at 223:13-17 (Morrissey). The Defendants

summarized the prior rulings: the Court relied on Mejia, so such experts "can testify about how

gangs operate in a generic sense, and in general they can testify that gangs identify themselves by

tattoos; that gangs may use slang words in communication, but they cannot do any specific

---

[8]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

testimony about the SNM, and their particular tattoos . . . ." June 14 Tr. at 223:21-25 (Morrissey). The Defendants continued: "[P]eople who worked at the prison and Government familiar with the SNM can testify about them, but no specifics." June 14 Tr. at 224:4-5 (Morrissey). The United States, the Defendants explained, could "call fact witnesses about how the Corrections Department" identifies people as gang members but not about who "is in fact a gang member." June 14 Tr. at 224:7:11 (Morrissey). Expert witnesses, the Defendants stated, "could not relate hearsay from a cooperator or [corroborator] in the guise of expert testimony." June 14 Tr. at 224:14-15 (Morrissey). According to the Defendants, testimony on whether SNM is an "enterprise," June 14 Tr. at 224:19 (Morrissey), or "engaged in racketeering activity," June 14 Tr. at 224:20 (Morrissey), is also inadmissible through the Gang Experts' testimony. See June 14 Tr. at 224:18-21 (Morrissey). The Defendants continued: "[T]here could be generic testimony about how gangs do crimes to advance their purposes but no testimony that the SNM does crimes to advance any particular purpose." June 14 Tr. at 224:21-24 (Morrissey). Finally, the Gang Experts, the Defendants clarified, could testify as fact witnesses "to what [they] did, saw[,] or heard." June 14 Tr. at 224:25-225:1 (Morrissey). The Defendants admitted that they did not know whether the United States would call the Gang Experts and that they did not expect the United States, at the moment, to commit one way or the other. See June 14 Tr. at 225:6-11 (Morrissey). The United States agreed with the Defendants' comments, see June 14 Tr. at 226:17-18 (Beck), and the Court indicated that it would "incorporate those rulings [from United States v. DeLeon] into this case," June 14 Tr. at 225:20 (Court).

## LAW REGARDING DISCOVERY IN CRIMINAL CASES

"A defendant is entitled, under some circumstances, to request a written summary of expert testimony the United States intends to use in its case-in-chief."  United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1227.  Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure provides:

> **(G) Expert witnesses.** -- At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.  If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition.  The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).

"It is not clear how much detail must be provided to satisfy this provision."  25 James Wm. Moore, Moore's Federal Practice § 616.05[3], at 616-65 (3d ed. 2012).  The United States Court of Appeals for the Seventh Circuit found the following summary of expert testimony sufficient, "although barely," when the United States planned to present evidence regarding a drug courier-profile:

> In response to your Request for Written Summary of the Government's Proposed Expert Testimony dated December 3, 1993, please be advised that Officers Emmit C. Carney, Jerry Cheung, and R.J. Kenney may testify at trial concerning the use of beepers, firearms, walkie-talkies, and Western Union wire transfers in connection with the sale of narcotics.  In addition, each of these officers may testify that narcotics traffickers often secure locations such as houses or apartments to serve as a base for dealing narcotics.  Each of these police officers will base their testimony on their years of training and experience in the area of drug investigations.

United States v. Jackson, 51 F.3d at 651. The Seventh Circuit elaborated that, in "cases involving technical or scientific evidence," there may be a "greater disclosure" obligation, "including written

and oral reports, tests, investigations, and any other information that may be recognized as a legitimate basis for an opinion under Fed. R. Evid. 703." United States v. Jackson, 51 F.3d at 651 (citing Fed. R. Crim. P. 16 advisory committee's notes). See Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002)(holding that the purpose of rule 26(a) expert disclosures is "not only to identify the expert witness, but also 'to set forth the substance of the direct examination'" (quoting Fed. R. Civ. P. 26(a)(2) advisory committee's notes)); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1253-54. See also United States v. Rodriguez, 125 F. Supp. 3d 1216, 1259 (D.N.M. 2015)(Browning, J.)(finding a rule 16(a)(1)(G) notice adequate when it gave no indication of the expert opinions' bases but specified the expert's qualifications and the Court could infer that the expert based the opinion on his "training and experience" and, at a hearing, the United States disclosed an opinion omitted from the summary); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1254 (holding a summary a rule 16(a)(1)(G) notice sufficient when it stated generally the subject matter, background, and basis for the experts' testimony).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1). In In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d 93 (2d Cir. 2008), the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information." 552 F.3d at 122. In United States v. Delia, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the

ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16, United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988):

> **(2) Failure to Comply.** If a party fails to comply with this rule, the court may:
>
> > **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
> >
> > **(B)** grant a continuance;
> >
> > **(C)** prohibit that party from introducing the undisclosed evidence; or
> >
> > **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)). In United States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the United States Court of Appeals for the Tenth Circuit held that "a court should impose the least severe sanction." 455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d at 1061). The Tenth Circuit noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies." States v. Martinez, 455 F.3d at 1131.

## RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert . . . , trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the

evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert, whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert . . . requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

> Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). In

United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1239, the Court identified as relevant, and admitted, testimony on:

> (ii) the likelihood that a drug organization would entrust individuals outside of the organization with a large amount of drugs; (iii) the significance of the presence of multiple cellular telephones in the vehicle; (iv) the significance of the possession of multiple license plates; (v) the separation of individuals who package drugs and individuals who are drug couriers within a drug organization; (vi) the significance of the presence of multiple air fresheners in the vehicle; and (vii) the significance of the presence of a firearm in the vehicle.

886 F. Supp. 2d at 1239. The Court did not admit testimony on whether a highway portion was a "drug route," because the "proposed testimony is too close to characterizing 'nearly any trip down the interstate' as traveling in a known drug route" United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1247 (quoting United States v. $252,300.00 in U.S. Currency, 484 F.3d 1271, 1274 n.3 (10th Cir. 2007)). See United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M. 2014)(Browning, J.)(deeming inadmissible testimony on the demeanor of a sex crime's victim during an examination, and stating that "demeanor is not always a reliable indicator whether someone is telling the truth, especially about sex -- then no expert testimony is needed. That knowledge is well within the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that "testimony regarding nationally accepted police standards is irrelevant" to issues of "excessive force and" reasonableness). The expert testimony's proponent has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an

overly narrow test of his own qualifications." <u>Gardner v. Gen. Motors Corp.</u>, 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted).). <u>See</u> <u>United States v. Rodella</u>, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert] is not qualified to testify about nationally accepted police procedures and practices."); <u>United States v. Goxcon-Chagal</u>, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony. <u>See</u> <u>United States v. Gomez</u>, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard").[9] The trial court has broad discretion in deciding whether to admit or exclude expert testimony, <u>see</u> <u>Werth v. Makita Elec. Works, Ltd.</u>, 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." <u>United States v. Ganadonegro</u>, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing <u>United States v. Benally</u>, 541 F.3d 990, 996 (10th Cir. 2008)). "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." <u>United States v.</u>

---

[9]The current law -- and its trajectory -- are casting serious shadows over the use of experts in cases, particularly those involving jury trials. It is probably a good time for the judiciary to rethink expert testimony rather than continuing with the current regime and making incremental changes. Lawyers and appellate courts overemphasize the importance of experts, and distrust juries.

Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

### 2. **The Standard in Daubert.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert, 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert, 509 U.S. at 594-95. The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence. See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . .). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and

> experience of his [or her] discipline.'" Id. (quoting Daubert, 509 U.S. at 592 . . . ).
> In making this determination, the district court must decide "whether the reasoning
> or methodology underlying the testimony is scientifically valid. . . ." Id. (quoting
> Daubert, 509 U.S. at 592-93 . . .). Second, the district court must further inquire
> into whether proposed testimony is sufficiently "relevant to the task at hand."
> Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted). "The second inquiry is

related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that

the proposed expert testimony logically advances a material aspect of the case. . . . The evidence

must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter

Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311,

1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591). If the

expert's proffered testimony fails on the first prong, the court does not reach the second prong.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v. Carmichael, the

Supreme Court expanded the rules under Daubert to non-scientific expert testimony. See Kumho

Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting

forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on

'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized'

knowledge." (quoting Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1521 (S.D. Ala.

1996)(Butler, C.J.)). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the

factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule
> 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do
> not constitute a definitive checklist or test. And Daubert adds that the gatekeeping
> inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted)(quoting

Daubert, 590 U.S. at 594).

In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert, 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted)(quoting Dodge v. Cotter Corp., 328 F.3d at 1222). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare Corp., 397 F.3d at 881. The Tenth Circuit noted in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206. The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct

prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis. At worst, the link has been tested and found to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th

Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3.     Necessity of Evaluating an Issue Under Daubert.

The restrictions in Daubert apply to both "novel" expert testimony and "well-established propositions."  509 U.S. at 593 n.11 ("Although the Frye[10] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence.").  "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."  Daubert, 509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201."  Daubert, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ."  Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability."  Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.  Whether courts have accepted theories underlying an expert's opinion is a relevant

---

[10]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."  293 F. at 1014.

consideration in determining whether expert testimony is reliable. See Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[11] and in fact some courts have indicated their acceptance of it.").

## LAW REGARDING EXPERT TESTIMONY BY LAW ENFORCEMENT OFFICERS

"[P]olice officers can testify as experts based on their experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld,'" United States v. Kamahele, 748 F.3d 984, 998 (10th Cir. 2014)(alteration in United States v. Kamahele but not in quoted source)(internal quotation marks omitted)(United States v. Garcia, 635 F.3d 472, 477 (10th Cir. 2011), and "because it is likely to assist the trier of fact to understand an otherwise unfamiliar enterprise," United States v. Wilson, 276 F. App'x 859, 861 (10th Cir. 2008)(unpublished).[12] See United States v. Quintana, 70 F.3d 1167, 1171 (10th Cir. 1995)("This Court has repeatedly held

---

[11]A "[p]olymerase chain reaction" ("PCR"), Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780, is a widely used method for copying DNA segments. See Polymerase chain reaction, Wikipedia, https://en.wikipedia.org/wiki/Polymerase_chain_reaction (last visited Nov. 28, 2018).

[12]United States v. Wilson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Wilson, United States v. Walker, 179 F. App'x 503 (10th Cir. 2006), United States v. Mundy, 97 F. App'x 844 (10th Cir. 2004), and United States v. Phillips, 165 F. App'x 677 (10th Cir. 2006) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

that in narcotics cases, expert testimony can assist the jury in understanding transactions and terminology." (citing United States v. Garcia, 994 F.2d 1499 (10th Cir. 1993); United States v. Sturmoski, 971 F.2d 452, 459 (10th Cir. 1992); United States v. McDonald, 933 F.2d 1519, 1522-23 (10th Cir. 1991); Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988))). The Tenth Circuit "has repeatedly held that in narcotics cases, expert testimony [by a law enforcement officer] can assist the jury in understanding transactions and terminology." United States v. Walker, 179 F. App'x 503, 507 (10th Cir. 2006)(unpublished)(quoting United States v. Quintana, 70 F.3d at 1171). "This rule is based on the Tenth Circuit's recognition that the modus operandi of drug organizations, the value of drug quantities, the language of narcotics dealers, and the tools of the narcotics trade 'are not subjects with which most jurors are familiar.'" United States v. Hernandez-Mejia, No. CR 05-0469 JB, 2007 WL 2219411, at *4 (D.N.M. April 30, 2007)(Browning, J.)(quoting United States v. McDonald, 933 F.2d at 1522). Other Courts of Appeals are in accord. See United States v. Martinez, 476 F.3d 961, 967 (D.C. Cir. 2007)("Expert testimony about the methods of drug organizations is common in drug cases."); United States v. Robles-Rosas, 27 F. App'x 897, 899 (9th Cir. 2001)(unpublished)(holding that the district court did not abuse its discretion in permitting testimony regarding the modus operandi of drug organizations); United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994)("[T]estimony on the modus operandi of criminals 'is commonly admitted,' particularly regarding the methods of drug dealers."). For example, in cases involving possession with intent to distribute, the Tenth Circuit has held that "testimony with regard to the significance of a quantity of drugs possessed is specialized knowledge that assists the jury in understanding a fact at issue." United States v. Mundy, 97 F. App'x 844, 846 (10th Cir. 2004)(unpublished). The Tenth Circuit has also recognized that, when a defendant denies awareness, the value of drugs found is relevant to the

issue of a defendant's knowledge of the presence of the drugs within the vehicle. See United States v. Rodriguez, 192 F.3d 946, 949 (10th Cir. 1999)(citing United States v. Hooks, 780 F.2d 1526, 1532 (10th Cir. 1986)). This Court has similarly admitted such evidence. In United States v. Rodriguez, the Court admitted a law enforcement officer's testimony on his previous experience with drug cartels, but did not allow the expert to testify as to his experience in the case at hand. See 125 F. Supp. 3d at 1256-57. The Court reasoned that the jury could apply the expert's testimony about his prior experience to the current facts. See 125 F. Supp. 3d at 1256-57. In United States v. Goxcon-Chagal, the Court admitted testimony from a law enforcement officer, relying on his experience in law enforcement, recounting background facts regarding drug trafficking -- trust relationships within drug organizations; the significance of multiple license plates, cell phones, air fresheners, and firearms in a vehicle; and how tasks were assigned to individuals who packaged drugs or were drug couriers. See 886 F. Supp. 2d at 1239-49.

Although early cases dealing with this genre of expert testimony articulated the standard of admissibility as being whether the expert testimony is "necessary" to achieve jury understanding, United States v. Robinson, 978 F.2d 1554, 1563 (10th Cir. 1992)("[G]ang-related items may necessitate the appearance of an expert witness if the jury could not understand the significance of possession of these items." (emphasis added)(citation omitted)); id. at 1564-65 ("[T]he expertise of this particular witness was necessary. . . . The average juror would fail to recognize the 'significance of this evidence without the particular background knowledge' of gangs and the philosophy of gang membership. 'Without [the expert testimony], the basic evidence would leave a juror puzzled.'" (emphases added)(quoting United States v. McDonald, 933 F.2d at 1522)), more recent cases articulate the standard as being whether the expert testimony "will assist the trier of fact," United States v. Rodriguez-Felix, 450 F.3d at 1122, or whether it will

be "helpful to the jury," <u>United States v. Kamahele</u>, 748 F.3d at 997, following rule 702's codification of the standard that <u>Daubert</u> first articulated: "[T]he expert's scientific, technical, or other specialized knowledge [is admissible if it] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The rule's requirement that the testimony "help" the jury is more liberal than the Tenth Circuit's pre-<u>Daubert</u> necessity standard.

Special concerns accompany law enforcement expert testimony. The leading case and most comprehensive case in outlining these dangers is the Second Circuit's opinion in <u>Mejia</u>. In that case, the United States

> called Hector Alicea, an investigator with the New York State Police, to testify regarding MS-13's "enterprise structure and the derivation, background and migration of the MS-13 organization, its history and conflicts," as well as MS-13's "hierarchy, cliques, methods and activities, modes of communication and slang." Alicea had been an officer of the New York State Police for eighteen years, and he had been an investigator since 1992. In June 2000, five years before the trial, Alicea had been assigned to the FBI Long Island Gang Task Force. He was also the Chair of the Intelligence Committee of the East Coast Gang Investigators Association.
>
> . . . .
>
> . . . Alicea stated that he had participated in somewhere between fifteen and fifty custodial interrogations of MS-13 members. When asked whether he could distinguish between information he had learned during custodial interrogations and information he had learned elsewhere, Alicea responded that his knowledge was based on "a combination of both." . . .
>
> Much of Alicea's testimony concerned MS-13's background. He testified about MS-13's history, its presence on Long Island, and its national and international presence; about the gang's colors, hand signs, graffiti use, naming practices, and tattoos; and about its local subunit structure, leadership structure, division of responsibilities, and membership rules. In addition, Alicea testified to more specific details about MS-13's operations. He stated that when MS-13 members fled from prosecution or needed to travel for "gang business reasons," such as "to transport narcotics," "to transport weapons," or "to commit crimes in other areas," they traveled "on a Greyhound bus" or by car. According to Alicea, MS-13 members from Virginia, California, and El Salvador had attended organizational meetings in New York State, and MS-13 leaders throughout the nation communicated with each other by telephone. He testified that MS-13

treasury money "[was] used to buy guns," to help members in prison or in other states, or to buy narcotics. Significantly, Alicea also asserted that MS-13 needed guns "to do what MS 13 does, which is, you know, shoot at rival gang members, and sometimes in the process, obviously, some people get hit."

With respect to MS-13's activities on Long Island, Alicea testified that since he had joined the Task Force in June 2000, the Task Force had seized "[p]robably between 15 and 25" firearms from MS-13 members. He further testified that Task Force members had seized ammunition, manufactured outside of New York State, from MS-13 members on Long Island. Moving on to MS-13's narcotics-related operations, Alicea told the jury that MS-13 members on Long Island had been arrested for dealing narcotics, primarily cocaine, and that the gang also occasionally dealt marijuana. Alicea also stated that MS-13 "tax[ed]" non-gang drug dealers who wished to deal drugs in bars controlled by MS-13. Most importantly, Alicea attested that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial.

On cross-examination, defense counsel probed the sources of Alicea's information. Because of the importance of Alicea's answers, we quote from his testimony at length:

> Q. . . . I thought you mentioned FLS [an M-13 sub-group] . . . funded itself at the beginning from the sale of marijuana?

> A. No. I was referring to the MS-13 gang as a whole.

> Q. Is it fair to say that somebody told you that?

> A. I had read that from some of the articles that I had researched.

> Q. Newspaper articles?

> A. Reports from other law enforcement personnel.

> . . . .

> Q. You also told us that MS members . . . put a tax on narcotics sales in certain bars; is that correct?

> . . . .

> A. I was told that by a gang member, yes.

> . . . .

Q.    And I believe you told us that some of those [membership] dues were used to purchase narcotics?

A.  That's correct.

Q.  Is it fair to say that that was told to you also by somebody who was in custody?

A.  In custody and some that were not.

Q.  Well, can you tell me . . . how many people in custody told you in substance that monies collected were used for narcotics?

A.  Probably like a dozen.

. . . .

A.  . . . I said I am aware that there has been contact between California and New York.

Q.  And how did you become aware of it?

A.  Listening to recordings.

. . . .

Q.  And you stated that you got information with regard to MS-13s involved with Mexican drug cartels; is that correct?

A.  Yes.

Q.  And where did you get that information from?

A.  From research on the Internet.

Q.  Do you know the source of that information on the Internet?

A.  Not off the top of my head.  But I did retrieve that.

Q.  Is it law enforcement or reporters?

A.  I think it is a combination of a reporter doing a story and having a conversation with law enforcement.

. . . .

>        Q. . . . [W]ith regard to the involvement of MS-13 [with] the
> Mexican cartels or Colombian cartels, you never interviewed anybody who
> told you that, it was strictly from the Internet; is that correct?
>
>        A.  That is correct.

Mejia, 545 F.3d at 186-88 (hearing transcript omissions in original)(footnote omitted).   The

Second Circuit had numerous qualms with this testimony:

> [D]espite the utility of, and need for, expertise of this sort, its use must be limited
> to those issues where sociological knowledge is appropriate.   An increasingly
> thinning line separates the legitimate use of an officer expert to translate esoteric
> terminology or to explicate an organization's hierarchical structure from the
> illegitimate and impermissible substitution of expert opinion for factual evidence.
> If the officer expert strays beyond the bounds of appropriately "expert" matters,
> that officer becomes, rather than a sociologist describing the inner workings of a
> closed community, a chronicler of the recent past whose pronouncements on
> elements of the charged offense serve as shortcuts to proving guilt.   As the officer's
> purported expertise narrows from "organized crime" to "this particular gang," from
> the meaning of "capo" to the criminality of the defendant, the officer's testimony
> becomes more central to the case, more corroborative of the fact witnesses, and
> thus more like a summary of the facts than an aide in understanding them.   The
> officer expert transforms into the hub of the case, displacing the jury by connecting
> and combining all other testimony and physical evidence into a coherent,
> discernible, internally consistent picture of the defendant's guilt.
>
>        In such instances, it is a little too convenient that the Government has found
> an individual who is expert on precisely those facts that the Government must prove
> to secure a guilty verdict -- even more so when that expert happens to be one of the
> Government's own investigators.   Any effective law enforcement agency will
> necessarily develop expertise on the criminal organizations it investigates, but the
> primary value of that expertise is in facilitating the agency's gathering of evidence,
> identification of targets for prosecution, and proving guilt at the subsequent trial.
> When the Government skips the intermediate steps and proceeds directly from
> internal expertise to trial, and when those officer experts come to court and simply
> disgorge their factual knowledge to the jury, the experts are no longer aiding the
> jury in its factfinding; they are instructing the jury on the existence of the facts
> needed to satisfy the elements of the charged offense. . . .   The Government cannot
> satisfy its burden of proof by taking the easy route of calling an "expert" whose
> expertise happens to be the defendant.   Our occasional use of abstract language to
> describe the subjects of permissible officer expert testimony cannot be read to
> suggest otherwise.

This Court has not been blind to these risks. More than fifteen years ago, we observed that although "the operations of narcotics dealers are a proper subject for expert testimony under Fed. R. Evid. 702, we have carefully circumscribed the use of such testimony to occasions where the subject matter of the testimony is beyond the ken of the average juror." . . .

. . . .

. . . [C]ase agents testifying as experts are particularly vulnerable to making "sweeping conclusions" about the defendants' activities.

We have identified two distinct ways in which the officer expert might "stray from the scope of his expertise." The expert might . . . "testif[y] about the meaning of conversations in general, beyond the interpretation of code words." Or, we noted, the expert might "interpret[] ambiguous slang terms" based on knowledge gained through involvement in the case, rather than by reference to the "fixed meaning" of those terms "either within the narcotics world or within this particular conspiracy."

. . . .

Testimony is properly characterized as "expert" only if it concerns matters that the average juror is not capable of understanding on his or her own. See United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); United States v. Locascio, 6 F.3d . . . 936 . . . (applying the "untrained layman" standard articulated in the Advisory Committee Notes to Rule 702).

Much of Alicea's testimony concerned material well within the grasp of the average juror. A few examples are particularly striking: Alicea's testimony that the FBI gang task force had seized "[p]robably between 15 and 25" firearms, as well as ammunition, from MS-13 members; his statement that MS-13 members on Long Island had been arrested for dealing narcotics; and his statement that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial. No expertise is required to understand any of these facts. Had the Government introduced lay witness testimony, arrest records, death certificates, and other competent evidence of these highly specific facts, the jury could have "intelligently" interpreted and understood it.

. . . .

Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if "experts in the field reasonably rely on such evidence in forming their opinions." Alicea unquestionably relied on hearsay evidence in forming his opinions. This hearsay evidence took the form of statements by MS-13 members given in interviews, both custodial and noncustodial, as well as statements made by other law enforcement officers, statements from intercepted telephone conversations among MS-13 members (which may or may not have been hearsay, depending on whether the conversations were in the course of and in furtherance of the charged conspiracies), and printed and online materials. Alicea's reliance on such materials was consistent with the ordinary practices of law enforcement officers, who "routinely and reasonably rely upon hearsay in reaching their conclusions."

The expert may not, however, simply transmit that hearsay to the jury. Instead, the expert must form his own opinions by "applying his extensive experience and a reliable methodology" to the inadmissible materials. Otherwise, the expert is simply "repeating hearsay evidence without applying any expertise whatsoever," a practice that allows the Government "to circumvent the rules prohibiting hearsay."

At trial, Alicea was unable to separate the sources of his information, stating that his testimony was based on "a combination of both" custodial interrogations and other sources. On cross-examination, however, Alicea identified hearsay as the source of much of his information. For example, his testimony that the Freeport clique initially funded itself through drug sales was based on "some of the articles that [he] had researched" and "[r]eports from law enforcement personnel." His testimony about MS-13's taxation of drug sales by non-members was based on a gang member having told him so during a custodial interrogation in this case. Alicea had learned about MS-13 treasury funds from about a dozen MS-13 members both in and out of custody. Additionally, Alicea discovered his information about MS-13's involvement in Mexican immigrant smuggling through "research on the Internet," and more specifically from a website containing a media report and an interview with a law enforcement official. And although Alicea did not identify the source of his statements about the number of firearms the Task Force had seized and the number of murders on Long Island that MS-13 members had committed, we cannot imagine any source for that information other than hearsay (likely consisting of police reports, Task Force meetings, conversations with other officers, or conversations with members of MS-13).

Mejia, 545 F.3d at 190-94, 197 (citations omitted).

There are, thus, many different angles from which defendants can attack law enforcement officers' expert testimony, and equally many pitfalls into which district courts can fall in admitting such testimony. The Court can identify at least six such dangers.

First, as the officer's expertise narrows in scope from broad generalities about certain criminal practices -- which are fixed in a meaning that transcends the case at hand, and about which the expert knew before his involvement in the case being tried -- to practices of which the expert has learned only through his or her investigation of the federal case before the court, there is the danger that the expert is cloaking percipient testimony in the garb of expert opinion.

> As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

Mejia, 545 F.3d at 190. At the grand jury stage, it is common for the United States to put on only a single witness -- a case agent, who succinctly summarizes the case, relaying facts to the grand jury that are outside of the agent's personal knowledge but were transferred to the agent through hearsay. See United States v. Brito, 907 F.2d 392, 394 (2d Cir. 1990)("The government admits to a policy of using a single witness before the grand jury in narcotics cases where the defendant is already under arrest."). This practice may be acceptable at the charging stage; the judiciary long ago ceased guarding the grand jury's function as a shield against unjust prosecution, and the institution has largely been rendered a paper tiger in modern times. See United States v. Basurto, No. CR 13-0969 JB, 2015 WL 4635715, at *13 n.5 (D.N.M. July 29, 2015)(Browning, J.)("[T]he institution of the grand jury has decayed from its standing at the Founding as a meaningful shield from unjust prosecution to its modern status as an investigatory sword for prosecutors."). The expert-testimony rules are not an invitation to the United States to turn the jury trial into the same

type of proceeding, wherein a single expert -- whose expertise is really just in the case at hand -- can serve as proof of the prosecution's entire case. To prevent this danger, the district court must limit the officer's testimony in three important ways. First, expert testimony is proper only if a typical juror would be unable to fully understand without expert assistance. See Fed. R. Evid. 702 advisory committee's notes to the 1972 proposed rule ("Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier . . . . [The test is] 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without [the expert testimony]'" (quoting Mason Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 418 (1952))); United States v. Montas, 41 F.3d 775, 784 (1st Cir. 1994)(disapproving of an expert's answer to the question why smugglers would use false names -- "'[w]ell that's obvious . . . to avoid being caught'" -- because it was "well within the bounds of a jury's ordinary experience"); United States v. Amuso, 21 F.3d at 1263 ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); United States v. Rahm, 993 F.2d 1405, 1413 (9th Cir. 1993)(precluding expert testimony on "areas believed to be within the jurors' common understanding"). Second, the expert must be able to point to a foundation for his or her expertise that rests principally outside of the facts of the case being tried. See Fed. R. Evid. 702(d) (requiring that "the expert has reliably applied the principles and methods to the facts of the case"); Mejia, 545 F.3d at 193 (holding that it is improper for an expert to "'interpret[] ambiguous slang terms' based on knowledge gained through involvement in the case, rather than by reference to the 'fixed meaning' of those terms" (alteration in original)(quoting United States v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2002))). The officer cannot develop "expertise" from investigating a case -- e.g., that

when members of an organization refer to "haircuts" on the telephone, they are talking about drug deals -- only to "apply" that supposed expertise at trial to prove the very same purported facts -- that the organization's members were referring to drug deals when they used the term "haircuts" in wiretapped conversations -- from which the officer derived the expertise. Using expert testimony in this circular fashion is misleading to the jury; the district court is, in effect, vouching for a fact witness' conclusions -- and counsel's arguments -- about what the term "haircut" means, by branding the witness an expert and thus suggesting that the witness' process for determining the term's meaning transcends the case at hand. Third, if a witness testifies as both an expert witness and a fact witness, the district court should demarcate for the jury what portions of the testimony are expert opinion[13] and what portions are fact testimony. See United States v. Lopez-Medina, 461 F.3d 724, 745 (6th Cir. 2006)("Because there was no cautionary jury instruction regarding the agents' dual witness roles nor a clear demarcation between their fact testimony and expert opinion testimony, we conclude that the district court committed an error that was plain or obvious in permitting the dual-role testimony.").

A second danger inherent in law enforcement officers' expert testimony is common to all situations where a witness' expertise is based on experience, rather than on scientific or technical

---

[13]The Court, in an attempt never to put its thumb on the scales or its imprimatur on a particular witness, tries not to use the word "expert witness" in front of the jury. Instead, when an expert witness' proponent asks the Court to accept the witness as an expert, the Court simply says that it will allow the witness to offer opinion testimony in certain areas. See United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1235 ("[T]he Court will not certify McNutt as an expert witness in the jury's presence, and the jury instructions will not refer to him as an expert.").

At least one court, in its attempt to reduce a law enforcement officer's sway on the jury, refused to allow the United States to refer to its expert witness as an "expert" in front of the jury, instead opting for the term "opinion witness." United States v. Thomas, 797 F. Supp. 19, 24 (D.D.C. 1992)(Richey, J.). The Court would not be as inclined to hamstring the United States, particularly in its closing arguments, as it would to simply be cautious about its own words.

principles.  It is easy for an experience-based expert witness to pass off suspicion, speculation, and intuition as real expertise.  <u>See</u> Joelle Anne Moreno, <u>What Happens When Dirty Harry Becomes an (Expert) Witness for the Prosecution?</u>, 79 Tul. L. Rev. 1, 30 (2004)("When an expert opinion is based on personal experience, opinions and conclusions derived from this experience are often personal, idiosyncratic, and subjective. . . .  '[T]he practical result is that the [experience-based expert] witness is immunized against effective cross-examination.'"  (footnote omitted)(quoting David L. Faigman, David H. Kaye, Michael J. Saks & Joseph Sanders, Science in the Law: Forensic Science Issues 16, 16 (2002)).  To prevent this danger, the district court must vigilantly apply the rule 702 reliability standard to each opinion or assertion to which the defendant objects and, again, ensure that facts outside of the case at hand back the witness' expertise.  <u>See</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (applying the rule 702 reliability standard to nonscientific expert testimony).  Although expert witnesses generally need not disclose the bases of their assertions or opinions as they give them at trial, <u>see</u> Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion -- and give the reasons for it -- without first testifying to the underlying facts or data."), -- pretrial, at the <u>Daubert</u> stage, an expert's obligation to show his or her work by establishing legitimate bases for the testimony may be higher when the expertise is of an experiential nature, <u>see</u> <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. at 146 (stating that district courts should not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"); <u>Erickson v. Baxter Healthcare, Inc.</u>, 131 F. Supp. 2d 995, 1000 (N.D. Ill. 2001)(Bucklo, J.)("More than bald assertions of opinion without any support are required; this is no more than any rational person would require. . . .  It would be unacceptable to cite no sources for statistical evidence in a scholarly work, and it is likewise unacceptable in an expert disclosure"

(footnote omitted).). Cf. Olander v. Bucyrus-Erie Co., 187 F.3d 599, 608 (7th Cir. 1999)("[O]ne bald assertion is as good as another . . . .").

A third danger is that stray facts and background information are often more damaging in the context of law enforcement testimony than with other expert testimony. See Fed. R. Evid. 403. A forensic accountant off-handedly mentioning that an organization's practice of maintaining a bank account in the Cayman Islands is per se suspicious may be somewhat damaging, but a law enforcement officer testifying about how the defendant rose to his position within an organization by supporting the murder of the organization's former leader is likely to be damning. This observation is not so much a separate danger as it is a recognition that minor errors in admitting expert testimony that should have been excluded -- errors that can happen in a matter of seconds in the courtroom -- can render an entire trial unfair.

A fourth danger is that law enforcement experts who were also involved in the case's investigation --- the most dangerous kind -- will often attempt to use profile evidence to bolster their conclusions about the defendant. "[A] profile is simply an investigative technique. It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity." United States v. Robinson, 978 F.2d at 1563. "A more tailored definition was offered in Florida v. Royer, 460 U.S. 491, 493 (1983), where 'drug courier profile' was described as an abstract of characteristics found to be typical of persons transporting illegal drugs." United States v. Robinson, 978 F.2d at 1563 (internal quotation marks omitted). Although most "[c]ourts have condemned the use of profiles as substantive evidence of guilt," the Tenth Circuit has been consistently more permissive than most other Courts of Appeals in allowing such evidence. United States v. Robinson, 978 F.2d at 1563. In the first of its two major profile-evidence cases, the Tenth Circuit wrote:

> Rather than focusing our inquiry upon defining and classifying evidence into categories of profile or non-profile, we believe the better approach is to commence our inquiry with an examination of the applicable rules of evidence. Fed. R. Evid. 702 instructs us to admit specialized knowledge if it will assist the trier of fact in understanding the evidence. Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject.

United States v. McDonald, 933 F.2d at 1563. The Tenth Circuit continued this approach -- effectively telling district courts not to worry whether a given piece of evidence is profile evidence -- through its second major profile-evidence case, and it remains unclear today whether and when "profile evidence" -- if a given piece of evidence is agreed to be just that -- is admissible in the Tenth Circuit. "In McDonald, we 'reserv[ed] the question of whether expert testimony regarding profiles is -- by itself -- substantive proof of crime . . . .' We again decline to decide that matter, both because this was not evidence of a profile under the McDonald definition and because the expertise of this particular witness was necessary." United States v. Robinson, 978 F.2d at 1564 (omission in original)(quoting McDonald, 933 F. 3d at 1523). Although the Court does not allow the United States to use the term "profile" in front of the jury, it also has not excluded evidence or curbed testimony on the ground that it would constitute impermissible profile evidence. United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1251 ("The United States should instruct [its witness], however, not to use the word profile to avoid the issue of profile evidence such that the jury would think about that issue."). See United States v. Mirabal, No. CR 09-3207 JB, 2010 WL 3894137, at *6-7 (D.N.M. July 31, 2010)(Browning, J.).

A fifth danger is that the United States will use the expert witness to circumvent the rules of evidence. An expert witness may rely upon any

> facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of

> facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703. "The expert may not, however, simply transmit . . . hearsay [or other inadmissible evidence] to the jury." Mejia, 545 F.3d at 197. This danger always exists with regard to expert witnesses, but it is especially great with law enforcement expert testimony, because -- as the Court has already mentioned -- the inadmissible facts on which law enforcement experts rely are often far more prejudicial to the defendant than those on which scientific and technical experts rely.

Sixth, and finally, there is something qualitatively different about law enforcement expertise from other forms of expertise that makes the Court uncomfortable. When an expert testifies about DNA left at a crime scene or an organization's bookkeeping, he or she does so in recognition of the fact that most jurors are inexpert in matters of biochemistry or forensic accounting, and to aid them in understanding such evidence and making determinations well shy of the final determination of the defendant's guilt or innocence. Law enforcement officers, on the other hand, are experts in whodunit, and there is a danger that a jury will perceive their area of expertise as solving crimes, and determining guilt or innocence. Juries -- or at least individual jurors -- are inexpert in making these determinations just as surely as they are in biochemistry and forensic accounting, but the Constitution nonetheless consciously vests the power to make these findings in the jury. See U.S. Const. art. III, § 2; id. amend. VI. Expert testimony by law enforcement officers can encroach not only on the jury's role, but on the role of counsel, as well. When the expert opines on the basis of "expertise" rooted in the facts of the case being tried, it is effectively arguing the case as a mouthpiece for counsel. It is inappropriate for an expert witness to bolster the credibility of another witness, and the Court finds this use of law enforcement expert

testimony -- which effectively serves to bolster counsel's arguments about how the jury should interpret the case's facts -- reminiscent of, and analogous to, credibility bolstering.

Even if these dangers do not render a given opinion or piece of testimony per se inadmissible under rule 702, they contribute to its unfair prejudicial value, which the district court may determine substantially outweighs any probative value it might have. See United States v. Fosher, 590 F.2d 381, 383 (1st Cir. 1979)("Quite apart from questions of limited relevance and reliability, . . . the proffered expert testimony would create a substantial danger of undue prejudice and confusion because of its aura of special reliability and trustworthiness.").

## EXPERT TESTIMONY ON ULTIMATE ISSUES

Rule 704 of the Federal Rules of Evidence states:

**(a) In General -- Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.

**(b) Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

Fed. R. Evid. 704. "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact." Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LAM, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.). "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury." Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12 (6th ed. 2006 update)). The Federal Rules of Evidence reflect that the ultimate-issue rule has been abolished. See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998). Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those that rule 704(b) expressed, regarding testimony on

ultimate issues.  More specifically, the Tenth Circuit has stated: "[A]n expert may not state legal conclusions drawn by applying the law to the facts."  <u>A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cty.</u>, 936 F.2d 472, 476 (10th Cir. 1991).

"Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state." <u>United States v. Ganadonegro</u>, No. CR 09-0312 JB, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing <u>United States v. Torres</u>, 53 F.3d 1129, 1141-42 (10th Cir. 1995)).  The restrictions in rule 704(b) do not apply to lay witnesses, <u>see</u> <u>United States v. Goodman</u>, 633 F.3d 963, 968 (10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier of fact to satisfy rule 701, <u>see</u> Fed. R. Evid. 701(b).  "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." <u>United States v. Barile</u>, 286 F.3d 749, 759-60 (4th Cir. 2002).  Pursuant to rule 704, it is the Court's task "to distinguish [helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a legal conclusion."  <u>United States v. Perkins</u>, 470 F.3d 150, 158 (4th Cir. 2006)(internal quotation marks omitted)(quoting <u>United States v. Barile</u>, 286 F.3d at 760).  In making that determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning.  <u>See</u> <u>United States v. Perkins</u>, 470 F.3d at 158.  The Court has addressed this issue in various contexts.  <u>See</u>, <u>e.g.</u>, <u>Sec'y & Exch. Comm'n v. Goldstone</u>, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *1, *44 (D.N.M. May 10, 2016)(Browning, J.)(internal quotation marks omitted)(prohibiting, in a case involving a Form 10-K's allegedly "fraudulent misrepresentations

and omissions," expert testimony on whether the defendants' actions were "reasonable" or "certain information" disclosed was "material" and distinguishing the case from Tenth Circuit decisions in which "[t]he issues . . . were far simpler and subject to easy determination by a single expert . . . ."); <u>United States v. Rodella</u>, 2014 WL 6634310, at *29 (rejecting expert testimony as on an ultimate issue when the United States introduced the expert to testify to whether an officer "acted reasonably or violated the Constitution"); <u>United States v. Gould</u>, No. CR 03-2274 JB, 2007 WL 1302596, at *4 (D.N.M. March 17, 2007)(Browning, J.)("The Tenth Circuit has indicated in recent opinions that, in the 42 U.S.C. § 1983 context, the jury cannot use law enforcement policies and standards to inform the debate whether a civil rights violation has occurred" (citing <u>Tanberg v. Sholtis</u>, 401 F.3d 1151, 1163-64 (10th Cir. 2005); <u>Marquez v. City of Albuquerque</u>, 399 F.3d 1216, 1222 (10th Cir. 2005); <u>Chamberlin v. City of Albuquerque</u>, No. CIV 02-0603, 2005 WL 2313527 (D.N.M. July 31, 2005)(Browning, J.))).

<b><u>LAW REGARDING THE CONFRONTATION CLAUSE</u></b>

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Tenth Circuit "has determined the Confrontation Clause does not apply at noncapital sentencing proceedings under the Guidelines." <u>United States v. Phillips</u>, 165 F. App'x 677, 681 (10th Cir. 2006)(unpublished)(cited in <u>United States v. Mata</u>, No. CR 05-2046 JB, 2006 WL 4079127, at *10 (D.N.M. May 2, 2006)(Browning, J.)). In <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), the Supreme Court held that, consistent with the Sixth Amendment, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-

examine." Davis v. Washington, 541 U.S. 36, 59 (2004). In Davis v. Washington, 547 U.S. 813

(2006), the Supreme Court further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation
> under circumstances objectively indicating that the primary purpose of the
> interrogation is to enable police assistance to meet an ongoing emergency. They
> are testimonial when the circumstances objectively indicate that there is no such
> ongoing emergency, and that the primary purpose of the interrogation is to establish
> or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822. The Tenth Circuit has restated this rule, defining a testimonial statement as "a

'formal declaration made by the declarant that, when objectively considered, indicates' that the

'primary purpose of the [statement is] to establish or prove past events potentially relevant to later

criminal prosecution.'" United States v. Morgan, 748 F.3d 1024, 1038 (10th Cir. 2014)(alteration

in original)(quoting United States v. Smalls, 605 F.3d 765, 777-78 (10th Cir. 2010)). Accord

United States v. Chaco, 801 F. Supp. 2d 1200, 1207-10 (D.N.M. 2011)(Browning, J.)(discussing

developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial

statement).[14]

---

[14]In United States v. Chaco, the Court explained:

> The Tenth Circuit has stated that a critical element in determining whether a
> statement is testimonial or non-testimonial "centers on the reasonable expectations
> of the declarant." United States v. Summers, 414 F.3d 1287, 1302 (10th Cir. 2005).
> The Tenth Circuit has held that "a statement is testimonial if a reasonable person in
> the position of the declarant would objectively foresee that his statement might be
> used in the investigation or prosecution of a crime." United States v. Townley, 472
> F.3d 1267, 1272 (10th Cir. 2007)(quoting United States v. Summers, 414 F.3d at
> 1302). Other Circuit Courts of Appeal are in accord. See United States v. Townley,
> 472 F.3d at 1272 (citing United States v. Hinton, 423 F.3d 355, 360 (3d Cir. 2005);
> United States v. Cromer, 389 F.3d 662, 675 (6th Cir. 2004); United States v. Saget,
> 377 F.3d 223, 229 (2d Cir. 2004)). The Tenth Circuit in United States v. Smalls
> called into question some aspects of the definition of testimonial that it set down in
> United States v. Summers. See United States v. Smalls, 605 F.3d at 777 ("Upon
> close inspection, Summers' definition of 'testimonial' appears somewhat in tension

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Supreme Court addressed whether the admission of an affidavit by a forensic chemist, who swore that the substance which the police seized from the defendant was cocaine of a certain amount, violated the Confrontation Clause. See 557 U.S. at 307. The Supreme Court first concluded that such affidavits were testimonial, because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and because, under Massachusetts law, the affidavit's sole purpose was to provide prima facie evidence of the

---

with Davis[ v. Washington, 547 U.S. 813 (2006)]' strictures, and perhaps overly broad . . . ."). Specifically, the Tenth Circuit stated that a testimonial statement must be made in a "formal" context, although they were not specific about what that might mean. See United States v. Smalls, 605 F.3d at 777-78. Next, the Tenth Circuit specified that the United States v. Summers articulation ignored the statement's "primary purpose," and focused instead on the foreseeability to the declarant of the purposes to which the statement "might" be put. United States v. Smalls, 605 F.3d at 777-78. With those two clarifications, it declined to restate a precise definition of a testimonial statement, instead setting forth two proposed definitions, either one of which it might adopt if the issue were put directly before it:

> [W]e might today formulate a definition of a testimonial statement which reads: a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution. Or, to better conform to the current state of Tenth Circuit precedent, we might say: A formal statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime.

United States v. Smalls, 605 F.3d at 778 (proffering these potential tests, but holding "we need not now . . . . tender a definitive definition of 'testimonial,' because Cook's statement is nontestimonial regardless of which of the foregoing definitions we apply").

United States v. Chaco, 801 F. Supp. 2d at 1209-10.

content of the substance seized. 557 U.S. at 310. The Supreme Court then used the affidavit introduced by the prosecution to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine." At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed. While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs." At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320. Because there was no opportunity to cross-examine on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause. See 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error"). The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Bullcoming v. New Mexico, 564 U.S. 647, 661 (2011)("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa'" (quoting Melendez-Diaz, 557 U.S. at 310 n.6).). See United States v. Harry, No. CR 10-1915 JB, 2014 WL 1950409, at *13 (D.N.M. May 7, 2014)(Browning, J.)(discussing the Confrontation Clause, but finding no violation where statement was not testimonial).

Except in rare cases, the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face violates a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness.  See United States v. Sandoval, No. CR 04-2362 JB, 2006 WL 1228953, at *7-9 (D.N.M. March 7, 2006)(Browning, J.).  In Maryland v. Craig, 497 U.S. 836 (1990) -- which the Supreme Court decided before Crawford v. Washington -- the Supreme Court rejected a Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child molestation case, under certain circumstances, to testify via a one-way closedclosed-circuit television, which did not allow the witness to view the defendant.  See Maryland v. Craig, 497 U.S. at 860.  While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court in Maryland v. Craig recognized that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." 497 U.S. at 845.[15]

The Supreme Court in Maryland v. Craig recognizes that the context of an adversary proceeding before the trier of fact involves "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor by the

---

[15]The Supreme Court has since distanced itself from this holding that the purpose of the Confrontation Clause is to ensure the reliability of evidence.  See Bullcoming v. New Mexico, 564 U.S. at 652 ("The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist."); Crawford v. Washington, 541 U.S. at 61 ("To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner . . . .").

trier of fact" that "is the norm of Anglo-American criminal proceedings." 497 U.S. at 846. The Supreme Court in Maryland v. Craig also acknowledges the peculiar power of face-to-face confrontation in that "face-to-face confrontation enhances the accuracy of fact finding by reducing the risk that a witness will wrongfully implicate an innocent person," 497 U.S. at 846 (citing Coy v. Iowa, 487 U.S. 1012, 1019-20 (1988)), and affirms that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,'" Maryland v. Craig, 497 U.S. at 847 (quoting California v. Green, 399 U.S. 149, 157 (1970)).

The Supreme Court explains in Maryland v. Craig that the Confrontation Clause "reflects a preference for face-to-face confrontation at trial," but that the preference "must occasionally give way to considerations of public policy and the necessities of the case." 497 U.S. at 849 (internal quotation marks omitted). The Supreme Court emphasizes that the preference for face-to-face confrontation is strong, and that a defendant's Sixth Amendment confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." 497 U.S. at 850.

While the issue is decidedly less clear, a violation of a defendant's Confrontation Clause rights does not occur when the defendant calls by videoconference or telephonically one of his or her own witnesses who is aligned with him. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ."). Cf. United States v. Olguin, 643 F.3d 384, 392 (5th Cir. 2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying against him, not against others."). The need for "adversariness" is not present when the witness is aligned with the defendant. Maryland v. Craig, 497 U.S. at 845. The Supreme Court spoke in Crawford v. Washington about

the need for the defendant to have "an adequate opportunity to cross-examine" a witness to satisfy the Confrontation Clause, a need which is not present when the witness is aligned with the defendant. 541 U.S. at 58. The Federal Rules of Evidence, for example, generally do not permit a party to ask leading questions -- a key tool of cross examination -- of a witness aligned with the party calling the witness. See Fed. R. Evid. 611(c).[16] A defendant also waives a Confrontation Clause challenge by calling his own witness by videoconference or telephonically. See United States v. Lopez-Medina, 596 F.3d 716, 730-34 (10th Cir. 2010)("Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause. The parties do not argue Crawford changed this rule.").

In 1969, the Supreme Court recognized that a defendant may waive his Confrontation Clause rights and that defendants commonly do so when pleading guilty. See Boykin v. Alabama, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial . . . . Third, is the right to confront one's accusers."). The Tenth Circuit recognizes that, both before and after the Supreme Court's decision in Crawford v. Washington, a defendant may knowingly waive his Confrontation Clause rights at trial. See United States v. Lopez-Medina, 596 F.3d at 730-34 (recognizing that Confrontation Clause rights may be waived at trial "at least where there is an explicit waiver"). Specifically, the Tenth Circuit states: "Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause. The parties do not argue Crawford changed

---

[16]Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness' testimony. Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed. R. Evid. 611(c).

this rule." United States v. Lopez-Medina, 596 F.3d at 731 (citations omitted). The Tenth Circuit

has held in prior cases that a defendant's counsel can stipulate to the admissibility of evidence that

would otherwise violate the Confrontation Clause if doing so "was a matter of prudent trial

strategy." Hawkins v. Hannigan, 185 F.3d 1146, 1155 (10th Cir. 1999). The United States Court

of Appeals for the Sixth Circuit has recognized that such a waiver can be permissible in the context

of the prosecution admitting a videotaped deposition of one of its witnesses. See Earhart v.

Konteh, 589 F.3d 337, 344 (6th Cir. 2009). The Sixth Circuit in that case relied on one of its prior

decisions where it had permitted such a waiver:

> The State relies upon our holding in Bailey v. Mitchell, 271 F.3d 652 (6th
> Cir. 2001), to argue that Earhart waived his right to contest the admission of the
> videotape deposition. In Bailey, we held that a criminal defendant waived his right
> to confrontation by entering into a quid pro quo agreement with a state prosecutor.
> Id. at 657. The petitioner in Bailey had agreed to allow the State to admit the
> videotape deposition if the prosecutor would consent to the defendant's motion for
> a continuance. Id. Importantly, the Ohio state courts found as a factual matter that
> Bailey had made an explicit deal with the prosecutor for the admission of the
> videotape. Id.

Earhart v. Konteh, 589 F.3d at 344. Notably, the Tenth Circuit's case in United States v. Lopez-

Medina involves an oral waiver on the record in open court. See 596 F.3d at 731 ("It is clear from

this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his

client's) confrontation right through his questioning of Johnson.").

In United States v. Sandoval, the Court considered the Confrontation Clause in the context

of a minor victim and her alleged sexual attacker, as well as a statute permitting such testimony

over closed-circuit television. See 2006 WL 1228953, at *10-13. The Court concluded that

"[t]wo-Way closed-circuit television testimony" would be appropriate in that case, "because the

introduction of testimony in this manner" did not "violate[] the Confrontation Clause of the Sixth

Amendment." 2006 WL 1228953, at *10. Given the accusations' nature and the case's unique

circumstances, the Court allowed closed-circuit television testimony. <u>See</u> 2006 WL 1228953, at

*12. The Court explained:

> Jane Doe will suffer emotional trauma if forced to testify in open court, in the same courtroom, with the person who allegedly abused her, and will thus be unable to testify. Jane Doe will also be unable to testify because of her fear of her father -- Dr. Kern's opinion does not rest on Jane Doe's ability to testify in a court room setting generally, but is based upon the fear of her father. The Court had an opportunity to examine Dr. Kern's findings at a hearing before trial and to make specific findings to satisfy the factors set forth in <u>Maryland v. Craig</u> and § 3509. The Court will best protect Jane Doe's welfare if it allows her to testify by two-way closed circuit television, and Sandoval's Confrontation Clause rights will not be violated.

2006 WL 1228953, at *12.

## <u>LAW REGARDING RULE 401 OF THE FEDERAL RULES OF EVIDENCE</u>

Under Rule 401:

Evidence is relevant if:

**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and

**(b)** the fact is of consequence in determining the action.

Fed. R. Evid. 401. "The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence." <u>Train v. City of Albuquerque</u>, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402 & 403). "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." <u>United States v. Gutierrez-Castro</u>, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")). "The standard for relevancy is

particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). Rule 801(c) of the Federal Rules of Evidence provides:  "'Hearsay' means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination."  United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999).  A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness.  See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay.  If admitted for impeachment purposes, however, it is not hearsay.").

Hearsay is generally unreliable and untrustworthy.  See Chambers v. Mississippi, 410 U.S. 284, 288 (1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability); United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible as evidence because it is considered unreliable." (citing Williamson v. United States,

512 U.S. 594, 598 (1994)); United States v. Console, 13 F.3d 641, 657-58 (3d. Cir. 1993)(stating hearsay is "inherently untrustworthy" because of the lack of an oath, presence in court, and cross examination (quoting United States v. Pelullo, 964 F.2d 193, 203 (3rd Cir. 1992)). Testimonial proof is necessarily based upon the human senses, which can be unreliable. See 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (J. McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence"). The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination. See Weinstein's Federal Evidence § 802.02[2][a], at 802-5. It is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable. See Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7. Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination. See, e.g., United States v. Console, 13 F.3d at 657-58.

## LAW REGARDING GANG EXPERTS

"Numerous . . . courts have admitted expert testimony about street gangs, where such evidence is sufficiently relevant." 7 Jones on Evidence § 53:119. See, e.g., United States v. Rios, 830 F.3d 403, 415 (6th Cir. 2016), cert. denied sub nom. Casillas v. United States, 137 S. Ct. 1120 (2017), and cert. denied, 138 S. Ct. 2701 (2018); United States v. Garcia, 793 F.3d at 1213; United States v. Escobar, 462 F. App'x 58, 61-62 (2d Cir. 2012)(unpublished); United States v. Mejia, 545 F.3d at 194-95. For example, the Tenth Circuit has held gang expert testimony admissible in Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1926(d), ("RICO") and VICAR cases. See United States v. Garcia, 793 F.3d at 1212-13 ("We have long recognized the usefulness of such testimony 'because the average juror is often innocent of the ways of the criminal underworld.'" (quoting United States v. Vann, 776 F.3d 746, 758 (10th Cir. 2015)); United States

v. Kamahele, 748 F.3d at 998-99 (concluding that gang expert evidence on a gang's "distinctive traits" could be helpful to a jury). According to the Tenth Circuit, a district court could, for instance, conclude that an officer testifying based on years of law enforcement experience and relevant schooling, and drawing information from multiple sources, satisfies rule 702's reliability requirements. See United States v. Kamahele, 748 F.3d at 999. See also United States v. Thomas, 490 F. App'x 514, 520 (4th Cir. 2012)(unpublished)(concluding that an expert opinion "related to the history and organization of the Bloods gang, how TTP [(a subset of the Bloods gang)] related to the overall gang hierarchy, and gang symbology and colloquialisms" was based on sufficient qualifications when the expert had ten years of experience as a police officer, three as a detective in a gang section, received training and classes on gangs, conducted field interviews and surveillance on gangs, and taught on gangs at a local college).

Gang expert testimony likely contravenes rule 702's relevance requirement when it focuses narrowly on the specific gang before the court and that gang's actions, particularly its crimes, because a jury can understand such information without assistance. See United States v. Rios, 830 F.3d at 415-16; United States v. Escobar, 462 F. App'x at 61-62; Mejia, 545 F.3d at 194-95. In Mejia, the Second Circuit reasons that general testimony places the expert in the role of providing expertise rather than summarizing facts:

> If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

545 F.3d at 190. The Second Circuit continues:

When the Government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense.

Mejia, 545 F.3d at 191 (citing United States v. Nersesian, 824 F.2d 1294, 1308 (2d Cir. 1987)). In

Mejia, the Second Circuit held inadmissible the expert's testimony

that the FBI gang task force had seized "[p]robably between 15 and 25" firearms, as well as ammunition, from MS-13 members; his statement that MS-13 members on Long Island had been arrested for dealing narcotics; and his statement that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial.

545 F.3d at 194-95 (citations omitted). In United States v. Escobar, the Second Circuit similarly

rejected evidence that a gang was "involved in narcotics trafficking, auto theft, assaults, murders,

robberies," and

that members of Neta could enhance their status within the gang by "committing crimes on behalf of the gang, whether it be dealing narcotics or stealing cars or committing assaults or procuring weapons or anything of that nature," including murder, . . . that Neta members who violated the gang's rules were disciplined for their infractions and that the punishment might be in the form of assault "or even sometimes murder," . . . and that encounters between members of Neta and MS-13 were generally violent . . . .

462 F. App'x at 61-62 (citations omitted). In United States v. Rios, the Sixth Circuit likewise

found inadmissible overly specific testimony about the gang around which the case revolved:

Haglund's testimony was largely either within the appropriate scope of gang-expert testimony, as it focused on the traditional areas in which a gang expert can testify -- history, organization, and unique terminology or symbols -- or involved him testifying to specific facts and events he personally witnessed. But Haglund strayed into testimony that is potentially problematic when he testified about specific criminal actions, including: (1) drug dealing by the Holland Latin Kings and, for example, his estimate that it was "a common thing for members to do" ; (2) how the Holland Latin Kings obtained and utilized "nation guns"; (3) his "experience" that the Holland Latin Kings commonly engage in violent disputes with other gangs; and (4) the use of violence against those who steal drugs from the Holland Latin Kings.

830 F.3d at 415-16 (citations omitted).  See, e.g., United States v. Castro, 411 F. App'x 415, 419

(2d Cir. 2011)("During trial, the special agent offered testimony about the structure of MS-13,

based upon his experience as a law enforcement officer.  We have considered and approved of

such testimony on numerous occasions" (citing United States v. Matera, 489 F.3d 115, 121 (2d

Cir. 2007); United States v. Feliciano, 223 F.3d 102, 109 (2d Cir. 2000); United States v. Locascio,

6 F.3d 924, 936 (2d Cir. 1993); United States v. Daly, 842 F.2d 1380 (2d Cir. 1988); United States

v. Levasseur, 816 F.2d 37, 45 (2d Cir. 1987); United States v. Borrone-Iglar, 468 F.2d 419, 421

(2d Cir. 1972)); Stephen A. Saltzburg, et. al, Federal Rules of Evidence Manual § 702.03[57][h],

at 702-240 (11th ed. 2015)(describing that, in United States v. Street, 548 618 (8th Cir. 2008), the

United States Court of Appeals for the Eighth Circuit held that a district court erred in admitting

testimony about "outlaw motorcycle gangs" when the defendant was not a member of the gang

and had "minimal connections" with the gang).

"[E]ven where the evidence is clearly relevant enough to overcome a claim of unfair

prejudice, a prosecutor and trial judge must take care not to cross the line between admissible

expert testimony and an impermissible summary witness." Jones on Evidence, supra.  See, e.g.,

United States v. Garcia, 793 F.3d at 1213 ("When the expert's testimony on such matters is not

based on personal knowledge but on testimonial hearsay, the testimony violates not only the rules

of evidence but also the Confrontation Clause."); United States v. Kamahele, 748 F.3d at 1000;

United States v. Thomas, 490 F. App'x at 521; Mejia, 545 F.3d at 197; Jack Nevin, Conviction,

Confrontation, and Crawford: Gang Expert Testimony as Testimonial Hearsay, 34 Seattle U. L.

Rev. 857, 880 (2010)(describing two areas in which a gang expert will testify based on testimonial

hearsay: (i) where he or she testifies about another's findings, and (ii) where he or she relies on

statements heard during his or her investigation).

> Federal Rule of Evidence 703 allows an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed"; and "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, *they need not be admissible for the opinion to be admitted*" (emphasis added).

United States v. Garcia, 793 F.3d at 1212 (emphasis in original)(quoting Fed. R. Evid. 703). An expert using hearsay evidence can use the evidence "to explain how he . . . formed some of his opinions and conclusions," but not offer it "to prove the truth of the assertions made by the out-of-court declarants." United States v. Affleck, 776 F.2d 1451, 1457 (10th Cir. 1985)(upholding the admission of expert testimony who used hearsay evidence in a 302-page report providing his conclusions about a parties' financial records). See, e.g., United States v. Posey, 647 F.2d 1048, 1051 (10th Cir. 1981)("Stevenson's testimony was in compliance with the rule. It is quite reasonable for a chemist to review another chemist's analysis when forming an opinion as to the veracity of the latter's test results."). An expert's testimony drawn from information that the expert compiled and analyzed does not violate prohibitions on hearsay or the Confrontation Clause; testimony repeating testimonial hearsay conversations violates both prohibitions. See, e.g., United States v. Garcia, 793 F.3d at 1212. The Tenth Circuit has "held that the Rule and the Clause can be reconciled if the expert exercises 'independent judgment' in assessing and using the hearsay (and other sources) to reach an expert opinion." United States v. Garcia, 793 F.3d at 1212 (quoting United States v. Kamahele, 748 F.3d at 1000, and citing United States v. Pablo, 696 F.3d 1280, 1288 (10th Cir. 2012)). See, e.g., Mejia, 545 F.3d at 197 ("The expert may not, however, simply transmit that hearsay to the jury" (citing United States v. Dukagjini, 326 F.3d at 54).). But see Saltzburg, et. al, supra (describing that, in United States v. Hankey, 203 F.3d 1160 (9th Cir. 2000), the Ninth Circuit concluded that an expert could rely on information "of the type normally obtained in his day-to-day police activities" to testify "that gang members who testify against one of their

own are typically beaten or killed by other members of their gang"). In <u>Meija</u>, the Second Circuit

listed the testimony it found inadmissible, because the expert recited hearsay:

> For example, his testimony that the Freeport clique initially funded itself through drug sales was based on "some of the articles that [he] had researched" and "[r]eports from law enforcement personnel." His testimony about MS-13's taxation of drug sales by non-members was based on a gang member having told him so during a custodial interrogation in this case. Alicea had learned about MS-13 treasury funds from about a dozen MS-13 members both in and out of custody. Additionally, Alicea discovered his information about MS-13's involvement in Mexican immigrant smuggling through "research on the Internet," and more specifically from a website containing a media report and an interview with a law enforcement official. And although Alicea did not identify the source of his statements about the number of firearms the Task Force had seized and the number of murders on Long Island that MS-13 members had committed, we cannot imagine any source for that information other than hearsay (likely consisting of police reports, Task Force meetings, conversations with other officers, or conversations with members of MS-13).

545 F.3d at 197. <u>See</u>, <u>e.g.</u>, <u>United States v. Escobar</u>, 462 F. App'x at 62 ("Second, Alicea

acknowledged that hearsay evidence -- including blogs, documents, and conversations with other

law enforcement officers -- was the source of much of his information. . . ." (citation omitted)).

Expert testimony "parrot[ing] 'out-of-court testimonial statements of cooperating

witnesses and confidential informants directly to the jury in the guise of expert opinion'" is

inadmissible, because it violates the Confrontation Clause. <u>United States v. Kamahele</u>, 748 F.3d

at 1000 (quoting <u>United States v. Johnson</u>, 587 F.3d 625, 635 (4th Cir. 2009)). "Introduction of

opinion testimony does not violate the Confrontation Clause when the experts rely on their

independent judgment -- even when this independent judgment is based on inadmissible evidence."

<u>United States v. Kamahele</u>, 748 F.3d at 1000 (citing <u>United States v. Johnson</u>, 587 F.3d at 634-

35). <u>See</u> <u>United States v. Garcia</u>, 793 F.3d at 1213 ("We have repeatedly cautioned about the

impropriety of permitting an 'expert' witness to 'parrot[]' testimonial hearsay" (alteration in

original)(quoting <u>United States v. Kamahele</u>, 748 F.3d at 1000).). Other Courts of Appeals have

reached similar decisions. See United States v. Rios, 830 F.3d at 418 ("[T]he Confrontation Clause is concerned with the use of experts to transmit particular testimonial statements, or their specific substance, to the jury."); United States v. Thomas, 490 F. App'x at 521 ("[W]hile testimonial hearsay raises special concerns because it implicates a defendant's constitutional rights, 'it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence'" (quoting United States v. Palacios, 677 F.3d 234, 243 (4th Cir. 2012).); Mejia, 545 F.3d at 198 ("When faced with the intersection of the Crawford rule and officer experts, we have determined that an officer expert's testimony violates Crawford "if [the expert] communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion." (footnote omitted)(quoting United States v. Lombardozzi, 491 F.3d 61, 72 (2d Cir. 2007)). In United States v. Kamahele, as the defendants did not indicate which statements the expert had "parroted," the Tenth Circuit concluded, "we are hard-pressed to find testimony by Officer Merino that simply parroted a testimonial fact learned from a particular interview." 748 F.3d at 1000. The Second Circuit in Mejia likewise could not determine how much information the expert drew from testimonial interrogations, but the Second Circuit noted: "We are at a loss in understanding how Alicea might have 'applied his expertise' to these statements before conveying them to the jury, such that he could have avoided 'convey[ing] the substance of [those] statements to the jury.'" 545 F.3d at 197-98 (quoting United States v. Lombardozzi, 491 F.3d at 73). See United States v. Lobo-Lopez, 468 F. App'x 186, 190-91 (4th Cir. 2012)(unpublished)(upholding a district court's decision to allow testimony when the "testimony indicates that [the expert] did not simply act as a conduit for transmitting testimonial hearsay, but instead offered statements that 'shed light on' the internal structure, rules,

terminology, and methods of MS-3." (citations omitted)); United States v. Castro, 411 F. App'x at 419 ("[T]he special agent's testimony was not based upon individual interviews with members of MS-13, but instead, on his experience with this organization and careful analysis of its operations."); United States v. Ayala, 601 F.3d 256, 275 (4th Cir. 2010)(upholding testimony where the experts "offered their independent judgments, most of which related to the gang's general nature as a violent organization and were not about the defendants in particular. These judgments resulted from many years of observing the gang, studying its methods, and speaking with its members."). But see United States v. Palacios, 677 F.3d at 243-44 (upholding a gang expert's admissibility when the expert "used . . . interviews, along with the other sources of his extensive knowledge about MS-13, to form an independent opinion about the gang's history, operation, structure, practices, and symbols").

In United States v. Garcia, Judge Hartz combines the analyses for rule 702 challenges with those for hearsay and Confrontation Clause challenges. See 793 F.3d at 1212-13. Judge Hartz notes that the Tenth Circuit has "held that the Rule and the Clause can be reconciled if the expert exercises 'independent judgment' in assessing and using the hearsay (and other sources) to reach an expert opinion." United States v. Garcia, 793 F.3d at 1212 (citing United States v. Kamahele, 748 F.3d at 1000; United States v. Pablo, 696 F.3d at 1288). According to Judge Hartz, "The independent-judgment requirement under the Confrontation Clause will generally be satisfied if the testimony by the expert satisfies the Rule 702 requirement that the expert testimony assist the jury because of the value of the witness's expertise." United States v. Garcia, 793 F.3d at 1212 (citing Williams v. Illinois, 567 U.S. 50, 80 (2012)). Because Judge Hartz identifies the "independent judgment" rule as resolving hearsay and Confrontation Clause concerns, and associates the "independent judgment" rule with rule 702's requirements, he gives priority in

analyzing proposed gang expert testimony to rule 702's requirements. Judge Hartz quotes extensively from Mejia:

> If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

> [Mejia, 545 F.3d] at 190. When an expert's bailiwick is only "internal expertise" of the investigation at hand and the expert does no more than "disgorge . . . factual knowledge to the jury," the expert is "no longer aiding the jury in its factfinding [but is] instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense." Id. at 191; cf. United States v. Dukagjini, 326 F.3d . . . 59 . . . (pre-Crawford opinion holding that expert testimony violated Confrontation Clause when gang expert "was not translating drug jargon, applying expert methodology, or relying on his general experience in law enforcement," but rather "was relying on his conversations with non-testifying witnesses and co-defendants").

United States v. Garcia, 793 F.3d at 1213-14. Combining concerns about usefulness to the jury and concerns about parroting testimonial hearsay, Judge Hartz writes: "[W]hen gang-expert testimony descends to a discussion of specific events recounted by others, the expert is merely adding 'unmerited credibility' to the sources . . . and summarizing evidence in a way that should be reserved for the government's closing argument." 793 F.3d at 1213. (quoting Mejia, 545 F.3d at 192)).[17] Applying the principles he articulates, Judge Hartz classifies as improper parroting and

---

[17]Although, in United States v. Kamaele, the Tenth Circuit emphasizes the general-specific distinction in differentiating its case from Mejia, the Tenth Circuit did so in response to the defendants' argument that Mejia controlled the decision and not as the rule for analyzing gang expert testimony. See 748 F.3d at 999 ("[T]he expert explained his testimony "not in terms of

as violative of the Confrontation Clause and hearsay rules testimony about specific gang activities, such as: (i) what made Gautemalans "attractive target[s]" to a particular gang's members, United States v. Garcia, 793 F.3d at 1214; (ii) what experience the officer had with Guatemalans losing substantial sums of money to that gang, see 793 F.3d at 1215; (iii) what status the defendants held within the gang, see 793 F.3d at 1215; (iv) what occurred in the gang's initiation rite, see 793 F.3d at 1215; and (v) information about a ledger recording members' payments to the gang, see 793 F.3d at 1215.

In determining whether gang expert testimony is admissible, "[a]n important consideration in distinguishing proper testimony from parroting is the generality or specificity of the expert testimony." United States v. Garcia, 793 F.3d at 1213. Testimony about specific information related to a gang is likely inadmissible. See United States v. Garcia, 793 F.3d at 1213-15. A court should avoid admitting internal information on the "investigation at hand," United States v. Garcia, 793 F.3d at 1213, because it conveys factual information to the jury and is indistinguishable from other inadmissible hearsay or evidence violating the Confrontation Clause, see United States v. Garcia, 793 F.3d at 1213-14. "Expert testimony about a gang's history, territory, colors, hand signs, graffiti use, naming practice, tattoos, structure, membership rules, and similar sociological evidence can assist the jury in understanding and evaluating evidence concerning the specific crimes charged." United States v. Garcia, 793 F.3d at 1213 (citing United States v. Archuleta, 737 F.3d 1287, 1294-95 (10th Cir. 2013); United States v. Robinson, 978 F.2d at 1561-63; United States v. Hartsfield, 976 F.2d 1349, 1352 (10th Cir. 1992); Mejia, 545 F.3d at 187). "But there is

specific crimes (as in Mejia), but in generalities to explain the context in which [the gang] operated.").

no sociological expertise in testifying to gang members' specific travels, specific uses of gang funds, or commission of specific crimes." United States v. Garcia, 793 F.3d at 1213.

## ANALYSIS

At the June 14, 2018, hearing, the Defendants proposed that the Gang Experts' testimony be limited according to the Court's order in <u>United States v. DeLeon</u> and proposed that the Gang Experts "can testify about how gangs operate in a generic sense, and in general they can testify that gangs identify themselves by tattoos; that gangs may use slang words in communication, but they cannot do any specific testimony about the SNM, and their particular tattoos . . . ." June 14 Tr. at 223:21-25 (Morrissey). The United States agreed to limit the Gang Experts according to the Defendants' suggestion. <u>See</u> June 14 Tr. at 226:17-18 (Beck). As the parties agreed to the limitations, the Court need not consider whether to require more specific notice about the Gang Experts from the United States or whether to require a <u>Daubert</u> hearing. The Court, as it indicated at that hearing, incorporates <u>United States v. DeLeon</u>'s limitations on gang experts into the present case. <u>See</u> June 14 Tr. at 225:20 (Court). "[T]he experts are not going to be able to really talk about the SNM . . . gang specifically. They can talk generally about gangs." Nov. 27 Tr. at 69:20-25 (Court). If the United States wants to introduce specific evidence about SNM tattoos or other specific evidence about SNM, the Court will "have a hearing," Nov. 27 Tr. at 70:8 (Court), and "listen to what the basis of [the Gang Experts'] opinion is, and then make balls and strikes calls on an individual basis," Nov. 27 Tr. at 70:9-11 (Court). The Court, thus, grants the Motion in part and denies it in part. Although the parties agreed to the Gang Experts' limitations, these limitations also follow Tenth Circuit caselaw and align with decisions by other Courts of Appeals.

Although the parties cannot state on what the Gang Experts will testify, pursuant to the parties' agreement, the Gang Experts may testify to gangs' operation generally -- that, for instance,

gang members may identify themselves with tattoos, use slang words to communicate, and advance their purposes through crime. The Gang Experts may not testify specifically to SNM's operations, crimes, purposes, tattoos, or vocabulary. When testifying as experts, the Gang Experts may not rely on hearsay from cooperators. Although the Gang Experts, in their capacity as lay witnesses, may testify to what they witnessed during relevant events, they may not do so as expert witnesses. If the United States desires the Gang Experts to testify on the Corrections Department, the Gang Experts may discuss how the Corrections Department identifies gang members but not who it believes belongs to SNM. Finally, the Gang Experts may not opine as to whether SNM is an enterprise or engaged in racketeering activity.

The Court looks to the Gang Memo. to develop guidelines for the information about which the Gang Experts might testify.[18] The Gang Experts may testify that "Gang ideologies exemplify intimidation, secrecy, and strong arm tactics," "exhibit the potential for disruptive, violent, and destructive activity, and are recognized by most corrections officials." Gang Memo. at 1. Such statements are general analyses of gangs' effects and beliefs. The Gang Experts likewise may explain that the Corrections Department developed a program to identify, monitor, and control gangs and their threats. See Gang Memo. at 1. Although the Gang Experts can explain the program, they cannot discuss how the Corrections Department used the program to identify SNM members or who the Corrections Department concluded were SNM members. The Court will allow the Gang Experts to speak to the factors driving gangs -- that prison gangs seek to develop

---

[18]Once the Court sanitizes, clips, and trims the Gang Experts' testimony, it becomes clearer that their testimony is not worth much value, if any. While they still pass the rule 702 bar -- they know something jurors who do not watch a lot of prison shows do not know -- the jurors will likely learn all of this information in the trial when the United States starts to prove the essentials elements of RICO and VICAR -- enterprise and racketeering activities.

power, to be a support group, to control drugs and, through the drugs, the prison, and to develop "[s]treet [c]red" through violent acts. Gang Memo. at 2. The Court also will likely allow the Gang Experts to describe the two categories of gangs -- "Security Threat Groups" and "Disruptive Groups," assuming that the Gang Experts use these terms as umbrellas under which the Gang Experts group multiple gangs. Gang Memo. at 2. If this assumption is true, the Gang Experts may describe that Security Threat Groups have a militaristic organization and Disruptive Groups are more democratic. See Gang Memo. at 2. If "Security Threat Group" is code for SNM and SNM is the only gang that the Corrections Department identifies as a Security Threat Group, the Court will not allow the Gang Experts to provide such specific testimony about SNM's governmental organization. Gang Memo. at 2. Likewise, if the Gang Experts are speaking about multiple gangs when they describe Security Threat Groups voting on an "Ilavero" and Disruptive Groups considering various gang members' opinions, they may provide such testimony at trial. Gang Memo. at 2. If the Gang Experts instead mean that SNM elects an "Ilavero," the Court will preclude such testimony. Gang Memo. at 2. Similarly, the Gang Experts may describe generally that several different gangs have and enforce their own rules, and that violating the rules leads to consequences like dissociation from the gang, murder, assault or group assault. See Gang Memo. at 2. The Gang Experts may even describe rules that are common across gangs -- like not informing on gang members, respecting yourself and others, or not backing down, but the Gang Experts may not state the information that they gleaned about SNM's rules in particular. See Gang Memo. at 2. The Court will draw similar lines to limit what the Gang Experts may say about communication between gang members and about gang members' tattoos. See Gang Memo. at 2-3. The Gang Experts may explain that gang members generally speak through code or sign language, that gangs refer to contraband messages as "kites or weelas," and that gang members

communicate through telephones, people with access to other institutional facilities, and recreation areas. Gang Memo. at 2-3. The Gang Experts may not, however, state that SNM uses particular signs, codes, or jargon, or that SNM developed specific means of communicating with members outside the institution. The Gang Experts also may testify that gang tattoos generally "include the name, initials, or symbols of the gang, and in some instances, could include the area to which the gang member belongs," Gang Memo. at 3, but the Gang Experts should avoid identifying the symbols and tattoo system that SNM uses. Further, if multiple Security Threat Groups exist and have similar initiation and membership rules, the Gang Experts may explain that potential members must have sponsors, should not have "bad charges" or have informed on other gang members, and must "spill blood" to enter the gang and die to leave the gang. Gang Memo. at 3. If the Gang Experts mean that SNM, and no other gang, follows these rules, the rules address specific facets of SNM, and the Court will preclude such testimony. The Court will enforce similar rules for the Gang Experts' information about Disruptive Gangs -- although the Court assumes that "Disruptive Gang" does not mean SNM. If the Gang Experts want to discuss the membership rules for Disruptive Gangs to provide an ethnographic-style overview of gangs within the institution, the Gang Experts may do so. The Gang Experts may describe that the Disruptive Gangs recruit based on geographic origin, do not require a sponsor, ask that gang members have no "bad charges" and not have informed on other gang members, and do not require that gang members "spill blood" to enter or die to leave. Gang Memo. at 3. The Gang Experts may also testify that multiple gangs -- both Security Threat Gangs and Disruptive Gangs -- require that their members perform activities, including and especially violent and drug-related activities for the gangs. See Gang Memo. at 3. The Court will not allow the Gang Experts to summarize or reference the

specific activities or crimes that SNM members performed or to suggest the crimes that SNM committed by listing examples of the activities that SNM asked its members to perform.

Although the United States conceded to the Defendants' proposal, the Court notes that its order at the November 27, 2017, hearing, in United States v. DeLeon, follows caselaw from the Tenth Circuit and other Courts of Appeals. The Court follows the Tenth Circuit's most recent opinion in United States v. Garcia in emphasizing the line between testimony on gangs generally, and testimony on SNM and its crimes particularly. 793 F.3d at 1213.

> [T]he experts are not going to be able to really talk about the SNM . . . gang specifically. They can talk generally about gangs. The fact that SNM comes out of their mouth as they talk about other gang [sic] I don't think is important, but they can't specifically talk about the SNM gang . . . .

Nov. 27 Tr. at 69:20-25 (Court). As reciting specific facts about and events involving the SNM and who the Corrections Department identifies as SNM members involves specific evidence that may be too helpful to the jury and supplant the jury's role as factfinder, United States v. Rio, 830 F.3d at 415-16; United States v. Escobar, 462 F. App'x at 61-62; United States v. Garcia, 793 F.3d at 1214-15; Mejia, 545 F.3d at 194-95, and, in reciting such facts, these "experts," likely draw on and recite facts gleaned from out-of-court sources, see United States v. Garcia, 793 F.3d at 1214-16 (describing specific facts to which the expert testified violated the Confrontation Clause and the prohibition against hearsay), the Gang Experts should avoid such specifics, and let the information come to the jury through fact witnesses if it comes in at all. The jury should be deciding who is an SNM member -- not relying on the Corrections Department -- although it may be that the Defendants, for tactical reasons, want the jury to know that the Corrections Department treated some corporators as SNM gang members. As Judge Hartz notes, "[a]n important consideration in distinguishing proper testimony from parroting is the generality or specificity of

the expert testimony." United States v. Garcia, 793 F.3d at 1213. "[W]hen gang-expert testimony descends to a discussion of specific events recounted by others, the expert is merely adding 'unmerited credibility' to the sources . . . and summarizing evidence in a way that should be reserved for the government's closing argument." United States v. Garcia, 793 F.3d at 1213. (quoting Mejia at 192)).[19] The Court trusts a jury to determine for itself the significance of many of SNM's activities, and the Court fears the Gang Experts becoming what the Second Circuit described in Mejia:

> If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

---

[19]In United States v. Kamahele, the Tenth Circuit likewise emphasizes the general-specific distinction in differentiating its case from Mejia. See United States v. Kamahele, 748 F.3d at 999. The Tenth Circuit stated:

> Officer Merino's testimony differs from the officer's testimony in *Mejia.* Unlike the *Mejia* expert, Officer Merino based his testimony on his accumulation of information from multiple sources, which he then filtered and analyzed based on his TCG [(Tongan Crips Gang)] expertise. *See* [Mejia, 545 F.3d] at 197 (noting that testimony "synthesi[zing] . . . various source materials" constituted proper expert testimony); *United States v. Johnson,* 587 F.3d 625, 636 (4th Cir. 2009)(distinguishing *Mejia* because the expert witnesses in *Johnson* were applying their expertise rather than simply passing "along an important testimonial fact . . . learned from a particular interview"). And in testifying about this analysis, Officer Merino described this progression in criminality not in terms of specific crimes (as in *Mejia),* but in generalities to explain the context in which TCG operated.

United States v. Kamahele, 748 F.3d at 999.

Mejia, 545 F.3d at 190.  For similar reasons, the Gang Experts should refrain from testifying on the ultimate issue for the jury -- whether SNM was an enterprise or engaged in racketeering activity.  See United States v. Dazey, 403 F.3d 1147, 1171 (10th Cir. 2005)("[A]n expert may not simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment."); Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150, 1204-05 (D.N.M. 2016)(Browning, J.)(prohibiting expert witness from testifying on the ultimate issue in a class action certification whether "common issues predominate"); Sec'y & Exch. Comm'n v. Goldstone, 2016 WL 3135651, at *1, *44 (internal quotation marks omitted)(prohibiting expert testimony on whether the defendants' actions were "reasonable" or "certain information" disclosed was "material"); United States v. Rodella, 2014 WL 6634310, at *29 (disallowing expert witness to testify on the ultimate issue whether police conduct was "reasonable").  The Gang Experts can, of course, use their expertise to synthesize information gleaned from hearsay conversations to present the jury with "sociological" evidence, United States v. Garcia, 793 F.3d at 1213, but they may not testify to facts gathered directly from cooperators' hearsay statements and parrot such statements to the jury, see, e.g., United States v. Garcia, 793 F.3d at 1212-13; United States v. Kamahele, 748 F.3d 1000.  Moreover, this prohibition on testimony specifically about SNM does not prevent the Gang Experts from using their personal knowledge to testify about events involving SNM. See, e.g., United States v. Martinez, 657 F.3d 811, 817 (9th Cir. 2011)(recognizing that a gang expert testified as an expert "on the Mexican Mafia's coded communications" and a lay witness "of some events"); United States v. Feliciano, 223 F.3d at 121 (recognizing that a gang expert testified as both an expert and a lay witness and that "[s]uch dual testimony is not objectionable in principle").

The line that the Court draws in admitting general testimony on gangs, and excluding testimony on specifics about SNM, differs from the line, based on Mejia and the Second Circuit line of cases, that the Honorable M. Christina Armijo, United States District Judge for the District of New Mexico drew in United States v. Dalley, No. CR 07-748 MCA, 2009 WL 10681855 (D.N.M. May 12, 2009)(Armijo, J.). Judge Armijo permitted the gang expert to testify on: (i) the Aryan Brotherhood's structure in New Mexico and Texas and changes in the Aryan Brotherhood's leadership; (ii) the Aryan Brotherhood's membership requirements; and (iii) "jargon, codes, or other specialized modes of communication" that the Aryan Brotherhood used. 2009 WL 10681855, at *4. Judge Armijo decided United States v. Dalley, however, before the Tenth Circuit decided United States v. Kamahele or United States v. Garcia. Particularly in light of United States v. Garcia, the Court does not see how the line that Judge Armijo drew can remain a valid delineation of the permissible scope of Gang Experts' testimony. Accordingly, given the Court's adherence to United States v. Garcia and the parties' agreement to the Gang Experts' limitations, the Court grants the Motion in part and denies it in part.

**IT IS ORDERED** that: (i) Anthony Cordova's Motion to Compel the Government to Comply with Rule 16 in Noting Its Intent to Rely on Gang Expert Witness Testimony, for a Daubert Hearing to Determine the Admissibility of Gang Expert Witnesses, Or, in the Alternative, to Exclude Testimony of Gang Expert Witnesses, filed April 5, 2018 (Doc. 561), is granted in part and denied in part; (ii) the United States need not provide further notice on its Gang Experts; (iii) the Court will not hold a Daubert hearing on the Gang Experts, and (iv) the Gang Experts may testify as experts about gangs generally but not about SNM and its activities specifically.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 USC § 515
Albuquerque, New Mexico

--and--

John C. Anderson
  United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

       *Attorneys for the Plaintiff*

Theresa M. Duncan
Duncan Earnest
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

       *Attorneys for Defendant Anthony Ray Baca*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

*Attorney for Defendant Manuel Jacob Armijo*

Louis E. Lopez, Jr.
El Paso, Texas

*Attorney for Defendant Frederico Munoz*

Donald F. Kochersberger, III
Business Law Southwest, LLC
Albuquerque, New Mexico

*Attorney for Defendant Sergio Loya Rodriguez*

Susan Burgess-Farrell
Barry G. Porter
Burgess & Porter Law
Albuquerque, New Mexico

*Attorneys for Defendant Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

--and--

R. Scott Reisch
Reisch Law Firm, LLC
Denver, Colorado

*Attorneys for Defendant Vincent Garduno*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

*Attorney for Defendant Mandel Lon Parker*

James Baiamonte
Albuquerque, New Mexico

--and--

Ahmad Assed
Ahmad Assed & Associates
Albuquerque, New Mexico

     *Attorneys for Defendant Daniel Archuleta*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

     *Attorneys for Defendant Daniel Sanchez*

Marcia A. Morrissey
Santa Monica, California

--and--

Gregory M. Acton
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Cordova*

Kari T. Morrissey
Law Office of Kari Morrissey
Albuquerque, New Mexico

Marshall J. Ray
Law Offices of Marshall J. Ray LLC
Albuquerque, New Mexico


David R. Evans
David R. Evans Law Offices
Los Angeles, California

*Attorneys for Defendant Richard Gallegos*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Laura E. Udall
Cooper & Udall, PC
Tucson, Arizona

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*