# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                       No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup";
CHRISTOPHER GARCIA; MANUEL
JACOB ARMIJO, a.k.a. "Big Jake";
FREDERICO MUNOZ, a.k.a. "Playboy";
SERGIO LOYA RODRIGUEZ, a.k.a
"Churro"; MANUEL BENITO, a.k.a.
"Panther"; VINCENT GARDUÑO, a.k.a.
"Fatal"; MANDEL LON PARKER, a.k.a.
"Chuco"; DANIEL ARCHULETA, a.k.a.
"Smurf"; DANIEL SANCHEZ, a.k.a.
"Dan Dan"; ANTHONY CORDOVA,
a.k.a. "Antone"; and ARTURO
ARNULFO GARCIA, a.k.a. "Shotgun,"

       Defendants.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Defendant Anthony Cordova's Motion

for New Trial, filed August 21, 2018 (Doc. 903)("Motion").  The primary issues are: (i) whether

the Court should grant Defendant Anthony Cordova ("A. Cordova") a new trial, because the Jury's

---

[1]In light of Defendant Anthony Cordova filing his Defendant Anthony Cordova's Motion for New Trial, filed August 21, 2018 (Doc. 903), as sealed, the Court will file this Memorandum Opinion and Order under seal, but order that the parties send to the Court any proposed redactions to the Memorandum Opinion and Order, if any are necessary to protect confidential information, within fourteen calendar days of the date that this Memorandum Opinion and Order is filed.  After fourteen calendar days, the Court will publicly file a redacted version of this Sealed Memorandum Opinion and Order.

verdict[2] entered against A. Cordova which A. Cordova alleges goes against the weight of the evidence, because of the alleged unreliability of several witnesses[3] -- Mario Montoya, Richard Gallegos, Billy Cordova, Steven Morales, and Federal Bureau of Investigation ("FBI") Special Agent Brian Acee; because the recorded conversation between Eric Duran, Defendant Chris Garcia, and Defendant Anthony Baca shows nothing more than that C. Garcia knew A. Cordova; because no physical evidence connects A. Cordova to the Dix murder; and because no evidence connects the Dix murder to the Syndicato de Nuevo Mexico ("SNM"); (ii) whether the Court should grant A. Cordova a new trial, because Plaintiff United States of America has not shown that the SNM engaged in racketeering acts or interstate commerce on or about the time of the Dix murder; (ii) whether the Court should grant A. Cordova a new trial for an alleged violation of the Fifth Amendment to the Constitution of the United States, because the United States commented during the United States' closing argument that, during a conversation at Central New Mexico Community College ("CNM")[4], A. Cordova remained silent in response to Acee's comments

---

[2]The Jury entered the verdict against A. Cordova on Count 2's charge of murdering Shane Dix in violation of the Violent Crimes in Aid of Racketeering Activity, 18 U.S.C. § 1959 ("VICAR"), and Count 3's charge of using and carrying a firearm in relation to the crime charged in Count 2, in violation of 18 U.S.C. §§ 924(c), (j)(1), respectively, using a firearm during a violent crime and using a firearm to cause a person's death, see Superseding Indictment at 54, filed March 9, 2017 (Doc. 372)("Indictment"); see also Verdict at 1-2, filed July 24, 2018 (Doc. 890).

[3]The allegedly unreliable witnesses are Mario Montoya, Richard Gallegos, Billy Cordova, Steven Morales, and Federal Bureau of Investigation ("FBI") Special Agent Brian Acee.

[4]"**Central New Mexico Community College** (**CNM**), formerly **Technical Vocational Institute (TVI)**, is a community college based in Albuquerque, New Mexico. Founded in 1964, CNM offers Associate degrees, professional certificates and training options." Central New Mexico Community College, Wikipedia, https://en.wikipedia.org/wiki/Central_New_Mexico_Community_College (last viewed March 12, 2019)(emphasis in Wikipedia).

about the SNM and M. Montoya (the "CNM conversation")[5]; (iii) whether the Court should grant

A. Cordova a new trial, because the United States allegedly violated rule 16 of the Federal Rules

of Criminal Procedure by not disclosing the CNM conversation's substance and by not disclosing,

---

[5]The United States commented on the following trial testimony:

CASTELLANO: Related to that, when you talked to the defendant about a month before you arrested him, was there anything from that conversation that also led to your decision to go forward with charges against Mr. Cordova?

ACEE: [A. Cordova] didn't deny it. There were a few things. That was the strongest. When I walked away, I was shocked. I said -- I was talking to the other agent and the two detectives. I'm, like, "He never denied it." He tried to put distance between himself and being an actual SNM member. He looked shocked when . . . I said, "You know we got Mario M. Montoya; right? Mario is with us." And I said, "Well, you wouldn't know that because that's not known yet, but Mario is working. And you're going to see." And I thought he didn't believe me. I was trying to convince him to work. But that was -- I'm sorry to interrupt, sir. That was -- yeah, I walked away thinking, man, we've stood out here and talked, and he's not saying, "Hey, you got the wrong guy. What are you talking about?" None of that.

And I thought he didn't believe me. I was trying to convince him to work. But that was -- I'm sorry to interrupt, sir. That was -- yeah, I walked away thinking, man, we've stood out here and talked, and he's not saying, "Hey, you got the wrong guy. What are you talking about?" None of that.

CASTELLANO: And just to be clear, so the jury knows, he also didn't say, "Yes, I was involved," either; right?

ACEE: Absolutely. And I hope I didn't represent 24 that. No, he did not.

CASTELLANO: I just wanted to make sure. Not only he didn't admit it, but he also didn't deny it?

ACEE: Correct.

Transcript of Brian Acee at 190:21-192:2 (taken July 11, 2018)(Acee), filed July 13, 2018 (Doc. 826).

until June 18, 2018, the Federal Bureau of Investigation 302 Report, filed August 21, 2018 (Doc. 903-9)("CNM 302 Report"); (iv) whether the Court should grant A. Cordova a new trial, because the United States allegedly violated Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), and Giglio v. United States, 405 U.S. 150 (1972)("Giglio"), by not disclosing the CNM conversation's substance and not revealing that Acee did not record the CNM conversation's full substance in the CNM 302 Report; and (v) whether the Court should grant A. Cordova a new trial for the United States' alleged prosecutorial errors in concealing from A. Cordova information about the CNM conversation, mischaracterizing at trial A. Cordova's silence, delivering a short closing argument and a long rebuttal, investigating the Dix murder in a manner not intended to ensure justice, and mischaracterizing evidence about M. Montoya and C. Garcia's November 29, 2015, conversation. The Court denies the Motion, because: (i) despite A. Cordova's contentions, the weight of the evidence supports the verdict; (ii) A. Cordova cannot use the Fifth Amendment to protect his silence in the CNM conversation, because A. Cordova did not invoke the right to silence during the conversation; (iv) the United States' late disclosure of the CNM 302 Report and its nondisclosure of Acee's comments regarding M. Montoya during the CNM conversation and of A. Cordova's silence in response to those comments violate rule 16, but the violations are harmless; (v) the United States' failure to disclose that Acee excluded from the CNM 302 Report his comments regarding M. Montoya during the CNM conversation and of A. Cordova's silence in response to those comments does not violate Brady and Giglio, because nondisclosure is not prejudicial; and (vi) the United States committed prosecutorial error by Acee's comments regarding M. Montoya during the CNM conversation and of A. Cordova's silence in response to those comments, and the United States did not commit prosecutorial error in characterizing

A. Cordova's silence, structuring its closing, investigating the Dix murder, or characterizing M. Montoya and C. Garcia's November 29, 2015, conversation, but all of the alleged errors are harmless.

## FACTUAL BACKGROUND

The Court recounts the factual background in its Memorandum Opinion and Order at 2-4, 2018 WL 5980443, at *1-2, filed November 14, 2018 (Doc. 932)("MOO"). The Court incorporates that recitation here.

> The Court takes its background facts from the Superseding Indictment, filed March 9, 2017 (Doc. 372)("Indictment"). The Court does not set forth these facts as findings or for their truth. The Court recognizes that the factual background is largely the Plaintiff United States of America's version of events and that the Defendants who have not pled guilty are all presumed innocent.

> This case deals with the crimes that the . . . SNM . . . allegedly committed through its members. See Indictment ¶¶ 1, 3, at 1-2. The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment ¶ 1, at 2. The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected interstate and foreign commerce." Indictment ¶ 2, at 2. The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2.

> The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Indictment ¶ 3, at 2. During the riot, thirty-three inmates were killed, and over 200 were injured. See Indictment ¶ 3, at 2. After the PNM riot, the SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment ¶ 4, at 2. The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for ["]table["]) of leaders who issue orders to subordinate gang members." Indictment ¶ 4, at 2-3. The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment ¶¶ 3, 5, at 2-3.

Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and the profit from narcotics trafficking. See Indictment ¶ 5, at 3. The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment ¶ 6, at 3. If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show its power. See Indictment ¶ 6, at 3. The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment ¶ 7, at 4. The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment ¶ 7, at 4. "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], homosexuals, or sex offenders." Indictment ¶ 8, at 4. To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and murder. See Indictment ¶¶ 6-8, at 3-4. The SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment ¶ 7, at 4. The SNM's recent activities in a conspiracy to murder high ranking New Mexico Corrections Department ["NM Corrections Department"] officials inspired the Federal Bureau of Investigation's [("FBI")] present investigation. See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

MOO at 2-4, 2018 WL 5980443, at *1 (alterations added).

## **PROCEDURAL BACKGROUND**

The FBI's SNM investigation resulted in this case and three other cases before the Court.

See United States v. DeLeon, No. CR 15-4268 ("DeLeon"); United States v. Varela, No. CR 15-4269; and United States v. Garcia, No. CR 15-4275. United States v. Varela and United States v. Garcia did not go to trial, but the Court held two trials in DeLeon. In the end, the Court held one four-defendant trial and one seven-defendant trial. Across the two trials, the juries found eight of the eleven DeLeon Defendants guilty of violating the Violent Crimes in Aid of Racketeering Activity, 18 U.S.C. § 1959 ("VICAR"), statute. See DeLeon, No. CR 15-4268, Jury Verdict at 1-3, filed March 12, 2018 (Doc. 1947); DeLeon, No. CR 15-4268, Jury Verdict at 1-5, filed May 25, 2018 (Doc. 2332).

On April 21, 2016, a Grand Jury returned the original indictment in this case. See Original Indictment at 1, filed April 21, 2016 (Doc. 2). On March 9, 2017, a Grand Jury returned the Indictment, which superseded the original indictment See Indictment at 1. Several DeLeon Defendants are charged in this case -- Baca, C. Garcia, Defendant Daniel Sanchez, and Defendant Arturo Arnulfo Garcia. Compare Indictment at 1, with DeLeon, No. CR 15-4268, Second Superseding Indictment at 1, filed March 9, 2017 (Doc. 947). Count 1 of the Indictment charges eleven Baca Defendants -- Baca, C. Garcia, Defendant Manuel Jacob Armijo, Defendant Frederico Munoz, Defendant Sergio Loya Rodriguez, Defendant Manuel Benito, Defendant Vincent Garduño, Defendant Mandel Lon Parker, Defendant Daniel Archuleta, D. Sanchez, and A. Garcia -- with engaging in a racketeering conspiracy contrary to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"). See Indictment at 8-9. Count 2 alleges that C. Garcia and A. Cordova committed murder on or about February 4, 2005, in violation of VICAR. See Indictment at 54. Count 3 charges A. Cordova with using and carrying a firearm in relation to the crime charged in Count 2, in violation of 18 US.C. § 924(c), (j)(1), respectively, using a firearm during a violent crime and using a firearm to cause a person's death. See Indictment at 54.

1.  **Scheduling Orders and Discovery Requests.**

On May 5, 2016, the Honorable Karen B. Molzen, United States Magistrate Judge for the United States District Court of New Mexico, filed the Order, filed May 5, 2016 (Doc. 81)("Discovery Order"), on discovery, in which she states that she sua sponte deems A. Cordova to have requested discovery and orders the United States to provide to A. Cordova all information that rule 16 requires that the United States produce. See Discovery Order at 1-2.

In the same Discovery Order, Magistrate Judge Molzen directs the United States to comply with Brady, Giglio, and the Jencks Act, 18 U.S.C. § 3500. See Discovery Order at 4-5. The Court subsequently entered the Scheduling Order, filed November 3, 2016 (Doc. 249), in which it set the United States' discovery deadline for 240 days before trial. See Scheduling Order at 1. Soon afterward, A. Cordova made specific discovery requests to the United States via the Letter from Marcia A. Morrissey to Maria Y. Armijo (dated November 6, 2017), filed August 21, 2018 (Doc. 903-12)("Nov. 6 Letter"). In the Nov. 6 Letter, A. Cordova asks the United States for "any statements made by Anthony Cordova on or about March 16, 2016, at Central New Mexico Community College" and indicates: "This request includes a designation of the persons present at the time Mr. Cordova made any statements." Nov. 6 Letter at 1.

In February, 2018, A. Cordova reminded the United States of the information that he sought and advised the United States that he would file a motion seeking the information. See Email from Marcia Morrissey to Maria Armijo (sent February 2, 2018), filed August 21, 2018 (Doc. 903-13)("Feb. 2 Email"). Subsequently, on February 5, 2018, A. Cordova filed the Sealed Motion to Compel Discovery, filed February 5, 2018 (Doc. 506)("Motion to Compel"), in which he requests that the Court issue order that the United States disclose information related to the CNM conversation. See Sealed Motion to Compel Discovery at 4-5, 7. The United States responded that it had already produced all such information in its possession. See United States' Response to Defendant Anthony Cordova's Motion to Compel Specific Discovery [506] at 2, filed March 26, 2018 (Doc. 548). A. Cordova replied that he could not find such information in his records and requested that the Court order the United States to provide a Bates number for any

relevant reports.  See Anthony Cordova's Sealed Reply to Response to His Motion to Compel Specific Discovery at 1, filed April 9, 2018 (Doc. 567).

A. Cordova raised the issue before the Court at the June 14, 2018, pretrial conference.  See Draft Transcript of Hearing at 125:13-23 (taken June 14, 2018)(Morrissey)("June 14 Tr.").[6]  The United States repeated that it had produced the requested 302 report.  See June 14 Tr. at 127:8-22 (Beck).  A. Cordova reiterated that he could not find the report and asked for its Bates number, which the United States promised to provide.  See June 14 Tr. at 128:2-17 (Morrissey, Court, Beck).  Four days later, on June 18, the United States attached the CNM 302 Report to a letter listing the CNM 302 Report's Bates number.  See Letter from Fred Federici to Brock Benjamin, et al. (dated June 18, 2018), filed August 21, 2018 (Doc. 903-11).

### 2. The CNM 302 Report.

Acee dates the CNM 302 Report March 16, 2016.  See CNM 302 Report at 1.  In the report, Acee records that, on March 16, 2016, he, FBI Special Agent Thomas Neale, and Task Force Officers Mark Myers and Anthony Medrano contacted A. Cordova on CNM's campus outside the welding building, in which A. Cordova had a workshop.  See CNM 302 Report at 1.  Acee writes that he and Myers explained to A. Cordova their desire to interview SNM associates.  See CNM 302 Report at 1.  According to Acee, A. Cordova replied that he understood, that he had previously been incarcerated with SNM members, and that his activities related to heroin had brought him into contact with the gang, but that he had never been an SNM member.  See CNM 302 Report at

---

[6]The Court's citations to any "draft" transcripts of hearings refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

1.  Acee recounts Cordova's statements that, at the time of the encounter, he was serving probation for a New Mexico heroin trafficking conviction and that, since his son's murder, he had begun to change his life.  See CNM 302 Report at 1.  Acee records A. Cordova's indication that he had not associated with SNM members in "several years," and his impression that A. Cordova "was cooperative" and "would continue to speak with agents if they had additional questions."  CNM 302 Report at 1.

   **3.  The Trial.**

   The parties agreed to begin the trial on July 9, 2018.  See Unopposed Motion for Third Scheduling Order and in Support of Unopposed Motion to Continue at 2, filed June 9, 2017 (Doc. 435).  The trial lasted two weeks.  The Jury convicted A. Cordova on Counts 2 and 3, see Verdict at 1, and the Court lays out the evidence that A. Cordova attacks in his Motion.

   **a.  Brian Acee.**

   The United States began its case-in-chief with Acee, who began by introducing SNM characters who were relevant to the trial, and noted C. Garcia as an SNM member whom the United States initially indicted on drug, firearm, and conspiracy-to-commit-murder charges, and later indicted for the Dix murder.  See Transcript of Brian Acee at 21:24-22:8 (taken July 11, 2018)(Acee), filed July 13, 2018 (Doc. 826)("Acee Tr.").  In response to a picture of C. Garcia, Acee identified scarring on C. Garcia's midsection, see Acee Tr. at 22:19-21 (Acee), allegedly from a gunshot wound, see Acee Tr. at 32:4-6 (Castellano, Acee), and C. Garcia's SNM tattoo, see Acee Tr. at 23:1-5 (Acee, Castellano).  Acee testified that Roy Martinez is a former SNM leader.  See Acee Tr. at 33:6-7 (Acee).  According to Acee, Mario Rodriguez is also an SNM member and was charged with murder-related crimes.  See Acee Tr. at 36:4-17 (Acee).  Acee

mentioned Munoz and Garduño as other SNM members whom the United States charged with a RICO conspiracy.  See Acee Tr. at 44:1-10 (Castellano, Acee); id. at 46:20-47:1 (Castellano, Acee).  According to Acee, Gerald Archuleta is a former SNM leader whom the United States charged and who agreed to cooperate with the United States.  See Acee Tr. at 48:5-49:25 (Castellano, Acee).

Acee explained that federal law enforcement officers arrested forty people in relation to the SNM.  See Acee Tr. at 39:23-40:2 (Acee).  Acee also noted that, for SNM members, cooperating with the United States meant death.  See Acee Tr. at 40:8-16 (Castellano, Acee).  Acee admitted that cooperators might work with the United States for reduced sentences or for money. See Acee Tr. at 55:23-56:7 (Acee, Castellano).  Acee explained that the FBI paid some cooperators approximately fifty dollars a month and, for cooperators in prison, reduced their security threat level and increased their visits with family.  See Acee Tr. at 61:14-62:16 (Acee).  Acee noted that former SNM members also received lower security level assignments, because they had renounced the gang.  See Acee Tr. at 65:1-6 (Castellano, Acee).

Acee then described the FBI's relationship with M. Montoya and narrated that the FBI had arrested M. Montoya for drug trafficking.  See Acee Tr. at 66:16-24 (Acee); id. at 67:2-10 (Acee). According to Acee, after the arrest, M. Montoya agreed to cooperate with the FBI.  See Acee Tr. at 67:11-13 (Castellano, Acee).  Acee described that, during Acee's initial conversation with M. Montoya, M. Montoya and the FBI "verbally wrestl[ed] with each other" until the FBI found M. Montoya an attorney and that, after receiving the attorney, M. Montoya received a Kastigar

letter.[7]  See Acee Tr. at 67:17-68:11 (Acee, Castellano).  Acee testified that he mentioned to M. Montoya the possibility of receiving a Kastigar letter and that he also initiated the conversation about the Dix murder.  See Acee Tr. at 100:8-12 (Acee), id. at 141:9 (Acee).  According to Acee, before the conversation with M. Montoya, he had not heard of A. Cordova.  See Acee Tr. at 100:13-15 (Acton, Acee).  Acee explained that, during discussions with M. Montoya about the Dix homicide, M. Montoya mentioned the name "Antone" and that the FBI later identified "Antone" as A. Cordova.  Acee Tr. at 72:18-73:1 (Castellano, Acee).  Acee testified that the FBI then began investigating A. Cordova.  See Acee Tr. at 73:18-20 (Castellano, Acee).

Acee described that, during the FBI's investigation of the Dix murder, M. Montoya walked the FBI through the murder's scene.  See Acee Tr. at 73:18-74:2 (Castellano, Acee).  Acee explained his understanding, based on that walk-through, that, on February 4, 2005, Dix stopped

---

[7]Both the United States and the Defendants have referred to the letters immunizing the United States' witnesses as Kastigar letters, named from Kastigar v. United States, 406 U.S. 441 (1972).  In Kastigar v. United States, 406 U.S. 441 (1972)(Powell, J.), the Supreme Court of the United States concluded that "the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony."  406 U.S. at 443.  That term is apparently a misnomer in this case, because, if the United States v. DeLeon, CR 15-4268 JB, Letter from Maria Armijo to John Samore (dated June 9, 2016), filed May 10, 2018 (Doc. 2246)(Clerk's Exhibit 15)("Cordova Letter"), is representative, Kastigar letters do not afford the United States' witnesses the immunity that Kastigar requires.  Calling those documents Kastigar letters, however, is accurate in a limited sense; those documents explain that permitting the United States to make use of information and pursue investigative leads is necessary "to eliminate the necessity for a Kastigar hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted."  Cordova Letter ¶ 2, at 1.  See Kastigar Hearing, Black's Law Dictionary (10th ed. 2014)("A hearing at which the prosecution must establish by a preponderance of the evidence that the government's evidence derives from proper, nonimmunized sources.).

his vehicle near a stop sign, and M. Montoya and A. Cordova stopped in their vehicle in front of Dix' car.  See Acee Tr. at 76:2-77:24 (Castellano, Acee); id. at 80:5-7 (Castellano, Acee).  Acee described that, after Dix was shot, Dix' car rolled onto a property near it and into a tree.  See Acee Tr. at 79:18-21 (Acee).  According to Acee, Dix' car stopped on Michael and Mikail Tinkers' property.  See Acee Tr. at 85:14-23 (Castellano, Acee).

Acee recounted that, as part of the cooperation, M. Montoya provided the FBI information about the Dix murder, see Acee Tr. at 68:15-18 (Castellano, Acee), and helped to foil the conspiracy to murder Gregg Marcantel,[8] see Acee Tr. at 69:14-18 (Castellano, Acee).  According to Acee, as part of the Marcantel murder investigation, M. Montoya recorded and reported on conversations with Baca and C. Garcia.  See Acee Tr. at 69:21-70:1 (Acee).  Acee described that, as part of the investigation, M. Montoya made controlled drug buys with C. Garcia, and, during one buy, M. Montoya recorded a conversation with C. Garcia in which he and C. Garcia discussed A. Cordova.  See Acee Tr. at 72:23-73:2 (Castellano, Acee).

Acee stated that the FBI has since helped M. Montoya relocate to another state, because the SNM retaliates against cooperators.  See Acee Tr. at 87:12-21 (Castellano, Acee).  According to Acee, the FBI paid for M. Montoya's relocation expenses, including money for fuel, for RV repairs, and for attending trade school.  See Acee Tr. at 89:22-89:8 (Acee).  Acee testified that he did not know how much money the FBI gave M. Montoya, see Acee Tr. at 143:11-19 (Acton, Acee), but he indicated that $432.00 for gas, $1,601.00 for vehicle maintenance, and $2,900.00 for trade school seemed accurate, see Acee Tr. at 143:20-23 (Acton, Acee); id. at 144:4-13 (Acton,

---

[8]Gregg Mercantel is the former-New Mexico Corrections Secretary.  See State Corrections Chief Stepping Down, Albuquerque Journal, https://www.abqjournal.com/867744/nm-corrections-chief-gregg-marcantel-to-step-down.html (last visited March 30, 2019).

Acee).   Acee noted that the FBI gave another cooperator -- Duran -- probably more than $40,000.00.  See Acee Tr. at 162:1-7 (Acton, Acee).

Acee explained that, before arresting A. Cordova, Acee spoke with him on CNM's campus. See Acee Tr. at 95:6-15 (Acee).  Acee noted that he asked to speak with A. Cordova and introduced himself and other agents.  See Acee Tr. at 95:6-15 (Acee).  After A. Cordova agreed to talk, Acee told him that the FBI agents were talking to SNM members and dismantling the gang.  See Acee Tr. at 95:17-19 (Acee).  Acee described that he told A. Cordova that the FBI knew of A. Cordova's association with the SNM, and notified A. Cordova that M. Montoya had agreed to cooperate with FBI agents and that the FBI agents also wanted A. Cordova to work with them.  See Acee Tr. at 95:19-23 (Acee).  Acee depicted that A. Cordova told the officers that, although A. Cordova was not an SNM member, he had been incarcerated with SNM members, had sold drugs for and with SNM members, and had used drugs with them.  See Acee Tr. at 96:1-5 (Acee).  Acee testified that A. Cordova seemed surprised that M. Montoya had agreed to cooperate with the FBI.  See Acee Tr. at 96:17-18 (Castellano, Acee).   On cross-examination, Acee testified that A. Cordova mentioned that his son had recently died and that, since that time, he had begun to change his life, and explained that A. Cordova appeared cooperative and willing to speak to FBI agents.  See Acee Tr. at 168:21-169:13 (Acton, Acee).  Acee admitted that the CNM 302 Report does not contain his impressions that A. Cordova denied participation in or knowledge of the Dix murder, and testified that he does not generally include his impressions in his reports.  See Acee Tr. at 197:19-23 (Castellano, Acee).

Acee described that he reviewed the evidence on the Dix murder as soon as the Bernalillo County Sheriff's Office ("BCSO") provided him the relevant files.  See Acee Tr. at 107:2-7

(Acton, Acee). Nevertheless, Acee commented that, in indicting A. Cordova, the United States relied primarily on M. Montoya's statements. See Acee Tr. at 112:19-21 (Acee). Acee admitted that he looked two weeks before trial at Dix' clothing from the night of the murder. See Acee Tr. at 109:24-110:1 (Acee). Acee stated that the clothing was the first physical evidence other than crime-scene photographs that he had reviewed. See Acee Tr. at 110:2-5 (Acee). Acee testified, however, that he understood that a division of labor existed among law enforcement offices and that he had left analyzing the physical evidence to the BCSO. See Acee Tr. at 182:15-183:3 (Castellano, Acee).

Acee explained that, in deciding to charge A. Cordova, he considered the audio recording of M. Montoya and C. Garcia's conversation, and that he also considered a recording of C. Garcia in which C. Garcia mentioned an A. Cordova with psoriasis.[9] See Acee Tr. at 190:3-20 (Castellano, Acee); id. at 188:14-189:6 (Castellano, Acee). Acee also stated that he considered A. Cordova's response to Acee's comments regarding M. Montoya during the CNM conversation; he described:

> CASTELLANO: Related to that, when you talked to the defendant about a month before you arrested him, was there anything from that conversation that also led to your decision to go forward with charges against Mr. Cordova?
>
> ACEE: [A. Cordova] didn't deny it. There were a few things. That was the strongest. When I walked away, I was shocked. I said -- I was talking to the other agent and the two detectives. I'm, like, "He never denied it." He tried to put distance between himself and being an actual SNM member. He looked shocked when . . . I said, "You know we got Mario M. Montoya; right? Mario is with us." And I said, "Well, you wouldn't know that because that's not known yet, but Mario

---

[9]"Psoriasis is a chronic skin condition caused by an overactive immune system. Symptoms include flaking, inflammation, and thick, white, silvery, or red patches of skin. Psoriasis treatments include steroid creams, occlusion, light therapy and oral medications, such as biologics." Psoriasis Health Center, WebMD, https://www.webmd.com/skin-problems-and-treatments/psoriasis/default.htm (last visited April 2, 2019).

is working. And you're going to see." And I thought he didn't believe me. I was trying to convince him to work. But that was -- I'm sorry to interrupt, sir. That was -- yeah, I walked away thinking, man, we've stood out here and talked, and he's not saying, "Hey, you got the wrong guy. What are you talking about?" None of that.

And I thought he didn't believe me. I was trying to convince him to work. But that was -- I'm sorry to interrupt, sir. That was -- yeah, I walked away thinking, man, we've stood out here and talked, and he's not saying, "Hey, you got the wrong guy. What are you talking about?" None of that.

CASTELLANO: And just to be clear, so the jury knows, he also didn't say, "Yes, I was involved," either; right?

ACEE: Absolutely. And I hope I didn't represent 24 that. No, he did not.

CASTELLANO: I just wanted to make sure. Not only he didn't admit it, but he also didn't deny it?

ACEE: Correct.

Acee Tr. at 190:21-192:2. See id. at 192:3-7 (Castellano, Acee).

### b.  Jeff Nine.

Dr. Jeff Nine testified that, from 2001 to 2009, he worked in New Mexico as a forensic pathologist and medical examiner. See Transcript of Excerpt of Testimony of Jeff Nine, M.D. at 4:3-6 (taken July 12, 2018)(Nine), filed July 13, 2018 (Doc. 829)("Nine Tr."). Dr. Nine explained that he applies knowledge about how the body reacts to diseases and injuries to determine what caused a person harm. See Nine Tr. at 4:14-21 (Nine). Dr. Nine testified that, on February 5, 2005, he performed an autopsy on Dix and prepared the report. See Nine Tr. at 7:24-8:4 (Armijo, Nine); id. at 14:20-23 (Armijo, Nine). Dr. Nine testified that Dix had four gunshot wounds on his body's left side -- one on his neck, two below his left shoulder blade on his back and lower left of his back, and one on his left thigh. See Nine Tr. at 15:7-12 (Nine). Dr. Nine noted that he

recovered a bullet from each wound.  <u>See</u> Nine Tr. at 18:15-17 (Nine).  Dr. Nine indicated that Dix also suffered a wound from a bullet grazing his body.  <u>See</u> Nine Tr. at 29:3-20 (Armijo, Nine).

Dr. Nine described that the bullet in Dix' left leg travelled straight across the leg while inside the body.  <u>See</u> Nine Tr. at 20:6-11 (Armijo, Nine).  Dr. Nine estimated that the bullet might have had a "slight upward trajectory" in the thigh.  Nine Tr. at 20:21 (Nine).  Dr. Nine suggested that the bullet hit an object before striking Dix, so Dr. Nine could not estimate the bullet's trajectory.  <u>See</u> Nine Tr. at 21:3-14 (Nine).  Dr. Nine testified that the bullet did not likely cause Dix' death.  <u>See</u> Nine Tr. at 21:15-17 (Armijo, Dix).

Dr. Nine testified that another bullet went through Dix' neck, across his mouth, and stopped in his right cheek.  <u>See</u> Nine Tr. at 22:2-5 (Nine).  Dr. Nine testified that the trajectory would have been from Dix' left to his right, slightly back to front, and slightly upward.  <u>See</u> Nine Tr. at 22:12-16 (Nine).  Dr. Nine explained that, because of this wound, Dix had a lot of blood in his lungs and would have suffocated relatively quickly.  <u>See</u> Nine Tr. at 23:14-18 (Armijo, Nine).  Dr. Nine could not determine the range from which the bullet was shot.  <u>See</u> Nine Tr. at 23:19-21 (Armijo, Nine).

Dr. Nine described that the bullet in Dix' back travelled from left to right essentially straight across his back, slightly back to front, and slightly upward.  <u>See</u> Nine Tr. at 24:11-21 (Armijo, Nine).  According to Dr. Nine, the bullet fractured a rib but did not otherwise cause significant injuries.  <u>See</u> Nine Tr. at 26:5-11 (Armijo, Nine).

Dr. Nine described that the fourth bullet caused significant injury as it went through Dix' diaphragm, spleen, and left kidney, and stopped left of his vertebrae.  <u>See</u> Nine Tr. at 26:23-27:8 (Nine).  Dr. Nine stated that the bullet entered the left lower chest and moved left to right, slightly

back to front, and slightly downward.  See Nine Tr. at 27:16-21 (Nine).  Dr. Nine noted that this wound also could have caused Dix' death.  See Nine Tr. at 28:1-4 (Armijo, Nine).  Dr. Nine noted that the gunshot wounds occurred around the same time, see Nine Tr. at 38:15-18 (Armijo, Nine), and indicated that he did not find anything to indicate close-range shooting, see Nine Tr. at 47:20-22 (Nine).

c.     **Jerry Roark.**

Jerry Roark identified himself as the Deputy Secretary of Operations at the NM Corrections Department.  See Transcript of Excerpt of Testimony of Jerry Roark at 3:19-25 (taken July 12, 2018)(Armijo, Roark), filed July 13, 2018 (Doc. 830)("Roark Tr.").  Roark explained that the SNM is a prison gang within the NM Corrections Department's prisons.  See Roark Tr. at 6:1-5 (Armijo, Roark).  Roark described that the NM Corrections Department has a system for identifying gangs and gang members.  See Roark Tr. at 7:3-22 (Armijo, Roark).  Roark explained that, in identifying whether inmates belong to a gang, the NM Corrections Department considers, among other things, self-admissions, symbolism, correspondence, and comments from other inmates.  See Roark Tr. at 24:15-25:7 (Roark, Acton).  Roark indicated that, early in developing this system, the NM Corrections Department had an associate category in which it placed individuals with low-level involvement with a gang, but Roark stated that the NM Corrections Department treated such people similarly to gang members.  See Roark Tr. at 27:24-28:24 (Acton, Roark).  Roark clarified that the NM Corrections Department eliminated the associate category early in the system's development.  See Roark Tr. at 32:15-25 (Armijo, Roark).  Roark admitted that the NM Corrections Department had not identified certainly all SNM members as gang members.  See Roark Tr. at 30:24-31:4 (Armijo, Roark).  Roark noted that the NM Corrections

Department has classified the SNM and two other prison gangs as prison gangs.  See Roark Tr. at 8:1-15 (Armijo, Roark).  According to Roark, the NM Corrections Department has isolates SNM members and subjects them to high security incarceration.  See Roark Tr. at 8:21-9:2 (Roark).  Roark described that the SNM is, and has been, engaged in murders, assaults, and drug activity within the prison system.  See Roark Tr. at 14:20-15:3 (Armijo, Roark).

### d. Mario Rodriguez.

M. Rodriguez testified that he joined the SNM in 2005 and that he belonged to the gang until October 24, 2017.  See Transcript of Excerpt of Testimony of Mario Rodriguez. at 7:5-6 (taken July 11, 2018)(M. Rodriguez), filed July 13, 2018 (Doc. 827)("M. Rodriguez Tr."); id. at 12:3-5 (Armijo, M. Rodriguez).  M. Rodriguez explained that A. Garcia recruited him into the SNM, see M. Rodriguez Tr. at 20:19-21:4 (Armijo, M. Rodriguez), and that Baca led the SNM throughout M. Rodriguez' time with the gang, see M. Rodriguez at 25:11-12 (M. Rodriguez).  M. Rodriguez testified that the SNM traffics drugs inside prisons and on the streets, and that the trafficking allows the gang to control the prison system.  See M. Rodriguez Tr. at 29:4-8 (M. Rodriguez); id. at 29:18-23 (Armijo, M. Rodriguez).  M. Rodriguez testified that, during the years 2004 and 2005, the SNM was involved in "violent stabbings, drug introduction into the New Mexico prison system, murder, extortion, bribery, [and] a lot of violence."  M. Rodriguez Tr. at 58:24-59:1 (M. Rodriguez).  According to M. Rodriguez, the gang's activities included drug trafficking outside prisons.  See M. Rodriguez Tr. at 59:2-6 (Armijo, M. Rodriguez).  M. Rodriguez described C. Garcia as a "main drug distributor for the SNM."  M. Rodriguez Tr. at 59:11-12 (M. Rodriguez).

M. Rodriguez described some terms that the SNM uses: "[j]ale" means "put in work," i.e., to "commit a violent assault," M. Rodriguez Tr. at 23:22-24:3 (Armijo, M. Rodriguez), and "associates" are people who are not SNM members but who traffic drugs, move messages, or perform other tasks for the SNM when its members cannot do such activities, see M. Rodriguez Tr. at 31:11-13 (M. Rodriguez, Armijo). According to M. Rodriguez, an associate's connection to the SNM sometimes continues outside the prison system. See M. Rodriguez Tr. at 34:21-23 (Armijo, M. Rodriguez). M. Rodriguez also explained some rules within the SNM, for instance: (i) if someone disrespects an SNM member, the SNM member must assault that person, see M. Rodriguez Tr. at 35:18-21 (Armijo, M. Rodriguez); and (ii) the SNM will "green light," i.e., give the go-ahead to kill, former SNM persons cooperating with law enforcement, M. Rodriguez Tr. at 36:12-17 (Armijo, M. Rodriguez). M. Rodriguez testified that he believes that SNM members have bragged about crimes that they have not committed, see M. Rodriguez Tr. at 98:4-7 (M. Rodriguez), although such bragging could get an SNM member killed, see M. Rodriguez Tr. at 98:8-13 (Armijo, M. Rodriguez). M. Rodriguez explained that people may brag to enhance their position within the SNM, because committing violent crimes and violent acts strengthens a person's reputation. See M. Rodriguez Tr. at 107:1-108:2 (Armijo, M. Rodriguez).

M. Rodriguez explained that he decided to cooperate with the United States on October 24, 2017, because he was tired of life in the SNM and saw a way free from his gang career. See M. Rodriguez Tr. at 72:6-20 (Armijo, M. Rodriguez). M. Rodriguez testified that he does not want to go back to the SNM and that he cannot go back now. See M. Rodriguez Tr. at 72:22-73:4 (M. Rodriguez). M. Rodriguez described that, on the day he decided to cooperate, he turned over to the United States handmade shanks. See M. Rodriguez Tr. at 74:3-20 (Armijo, M. Rodriguez).

M. Rodriguez explained that he faces life imprisonment plus thirty to forty years for charges of murder and serious bodily injury. See M. Rodriguez Tr. at 77:9-13 (Armijo, M. Rodriguez); id. at 75:25-76:7 (Armijo, M. Rodriguez); id. at 76:8-14 (Armijo, M. Rodriguez). M. Rodriguez admitted that he hopes for leniency from the Court for his cooperation and described that the conditions for leniency include testifying truthfully about his activities with the SNM. See M. Rodriguez Tr. at 77:14-78:7 (Armijo, M. Rodriguez). According to M. Rodriguez, he has been incarcerated since he was eighteen, see M. Rodriguez Tr. at 92:24-93:4 (Morrissey, M. Rodriguez), and hopes eventually to leave incarceration, see M. Rodriguez Tr. at 93:5-6 (Morrissey, M. Rodriguez). He stated that he believes that testifying and cooperating with the United States might help him achieve this goal. See M. Rodriguez Tr. at 93:10-16 (Morrissey, M. Rodriguez).

e. **Julian Romero.**

Julian Romero admitted that he had been an SNM member and was involved in founding the SNM. See Transcript of Excerpt of Testimony of Julian Romero Tr. at 4:3-7 (taken July 12, 2018)(Romero), filed July 13, 2018 (Doc. 831)("Romero Tr."); id. at 9:13-14 (Beck, Romero). Romero stated that, in 2016, he agreed to cooperate with the FBI. See Romero Tr. at 26:11-23 (Beck, Romero). According to Romero, the SNM has always been involved with drugs, because drugs fuel its power. See Romero Tr. at 19:24-20:5 (Beck, Romero). Romero testified that he knows C. Garcia and described him as an SNM member and a big drug dealer. See Romero Tr. at 40:11-15 (Romero); id. at 45:10-12 (Romero). Romero explained that, around 2004, he purchased crack cocaine and heroin from C. Garcia. See Romero Tr. at 40:21-24 (Romero). Romero testified that, in 2004, C. Garcia was on crutches, because he had been shot in the stomach. See Romero Tr. at 40:25-41:8 (Romero). According to Romero, the SNM will retaliate against any person who

disrespects an SNM member.  See Romero Tr. at 18:17-19:15 (Beck, Romero).  Romero explained that C. Garcia offered to pay Romero for killing Dix and that Romero refused to commit the murder.  See Romero Tr. at 41:19-42:5 (Romero, Beck); id. at 43:14-18 (Romero).  Romero testified that he also knew A. Cordova, but that A. Cordova was not an SNM member.  See Romero Tr. at 45:17-23 (Romero).

<strong>f.      Mario Montoya.</strong>

M. Montoya stated that he no longer identifies as an SNM member but acknowledged that he belonged to the SNM for most of his life and joined in 1993 or 1994.  See Transcript of Excerpt of Testimony of Mario M. Montoya at 4:11-14 (taken July 12-13, 2018)(M. Montoya), filed July 17, 2018 (Doc. 843)("M. Montoya Tr.").  M. Montoya stated that he knew C. Garcia, another SNM member, from prison and from years of routinely purchasing drugs from him.  See M. Montoya Tr. at 24:24-25:15 (M. Montoya, Castellano).  M. Montoya described that he purchased drugs from C. Garcia as recently as the fall of 2015.  See M. Montoya Tr. at  27:4-6 (M. Montoya, Castellano).  According to M. Montoya, during 2015, M. Montoya was both using drugs and dealing drugs for the SNM.  See M. Montoya Tr. at 29:15-20 (M. Montoya, Castellano).  M. Montoya stated that he could not think of a time since he became a member when the SNM did not deal drugs.  See M. Montoya Tr. at 29:15-30:1 (M. Montoya, Castellano).  M. Montoya admitted to a history of smuggling drugs, involving his romantic partners in drug smuggling, domestic abuse, car theft, aliases, and other crimes.  See M. Montoya Tr. at 131:11-152:21 (Morrissey, M. Montoya).

M. Montoya recounted his September 11, 2015, arrest for selling drugs.  See M. Montoya Tr. at 30:2-32:4 (Castellano, M. Montoya, Morrissey, Court); id. at 34:3-37:23 (Castellano, M. Montoya, Morrissey, Court).  M. Montoya described that, between the arrest and his plea,

M. Montoya agreed to cooperate with the FBI's SNM investigation.  See M. Montoya Tr. at 38:2-11 (M. Montoya, Castellano).  According to M. Montoya, he agreed to engage in wiretapped telephone calls with SNM members and in controlled drug buys, including buys from C. Garcia.  See M. Montoya Tr. at 38:11-40:8 (M. Montoya, Castellano).  M. Montoya explained that he also gave the FBI information on SNM activities, including information on the Dix murder and his role in it.  See M. Montoya Tr. at 40:17-25 (Castellano, M. Montoya).  M. Montoya explained that, before sharing this information, the FBI appointed him a lawyer and provided him a Kastigar letter, in which he received protection from prosecution in exchange for truthful information.  See M. Montoya Tr. at 41:1-16 (Castellano, M. Montoya).  M. Montoya explained that his plea agreement provides that the United States will advise the Court during sentencing to consider M. Montoya's cooperation.  See M. Montoya Tr. at 44:19-45:4 (Castellano, M. Montoya).  M. Montoya explained that he wanted to tell the FBI the truth to get past his involvement with the SNM and admitted that the Kastigar letter gives him a "really good deal," because it permits him to tell the truth without facing charges. M. Montoya Tr. at 129:17 (M. Montoya).  See id. at 129:4-20 (Morrissey, M. Montoya).  M. Montoya conceded that he essentially got a pass on the Dix murder, see M. Montoya Tr. at 129:24-130:10 (Morrissey, M. Montoya), and that he disclosed to the FBI a lifetime of crime, see M. Montoya Tr. at 102:16-17 (Morrissey, M. Montoya).  M. Montoya stated that he also received benefits for cooperating with the FBI: "vocation training," money for relocation, and money for cooperating.  M. Montoya Tr. at 89:22-90:3 (M. Montoya).  M. Montoya expressed his concern that the SNM will retaliate for his cooperation with the FBI.  See M. Montoya Tr. at 91:8-15 (Castellano, M. Montoya).

M. Montoya described C. Garcia's past with Dix, explaining that, in 2001, Dix shot C. Garcia and recounting that C. Garcia initially told M. Montoya that he would allow Dix to think that C. Garcia would overlook the incident. See M. Montoya Tr. at 48:8-50:11 (Castellano, M. Montoya). M. Montoya narrated that, after Dix left incarceration and when M. Montoya owed C. Garcia considerable money for drugs, C. Garcia asked M. Montoya to "take care" of Dix, M. Montoya Tr. at 50:18-19 (M. Montoya), i.e., shoot, Dix for him, see M. Montoya Tr. at 50:12-51:5 (Castellano, M. Montoya). According to M. Montoya, C. Garcia wanted Dix shot in retaliation for Dix' shooting him in the stomach in a fight over a female. See M. Montoya Tr. at 156:10-22 (Morrissey, M. Montoya). M. Montoya characterized the Dix murder as authorized by the SNM, because shooting C. Garcia was an attack on SNM. See M. Montoya Tr. at 157:5-16 (Morrissey, M. Montoya).

M. Montoya stated that he agreed to C. Garcia's request and that, following that conversation, C. Garcia gave M. Montoya a gun and proceeded to persistently ask M. Montoya about his plans for the murder. See M. Montoya Tr. at 51:8-22 (Castellano, M. Montoya). M. Montoya noted that, during a traffic stop, law enforcement officers seized the first gun that C. Garcia gave him. See M. Montoya Tr. at 51:23-52:17 (Castellano, M. Montoya). M. Montoya described that C. Garcia started getting annoyed when M. Montoya delayed the murder and C. Garcia eventually partnered him with A. Cordova to commit the act. See M. Montoya Tr. at 53:3-18 (Castellano, M. Montoya); id. at 62:18-63:2 (Castellano, M. Montoya). M. Montoya indicated that he had seen A. Cordova at C. Garcia's house before the Dix murder. See M. Montoya Tr. at 253:23-254:2 (Castellano, M. Montoya). M. Montoya explained that A. Cordova was not an SNM member but that he got along with the SNM and worked with the gang. See M. Montoya Tr. at

254:20-24 (M. Montoya). According to M. Montoya, C. Garcia informed M. Montoya and A. Cordova that he would attend a Super Bowl party in Las Vegas, Nevada, where cameras would record his comings and goings, and wanted the Dix murder completed before he returned. See M. Montoya Tr. at 63:3-25 (Castellano, M. Montoya).

M. Montoya admitted that he has some memory problems, but insisted that he remembers important events, like the Dix murder. See M. Montoya Tr. at 97:10-98:3 (Morrissey, M. Montoya). M. Montoya admitted that he might not remember some events, because he was on crack, but insisted that the drug does not cause him to remember events that did not happen. See M. Montoya Tr. at 162:4-8 (Morrissey, M. Montoya). M. Montoya recounted that, on the night of the Dix murder, A. Cordova and M. Montoya drove around town in A. Cordova's maroon Pontiac while smoking crack, and located Dix at a Chevron station on Isleta Boulevard. See M. Montoya Tr. at 64:1-15 (Castellano, M. Montoya); id. at 137:8-10 (Morrissey, M. Montoya); id. at 79:7-8 (M. Montoya). M. Montoya conceded that he does not remember how many nights he drove with A. Cordova looking for Dix, see M. Montoya Tr. at 98:17-22 (M. Montoya, Morrissey), and stated that he may have previously told an investigator that he may have been in a car with A. Cordova more than one night, see M. Montoya Tr. at 99:18-100:1 (Morrissey, M. Montoya). M. Montoya described that he and A. Cordova asked Dix if he could get them drugs; that Dix indicated that he would call an individual named Michael Snow about obtaining drugs; and that both Dix and A. Cordova spoke with Snow on the telephone. See M. Montoya Tr. at 65:21-66:16 (Castellano, M. Montoya). M. Montoya testified to pumping gas while A. Cordova approached Dix, but stated that he did not remember previously telling the FBI or others this fact. See M. Montoya Tr. at 116:2-14 (Morrissey, M. Montoya). According to M. Montoya, Dix indicated that he would

retrieve the drugs from Snow, and A. Cordova, who was sitting in the Pontiac's passenger seat, told M. Montoya that he knew where Dix would go and to follow him. See M. Montoya Tr. at 67:23-68:3 (Castellano, M. Montoya). On cross-examination, M. Montoya agreed that he had earlier recounted to the FBI that he and A. Cordova visited a friend's trailer before going to the Chevron station, and M. Montoya stated that he remembers going to the trailer but not finding Dix there. See M. Montoya Tr. at 113:23-115:10 (Morrissey, M. Montoya); id. at 251:4-15 (Castellano, M. Montoya).

M. Montoya described that eventually M. Montoya and A. Cordova found Dix in the van that he had been driving, and M. Montoya stopped their car immediately in front of the van. See M. Montoya Tr. at 68:23-69:13 (Castellano, M. Montoya). M. Montoya positioned the car directly in front of Dix' van so the cars formed a "T." See M. Montoya Tr. at 69:16-20 (Castellano, M. Montoya). On cross-examination, M. Montoya conceded that he initially told the FBI that the cars' headlights shone at each other, but M. Montoya insisted that he corrected that statement through his lawyer. See M. Montoya Tr. at 123:4-12 (Morrissey, M. Montoya). M. Montoya asserted that the cars could not have directly faced each other, because he and A. Cordova drove down the road and did not enter the driveway in which Dix' car sat. See M. Montoya Tr. at 124:15-24 (Morrissey, M. Montoya). M. Montoya insisted that the FBI report that contained his original statement was incorrect and that the vehicles "were T-boned, sideways," M. Montoya Tr. at 247:17, but that the occupants were looking at each other, see M. Montoya Tr. at 247:10-248:5 (Castellano, M. Montoya).

M. Montoya recounted that A. Cordova then inquired of Dix who was with him, and, when Dix answered that no one was accompanying him, A. Cordova fired at Dix. See M. Montoya Tr.

at 70:12-21 (Castellano, M. Montoya).  M. Montoya testified that A. Cordova remained in the car while shooting Dix.  See M. Montoya Tr. at 175:11-22 (Morrissey, M. Montoya).  M. Montoya described that A. Cordova fired a lot of shots, then paused, during which time M. Montoya "was about to take off," and then A. Cordova started shooting again.  See M. Montoya Tr. at 70:18-21 (M. Montoya).  According to M. Montoya, A. Cordova then told M. Montoya to drive; M. Montoya drove them from the scene slowly, around fifteen miles per hour, and when he looked back at the van, he saw its headlights move across the street.  See M. Montoya Tr. at 70:22-71:6 (Castellano, M. Montoya).  M. Montoya stated that, as they crossed the Rio Grande, A. Cordova told M. Montoya to stop and threw both their guns into the river.  See M. Montoya Tr. at 76:2-9 (Castellano, M. Montoya).  According to M. Montoya, C. Garcia had given both A. Cordova and M. Montoya their guns.  See M. Montoya Tr. at 76:14-77:12 (Castellano, M. Montoya).  On cross-examination, M. Montoya admitted that the 302 report that A. Cordova's counsel showed him reflects that M. Montoya told the FBI that C. Garcia gave M. Montoya and A. Cordova a Buick Sedan to drive for the Dix murder, but M. Montoya contended that he did not make those statements to the FBI.  See M. Montoya Tr. at 113:5-22 (Morrissey, M. Montoya).

M. Montoya described that, after that night, A. Cordova told M. Montoya that he got rid of the Pontiac and that C. Garcia had purchased A. Cordova a new truck.  See M. Montoya Tr. at 80:1-7 (M. Montoya).  M. Montoya explained that he told C. Garcia about the Dix murder, see M. Montoya Tr. at 80:20-81:3 (M. Montoya, Castellano), and that C. Garcia fulfilled his promise to pay M. Montoya by giving him one thousand dollars and drugs, see M. Montoya Tr. at 81:4-19 (Castellano, M. Montoya).  According to M. Montoya, C. Garcia also paid A. Cordova in cash and drugs.  See M. Montoya Tr. at 81:25-82:6 (Castellano, M. Montoya).  M. Montoya testified that

he did not recall whether he had previously told someone that A. Cordova also received money from C. Garcia.  See M. Montoya Tr. at 127:6-9 (Morrissey, M. Montoya).  On cross-examination, M. Montoya agreed that the 302 report that A. Cordova's counsel showed him reflects that M. Montoya initially told the FBI that, after the murder, A. Cordova drove M. Montoya home and left in the Buick which Garcia had given him, but M. Montoya contends that the FBI incorrectly recorded that account.  See M. Montoya Tr. at 125:9-18 (Morrissey, M. Montoya).  On cross-examination, M. Montoya conceded that he made a correction to the FBI reports; according to M. Montoya, he changed the statement that he had killed Dix to reflect that he aided and abetted the Dix murder.  See M. Montoya Tr. at 213:25-214:15 (M. Montoya, Morrissey).  M. Montoya insisted that he made also other corrections, including to the description of the vehicles' positions.  See M. Montoya Tr. at 214:8-12 (M. Montoya).

M. Montoya admitted that he told the FBI that the SNM punishes people who take credit for crimes that they have not committed.  See M. Montoya Tr. at 172:10-173:24 (Morrissey, M. Montoya).  M. Montoya explained that, after the Dix murder, he bragged about the crime to promote himself in the SNM.  See M. Montoya Tr. at 82:7-15 (Castellano, M. Montoya).  M. Montoya stated that he did not mention A. Cordova's name, because he preferred not to get someone else in trouble.  See M. Montoya Tr. at 83:2-6 (M. Montoya).  M. Montoya admitted that he told different people different stories, see M. Montoya Tr. at 83:19-23 (M. Montoya), and that he let people believe that he killed Dix, see M. Montoya Tr. at 165:21-24 (M. Montoya); id. at 159:8-11 (Morrissey, M. Montoya).  M. Montoya denied telling Benji Montano, an SNM member, about the Dix murder, but admitted telling Jerry Montoya, another SNM member, stories about the murder.  See M. Montoya Tr. at 153:6-155:22 (Morrissey, M. Montoya).  M. Montoya

indicated that he told Robert Lovato, an SNM member, a story about killing Dix with an AK-47. See M. Montoya Tr. at 166:5-14 (Morrissey, M. Montoya). M. Montoya testified that he would tell not Baca about the murder via a telephone call, but stated that he would tell Baca about the murder, because Baca is an SNM leader. See M. Montoya Tr. at 169:3-19 (Morrissey, M. Montoya). M. Montoya later testified after hearing a tape recording of a conversation between him, Duran, and Baca that he had spoken with Baca about the Dix murder, see M. Montoya Tr. at 226:25-229:18 (M. Montoya, Morrissey), and explained that, when he spoke about the Dix murder with Baca, he did it to build Baca's trust and get information for the FBI, see M. Montoya Tr. at 245:4-6 (M. Montoya).

M. Montoya also explained that, in 2015, he and C. Garcia had a conversation in which C.Garcia expressed concern that A. Cordova had spoken to an outside party about the Dix murder. See M. Montoya Tr. at 84:10-89:11 (Castellano, M. Montoya). M. Montoya indicated that C. Garcia shared his concerns that A. Cordova had spoken to Ray Arguello about doing jale, a violent crime, for the SNM. See M. Montoya Tr. at 89:7-9 (Castellano, M. Montoya). The United States played the recording of the conversation. See M. Montoya Tr. at 86:13 (tape). See also Recording of Nov. 29, 2015 M. Montoya and Garcia Conversation at 28:00-29:00, filed August 21, 2018 (on file with Court).[10] M. Montoya later could not remember what he told the FBI about the conversation, so the United States refreshed his memory with Acee's observations from the recording. See M. Montoya Tr. at 239:2-241:12 (Castellano, M. Montoya, Morrissey, Court). M.

---

[10]The Court notes that the recording is difficult to understand and partially inaudible. See generally Recording of Nov. 29, 2015 Montoya and Garcia Conversation.

Montoya added that, in the recording, C. Garcia spoke in code by referencing another individual who had not kept secret a gang crime. See M. Montoya Tr. at 242:3-16 (Castellano, M. Montoya).

        g.      **Roy Martinez.**

Martinez testified that he is a former SNM member. See Draft Transcript of Testimony of Roy Martinez at 3:20-22 (taken July 13, 2018)(Castellano, Martinez), filed July 17, 2018 (Doc. 844)("Martinez Tr."). Martinez testified that "jale" and "putting in work" for the SNM refer to committing violence. Martinez Tr. at 48:8-21 (Castellano, Martinez). Martinez stated that he knows M. Montoya by his nickname "Poo Poo." Martinez Tr. at 51:22-52:1 (Castellano, Martinez). Martinez explained that he understood that the Court would have discretion to consider his cooperation in sentencing. See Martinez Tr. at 54:14-24 (Castellano, Martinez). Martinez described that he began cooperating with the FBI before he knew the evidence against him, because he understood that he was in the wrong, and because there was no way out of the gang life and he wanted out of that life. See Martinez Tr. at 60:9-22 (Martinez, Castellano). Martinez stated that, once he began cooperating, the SNM wanted him dead. See Martinez Tr. at 60:23-61:2 (Martinez, Castellano). Martinez testified that he received around $1,300.00 from the government for his cooperation, see Martinez Tr. at 77:1-11 (Morrissey, Martinez), and was given contact with his daughter while in jail, see Martinez Tr. at 77:17-19 (Morrissey, Martinez). Martinez admitted that, pending trial, he tampered with the tablet device that the United States had provided him when it gave all the SNM defendants tablet devices on which to read discovery documents ("discovery tablets"). See Martinez Tr. at 68:3-69:17 (Morrissey, Martinez).

h.    **Larry Muro**.

Larry Muro testified that, on February 4, 2005, he was the primary crime scene investigator at the Dix murder scene. See Transcript of Excerpt of Testimony of Larry Muro at 7:1-3 (taken July 13, 2018 and July 16, 2018)(Armijo, Muro), filed July 17, 2018 (Doc. 844)("Muro Tr."); id. at 7:11-12 (Armijo, Muro). Muro explained that, on that day, he took photographs of the crime scene, collected and marked evidence, and measured the evidences' positions within the crime scene. See Muro Tr. at 8:21-9:3 (Muro). Muro stated that his team stored the evidence in a manner intended to preserve any physical evidence, like blood, DNA, fingerprints, and objects. See Muro Tr. at 9:6-13 (Muro). Muro testified that the crime scene's photographs reveal the glass of the van's passenger-side sliding door shattered and a hole in the passenger seat. See Muro Tr. at 13:22-14:8 (Muro). Muro described that a photograph of Dix shows him slumped to his right with a bullet wound visible below his left ear. See Muro Tr. at 18:15-19 (Muro).

i.    **Gerald Archuleta**.

G. Archuleta testified that he joined the SNM around 1989. See Transcript of Excerpt of Testimony of Gerald G. Archuleta at 5:11-14 (taken July 17, 2018)(Beck, G. Archuleta), filed July 19, 2018 (Doc. 850)("G. Archuleta Tr."). G. Archuleta described the SNM's terms, rules, and activities, explaining that an SNM member with drugs inside a prison is expected to distribute the drugs to other SNM members and that people bringing drugs into a prison are expected to pay the SNM members in that facility or face assault. See G. Archuleta Tr. at 12:8-21 (Beck, G. Archuleta). G. Archuleta stated that the SNM also sells drugs outside prisons, and that G. Archuleta has sold drugs for the SNM. See Tr. at 13:9-15 (Beck, G. Archuleta). G. Archuleta explained that an SNM member's reputation depends on violence and respect, see G. Archuleta

Tr. at 28:17-22 (Beck, G. Archuleta), and that anyone who disrespects the SNM will be targeted for assault or even execution, see G. Archuleta Tr. at 29:12-16 (G. Archuleta). G. Archuleta defined "jale" or "putting in work" as doing a range of activities for the SNM. G. Archuleta Tr. at 6:25-7:4 (Beck, G. Archuleta). According to G. Archuleta, the penalty for cooperating with law enforcement is "execution." G. Archuleta Tr. at 10:5 (G. Archuleta). See id. at 10:3-5 (Beck, G. Archuleta). G. Archuleta explained that an SNM member who brags about a crime that they did not commit will face consequences, such as assault or even execution. See G. Archuleta Tr. at 45:21-47:3 (Morrissey, G. Archuleta). G. Archuleta conceded that SNM members speak about their crimes to each other and might discuss crimes that they committed with non-SNM members, whom the SNM sometimes uses for such tasks. See G. Archuleta Tr. at 47:19-48:3 (Beck, G. Archuleta).

G. Archuleta explained that he began cooperating with the FBI when he returned to New Mexico from the State of Tennessee. See G. Archuleta Tr. at 32:16-22 (Beck, G. Archuleta). He explained that he left New Mexico, because he wanted a life outside the SNM for his son. See G. Archuleta Tr. at 32:24-33:10 (G. Archuleta). G. Archuleta admitted that C. Garcia provided him Suboxone when he lived in Tennessee. See G. Archuleta Tr. at 58:9-10 (Morrissey, G. Archuleta). G. Archuleta testified that he understood that, in his plea agreement, he agreed to cooperate truthfully and that, in exchange for truthful information, he might receive a downward departure in his sentence. See G. Archuleta Tr. at 36:3-22 (Beck, G. Archuleta). G. Archuleta explained

that he received $2,400.00 from the FBI and a discovery tablet,[11] and that, pending trial, he reset the discovery tablet to access the internet. See G. Archuleta Tr. at 37:8-38:4 (Beck, G. Archuleta).

G. Archuleta stated that, when outside prison, he went to C. Garcia for drugs. See G. Archuleta Tr. at 13:19-24 (Beck, G. Archuleta). G. Archuleta described that he saw C. Garcia in May, 2005. See G. Archuleta Tr. at 39:21-40:8 (Beck, G. Archuleta). G. Archuleta described that, at that time, C. Garcia had a picture of himself and his brother in Las Vegas, and that C. Garcia stated that they were in Las Vegas when Dix was killed and commented: "That's how you do it; right, brother?" G. Archuleta Tr. at 40:10-16 (G. Archuleta). G. Archuleta explained that he interpreted the comment as C. Garcia boasting about having Dix killed. See G. Archuleta Tr. at 40:17-20 (Beck, G. Archuleta).

G. Archuleta identified A. Cordova as an SNM associate who was frequently with C. Garcia and doing what C. Garcia needed. See G. Archuleta Tr. at 40:25-41:3 (G. Archuleta). G. Archuleta described that he had seen A. Cordova at C. Garcia's house and delivering drugs for C. Garcia when C. Garcia could not make the delivery. See G. Archuleta Tr. at 41:4-10 (Beck, G. Archuleta). G. Archuleta described that when FBI officers first asked him about an "Antone" who sold drugs, he thought of Antone Valdez, but that, when the FBI officers mentioned C. Garcia, he

---

[11]The United States provided each Defendant in the various SNM cases discovery tablets on which they could electronically view the cases' paperwork and evidence. See Acee Tr. at 60:6-11 (Acee). The United States did this to minimize the amount of paperwork that the Defendants might pass between them. See Acee Tr. at 60:2-11 (Castellano, Acee). The discovery tablets contained around 80,000 pages of discovery, and hundreds to thousands of hours of recordings. See Acee Tr. at 60:12-20 (Castellano, Acee). The discovery tablets included police reports and all other discovery. See Acee Tr. at 60:21-61:2 (Castellano, Acee). Only the Defendants received discovery tablets; people who only cooperated did not receive anything. See Acee Tr. at 61:3-8 (Castellano, Acee). If a Defendant abused the discovery tablet, the United States seized the device. See Acee Tr. at 61:5-8 (Castellano, Acee).

realized that they meant A. Cordova. G. Archuleta Tr. at 43:5-44:3 (Beck, G. Archuleta). G. Archuleta also testified that he knew B. Cordova as another SNM member. See G. Archuleta Tr. at 48:13-16 (Beck, G. Archuleta).

### j.      **Billy Cordova.**

B. Cordova identified himself as a former SNM member. See Transcript of Excerpt of Testimony of Billy Cordova at 3:18-20 (taken July 16, 2018)(B. Cordova), filed July 19, 2018 (Doc. 851)("July 16 B. Cordova Tr."). B. Cordova explained that he trafficked drugs for the SNM while he was outside prison, and that he sent money and drugs to SNM members who were in prison. See July 16 B. Cordova Tr. at 15:8-23 (Castellano, B. Cordova). B. Cordova testified that he knew C. Garcia from trafficking drugs for him. See July 16 B. Cordova Tr. at 16:8-18 (Castellano, B. Cordova).

B. Cordova testified that he cooperated, because he was tired of "the gang life." Transcript of Excerpt of Testimony of Billy Cordova at 9:1 (taken July 17, 2018), filed July 19, 2018 (Doc. 852)(B. Cordova)("July 17 B. Cordova Tr."). B. Cordova confirmed that, when he started talking to the FBI in 2016, he faced a state seven-year sentence for manslaughter and also faced federal charges. See July 17 B. Cordova Tr. at 57:11-58:8 (Castellano, B. Cordova). B. Cordova admitted to various crimes, including waterboarding, intimidating a jury, domestic abuse, and drug trafficking. See July 17 B. Cordova Tr. at 80:21-81:8 (B. Cordova); id. at 82:20-83:7 (Morrissey, B. Cordova); id. at 89:12-91:1 (Morrisey, B. Cordova); id. at 93:3-7 (Morrissey, B. Cordova). B. Cordova stated that, with the Kastigar letter, the United States would not prosecute him for the crimes he committed with the SNM. See July 17 B. Cordova Tr. at 105:5-11 (Morrisey, B. Cordova). B. Cordova described that, for his cooperation, he received $950.00 from the FBI in

total, including $650.00 in general payments, $100.00 for food, and $200.00 for telephone expenses. See July 17 B. Cordova Tr. at 13:6-10 (Morrisey, B. Cordova). B. Cordova confirmed that, in exchange for his cooperation, the United States would, through witness protection, also give him money, a job, and a home. See July 17 B. Cordova Tr. at 108:12-109:4 (Morrissey, B. Cordova). B. Cordova stated that, now that he has cooperated with the FBI, the SNM has targeted him for death. See July 17 B. Cordova Tr. at 117:11-12 (Morrissey, B. Cordova). B. Cordova explained the SNM targets anyone who attacks an SNM member. See July 17 B. Cordova Tr. at 12:15-20 (Castellano, B. Cordova).

B. Cordova stated that, soon after agreeing to cooperate, he engaged in wiretaps for the FBI. See July 17 B. Cordova Tr. at 9:9-15 (B. Cordova). B. Cordova also admitted that he told the FBI about his suspicions regarding another murder -- that he believed S. Rodriguez had killed a man named Sammy Chavez -- and explained that he believed this accusation, because S. Rodriguez died after Chavez died. See July 17 B. Cordova Tr. at 74:22-75:5 (Morrissey, B. Cordova). B. Cordova stated that he had not known know that S. Rodriguez was incarcerated and incapable of committing the murder at the time of Chavez' death. See July 17 B. Cordova Tr. at 75:10-17 (Morrissey, B. Cordova).

B. Cordova described that, in 2004 and 2005, he was trafficking drugs for C. Garcia. See July 17 B. Cordova Tr. at 20:10-16 (Castellano, B. Cordova). B. Cordova explained that, around that time, in 2004, the SNM greenlighted -- sanctioned killing -- Dix for encouraging people not to join the SNM. See July 17 B. Cordova Tr. at 20:17-21:22 (Castellano, B. Cardova). B. Cordova also described that Dix had committed acts of violence toward SNM members, like C. Garcia. See July 17 B. Cordova Tr. at 21:19-22:4 (Castellano, B. Cordova). According to B. Cordova, after

Dix shot C. Garcia, the SNM actively sought to kill Dix, whereas, before the incident with C. Garcia, the SNM sanctioned killing Dix if the circumstances permitted.  See July 17 B. Cordova Tr. at 22:5-11 (Castellano, B. Cordova).

According to B. Cordova, in 2004, C. Garcia asked him to kill Dix.  See July 17 B. Cordova Tr. at 23:7-9 (Castellano, B. Cordova).  B. Cordova narrated that he agreed to do the task but was incarcerated before he could commit the murder.  See July 17 B. Cordova Tr. at 23:10-13 (Castellano, B. Cordova).  B. Cordova remembered expecting cash and respect for murdering Dix. See July 17 B. Cordova Tr. at 23:14-17 (Castellano, B. Cordova).

B. Cordova testified that he knew A. Cordova as C. Garcia's "runner," i.e., an individual who would do tasks for an SNM member.  July 17 B. Cordova Tr. at 23:18-24:3 (Castellano, B. Cordova).  B. Cordova explained that he often met with A. Cordova to purchase C. Garcia's drugs. See July 17 B. Cordova Tr. at 25:16-18 (B. Cordova).  B. Cordova described A. Cordova as an SNM associate who supported the SNM's activities.  See July 17 B. Cordova Tr. at 26:6-13 (Castellano, B. Cordova).

B. Cordova testified that, during a drug buy with A. Cordova and while reassuring A. Cordova that Dix' gang would not trouble his crack house, A. Cordova described the Dix murder. See Tr. at 27:13-29:3 (Castellano, B. Cordova); id. at 22:13-16 (B. Cordova).  According to B. Cordova, A. Cordova described waiting outside the house for Dix, pulling up to Dix' car, and shooting him himself.  See July 17 B. Cordova Tr. at 28:18-29:3 (Castellano, B. Cordova).  B. Cordova described that A. Cordova mentioned that M. Montoya conspired with him, that Dix drove a green minivan, and that A. Cordova gave Dix a final shot behind the ear.  See July 17 B. Cordova Tr. at 29:5-16 (Castellano, B. Cordova).  B. Cordova conveyed that A. Cordova described

shooting Dix in the back of the head.  See July 17 B. Cordova Tr. at 123:23-124:11 (Castellano, B. Cordova).  B. Cordova recounted that, according to A. Cordova, Dix' gang did not like Dix and had set him up for the murder.  See July 17 B. Cordova Tr. at 30:2-5 (Castellano, B. Cordova).  B. Cordova then described a conversation with M. Montoya about Dix.  See July 17 B. Cordova Tr. at 30:6-10 (Castellano, B. Cordova).  B. Cordova explained that, in 2010, after M. Montoya bonded B. Cordova from jail, M. Montoya praised A. Cordova to B. Cordova for supporting the SNM and not hesitating before shooting Dix.  See July 17 B. Cordova Tr. at 31:9-34:8 (Castellano, B. Cordova, Morrisey, Court).

On cross-examination, B. Cordova stated that he told the FBI about the green light on Dix for the first time on June 28, 2018.  See July 17 B. Cordova Tr. at 62:4-7 (Morrissey, B. Cordova).  B. Cordova described that the SNM's full force against Dix emerged after he shot C. Garcia.  See July 17 B. Cordova Tr. at 63:1-4 (B. Cordova).  On redirect, B. Cordova testified to first telling the FBI about C. Garcia's, M. Montoya's, and A. Cordova's involvement in the Dix murder on July 12, 2016.  See July 17 B. Cordova Tr. at 128:14-129:16 (Castellano, B. Cordova).  B. Cordova also stated that, in 2016, he told the FBI about C. Garcia, and that C. Garcia's and Dix' fight started over a woman.  See July 17 B. Cordova Tr. at 138:11-20 (Castellano, B. Cordova).

**k.    Richard Gallegos.**

Gallegos testified that he is not an SNM member but is a former member of a different gang in Albuquerque, New Mexico -- the West Side Locos.  See Transcript of Excerpt of Testimony of Richard Gallegos at 6:9-15 (taken July 17, 2018)(Armijo, Gallegos), filed July 19, 2018 (Doc. 853)("Gallegos Tr.").  Gallegos stated that he was, however, an SNM associate.  See Gallegos Tr. at 18:20-21 (Armijo, Gallegos).  Gallegos explained that he had murdered someone

for the SNM's purposes, although he was not an SNM member. See Gallegos Tr. at 105:19-106:4 (Armijo, Gallegos). Gallegos admitted that he was charged with murder, which carried a death penalty or life in prison, see Gallegos Tr. at 81:7-9 (Morrissey, Gallegos), and that, after being charged, he started cooperating with the FBI, see Tr. at 82:2-4 (Morrissey, Gallegos). Gallegos explained that he received a reduced sentence and now faces between ten and fifteen years. See Tr. at 40:1-10 (Armijo, Gallegos). Gallegos admitted that he shared information with the FBI to get points with the FBI agents. See Gallegos Tr. at 88:1-14 (Morrissey, Gallegos). Gallegos testified that, in summer 2016, he received discovery tablet that including among its content the charges against A. Cordova, and that he had the discovery tablet until February, 2017. See Gallegos Tr. at 79:23-80:15 (Morrissey, Gallegos).

Gallegos testified that he knew A. Cordova's son -- Anthony Cordova, Jr., see Gallegos Tr. at 6:18-23 (Armijo, Gallegos), but that A. Cordova Jr., has died, see Gallegos Tr. at 9:8-10 (Armijo, Gallegos). Gallegos testified that he knew A. Cordova, Jr.'s name, but that he and others called him "Gordy." See Gallegos Tr. at 46:16-22 (Morrissey, Gallegos). According to Gallegos, A. Cordova Jr. was a year older than him, and their mutual street gang included over a hundred people. See Gallegos Tr. at 46:23-47:9 (Morrissey, Gallegos).

Gallegos explained that A. Cordova also belonged to the West Side Locos, see Gallegos Tr. at 8:22-23 (Armijo, Gallegos), and that Gallegos met A. Cordova personally on April 28, 2016, see Gallegos Tr. at 14:7-15:4 (Armijo, Gallegos). Gallegos admitted that he did not recognize A. Cordova when he was first in the cell with him, that he had not personally known him previously, see Gallegos Tr. at 64:14-25 (Morrissey, Gallegos), and, that, during a telephone call after he initially entered prison, he asked who A. Cordova was, see Gallegos Tr. at 46:9-12

(Morrissey, Gallegos). Gallegos testified that, after he asked the question, he remembered the name "A. Cordova." See Gallegos Tr. at 103:6-7 (Morrissey, Gallegos). Gallegos stated that, while incarcerated, he told multiple people via telephone that he and A. Cordova were the only individuals in the institution who were not SNM members, see Gallegos Tr. at 66:17-67:2 (Morrissey, Gallegos), but Gallegos testified that older SNM members called A. Cordova "brother," see Gallegos Tr. at 38:22-39:9 (Armijo, Gallegos). Gallegos described sharing a cell with A. Cordova for four months in Torrance County jail. See Gallegos Tr. at 16:1-14 (Armijo, Gallegos). According to Gallegos, while in the jail, he worked with A. Cordova and a third man to bring drugs into the jail. See Gallegos Tr. at 16:25-17:18 (Armijo, Gallegos).

Gallegos noted that he had previously met C. Garcia, who he knew to be an SNM member, through his cousin. See Gallegos Tr. at 15:10-25 (Armijo, Gallegos). Gallegos testified that he asked A. Cordova why C. Garcia was on A. Cordova's case, and that A. Cordova explained that C. Garcia had ordered a hit on Dix and hired M. Montoya to commit the murder. See Gallegos Tr. at 36:20-25 (Armijo, Gallegos). According to Gallegos, A. Cordova stated that M. Montoya hired A. Cordova to make the hit and that, if C. Garcia cooperated, A. Cordova would be convicted. See Gallegos Tr. at 37:2-5 (Armijo, Gallegos); id. at 37:11-13 (Armijo, Gallegos). Gallegos recounted that A. Cordova described initially driving the car and then switching driving with M. Montoya, following Dix to a house in Albuquerque, New Mexico, waiting for Dix to leave the house, and then shooting Dix. See Gallegos Tr. at 37:17-23 (Armijo, Gallegos). Gallegos explained that A. Cordova described shooting Dix by making a shooting gesture and standing up from his bed. See Gallegos Tr. at 71:6-15 (Morrissey, Gallegos). Gallegos admitted that he first told the FBI that A. Cordova reported that M. Montoya hired him to kill Dix. See Gallegos Tr. at

69:23-69:1 (Morrissey, Gallegos). Gallegos also noted that he originally told the FBI that A. Cordova reported following Dix to a gasoline station or to a convenience store. See Gallegos Tr. at 69:25-70:4 (Morrissey, Gallegos). According to Gallegos, A. Cordova stated that, after the murder, he threw his firearm in the Rio Grande. See Gallegos Tr. at 38:1-3 (Armijo, Gallegos); id. at 38:20-21 (Armijo, Gallegos). Gallegos described that A. Cordova stated that he received drugs as payment for the Dix murder. See Gallegos Tr. at 38:12-14 (Armijo, Gallegos).

### l.     Steven Morales.

Morales testified that he identifies as a former SNM member and that he joined the gang around 1999 to 2000. See Transcript of Excerpt of Testimony of Steven Morales at 3:20-25 (taken July 16, 2018)(Beck, Morales), filed July 19, 2018 (Doc. 854)("Morales Tr."). Morales testified generally on the SNM, noting, for instance, that putting in work for the SNM means "drawing blood, stabbing and killing." Morales Tr. at 9:14-15 (Beck). See id. at 9:14-16 (Beck, Morales). Morales also explained that, if an SNM member is disrespected, the SNM expects members to retaliate for that disrespect or to have another member retaliate. See Morales Tr. at 15:10-14 (Beck, Morales).

Morales stated that he agreed to cooperate with the United States in 2017 and that he approached the United States about cooperating. See Morales Tr. at 23:21-24:1 (Beck, Morales). Morales explained that he felt that he needed to step away from the SNM. See Morales Tr. at 24:3-6 (Morales). Morales confirmed that New Mexico dismissed homicide charges against him when he agreed to cooperate with the FBI. See Morales Tr. at 26:13-21 (Beck, Morales). Morales stated that he has not been signed as a confidential human source with the FBI, has not received money for his cooperation, but has received a discovery tablet. See Morales Tr. at 26:22-27:4 (Beck,

Morales). Morales admitted that his plea agreement provides that, if he cooperates, he may receive a reduced sentence. <u>See</u> Morales Tr. at 77:9-11 (Morrissey, Morales). Morales indicated that he hopes to be released from prison and that the Court will sentence him to less than twenty years. <u>See</u> Morales Tr. at 78:5-12 (Morrissey, Morales).

Morales has known C. Garcia in and out of prison. <u>See</u> Morales Tr. at 27:5-14 (Beck, Morales). Morales explained that, between 2004 and 2006, he was dealing drugs and sending money to SNM members who were in prison. <u>See</u> Morales Tr. at 39:1-3 (Beck, Morales). Morales stated that, around 2004, he was buying drugs from C. Garcia, and retrieving several ounces to a pound of drugs every other week. <u>See</u> Morales Tr. at 28:1-15 (Beck, Morales). During that year, Morales observed C. Garcia's gunshot wound. <u>See</u> Morales Tr. at 28:19-24 (Beck, Morales).

According to Morales, C. Garcia asked Morales to kill Dix in exchange for a pound of heroin and $5,000.00. <u>See</u> Morales Tr. at 29:12-30:4 (Beck, Morales). Morales explained that C. Garcia offered to get him a gun if he required one to murder Dix. <u>See</u> Morales Tr. at 64:21-65:4 (Morrissey, Morales). Morales explained that he tried to set up Dix to kill him, but that Dix did not fall for Morales' trick. <u>See</u> Morales Tr. at 30:8-10 (Beck, Morales). Morales confirmed that he planned to and intended to kill Dix. <u>See</u> Morales Tr. at 67:13-16 (Morrissey, Morales).

Morales stated that he knows A. Cordova. <u>See</u> Morales Tr. at 30:20-22 (Beck, Morales). Morales explained that he had seen A. Cordova at C. Garcia's house and that some SNM members considered A. Cordova an SNM associate. <u>See</u> Morales Tr. at 31:5-23 (Beck, Morales). Morales identified C. Garcia and some powerful SNM members as among those SNM members who consider A. Cordova an associate. <u>See</u> Morales Tr. at 32:1-4 (Beck, Morales). Morales described that he also knows M. Montoya and that M. Montoya formerly worked with C. Garcia. <u>See</u>

Morales Tr. at 32:23-33:7 (Beck, M. Montoya). Morales explained that, in 2004 and 2005, he would see M. Montoya at C. Garcia's house. See Tr. at 33:8-13 (Beck, Morales).

Morales explained that, in 2016, he was housed in a jail with A. Cordova. See Morales Tr. at 33:17-25 (Beck, Morales). Morales indicated that they discussed each other's cases. See Morales Tr. at 37:7-10 (Morales). According to Morales, after Morales complimented A. Cordova on the Dix murder, A. Cordova said "[y]ou know how I do it," which Morales understood to mean that A. Cordova committed the murder. Morales Tr. at 37:7-22 (Beck, Morales). Morales confirmed that he has spoken with the FBI multiple times about this case, but that he did not tell the FBI about the conversation with A. Cordova until May 31, 2018. See Morales Tr. at 81:3-8 (Morrissey, Morales). Morales indicated that he realized the significance of seeing A. Cordova at C. Garcia's house after an interview with the FBI. See Morales Tr. at 82:5-7 (Morrissey, Morales).

Morales also testified that A. Cordova yelled at him: "Fucking rat. Stop snitching, rat." Morales Tr. at 39:1-17 (Beck, Morales). Morales explained that a rat is someone who cooperates with law enforcement, as Morales was doing. See Morales Tr. at 39:20-22 (Beck, Morales). Morales denied that the 302 report in which the FBI recorded A. Cordova's yelling accurately recorded word-for-word that A. Cordova stated: "What's up, you fucking rat," Morales Tr. at 99:23-24 (Morrissey), and "You're a rata," Morales Tr. at 100:12 (Morrissey). See Morales Tr. at 99:23-100:7 (Morrissey, Morales).

**m.** **Frederico Munoz.**

Munoz stated that he was at one point an SNM member. See Transcript of Excerpt of Testimony of Frederico Munoz at 3:20-22 (taken July 16, 2018)(Munoz), filed July 19, 2018 (Doc. 855)("Munoz Tr."). Munoz testified that he has been in protective custody since 2007, when

he left the SNM.  See Munoz Tr. at 44:2-13 (Morrissey, Munoz).  Munoz identified C. Garcia as the SNM's drug dealer and one of the best drug dealers in Albuquerque, see Munoz Tr. at 14:24-15:12 (Armijo, Munoz), and explained that, when he left prison in 2003, he went to C. Garcia to obtain drugs to start drug trafficking, see Munoz Tr. at 15:16-24 (Armijo, Munoz); id. at 16:8-13 (Armijo, Munoz).  According to Munoz, in 2005, SNM was an active gang involved in activities like drug trafficking.  See Munoz Tr. at 60:16-23 (Armijo, Munoz).

Munoz described generally the SNM and testified that, if someone disrespects an SNM member, the SNM will hurt that person in retaliation.  See Munoz Tr. at 28:5-9 (Armijo, Munoz).  Munoz testified that anyone who disrespects the SNM must react or have other members react for him, or face punishment from the SNM.  See Munoz Tr. at 28:11-29:12 (Armijo, Munoz).  Munoz explained that SNM members may call non-members with good standing and ties to the SNM "carnal" -- brother.  Munoz Tr. at 29:25-30:8 (Armijo, Munoz).  Munoz defined an "associate" as someone on whom the SNM can count and someone who can count on the SNM.  See Munoz Tr. at 30:12-17 (Armijo, Munoz).  According to Munoz, SNM members should not brag about crimes that they have not committed.  See Munoz Tr. at 43:7-11 (Morrissey, Munoz).  Munoz noted that an SNM member doing such bragging could be killed.  See Munoz Tr. at 43:16-21 (Morrissey, Munoz).  Munoz indicated, however, that such bragging might build an SNM member's reputation within the gang and that, generally, an SNM member should give credit to cooperators where they deserve credit.  See Munoz Tr. at 61:23-62:23 (Armijo, Munoz).

Munoz described that, for his two state life sentences in New Mexico, he becomes parole-eligible after thirty years, which places him at parole-eligible for the first sentence in 2033 and in 2037 for the second sentence.  See Munoz Tr. at 50:10-25 (Morrissey, Munoz).  Munoz testified

that, if he testifies truthfully, the United States may seek a downward departure on his federal life

sentence. See Munoz Tr. at 36:17-37:7 (Armijo, Munoz). Munoz described that the United States

has given him money for his cooperation. See Munoz Tr. at 55:1-23 (Armijo, Munoz).

### n. Tom Neale.

Tom Neale, an FBI agent, testified that a monitored call among C. Garcia, Duran, and Baca

revealed discussion of the name Antone, and that the FBI recorded the call. See Transcript of

Excerpt of Testimony of Tom Neale at 8:19-9:6 (taken July 17, 2018)(Castellano, Neale), filed

July 19, 2018 (Doc. 856)("Neale Tr."). In the recording, Baca asks C. Garcia about an "Antone,"

and C. Garcia responds "Antone? You know, you know who it is? It's Antone ah, the homie,

Antone ah Cordova." Transcript of Recording at 2 (taken April 15, 2016), filed August 21, 2018

(Doc. 903-7)("Garcia, Duran, Baca Tr."). C. Garcia continues, prompting "you remember him no,

from the west side?" and mentions that A. Cordova "says I know [Baca]." Garcia, Duran, Baca

Tr. at 2. After this statement, Baca asks "[h]ow is he doing out there?" and C. Garcia describes A.

Cordova's problems with psoriasis and his Suboxone use. Garcia, Duran, Baca Tr. at 2. Neale

identified C. Garcia's and Baca's voices in the conversation, and testified that Duran captured the

conversation on a wiretapped cellular telephone. See Neale Tr. at 10:2-22 (Castellano, Neale).

Neale testified that, during the conversation, he also heard mention of psoriasis, of someone from

the West Side, and of the name Ray Arguello, and that he had learned previously that A. Cordova

had psoriasis. See Neale Tr. at 11:11-12:5 (Castellano, Neale).

Neale also confirmed that the 2005 Super Bowl was on February 6, 2005, see Neale Tr. at

23:24-24:2 (Castellano, Neale), and also testified that he searched for A. Cordova's registered

vehicles and discovered that he owned a 1990 maroon Pontiac sedan, see Neale Tr. at 21:23-22:7

(Castellano, Neale). Neale testified that he searched A. Cordova's car records, which reflect that the 1990 maroon Pontiac sedan was registered to A. Cordova from February 13, 2004, <u>see</u> Neale Tr. at 23:18 (Neale), to February 28, 2005, <u>see</u> Neale Tr. at 31:4-9 (Castellano, Neale). Neale testified that, from his review of A. Cordova's telephone calls, Neale concluded that A. Cordova knows Arguello from Albuquerque. <u>See</u> Neale Tr. at 18:24-19:2 (Castellano, Neale). Neale described that this fact has significance, because in M. Montoya's conversation with C. Garcia, C. Garcia mentioned A. Cordova discussing jale with Arguello. <u>See</u> Neale Tr. at 31:10-24 (Castellano, Neale).

o.     **Michael Tinker.**

Michael Tinker lives in the neighborhood where Dix was shot, and indicated that, on the evening of February 4, 2005, he was watching television with his wife when he heard five gunshots. <u>See</u> Transcript of Excerpt of Testimony of Michael Tinker at 4:1-11 (taken July 12, 2018(Beck, Michael Tinker), filed August 10, 2018 (Doc. 986)("Michael Tinker Tr."). He explained that the gunshots shocked him and his wife, and that, shortly thereafter, he called 911. <u>See</u> Michael Tinker Tr. at 4:12-22 (Michael Tinker, Beck). Michael Tinker testified that, around 8:00 p.m., he and his wife tried to determine what had happened by looking out their windows. <u>See</u> Michael Tinker Tr. at 5:3-16 (Beck, Michael Tinker). Michael Tinker explained that they noticed a bright light illuminating their room and eventually realized that the car from which the headlights came had stopped in their front lawn. <u>See</u> Michael Tinker Tr. at 8:3-9:2 (Beck, Michael Tinker). Michael Tinker remembered telling the 911 operator about the gunshots fired and about the car in his front lawn. <u>See</u> Michael Tinker Tr. at 9:7-19 (Beck, Michael Tinker). Michael Tinker described walking up to the vehicle and seeing Dix. <u>See</u> Michael Tinker Tr. at 11:10-12:22

(Beck, Michael Tinker). Tinker stated that, at the time, he did not know who Dix was. See Michael

Tinker Tr. at 15:22-16:2 (Beck, Michael Tinker). Michael Tinker surmised that the van came from

a group of homes and mobile homes near a stop sign up his road. See Michael Tinker Tr. at 17:5-

18:7 (Michael Tinker, Beck). Michael Tinker indicated that, before hearing the gunshots, he and

his wife did not hear shouting, yelling, people running, or cars, see Michael Tinker Tr. at 19:12-

23 (Beck, Michael Tinker), and that, after the gunshots, likewise, Michael Tinker did not hear any

sounds of cars or running, see Michael Tinker Tr. at 20:5-13 (Beck, Michael Tinker).

       **p.**      **Luis Funes.**

Luis Funes identified himself as the community service aide who initially answered

Michael Tinker's 911 call. See Draft Transcript of Trial at 32:4-33:12 (taken July 12,

2018)(Armijo, Funes)("July 12 Tr."). Funes explained that a community service aide is a civilian

employee who drives a police vehicle and engages in activities like directing traffic and towing

vehicles to free police officers' time for other tasks. See July 12 Tr. at 32:22-33:3 (Funes). Funes

recollected that, on the night of February 4, 2005, he received a call to a traffic accident. See July

12 Tr. at 33:15-21 (Armijo, Funes). Funes recollected approaching Dix' driver-side window and

realizing that Dix' injuries did not result from a crash and recounted that, at this point, he advised

the BCSO via radio that they had a gunshot victim and not a crash victim. See July 12 Tr. at 35:22-

36:15 (Armijo, Funes). Funes described that a man left the house near the van and told Funes that

he had heard gunshots. See July 12 Tr. at 38:4-10 (Armijo, Funes). Funes recalled advising the

man to return inside his home, see July 12 Tr. at 41:19-25 (Funes), and that this encounter

reinforced his opinion that the BCSO had a gunshot victim, see July 12 Tr. at 38:4-17 (Armijo,

Funes).  After receiving Funes' call, the BCSO advised Funes to leave the scene, which he did. <u>See</u> July 12 Tr. at 36:22-37:18 (Armijo, Funes).

q.     **Nathan Lerner.**

Nathan Lerner testified that, on and around February 19, 2004, the BCSO employed him in its narcotics unit.  <u>See</u> Draft Transcript of Trial at 84:11-85:6 (taken July 13, 2018)(Castellano, Lerner)("July 13 Tr.").  Lerner recounted that, on February 19, 2004, he encountered C. Garcia after an incident in which someone shot C. Garcia.  <u>See</u> July 13 Tr. at 85:7-13 (Castellano, Lerner). Lerner noted that he received the call, because the BCSO suspected C. Garcia of trafficking drugs. <u>See</u> July 13 Tr. at 85:14-17 (Castellano, Lerner).  Lerner then described that, on December 26, 2004, he encountered M. Montoya after an arrest that revealed items including "a mask, duct tape," and a gun in M. Montoya's car.  July 13 Tr. at 86:19 (Lerner).  <u>See</u> July 13 Tr. at 85:25-86:19 (Castellano, Lerner).  Lerner narrated that later, on February 4, 2005, he received a call to a crime scene, and discovered a vehicle still running and crashed into a fence, and the driver slumped over. <u>See</u> July 13 Tr. at 87:5-88:13 (Castellano, Lerner).  Lerner recalled seeing no footprints at the scene, <u>see</u> July 13 Tr. at 88:22-24 (Castellano, Lerner), but, on cross-examination, Lerner clarified that he meant that he saw no footprints on the pavement or near the car, <u>see</u> July 13 Tr. at 99:3-9 (Lerner, Acton).  Lerner affirmed that he did not document any suspects during his time at the crime scene.  <u>See</u> July 13 Tr. at 120:12-17 (Acton, Lerner).  Lerner also testified that he had responded to several calls at C. Garcia's house and that, during a search of C. Garcia's house after C. Garcia was shot, the BCSO discovered multiple grams of crack cocaine and powder cocaine. <u>See</u> July 13 Tr. at 90:11-25 (Castellano, Lerner).  Lerner further remembered pulling over C. Garcia at a traffic stop and documenting C. Garcia's tattoos, including an SNM tattoo.  <u>See</u> July

13 Tr. at 91:4-92:5 (Castellano, Lerner).  Lerner testified that, while working with the BCSO, he did not have any memorable interactions with A. Cordova.  See July 13 Tr. at 120:21-24 (Acton, Lerner).

r.    **Brandon Blackmon**.

Brandon Blackmon testified that, on February 4, 2005, he was a detective in the Criminal Investigations Division's Gang Unit at the BCSO.  See July 13 Tr. at 127:24-128:6 (Armijo, Blackmon).  Blackmon recalled that, around 8:35 p.m. on February 4, 2005, he heard on the radio a call about a car crash in a neighborhood.  See July 13 Tr. at 129:1-25 (Armijo, Blackmon).  He described that he went to the scene when he heard that the car's driver had suffered multiple gunshot wounds.  See July 13 Tr. at 130:19-25 (Blackmon).  Blackmon recounted that he saw a green van that had run into a fence and that the car was still running.  See July 13 Tr. at 131:17-132:9 (Armijo, Blackmon).  Blackmon described seeing multiple bullet holes in the driver's door; the driver slumped in the front seat, covered in blood; and the passenger-side sliding door's glass shattered.  See July 13 Tr. at 134:6-7 (Blackmon); id. at 134:22-135:20 (Armijo, Blackmon).  Blackmon described that, based on the nearby homeowners' reports, the BCSO assumed that the culprit was on foot nearby.  See July 13 Tr. at 137:2-11 (Blackmon).  Blackmon described that he later learned that the victim was Dix, whom Blackmon had transported to a jail several months earlier.  See July 13 Tr. at 139:17-141:4 (Armijo, Blackmon).  Blackmon testified that, during his time with the BCSO, he knew that the neighborhood in which the BCSO found Dix' car had problems with drug trafficking and gang membership.  See July 13 Tr. at 141:20-142:2 (Armijo, Blackmon).

s. **Michael Sullivan.**

Michael Sullivan testified that he met Dix, because he sold Dix drugs, and that he encountered him again in prison in 2001. See July 13 Tr. at 254:15-255:6 (Beck, Sullivan); id. at 255:11-13 (Sullivan, Beck). Sullivan testified that Dix belonged to a gang centered in Albuquerque's South Valley. See July 13 Tr. at 256:3-7 (Beck, Sullivan). Sullivan described that, in 2004, he again ran into Dix and stayed with him for a couple weeks in what amounted to a drug house. See July 13 Tr. at 256:10-19 (Beck, Sullivan). Sullivan mentioned that he also knew C. Garcia from parties when they were younger. See July 13 Tr. at 258:11-14 (Beck, Sullivan). Sullivan noted that Dix told him about shooting C. Garcia, see July 13 Tr. at 259:6-11 (Beck, Sullivan), and Sullivan remembered being informed that C. Garcia wanted Dix killed and asked Sullivan to kill Dix, see July 13 Tr. at 260:7-11 (Sullivan); id. at 274:5-9 (Beck, Sullivan).

t. **Michael King.**

Michael King testified that, in 2009, he retired from the BCSO, but that, for his last fifteen years with the BCSO, he worked as a detective in the crime scene unit. See July 13 Tr. at 278:18-279:5 (Armijo, King). King remembered going to the crime scene on February 4, 2005. See July 13 Tr. at 280:2-4 (Armijo, King). King reviewed and narrated a videotape that he took at the scene, and that showed the neighborhood and the van. See July 13 Tr. at 282:21-288:25 (Armijo, King). King described that his team impounded the vehicle and attempted to determine the shots' trajectories and he noted that the shots centered around the driver's door. See July 13 Tr. at 289:9-290:2 (King). King noted that the FBI did not speak with him about this case until a couple days before trial when they contacted him about testifying. See July 13 Tr. at 319:1-13 (Acton, King).

u.    **Kimberly Haag**.

Kimberly Haag introduced herself as a "firearm and tool mark examiner." Draft Transcript of Hearing at 111:16 (taken July 16, 2018)(Haag)("July 16 Tr."). Haag testified that the eight bullet casings recovered from the crime scene came from the same firearm. See July 16 Tr. at 138:8-14 (Haag). Haag opined that she could not determine definitively what caused damage to any bullet casings. See July 16 Tr. at 141:8-15 (Haag). She noted, however, that four casings showed some damage potentially from hitting the road. See July 16 Tr. at 142:5-6 (Haag). Haag also indicated that she received seven bullets and one bullet fragment. See July 16 Tr. at 142:17-18 (Haag). Haag stated that, for several of these bullets, she could not determine whether they travelled through the same firearm. See July 16 Tr. at 143:7-19 (Haag). Haag testified that, from the evidence she had, she determined that the shooter likely used a High Point brand firearm. See July 16 Tr. at 147:21-148:12 (Haag, Castellano). She indicated that such firearms are common. See July 16 Tr. at 159:4 (Haag). Haag added that the BCSO could not match the shooting to any other shooting events to suggest a serial shooting. See July 16 Tr. at 150:1-151:5 (Haag, Castellano).

p.    **Brian Acee July 17, 2018**.

Acee returned to the stand and testified that M. Montoya told him after the conversation with C. Garcia: "[Arguella] told Chris Garcia that Antone was talking about Dix." Transcript of Excerpt of Testimony of Bryan Acee at 7:15-16 (taken July 17, 2018)(Acee), filed July 19, 2018 (Doc. 849)("Acee July 17 Tr."). Acee explained, regarding M. Montoya's conversation with Baca in which M. Montoya admitted to murdering Dix, that the FBI encouraged M. Montoya to speak with Baca. See Acee July 17 Tr. at 7:20-8:13 (Castellano, Acee). Acee also clarified that M.

Montoya knew that the FBI had wiretapped his telephone and that the FBI listened to that conversation. See Acee July 17 Tr. at 8:11-17 (Castellano, Acee). Acee explained that, during the conversation, M. Montoya was outside the prison on a telephone call and Duran was inside the prison, and that neither knew that the other was cooperating. See Acee July 17 Tr. at 9:10-10:8 (Castellano, Acee).

### q. Mikail Tinker.

A. Cordova began his case-in-chief with Mikail Tinker, who testified that she is married to Michael Tinker. See Transcript of Excerpt of Testimony at 3:17-19 (taken July 18, 2018)(Morrissey, Mikail Tinker), filed August 10, 2018 (Doc. 896)("Mikail Tinker Tr."). Mikail Tinker noted that, around the date of the Dix murder, she remembered considerable traffic visiting a compound of buildings near her home. See Mikail Tinker Tr. at 15:4-23 (Morrissey, Mikail Tinker). Mikail Tinker testified that, at 8:00 p.m. on the evening of February 4, 2005, she was watching television with Michael Tinker when they heard five gunshots. See Mikail Tinker Tr. at 3:20-5:2 (Morrissey, Mikail Tinker). When Mikail Tinker went to her window, she saw a van stuck in the family's fence and still running with the headlights illuminating the house. See Mikail Tinker Tr. at 8:12-9:10 (Morrissey, Mikail Tinker). While Michael Tinker called 911, Mikail Tinker watched out the window, and saw somebody walking swiftly away from the van and the house. See Mikail Tinker Tr. at 9:17-22:2 (Morrissey, Mikail Tinker). Mikail Tinker testified that she saw and heard nothing unusual before the gunshots. See Mikail Tinker Tr. at 12:3-6 (Morrissey, Mikail Tinker). Mikail Tinker remembered observing only one vehicle -- the van -- in the neighborhood. See Mikail Tinker Tr. at 12:23-13:4 (Morrissey, Mikail Tinker). Mikail Tinker initially commented that she did not see any other vehicle during the three hours that she

and her husband waited for the BCSO to arrive.  See Mikail Tinker Tr. at 16:22-17:9 (Morrissey, Mikail Tinker).  Mikail Tinker later agreed that, in the report that she initially gave the BCSO, she indicated that a car had passed and illuminated the person who she had seen walking that she had seen, and that she had seen another red truck that night.  See Mikail Tinker Tr. at 22:24-23:1 (Mikail Tinker); id. at 24:1-4 (Beck, Mikail Tinker).

### r. **David Littlefield**.

David Littlefield testified that he works for the BCSO and that, in February, 2005, he worked in the BCSO's Field Services Division as a patrol officer.  See Draft Transcript of Hearing at 75:21-76:6 (taken July 18, 2018)(Littlefield)("July 18 Tr.").  According to Littlefield, he had some involvement in the Dix murder investigation.  See July 18 Tr. at 61:23-62:1 (Acton, Littlefield).  Littlefield recounted that, at the crime scene on February 4, 2005, he taped off the perimeter and, at a superior's direction, searched for a red Toyota Camry.  See July 18 Tr. at 65:6-16 (Littlefield).  Littlefield also indicated that, on December 26, 2004, he arrested M. Montoya on an outstanding misdemeanor warrant.  See July 18 Tr. at 70:5-71:4 (Littlefield).  Littlefield explained that, after the arrest, he directed M. Montoya's car to another person to inventory.  See July 18 Tr. at 76:22-77:1 (Acton, Littlefield).  Littlefield confirmed that, in his report, he noted finding nothing in M. Montoya's car before the inventory.  See July 18 Tr. at 77:21-78:2 (Beck, Littlefield).

### s. **Robert Lovato**.

Lovato explained that, in 1998, he became an SNM member by committing a murder.  See July 18 Tr. at 162:5-17 (Armijo, Lovato).  Lovato confirmed that he has now provided the FBI information about the SNM and M. Montoya.  See July 18 Tr. at 158:3-8 (Morrissey, Lovato).

Lovato confirmed that SNM members may discuss crimes with which they have not been charged and sometimes do not mention their accomplices, although the SNM frowns on such discussions. See July 18 Tr. at 164:4-24 (Armijo, Lovato). Lovato testified that he would not be surprised if, in describing a crime, an SNM member did not mention an accomplice, and explained that murder, particularly murder through a close encounter, like a shot to the head, enhanced one's status in the SNM. See July 18 Tr. at 176:3-24 (Armijo, Lovato).

Lovato testified that he knew M. Montoya and that the two men had been incarcerated together on multiple occasions. See July 18 Tr. at 158:19-159:1 (Morrissey, Lovato). According to Lovato, M. Montoya took credit for killing Dix, and recounted that C. Garcia paid M. Montoya about half a kilogram of cocaine for the murder and that Snow witnessed the crime. See July 18 Tr. at 159:4-160:4 (Morrissey, Lovato). Lovato explained that M. Montoya told him that he killed Dix with an AK-47. See July 18 Tr. at 161:10-14 (Morrissey, Lovato). Lovato remembered telling the FBI that M. Montoya's conveyed that his wife assisted him with the murder. See July 18 Tr. at 160:5-22 (Morrissey, Lovato). Lovato described that, although SNM members should not brag about their crimes or discuss crimes for which they had not been charged, when M. Montoya shared the story about the Dix murder, M. Montoya and Lovato were close, and M. Montoya knew that Lovato would not share the story. See July 18 Tr. at 177:22-178:23 (Morrissey, Lovato).

Lovato stated that A. Cordova was not an SNM member and that he had never heard of A. Cordova's involvement in the Dix murder. See July 18 Tr. at 161:1-9 (Morrissey, Lovato). Lovato testified that he knows C. Garcia as an SNM member who possesses power, because he has money and drugs. See July 18 Tr. at 168:16-169:17 (Armijo, Lovato). Lovato noted that, in 2005, C. Garcia was successfully dealing drugs. See July 18 Tr. at 170:2-8 (Armijo, Lovato). Lovato

testified that, in 2016, M. Montoya shared that he felt guilty for telling the FBI about A. Cordova's help with the Dix murder.  See July 18 Tr. at 175:14-23 (Armijo, Lovato).

       **t.**        **Timothy Hix.**

Timothy Hix introduced himself as a BCSO patrol sergeant and explained that he had some involvement with the Dix murder investigation.  See July 18 Tr. at 181:14-182:3 (Acton, Hix). Hix described that, although he was not one of the initial detectives on the case, he inherited the case on February 24, 2005.  See July 18 Tr. at 182:9-23 (Hix, Acton).  Hix remembered joining the execution of one search warrant related to the Dix murder.  See July 18 Tr. at 183:19-184:25 (Hix, Acton).  Hix testified that, during that search -- which was of Snow's house -- Hix secured the residence.  See July 18 Tr. at 185:3-10 (Hix, Acton).

Hix also explained that, years later, the BCSO interviewed him to reconstruct the Dix murder investigation.  See July 18 Tr. at 187:4-8 (Acton, Hix).  Hix described that he discussed the search warrant and a later interview that the BCSO had with C. Garcia.  See July 18 Tr. at 187:24-188:4 (Hix).  Hix indicated that C. Garcia drew the BCSO's attention, because the BCSO suspected that Dix had previously shot C. Garcia, but Hix confirmed that the interview with C. Garcia was the only interview that Hix conducted in the investigation.  See July 18 Tr. at 188:8-18 (Hix, Acton).  He testified that C. Garcia denied involvement in the murder, but gave only rumors about who was involved, and agreed that the report reflects that no one wanted to talk about the murder.  See July 18 Tr. at 194:8-195:21 (Beck, Hix).  Hix recounted that, around 2010, he had no leads on the Dix murder and gave the file to the BCSO's Criminal Investigations Division's Homicide Unit.  See July 18 Tr. at 192:18-25 (Hix).

u.    **Patrick Charlton.**

Patrick Charlton introduced himself as a retired BCSO lieutenant.  See July 18 Tr. at 217:22-24 (Charlton).  Charlton explained that, in February, 2005, he held a position as a crime scene investigation detective.  See July 18 Tr. at 219:7-8 (Charlton).  Charlton stated that he was involved in the Dix murder investigation.  See July 18 Tr. at 219:12-14 (Acton, Charlton).  Charlton described helping to process Dix' van.  See July 18 Tr. at 219:21-22 (Charlton).  Charlton explained that he did not document any measurements when examining the bullets' potential trajectories, but noted that photographs reveal some measurements.  See July 18 Tr. at 222:12-223:4 (Charlton, Acton).  Charlton offered that the BCSO did vertical measurements to estimate the bullets' trajectories but opined that he wished that the BCSO had done other measurements.  See July 18 Tr. at 225:18-226:11 (Acton, Charlton).

r.    **Vincent Aguilar.**

Vincent Aguilar testified that he was best friends with A. Cordova Jr., whom he met when he was approximately sixteen years old.  See Transcript of Excerpt of Testimony at 4:9-15 (taken July 18, 2018)(Aguilar), filed July 20, 2018 (Doc. 864)("Aguilar Tr.").  Aguilar testified that he did not recognize Gallegos and had not seen him associated with the West Side gang to which they allegedly both belonged.  See Aguilar Tr. at 6:3-12 (Morrissey, Aguilar).  Aguilar admitted, however, that he does not know all West Side gang members.  See Aguilar Tr. at 13:11-12 (Armijo, Aguilar).  Aguilar asserted that he knew everyone close to A. Cordova Jr., and that because he did not know Gallegos, Gallegos likely was not friends with A. Cordova Jr.  See Aguilar Tr. at 14:5-17 (Morrissey, Aguilar).

###### s. **Matthew McCoy.**

Matthew McCoy introduced himself as a former BCSO sergeant. See July 18 Tr. at 251:16-18 (McCoy). McCoy noted that, in 2005, he was a detective and that he had worked some on the Dix murder case. See July 18 Tr. at 252:1-8 (Acton, McCoy). McCoy explained that, on the evening of February 4, 2005, he was with Blackmon and that they went to the crime scene after hearing Funes' report about a gunshot victim. See July 18 Tr. at 252:9-253:7 (Acton, McCoy). McCoy described that he saw Dix' body and began roping off the scene. See July 18 Tr. at 253:17-21 (McCoy); id. at 260:5-24 (Acton, McCoy). McCoy noted that he detained Snow's maroon car as Snow attempted to pass the crime scene. See July 18 Tr. at 256:7-257:12 (Acton, McCoy). McCoy remembered patting down Snow and did not remember what happened next with Snow. See July 18 Tr. at 260:5-24 (Acton, McCoy). McCoy added that another adult accompanied Snow in the car. See July 18 Tr. at 261:22-24 (Acton, McCoy).

###### t. **Samuel Gonzalez.**

Samuel Gonzalez testified that he knew A. Cordova from incarceration and knew him not to be affiliated with a gang. See Transcript of Excerpt of Testimony of Samuel Gonzalez at 4:14-5:2 (taken July 18, 2018)(Morrissey, Gonzalez), filed July 20, 2018 (Doc. 865)("Gonzalez Tr."). Gonzalez testified that he knew that C. Garcia was supposed to kill Dix for disrespecting Archuleta, that C. Garcia had more motivation to kill Dix after Dix shot him, and that C. Garcia was a big SNM drug dealer. See Gonzalez Tr. at 10:18-11:4 (Castellano, Gonzalez).

###### u. **Brian Lindley.**

Brian Lindley identified himself as the chief deputy of the BCSO's Criminal Investigations Division. See Transcript of Excerpt of Testimony of Brian Lindley at 3:21-23 (taken July 18,

2018)(Lindley), filed July 20, 2018 (Doc. 866)("Lindley Tr.").  Lindley stated that, on the night of the Dix murder, he was the "on-call homicide detective."  Lindley Tr. at 30:16 (Lindley).  Lindley noted, however, that, several hours after he reached the scene, the BCSO gave the case to a different detective.  See Lindley Tr. at 41:22-24 (Lindley).  Lindley described that he did not identify any suspects while at the scene.  See Lindley Tr. at 38:23-25 (Acton, Lindley).  Lindley testified that he did not recall making any conclusions that night, see Lindley Tr. at 41:13-15 (Acton, Lindley), but, after refreshing his recollection, he recalled concluding that bullets were fired from a low angle, and possibly from an individual in a vehicle or lying down, see Lindley Tr. at 45:3-10 (Lindley).

Lindley discussed the calls that the BCSO received about the scene, noting that, around 8:30 p.m., the BCSO received calls that shots had been fired and that a male had been shot.  See Lindley Tr. at 33:3-34:4 (Acton, Lindley).  Lindley stated more specifically that, at 8:25 p.m., the BCSO received a call about gunshots and confirmed that he would assume that the shots occurred before the call.  See Lindley Tr. at 52:6-11 (Beck, Lindley).  Lindley noted that, at 8:26 p.m., the BCSO received a call that a vehicle had hit a fence, see Lindley Tr. at 34:1-14 (Acton, Lindley), and that, at 8:30 p.m., the BCSO received a call about a subject leaving the scene on foot, see Lindley Tr. at 34:15-16 (Acton, Lindley).  Lindley noted that, also at 8:30 p.m., the BCSO received a call about another car in the area.  See Lindley Tr. at 52:20-25 (Beck, Lindley).

### v.     Benji Montano.

Benji Montano testified that he knows M. Montoya and that M. Montoya declared that he killed Dix for C. Garcia.  See Transcript of Excerpt of Testimony of Benji Montano at 3:21-4:6 (taken July 18, 2018)(Morrissey, Montano), filed July 20, 2018 (Doc. 867)("Montano Tr.").

Montano described that M. Montoya made this statement in 2013, or 2014, while they were neighbors in prison in Las Cruces, New Mexico.  See Montano Tr. at 4:9-14 (Morrissey, Montano). Montano testified that he knew M. Montoya to be an SNM member.  See Montano Tr. at 8:20-21 (Armijo, Montano).

       w.       **Sam Giron.**

Sam Giron introduced himself as an evidence technician with the Albuquerque Police Department at the Metropolitan Forensic Science Center.  See July 18 Tr. at 320:19-22 (Giron). Giron testified that he remembered A. Cordova's defense team asking to view the Dix murder scene video, see July 18 Tr. at 322:15-19 (Acton, Giron), and that he, at least on one occasion, denied the team access to the video, see Draft Transcript of Hearing at 29:19-30:7 (taken July 19, 2018)(Acton, Giron)("July 19 Tr.").  Giron confirmed that he would not have allowed the team to "check out" the video, because the detective that tagged the evidence would need to approve such an action.  July 18 Tr. at 323:1 (Acton).  See July 18 Tr. at 322:15-323:8 (Giron).  Giron clarified that A. Cordova's defense team could view the evidence, but not access it to perform actions like testing a blood spot or viewing a video.  See July 19 Tr. at 33:22-34:3 (Acton, Giron).  Giron agreed that, for a cold case, the detective who could approve checking out evidence might be an employee from years earlier and stated that the investigation unit's head would have to approve such an inquiry.  See July 18 Tr. at 323:9-16 (Giron).  On cross-examination, Giron noted, however, that A. Cordova's counsel and investigator were listed as having viewed the crime scene video.  See July 19 Tr. at 19:5-22 (Beck, Giron).

According to Giron, the items related to the Dix murder are on checked-out status.  See July 19 Tr. at 9:15-19 (Beck, Giron).  Giron confirmed that, if the FBI checked out the evidence,

the evidence would be documented as checked out. See July 18 Tr. at 339:1-13 (Beck, Giron). Giron indicated that the relevant documentation showed that the FBI had checked out the items for court. See July 19 Tr. at 10:16-22 (Beck, Giron). Giron then agreed that the chain of custody, and the way that the FBI and the parties presented the evidence before the Court, were not problematic. See July 19 Tr. at 15:3-9 (Beck, Giron).

### x. Paul Jacobs.

Paul Jacobs introduced himself as a retired BCSO officer. See July 19 Tr. at 37:14-15 (Jacobs). Jacobs explained that, in 2005, he was a field sergeant and that he was involved briefly in the Dix murder investigation. See July 19 Tr. at 38:4-17 (Acton, Jacobs). Jacobs recounted that, after receiving Funes' call that the alleged crash scene victim had suffered gunshot wounds, Jacobs drove to the crime scene. See July 19 Tr. at 39:1-7 (Acton). Jacobs described that he saw the green minivan, still running, with the driver slumped onto the steering wheel and covered in blood. See July 19 Tr. at 41:16-22 (Jacobs). Jacobs described the crime scene and noted that, when a rescue team arrived, to preserve the evidence, he attempted to keep all but one rescue team member from the scene. See July 19 Tr. at 43:16-21 (Jacobs, Acton). Jacobs recalled arriving at the scene around the same time that Blackmon and McCoy arrived. See July 19 Tr. at 44:18-23 (Jacobs). Jacobs testified that he did not observe a vehicle stopping in the area and that he did not remember interviewing any suspects. See July 19 Tr. at 49:16-50:10 (Jacobs, Acton).

### y. Peter Golden.

Golden testified that he is a lieutenant with the BCSO and was involved in trying to rebuild the cold case file for the Dix murder. See July 19 Tr. at 77:16-78:4 (Acton, Golden). Golden noted that initially the BCSO had some difficulty locating the original file and that, at that time,

the BCSO had an incomplete file, so he interviewed some detectives about the initial investigations. See July 19 Tr. at 78:7-12 (Golden); id. at 78:22-79:12 (Acton, Golden). Golden explained that a full file would include photographs, a video, and possibly a crime scene diagram. See July 19 Tr. at 79:14-80:19 (Acton, Golden). According to Golden, he wrote notes from his interviews with BCSO detectives. See July 19 Tr. at 80:23-81:24 (Acton, Golden). Golden stated that he asked BCSO Captain Andrea Taylor to locate the BCSO's files on the Dix murder. See July1 9 Tr. at 78:16-20 (Golden). Golden asserted that he was not further involved in finding the original file and that he could not speak from personal knowledge to whether the BCSO located the file. See July 19 Tr. at 84:8-84:6 (Acton, Golden). Golden testified that he would not be surprised if the BCSO had found the file and indicated that the evidence in the file would still be good evidence. See July 19 Tr. at 94:5-16 (Beck, Golden, Acton, Court).

### z.   **David Calbert.**

David Calbert testified that, after being arrested and charged in this case, he was housed with C. Garcia, whom Calbert identified as an SNM member. See Transcript of Excerpt of Testimony of David Calbert at 4:6-12 (taken July 19, 2018)(Morrissey, Calbert), filed July 20, 2018 (Doc. 869)("Calbert Tr."). According to Calbert, C. Garcia shared that he had M. Montoya "smoke[, i.e., kill] Shane Dix" while C. Garcia was in Las Vegas. Calbert Tr. at 4:14 (Morrissey). See id. at 4:13-16 (Morrisey, Calbert). Calbert testified that M. Montoya was not housed with Calbert and C. Garcia when C. Garcia shared that information, see Calbert Tr. at 7:24-8:1 (Beck, Calbert), and that, at that time, C. Garcia worried about M. Montoya cooperating with the FBI, see Calbert Tr. at 8:23-9:4 (Beck, Calbert). Calbert clarified that many people worried about M.

Montoya, because they believed that M. Montoya had killed Dix, and because M. Montoya was not incarcerated.  See Calbert Tr. at 11:3-8 (Morrissey, Calbert).

### aa.   **Leonard Lujan.**

Leonard Lujan testified that M. Montoya connected him with the SNM.  See Transcript of Excerpt of Testimony Leonard Lujan at 7:15-17 (taken July 19, 2018)(Morrissey, Lujan), filed September 20, 2018 (Doc. 871)("Lujan Tr.").  Lujan testified to telling a law enforcement interviewer that Dix shot C. Garcia in the stomach.  See Lujan Tr. at 4:4-14 (Morrissey, Lujan). Lujan also commented that he told the interviewer that C. Garcia paid M. Montoya to kill Dix. See Lujan Tr. at 4:15-17 (Morrissey, Lujan).  Lujan confirmed that C. Garcia was a well-known drug dealer for the SNM.  See Lujan Tr. at 10:4-6 (Beck, Lujan).  Lujan explained that the news of C. Garcia's shooting made its rounds through the SNM, because the SNM members were discussing a member of another gang shooting one of their own.  See Lujan Tr. at 10:7-11:6 (Beck, Lujan).  Lujan confirmed that, within the SNM, people widely believed that M. Montoya killed Dix.  See Lujan Tr. at 11:7-9 (Beck, Lujan).

Lujan confirmed that M. Montoya and he grew up together, and trusted each other, and described that, three weeks after the Dix murder, M. Montoya shared that he had killed Dix.  See Lujan Tr. at 4:4-4:6 (Morrissey, Lujan); id. at 5:16-19 (Morrissey, Lujan).  Lujan testified that he vaguely remembered telling the FBI interviewer that M. Montoya described walking up to Dix and shooting.  See Lujan Tr. at 7:2-7 (Morrissey, Lujan).

Lujan testified that he knew A. Cordova as an SNM member.  See Lujan Tr. at 13:13-14:6 (Beck, Lujan).  Lujan stated that he has not been around the SNM since 2008 and would not know what A. Cordova has been doing during that time.  See Lujan Tr. at 17:7-12 (Beck, Lujan).  Lujan

explained that he identified A. Cordova as an SNM member, because A. Cordova associated with the SNM members while in prison.  See Lujan Tr. at 19:15-25 (Morrissey, Lujan).  Lujan testified that he has never mentioned to the FBI A. Cordova's name in connection with the Dix murder.  See Tr. at 26:15-18 (Morrissey, Lujan).

      **bb.**      <u>**Jerry Montoya.**</u>

J. Montoya identified himself as a former SNM member, <u>see</u> Transcript of Excerpt of Testimony of Jerry Montoya at 8:5-7 (taken July 19, 2018)(Beck, J. Montoya), filed July 20, 2018 (Doc. 872)("J. Montoya Tr."), and confirmed that, in his plea agreement, he agreed to tell the truth at trial in exchange for the possibility of a lesser sentence, <u>see</u> J. Montoya Tr. at 27:1-9 (Beck. J. Montoya).  J. Montoya testified that, around 2006 or 2007, M. Montoya shared with him that M. Montoya had killed Dix for C. Garcia.  See J. Montoya Tr. at 5:21-24 (Morrissey, J. Montoya).  J. Montoya commented that he suspected M. Montoya of bragging to boost his reputation within the SNM.  <u>See</u> J. Montoya Tr. at 11:8-12 (Beck, J. Montoya).  J. Montoya indicated that M. Montoya would earn that respect by stating that he committed the murder.  <u>See</u> J. Montoya Tr. at 13:17-23 (Beck, J. Montoya).  J. Montoya stated that the SNM would look more highly on an individual who walked up to and shot someone than on someone who shot an individual from a car.  <u>See</u> J. Montoya Tr. at 14:17-15:1 (Beck, J. Montoya).

J. Montoya also noted that C. Garcia commented on being in Las Vegas when Dix was murdered.  <u>See</u> J. Montoya Tr. at 6:4-7 (Morrissey, J. Montoya).  J. Montoya identified A. Cordova as an SNM associate and indicated that he and A. Cordova met when charged in this case.  <u>See</u> J. Montoya Tr. at 6:12-7:1 (Morrisey, J. Montoya).  J. Montoya indicated that A. Cordova associated particularly with C. Garcia and M. Montoya.  <u>See</u> J. Montoya Tr. at 9:19-24 (Beck, J. Montoya).

J. Montoya noted that he had no knowledge of A. Cordova's involvement in the Dix murder other than that A. Cordova requested to see J. Montoya's discovery tablet with the evidence against A. Cordova.  See J. Montoya Tr. at 7:2-13 (Morrisey, J. Montoya).

cc.  **Joseph Allen Foster.**

Joseph Allen Foster testified that he is a "crime scene investigator and reconstructionist." Transcript of Excerpt of Testimony at 3:17-18 (taken July 19, 2018)(Foster), filed July 20, 2018 (Doc. 870)("Foster Tr.").  Foster opined that M. Montoya's testimony was inconsistent with the physical evidence.  See Foster Tr. at 70:17-23 (Acton, Foster).  Foster explained that he has reviewed the crime scene photographs, autopsy report, latent fingerprint report, firearm and tool mark report, some FBI reports, and the physical crime scene.  See Foster Tr. at 9:14-10:2 (Foster). Foster testified that a bullet casing found dented at the crime scene may have been dented when a person stepped on it, see Foster Tr. at 16:8-20:7 (Acton, Foster), and noted that four of the eight casings recovered showed some minimal damage, see Foster Tr. at 20:8-20 (Acton, Foster).  Foster indicated that the BCSO tested the casings for fingerprints, but not for DNA, although he could not answer whether DNA results would be useful thirteen years after the crime.  See Foster Tr. at 75:15-76:1 (Foster, Castellano).  Foster also generally described shoe sole impressions' usefulness and opined that a footprint found at the crime scene had been made after a car passed through the area.  See Foster Tr. at 24:20-27:25 (Acton, Foster).  Foster stated, however, that the footprint could not have been from the shooter, because it did not align with the casings.  See Foster Tr. at 102:11-13 (Castellano, Foster).

Foster identified a spot on the asphalt as blood and indicated that law enforcement should test such blood to determine to whom it belongs.  See Foster Tr. at 35:16-36:5 (Acton, Foster).

Foster noted that the alleged blood did not align with the van's path into the fence and that no evidence suggested that blood had dripped from the van. See Foster Tr. at 36:7-37:6 (Foster). Foster admitted that the BCSO had not identified that the spot on the road is blood, but he noted that the BCSO never tested the spot, although it marked the spot as blood and collected a sample. See Foster Tr. at 115:1-10 (Castellano, Foster).

Foster also explained that, based on where the van window's glass fell, he determined that Dix' van had been positioned slightly before a stop sign and angled slightly toward the southeast when the shooter fired. See Foster Tr. at 30:4-31:17 (Foster). Regarding the topography, Foster testified that that Dix would not have sat long at the stop sign, and that, as soon as Dix' foot left the brake, the van would roll downhill. See Foster Tr. at 48:9-52:3 (Acton, Foster). Foster described that casings from High Point firearms fall to the right and that the casings at the crime scene appeared eight-to-ten feet from the van. See Foster Tr. at 33:16-35:9 (Acton, Foster). Foster continued, noting that the casings fell parallel to Dix' van. See Foster Tr. at 51:6-11 (Foster). Foster noted that the firearm likely spit the casings only a couple feet. See Foster Tr. at 42:1-7 (Acton, Foster). Foster then discussed the process by which the investigators would estimate the angle at which the bullets hit the van and criticized the investigators' application of the process. See Foster Tr. at 52:4-58:11 (Acton, Foster). Foster admitted, however, that the gunshot hole on the driver's door was damaged and that this deformation interfered with the investigators' projecting the bullet's trajectory, see Foster Tr. at 86:4-13 (Castellano, Foster), and that, if the shooter aimed from a car, the casings would have landed on the road as they did at the crime scene, see Foster Tr. at 87:8-12 (Castellano, Foster).

Based on his review of the scene and the evidence, Foster criticized the FBI's re-creation of the crime scene and of the vehicles' locations the night of the murder. See Foster Tr. at 61:21-62:4 (Foster); id. at 62:20-63:2 (Foster); id. at 63:8-19 (Foster); id. at 64:12-16 (Foster). Foster confirmed, however, that, if the FBI had moved the vehicles in its re-creation closer, the re-creation would better align with the bullet's projected trajectories. See Foster Tr. at 93:6-15 (Castellano, Foster). Foster admitted that M. Montoya's being on crack the night of the murder might have distorted his perception of and memory of the vehicles' locations. See Foster Tr. at 89:11-15 (Castellano, Foster).

Foster contended that M. Montoya's testimony that A. Cordova never left their car does not align with the probable angle at which the bullets hit the van; according to Foster, if A. Cordova shot from the car, the bullets would have hit the van at a higher angle than the evidence suggests. See Foster Tr. at 66:13-67:3 (Foster). Foster also indicated that M. Montoya's testimony that the shots occurred in two rounds did not fit the evidence, because, if the car moved between the rounds, the shooter would have had to shift angles to shoot, and because the investigators recovered only eight casings. See Foster Tr. at 67:19-68:9 (Foster). According to Foster, the impact on the van's door is the only indication that the shooter may have moved while shooting. See Foster Tr. at 69:9-19 (Foster). Foster stated that he saw no physical evidence of a second vehicle at the crime scene, and opined that M. Montoya's testimony about his and A. Cordova's car conflicted with the Tinkers' statements. See Foster Tr. at 59:25-60:7 (Foster, Acton); id. at 119:7-10 (Foster). Foster confirmed, nevertheless, that, if M. Montoya and A. Cordova left the scene slowly, the Tinkers would not have heard an engine revving. See Foster Tr. at 127:1-4 (Castellano, Foster).

###### dd. **Michael Haag.**

The United States then put on the stand two rebuttal witnesses, and called first an expert -- Michael Haag, who introduced himself as the "senior forensic scientist with the crime laboratory" for the City of Albuquerque (the "Crime Lab"). Transcript of Excerpt of Testimony of Michael Haag at 4:16-17 (taken July 20, 2018)(Haag), filed July 25, 2018 (Doc. 882)("Haag Tr."). See id. at 4:13-19 (Haag, Castellano). Haag testified that, in his experience, the Crime Lab generally does not test casings for fingerprints or for DNA, because the tests have low success rates. See Haag Tr. at 21:15-20 (Haag). He explained that law enforcement must always make choices in testing and prioritize what substances to test, because the testing creates backlogs in the laboratories. See Haag Tr. at 80:21-81:10 (Haag). Haag noted that he understood that, in this case, investigators had examined the casings for fingerprints. See Haag Tr. at 21:21-23 (Castellano, Haag). Haag admitted that he had some bias, because his wife did the case's firearm analysis. See Haag Tr. at 57:19-25 (Acton, Haag). Haag noted that he has seen the crime scene himself, and that the topography appears flat and insignificant to his analysis. See Haag Tr. at 22:12-21 (Haag, Castellano). Haag opined that the area has decent visibility. See Haag Tr. at 23:9-12 (Haag). Haag commented that casings can be damaged in various ways, including from being stepped on, run over, or damaged by a firearm during a jam. See Haag Tr. at 29:5-10 (Haag). He described that to clear a firearm jam, the shooter would need to shake the damaged casing from the firearm. See Haag Tr. at 75:17-25 (Haag).

Haag presented a PowerPoint presentation that he assembled based on the physical evidence and in consideration of the trial testimony. See Haag Tr. at 36:9-12 (Haag). He opined that he could not rule out M. Montoya's testimony. See Haag Tr. at 54:25-55:19 (Haag). Haag

used the shattered glass as a rough estimation for the van window's location and noted that such glass cannot give a precise location, because it breaks into pieces that fall at different rates.  See Haag Tr. at 46:11-47:1 (Haag).  Haag generally agreed with Foster about the location of Dix' van, see Haag Tr. at 49:5-6 (Haag), and, based on the bullets' projected trajectory, Haag offered an approximation for where the shots originated, see Haag Tr. at 50:11-51:1 (Haag, Castellano).  Haag agreed that, in determining the trajectory, the parties could consider only photographs, because the BCSO made no measurements of projected trajectories.  See Haag Tr. at 64:4-65:4 (Acton, Haag).  Haag noted that the bullets' projected trajectories were relatively perpendicular to the van and angled slightly from front to back.  See Haag Tr. at 39:10-16 (Haag).  Haag testified that the bullets' trajectories were consistent with M. Montoya and A. Cordova's vehicle moving slightly forward during the shooting.  See Haag Tr. at 40:6-18 (Haag).  He offered that, given the slight variation for the bullets' actual trajectories, the physical evidence could align with M. Montoya's testimony that he moved the car slightly between A. Cordova's two rounds of shots, see Haag Tr. at 71:18-72:25 (Haag), but Haag agreed that the shooter likely did not move much but remained largely stationary, see Haag Tr. at 65:20-66:14 (Haag).  Haag indicated that the trajectories' relatively horizontal nature suggests that the shooter did not shoot while standing upright.  See Haag Tr. at 41:13-42:11 (Haag).  According to Haag, the shooter could have fired from any position as long as the firearm was relatively low.  See Haag Tr. at 41:14-19 (Haag).  Haag agreed that the physical evidence could align with someone squatting on the ground to shoot, then standing up and walking away from the scene.  See Haag Tr. at 83:21-84:2 (Haag).  Haag stated that, in his analysis, he did not consider the alleged bloodspot, because he did not know what the substance was.  See Haag Tr. at 45:6-19 (Castellano, Haag).  Haag additionally noted that M. Montoya's

description that the vehicles' headlights shone at each other could be true for a variety of positions that the vehicles may have occupied. See Haag Tr. at 51:16-52:4 (Haag, Castellano). Haag qualified that he presents a potential orientation for the objects at issue and does not opine what definitively occurred. See Haag Tr. at 53:7-16 (Haag). Haag confirmed that he has previously seen crime scenes that displayed no evidence of a vehicle's presence although a vehicle had been at the scene. See Haag Tr. at 54:10-16 (Haag).

ee. **Andrea Taylor.**

Andrea Taylor introduced herself as the former captain of the BCSO's Criminal Investigations Division and current Area Commander for the South Valley. See Transcript of Excerpt of Testimony of Andrea Taylor at 3:21-4:10 (taken July 20, 2018)(Armijo, Taylor), filed July 25, 2018 (Doc. 882)("Taylor Tr."). Taylor stated that, in 2005, she worked in the BCSO's undercover narcotics division and was aware of the Dix murder. See Taylor Tr. at 5:5-12 (Armijo, Taylor). According to Taylor, she later worked with the FBI to identify cold cases potentially linked to the SNM. See Taylor Tr. at 6:5-11 (Armijo, Taylor). Taylor indicated that, in 2016, she began searching for the box with the Dix murder file. See Taylor Tr. at 17:4-7 (Taylor). Taylor described that, in 2017, she found the Dix murder file in a Bankers Box. See Taylor Tr. at 6:15-7:2 (Armijo, Taylor). Taylor noted that she identified the box as related to the Dix murder based on a sticky note that she observed on the box that recorded a tip that indicated that M. Montoya killed Dix. See Taylor Tr. at 13:7-14 (Morrisey, Taylor). Taylor described that the box contained video tapes, cassette tapes, notes, and some paperwork. See Taylor Tr. at 14:12-22 (Morrisey, Taylor). According to Taylor, after discovering the box, she gave it to the FBI. See Taylor Tr. at 23:5-9 (Morrissey, Taylor).

ff.     **Closing and Rebuttal.**

The United States offered a shorter closing, see Transcript of Closing Arguments at 2:13-20:14 (taken July 23, 2018)(Armijo), filed August 1, 2018 (Doc. 891)("Closing Tr."), than it did a rebuttal, see Closing Tr. at 66:9-106:13 (Beck).  In closing, the United States discussed the recorded conversation between M. Montoya and C. Garcia:

> [Y]ou're going to hear the name "Antone" several times.  You should probably also be able to hear the word "jale," which, as you know, is a word for a job, and the name Ray Arguello.  (Tape played.)  Remember that was put in context for you that Antone's name was brought up in relationship to another individual that -- you heard testimony, that the defendant on his jail calls admits that he knows.  And the concern was that Antone was telling him about a jale that he did.  The jale that he did was the murder of Shane Dix.  And that's why Chris Garcia is concerned about it, and he's talking to the other person that would know about the jale, Mario Montoya.

Closing Tr. at 19:3-16 (Armijo).  The United States also highlighted A. Cordova's silence in response to Acee's comments about M. Montoya during the CNM conversation and argued: "You know, the most important corroboration in this case is perhaps not what is said, but what is left unsaid."  Closing Tr. at 103:12-14 (Beck).  The United States quoted Acee's testimony about his comments regarding M. Montoya and A. Cordova's silence in response and then summarized: "So you've got corroboration from the defendant himself."  Closing Tr. at 104:7-8 (Beck).

gg.     **Jury Verdict.**

The Jury convicted A. Cordova on Count 2's VICAR charge.  See Jury Verdict at 1.  The Jury specifically found that A. Cordova's "general purpose in committing murder was as consideration for a promise or agreement to pay anything of pecuniary value from the charged enterprise," but not "for the purpose of gaining entrance to, or maintaining, or increasing position

in the enterprise." Jury Verdict at 1-2. The Jury also convicted A. Cordova on Count 3's charge of causing Dix' death "through use or possession of a firearm." Jury Verdict at 2.

### 4.    **The Motion.**

A. Cordova asks the Court for a new trial. See Motion at 1. A. Cordova first argues that the verdict is contrary to the weight of the evidence. See Motion at 1. He contends that M. Montoya provided unreliable testimony that deserves little weight. See Motion at 2. According to A. Cordova, M. Montoya implicated A. Cordova for Dix' murder to avoid prosecution for the murder, see Motion at 2-3; M. Montoya changed his story after the initial FBI interview, see Motion at 4, and M. Montoya lied about his November 29, 2015, conversation with C. Garcia, see Motion at 4-7. A. Cordova argues that the other cooperators also provided unreliable testimony worthy of little weight. See Motion at 7. A. Cordova contends that Gallegos received a Kastigar letter allowing him to avoid a mandatory life sentence and knew the Dix murder's facts from his discovery tablet. See Motion at 7-9. A. Cordova states that: (i) B. Cordova likewise provided the FBI information to avoid a life sentence or the death penalty; (ii) B. Cordova previously incorrectly implicated S. Rodriguez in Chavez' death, (iii) B. Cordova's testimony about the Dix murder did not align with other evidence; and (iii) B. Cordova did not mention the Dix murder until eleven days before the trial despite cooperating with the FBI since 2016. See Motion at 9-11. According to A. Cordova, Morales agreed to cooperate in exchange for New Mexico dismissing a murder charge and provided ambiguous testimony on A. Cordova's role in the Dix murder. See Motion at 11-12. A. Cordova continues that the conversation between C. Garcia, Duran, and Baca reveals simply that C. Garcia knew A. Cordova. See Motion at 12. A. Cordova also notes that no physical evidence connects him to the Dix murder, and that no evidence connects the Dix murder to the

SNM's purposes, establishes specific racketeering acts on or around February 4, 2005, or shows specific drug transactions establishing the SNM's activity in interstate commerce around that date. See Motion at 13-14.

A. Cordova next argues that the United States committed prosecutorial errors warranting a new trial. See Motion at 14. A. Cordova contends that the United States hid until re-direct the evidence that A. Cordova stood silent in response to Acee's accusations about the Dix murder. See Motion at 15. A. Cordova also notes that Acee did not testify that he accused A. Cordova of committing the murder and that this omission leaves open the possibility, for instance, that he accused A. Cordova of knowing about the murder. See Motion at 15. A. Cordova argues, moreover, that he made his silent statement while in a custodial interrogation, so the United States violated his Fifth Amendment rights by commenting on the silence during closing. See Motion at 15-18. A. Cordova also asserts that the United States' brief closing and long rebuttal foreclosed his ability to make an effective closing. See Motion at 18. A. Cordova further avers that the United States did not seek justice and sought to secure a conviction despite the evidence. See Motion at 18-19. A. Cordova lists as examples of the United States' shortcuts that: (i) it did not call as a witness Mikail Tinker, the first eyewitness to the scene; (ii) it did "not . . . compare the size of the foot prints, tagged into evidence, with the size of Mr. A. Cordova's feet"; and (iii) it did "not test the spot of blood tagged into evidence and compare it with Mr. A. Cordova's blood." Motion at 19. A. Cordova also contends that, in closing, the United States mischaracterized M. Montoya's and C. Garcia's conversation by stating that C. Garcia expressed concerns that A. Cordova had spoken about the Dix murder. See Motion at 19.

A. Cordova also avers that the United States violated rule 16. See Motion at 19. A. Cordova contends that, in the CNM 302 Report, Acee does not explain his comments to A. Cordova that left him with the impression that A. Cordova committed the Dix murder. See Motion at 20. A. Cordova argues that he did not become aware of this allegation until the United States' re-direct. See Motion at 21-22. A. Cordova asks that the Court conclude that the United States violated rule 16 even though Acee did not record A. Cordova's silence in the CNM 302 Report. See Motion at 22-23. A. Cordova depicts Acee's statement accompanied by A. Cordova's silence as a statement that fell within rule 16. See Motion at 23. A. Cordova argues that, if the United States had disclosed the information, he could have asked for its preclusion. See Motion at 24-25. A. Cordova also avers that the United States' failure to produce the CNM 302 Report until three weeks before trial violated rule 16. See Motion at 26. A. Cordova notes that Acee drafted the CNM 302 Report the same day as the CNM conversation, so the United States possessed the report since 2016. See Motion at 27.

A. Cordova avers that, under Brady and Giglio, the United States had an obligation to inform A. Cordova that Acee did not record A. Cordova's silence, because that information impeaches Acee. See Motion at 28. A. Cordova argues that the information "impugns" Acee's honesty. Motion at 28. A. Cordova adds that Acee's dishonesty also supports the attack on the verdict as against the weight of the evidence. See Motion at 29. A. Cordova adds that Acee also acted dishonestly by testifying that he wanted A. Cordova to work with the FBI when Acee knew that A. Cordova could not cooperate in prosecuting M. Montoya for the Dix murder, because M. Montoya had already agreed to cooperate. See Motion at 29.

### 4.    **The Response**.

The United States first contends that A. Cordova's arguments do not warrant a new trial in light of his admissions and the other evidence at trial.  See Motion at 3.  The United States avers that, to attack witness testimony in a new trial motion, A. Cordova must show that the witnesses were incredible and argues that the witnesses' self-interest did not so seriously damage their trustworthiness as to make them incredible.  See Response at 3-4, 6.  The United States avers that, contrary to A. Cordova's allegations, M. Montoya had something -- the SNM's support -- to lose through cooperation.  See Response at 6-7.  The United States notes that M. Montoya clarified with the FBI and at trial his statements about the vehicles' locations on the night of the Dix murder. See Response at 7.  The United States also argues that M. Montoya did not lie about the November 29, 2015, conversation with Garcia, but explained the conversation's significance to him, and avers that A. Cordova spins the conversation.  See Response at 7-8.  The United States indicates that M. Montoya's familiarity with A. Cordova before the Dix murder, identification for the FBI of a photograph of A. Cordova, and pre-Dix murder encounter with law enforcement resulting in the seizure of C. Garcia's firearm corroborate M. Montoya's testimony.  See Response at 8.

The United States contends that Gallegos, like M. Montoya, would not have lied because false statements would not help gain him a reduced sentence.  See Response at 8-9.  The United States notes that Gallegos pled to a drug conspiracy involving A. Cordova and that, although he might have learned of the Dix murder from outside sources, he more likely learned of it from A. Cordova.  See Response at 9.  The United States attacks A. Cordova's arguments about B. Cordova for similar reasons, arguing that his admission of his bad acts shows that he knew that he was willing to testify to the truth.  See Response at 9-10.  The United States notes that B. Cordova

admitted that he joined the Dix-murder conspiracy and that this fact undermines A. Cordova's theory that the murder resulted from C. Garcia's personal vendetta. <u>See</u> Response at 10. Moreover, according to the United States, Romero, M. Montoya, and Morales corroborated B. Cordova's statements. <u>See</u> Response at 10. The United States also notes that B. Cordova did not lie about the Chavez murder to escape punishment, because he was also incarcerated at the time of the murder. <u>See</u> Response at 10. According to the United States, B. Cordova also explained that he recounted only what A. Cordova told him about the Dix murder. <u>See</u> Response at 11. The United States further argues that B. Cordova told the FBI in 2016 that the Dix murder involved M. Montoya, C. Garcia, and A. Cordova, and indicates that B. Cordova's testimony about the murder does not deviate greatly from M. Montoya's testimony. <u>See</u> Response at 11.

The United States argues that Morales' criminal history should not make his testimony less credible as that history gives his testimony reliability. <u>See</u> Response at 11-12. The United States argues that Morales' living with A. Cordova while incarcerated makes his testimony more credible, and that A. Cordova did not tell Morales not to lie, but told him not to snitch, <u>i.e.</u>, to stop telling the truth. <u>See</u> Response at 12.

The United States argues that the recording of C. Garcia, Duran, and Baca corroborates the cooperators' testimony, because it shows that C. Garcia knew A. Cordova, and that C. Garcia, Baca, and A. Cordova associated with each other. <u>See</u> Response at 12-13. According to the United States, the evidence shows that A. Cordova knew C. Garcia well enough that C. Garcia trusted A. Cordova with the murder. <u>See</u> Response at 12-13. The United States notes that the recording also supports that C. Garcia gave M. Montoya a firearm and why M. Montoya named A. Cordova as his accomplice. <u>See</u> Response at 12-13.

The United States argues that, although A. Cordova indicates that no physical evidence ties M. Montoya to the crime scene, no evidence ties either M. Montoya or A. Cordova to the scene other than their admissions and M. Montoya's statements.  See Response at 13.  The United States further offers that Haag's testimony supports M. Montoya's story, because Haag indicates that M. Montoya presents a story plausible in light of the physical evidence.  See Response at 13.

The United States then summarizes evidence that connects the Dix murder to the SNM: C. Garcia solicited other SNM members -- Romero, M. Montoya, Billy A. Cordova, and Morales -- to commit the murder; M. Montoya knew that Dix would suffer repercussions for shooting an SNM member; a basic SNM tenet is that shooting one SNM member equates to shooting any SNM member; the shooting indicated disrespect for the SNM; and Dix had previously disrespected the SNM.  See Response at 14.  The United States also indicates that, throughout the trial, witnesses testified to racketeering activity and especially to drug trafficking.  See Response at 14.  The United States avers that evidence also shows that M. Montoya owed C. Garcia for drugs before the Dix murder, so the SNM engaged in drug trafficking around the murder's time.  See Response at 14-15.  The United States notes that this evidence also illustrates that the SNM engaged in interstate commerce.  See Response at 15.  According to the United States, the SNM affected commerce through selling drugs, using the mail and telephone systems, traveling between states, and sending drugs to G. Archuleta in Tennessee.  See Response at 15.

The United States turns to its alleged prosecutorial errors, and argues that the line of questioning about the CNM conversation arose in response to A. Cordova's cross-examination. See Response at 15.  The United States contends it did not mischaracterize Acee's testimony about the conversation, because "[t]he evidence established that Agent Acee accused the defendant of

being involved with the murder." Response at 15-16. The United States avers that no violation of Miranda v. Arizona, 384 U.S. 436 (1966)("Miranda"), occurred, because A. Cordova did not refuse to answer questions and voluntarily cooperated with Acee when Acee approached A. Cordova inside the welding building on CNM's campus. See Response at 16-17. The United States also argues that A. Cordova's complaints about its structure for its closing argument and rebuttal are not convincing, because he cites as authority only a State of California case, and because the United States stayed within its allotted total closing and rebuttal time. See Response at 17. The United States responds to A. Cordova's arguments about its investigation by noting that no caselaw supports his contentions, that the timing of witness interviews is irrelevant, and that Mikail Tinker's testimony helped the prosecution by corroborating M. Montoya's testimony. See Response at 18. The United States explains that it had no need for the physical evidence that A. Cordova suggests it ignored. See Response at 18.

The United States also takes the stance that A. Cordova cannot support his rule 16 argument, because A. Cordova made no statement to Acee about the Dix murder, because the questioning arose on redirect after A. Cordova asked Acee whether he pursued A. Cordova based only on M. Montoya's word, and because Acee testified that he normally does not document his impressions in his reports. See Response at 19-20. Moreover, according to the United States, A. Cordova has not demonstrated prejudice from the non-disclosure, because this case is not close. See Response at 20. The United States also disputes A. Cordova's contentions that it violated Brady and, according to the United States, A. Cordova admits that the United States complied with Brady by disclosing the CNM 302 Report. See Response at 20. The United States summarizes A. Cordova's argument's gist as that Acee could not have put A. Cordova to work cooperating when

M. Montoya had already agreed to cooperate.  See Response at 20.  The United States notes that

A. Cordova overlooks that he could have cooperated by controverting false information from M.

Montoya, could have cooperated against C. Garcia, or could have provided information about the

SNM's other criminal activity.  See Response at 20-21.  The United States emphasizes that, at the

time Acee approached A. Cordova, C. Garcia had not yet agreed to cooperate.  See Response at

21.

The United States indicates that its closing arguments are not improper, because Acee did

not improperly record his conversation with A. Cordova, because no Fifth Amendment protection

adheres to the CNM conversation, and because, even if the United States committed prosecutorial

misconduct, such conduct is harmless.  See Response at 21.  The United States further notes that,

at trial, A. Cordova objected to "virtually none" of the issues he raises in the Motion at trial and,

accordingly, he must meet the plain-error standard to obtain a new trial.  See Response at 21-22.

The United States concludes by asking the Court to deny A. Cordova a hearing on the Motion,

because he is not entitled to a new trial as a matter of law.  See Response at 22.

5.  **The Reply.**

A. Cordova replies to the United States' Response.  See Defendant Anthony Cordova's

Sealed Reply to the United States Sealed Response to Anthony Cordova's Motion for New Trial,

filed October 30, 2018 (Doc. 927)("Reply").  A. Cordova contends that the verdict depends on

whether the "johnny-come-lately cooperators" told the truth, because no physical evidence

connects A. Cordova to the Dix murder.  Reply at 1.  A. Cordova notes that there is no reason to

think a cooperator would not take the one shot to get away with a lie and secure a lesser sentence,

and that, once a cooperator agrees to cooperate, he will face trouble with the SNM regardless what he tells the United States. See Reply at 2.

A. Cordova contends that the United States conflates verdicts-against-the-weight-of-the-evidence and insufficiency-of-the evidence challenges, and that, in a verdict-against-the-weight-of-the-evidence challenge, the Court has discretion to weigh the evidence and make evidentiary determinations. See Response at 5-7. A. Cordova summarizes contradictory testimony. See Reply at 2. A. Cordova notes that Mikail Tinker saw someone walking from the scene no more than four minutes after the shooting and did not hear a vehicle leave the scene. See Reply at 2-3. A. Cordova states that, to align with M. Montoya's story, the individual would have had to have walked by or left a house near the scene at the time of the shooting, and would have observed the crime. See Reply at 3. A. Cordova also notes that M. Montoya changed his story about the orientation of his and A. Cordova's car and Dix' van, the car's make and model, and the car's owner. See Reply at 3. A. Cordova explains that photographs show Dix shot in the side of the neck below the left earlobe, but that B. Cordova testified that Cordova shot Dix in the back of the head; Gallegos testified that A. Cordova demonstrated killing Dix standing up, and M. Montoya testified that A. Cordova shot from the car's passenger window. See Reply at 3-4. A. Cordova avers that Gallegos' truthfulness depends solely on his word. See Reply at 4.

A. Cordova reiterates that the United States did not provide the CNM 302 Report until three weeks before trial, and well after the Court issued the Scheduling Order and A. Cordova filed the Motion to Compel requesting such documents. See Response at 7. A. Cordova contends that the CNM 302 Report is misleading, because it does not reveal Acee's accusations regarding the Dix murder nor that A. Cordova did not respond to the accusations. See Response at 7. A. Cordova

complains that he did not hear of this evidence until redirect and that the United States admits that it would not have used the evidence if A. Cordova had not suggested on cross-examination that the United States charged A. Cordova without sufficient evidence. <u>See</u> Response at 8. A. Cordova reiterates that the cross-examination does not excuse not disclosing this evidence pursuant to rule 16, the Discovery Order, and the requirements of <u>Brady</u> and <u>Giglio</u>, and that introducing the evidence violates the Fifth Amendment. <u>See</u> Response at 8. A. Cordova contends that the Federal Rules of Evidence treat silence as a statement and that the Court should consider his silence as a statement. <u>See</u> Response at 8-9.

A. Cordova also repeats that no evidence connects the Dix murder to the SNM. <u>See</u> Response at 10. A. Cordova contends that C. Garcia alone connected Dix to the SNM. <u>See</u> Response at 10. A. Cordova summarizes that C. Garcia authorized the killing and compensated people for the killing, and that the SNM as an entity did not ordered the killing or considered the killing related to the SNM. <u>See</u> Response at 11.

## LAW REGARDING MOTIONS FOR A NEW TRIAL

Rule 33 of the Federal Rules of Criminal Procedure provides:

(a) **Defendant's Motion.** Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

(b) **Time to File.**

(1) **Newly Discovered Evidence.** Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

> **(2) Other Grounds.** Any motion for a new trial grounded on
> any reason other than newly discovered evidence must be
> filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33 (bolded in original). Under rule 33, the district court has discretion to grant a

new trial if the interests of justice require one. See Fed. R. Crim. P. 33(a). See also United States

v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999). "A motion for a new trial is not," however,

"regarded with favor and should only be granted with great caution." United States v. Sinclair,

109 F.3d 1427, 1531 (10th Cir. 1997)(citing United States v. Chatman, 994 F.2d 1510, 1518 (10th

Cir. 1997)). "'[A] defendant may not invoke rule 33 when he or she has pled guilty.'" United

States v. Christy, 883 F. Supp. 2d 1040, 1047 (D.N.M. 2012)(Browning, J.)(quoting United States

v. Lambert, 603 F.3d 808, 809 (10th Cir. 1979)).

"The [United States Court of Appeals for the] Tenth Circuit has further stated that when

'deciding a motion for new trial, the [trial] court may weigh the evidence and consider the

credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence

such that a miscarriage of justice may have occurred.'" United States v. Thomas, No. 13-CR-

01874 MV, 2016 WL 9819560, at *8 (D.N.M. Aug. 5, 2016)(Vázquez, J.)(quoting United States

v. Evans, 42 F.3d 586, 593 (10th Cir. 1994)). "'The power to grant a new trial on the ground that

the verdict is against the weight of the evidence should be invoked only in exceptional cases in

which the evidence preponderates heavily against the verdict.'" United States v. Guzman-

Martinez, No. CR 03-2118 RB, 2004 WL 7338099, at *1 (D.N.M. March 10,

2004)(Brack, J.)(quoting United States v. Mounkes, 204 F.3d 1024, 1027 (10th Cir. 2000)).

The Court has previously addressed motions for new trials under rule 33 in various cases.

See, e.g., United States v. Folse, No. CR 15-2485 JB, 2018 WL 6047415, at *20-22 (D.N.M. Nov.

19, 2018)(Browning, J.)(denying a motion for a new trial and a request for additional discovery where the defendant did not produce evidence that, with additional discovery, he could show that the United States destroyed evidence and, despite having earlier had notice that alleged deficiencies might exist in the United States' evidence, he did not seek evidence of such information); United States v. Neha, No. CR 04-1677 JB, 2006 WL 4062889, at *2-4 (D.N.M. June 26, 2006)(Browning, J.)(denying a new trial motion where the defendant complained of the United States' brief references to his criminal history and of the United States' comment to the jury that the Court altered a co-conspirator's statement, and where the weight of the evidence supported the verdict).

Rule 33 permits a defendant to move for a new trial in the event of newly discovered evidence if the defendant presents that motion within three years of the verdict of guilt. See Fed. R. Crim. P. 33(b)(1). Ordinarily, a defendant seeking a new trial under rule 33(b)(1) must satisfy a five-part test for newly discovered evidence that the Tenth Circuit outlined in United States v. Sinclair. See 109 F.3d at 1531. The defendant must show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

United States v. Sinclair, 109 F.3d at 1531 (internal quotation marks omitted)(quoting United States v. Stevens, 978 F.2d 565, 570 (10th Cir. 1992)). See United States v. Quintanilla, 193 F.3d at 1147 (discussing United States v. Sinclair's rule 33 test). See also United States v. Velarde, No. CR 98-391JB, 2008 WL 5993210, at *31-44 (D.N.M. May 16, 2008)(Browning, J.)(permitting a new trial in a sexual assault case where, after the trial, the defendant uncovered evidence that the

alleged victim had accused other individuals of sexual assault). "Under <u>Sinclair</u>, a court cannot

grant a new trial on the discovery of new impeachment evidence." <u>United States v. Rodella</u>, No.

CR 14-2783 JB, 2015 WL 711931, at *33 (D.N.M. Feb. 2, 2015)(Browning, J.)(citing <u>United</u>

<u>States v. Sinclair</u>, 109 F.3d at 1531).

## LAW REGARDING THE UNITED STATES' DUTY TO
## <u>DISCLOSE IN CRIMINAL CASES</u>

The United States' duty to disclose in criminal cases arises from at least three sources:

(i) rule 16 of the Federal Rules of Criminal Procedure; (ii) the Due Process Clause of the Fifth

Amendment; and (iii) the Jencks Act. Put roughly, rule 16 requires the United States to disclose

items material to the defense, items it intends to use in its case-in-chief, and items it obtained from

the defendant. <u>See</u> Fed. R. Crim. P. 16. The Due Process Clause requires the United States to

furnish information in its possession to the defense that is favorable to the accused. Finally, the

Jencks Act requires the United States to disclose statements that its witnesses made if those

statements are in the United States' possession and relate to those witnesses' trial testimony, after

those witnesses have testified at trial.

1.   **<u>Rule 16</u>.**

Rule 16 of the Federal Rules of Criminal Procedure provides:

**(1) Information Subject to Disclosure.**

> **(A) Defendant's Oral Statement.** Upon a defendant's request, the
> government must disclose to the defendant the substance of any relevant
> oral statement made by the defendant, before or after arrest, in response to
> interrogation by a person the defendant knew was a government agent if the
> government intends to use the statement at trial.

> **(B) Defendant's Written or Recorded Statement.** Upon a defendant's
> request, the government must disclose to the defendant, and make available
> for inspection, copying, or photographing, all of the following:

**(i)** any relevant written or recorded statement by the defendant if

• the statement is within the government's possession, custody, or control; and

• the attorney for the government knows -- or through due diligence could know -- that the statement exists;

**(ii)** the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent; and

**(iii)** the defendant's recorded testimony before a grand jury relating to the charged offense.

. . . .

**(D) Defendant's Prior Record.** Upon a defendant's request, the government must furnish the defendant with a copy of the defendant's prior criminal record that is within the government's possession, custody, or control if the attorney for the government knows -- or through due diligence could know -- that the record exists.

**(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

**(i)** the item is material to preparing the defense;

**(ii)** the government intends to use the item in its case-in-chief at trial; or

**(iii)** the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(A)-(B), (D)-(E).  Criminal defendants may not, however, embark on a "broad or blind fishing expedition among documents possessed by the Government."  Jencks v. United States, 353 U.S. 657, 667 (1957)(internal quotation marks omitted)(quoting Gordon v.

United States, 344 U.S. 414, 419 (1953)).  Rule 16(a)(2) provides, in part, that rule 16 "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2).  The Supreme Court of the United States has interpreted the term "defense" in this statute as referring to "an argument in response to the prosecution's case in chief."  United States v. Armstrong, 517 U.S. 456, 462 (1996)("[W]e conclude that in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief.").  Additionally, rule 16 does not require the United States to produce "reports, memoranda, or other internal government documents . . . [or] statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16 (a)(2).

The Court has addressed rule 16 discovery in several cases.  See, e.g., United States v. Rodella, 2015 WL 711931, at *38-39 (denying a request for medical records under rule 16 where the United States did not use the medical records in its case-in-chief and the records were not material to the defendant's response to the case-in-chief); United States v. Roybal, 46 F. Supp. 3d 1127, 1156-61, 1166-70 (D.N.M. 2014)(Browning, J.)(denying a request under rule 16 for all raw pen register information as immaterial, because the United States did not present all the raw data to the judge when acquiring a warrant and using the pen register did not constitute a search; denying a request under rule 16 for progress reports of the wiretap, because the reports were not material to whether probable cause existed for the wiretap; and requiring under rule 16 the United States to provide the financial documents seized from the defendants' house and the laboratory reports of the United States' proposed experts); United States v. Badonie, No. CR 03-2062 JB,

2005 WL 2312480, at *3 (D.N.M. Aug. 29, 2005)(Browning, J.)(stating that documents that the United States does not possess are not discoverable under rule 16).

2.      **Due Process Clause.**

"The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment." United States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *5 (D.N.M. 2011)(Browning, J.).  In Brady, the Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87.  In Giglio, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See Giglio, 405 U.S. at 153; United States v. Torres, 569 F.3d 1277, 1282 (10th Cir. 2009)("Impeachment evidence is considered exculpatory for Brady purposes."); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985))); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").

The Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682). See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request."). "In the end, the burden remains on the United States to know its case and comply scrupulously with those requirements. If it is going to resist production of these reports, it must be certain that they do not contain exculpatory or impeachment material." United States v. Burton, 81 F. Supp. 3d 1229, 1254 (D.N.M. 2015)(Browning, J.). "[T]he Due Process Clause does not," however, "require the government to disclose before trial the names of its witnesses, just so the defense can have sufficient time to investigate their backgrounds for impeachment information." United States v. Ashley, 274 F. App'x 693, 697 (10th Cir. 2008)(unpublished).[12] See Weatherford v. Bursey,

---

[12]United States v. Ashley is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> . . . . In this circuit, unpublished orders are not binding precedent, . . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Ashley, United States v. Lemon, 714 F. App'x 851 (10th Cir. 2017)(unpublished), United States v. Krehbiel, 378 F. App'x 832 (10th Cir. 2010)(unpublished), Garcia v. Figueroa, 401 F. App'x 369 (10th Cir. 2010)(unpublished), and Wauqua v. Cowley, 1 F.3d 1250 (10th Cir. 1993)(unpublished table opinion), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

429 U.S. 545, 559 (1977)("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably."); United States v. Harmon, 871 F. Supp. 2d. 1125, 1149 (D.N.M. 2012)(Browning, J.).

a.    **Timing of the Disclosure.**

The prosecution's obligation to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue.  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady . . . ."  United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009).  The Tenth Circuit has recognized that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  United States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)).  The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054.  On the other hand, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense."  United States v. Burke, 571 F.3d at 1056.  "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."  United States v. Burke, 571 F.3d at 1056.

Courts should, "[w]hen assessing the materiality of <u>Giglio</u> information, . . . consider the significance of the suppressed evidence in relation to the entire record." <u>United States v. Gonzalez-Montoya</u>, 161 F.3d 643, 650 (10th Cir. 1998).

When a prosecutor's obligations under <u>Brady</u> are triggered, however, they "continue[] throughout the judicial process." <u>Douglas v. Workman</u>, 560 F.3d at 1173. For instance, the obligation to disclose material under <u>Brady</u> can arise during trial. <u>See United States v. Headman</u>, 594 F.3d 1179, 1183 (10th Cir. 2010)("Although <u>Brady</u> claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway."). Additionally, the disclosure obligation continues even while a case is on direct appeal. <u>See United States v. Headman</u>, 594 F.3d at 1183; <u>Smith v. Roberts</u>, 115 F.3d 818, 819-20 (10th Cir. 1997)(applying <u>Brady</u> to an allegation that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal); <u>United States v. Harry</u>, No. CR 10-1915 JB, 2013 WL 684671, at *5 (D.N.M. Feb. 6, 2013)(Browning, J.).

**b.** **Material Exculpatory Evidence.**

The holding in <u>Brady</u> requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." <u>Brady</u>, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. at 682. <u>See United States v. Allen</u>, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. at 682. The Tenth Circuit has noted that "[t]he mere possibility that evidence

is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also found that "[d]uplicative impeachment evidence is not material." Douglas v. Workman, 560 F.3d at 1173. "To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989)).

The burden is on the government to produce exculpatory materials; the burden is not on the defendant to first note that such materials exist. See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses); United States v. Padilla, 2011 WL 1103876, at *6. The United States' good or bad faith is irrelevant. See Brady, 373 U.S. at 87; United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982)("Under Brady, the good or bad faith of government agents is irrelevant."). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439. The government has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation exists only "when suppression of the evidence would be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)). On the other hand, "[t]he Constitution, as interpreted in Brady,

does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Additionally, "'[t]he constitution does not grant criminal defendants the right to embark on a broad or blind fishing expedition among documents possessed by the'" United States. United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990)(quoting Jencks v. United States, 353 U.S. at 667); United States v. Harry, 2013 WL 684671, at *8.

### c.     **Evidence Must Be in the United States' Possession.**

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)). Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *3. On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984). Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)). "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Johnson, No. 96-40082-02-SAC, 1997 WL 447681, at *3 (D. Kan. June 9, 1997)(Crow, J.)). See United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992). See also United States v. DeLeon, No. CR 15-

4268 JB, 2017 WL 2271430, at *50 (D.N.M. Feb. 8, 2017)(Browning, J.)(concluding that where "[t]he New Mexico Corrections Department is jumping at the chance to help the prosecution[,] . . . the Court can confidently say that the New Mexico Corrections Department's records, under the unique facts of this case, are under the [Assistant United States Attorney's] control"). A prosecutor does not have a duty, however, to obtain evidence from third parties. See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady does not oblige the government to obtain evidence from third parties). See also United States v. Huerta-Rodriguez, No. CR 09-3206, 2010 WL 3834061, at *4, *10 (D.N.M. Aug. 12, 2010)(Browning, J.)(noting that the United States cannot be compelled to produce the New Mexico State Police officers' personnel files, because the New Mexico State Police, which was not a party to the case, possessed the files, and because the United States was able to review the files only at the New Mexico State Police office and could not remove or photocopy any documents without a subpoena); United States v. Velarde, 2008 WL 5993210, at *30 ("Investigation of the newly discovered evidence has disclosed that the United States did not suppress evidence, but rather that Agent Chimits did not possess this newly discovered evidence because no one told him of L.V.'s false accusations. Thus, the first element of Brady . . . is not satisfied."); United States v. Badonie, 2005 WL 2312480, at *3 (denying a motion to compel, because the New Mexico State Police possessed the documents and was not working closely with the United States even though the United States "could get the information Badonie seeks merely by requesting them").

The Court has addressed Brady's and Giglio's requirements in several cases. See, e.g., United States v. DeLeon, No. CR 15-4268 JB, 2017 WL 2271427, at *65 (D.N.M. March 8, 2017)(Browning, J.)(ordering "the pretrial disclosure of testifying [confidential informants]

pursuant to a protective order, to ensure the CI's safety"); United States v. DeLeon, 2017 WL 2271430, at *46-52 (declining to require the United States to provide the defendants all evidence favorable to them under Brady, and stating that "the United States . . . has a duty to search the files that the governmental agencies closely aligned with this prosecution maintain, where there is a reasonable prospect of finding exculpatory evidence," and to turn over this information); United States v. Hykes, No. CR 15-4299 JB, 2016 WL 1730125, at *20 (D.N.M. April 11, 2016)(Browning, J.)(requiring that the United States search personnel files where "officers' involvement in several excessive-force lawsuits, discrepancies between the officers' story and eyewitnesses' stories, and evidence that the officers had a personal feud with" the defendant suggested that the files contained impeachment evidence); United States v. Rodella, 2015 WL 711931, at *39-42 (deeming that, under Brady, the United States did not need to produce medical records that were not in the United States' possession and that the medical records, which impeached the defendant's witness but not a United States' witness were not subject to Giglio); United States v. Roybal, 46 F. Supp. 3d at 1162-63, 1170-71 (denying a request under Brady for all pen register data, because the United States has a preexisting duty to turn over Brady materials and because the defendant based the request on hopeful thinking, and denying a request for progress reports of the wiretap, because the defendant likely possessed the exculpatory information and the United States had a pre-existing duty to turn over the information); United States v. Rivas, 26 F. Supp. 3d 1082, 1121 (D.N.M. 2014)(Browning, J.)(not requiring disclosure of a CI's identity where the defendant could obtain the evidence through other means, the CI was not present at the alleged crime, and the CI had already received a threat; and, under Brady and Giglio, requiring disclosure of evidence regarding a drug transaction that the Court would consider in sentencing

although not for which the United States indicted the defendant); United States v. Gould, No. CR 03-2274 JB, 2011 WL 1103805, at *12-14 (D.N.M. March 16, 2011)(Browning, J.)(deeming a psychological report of a victim that would only have helped a defendant decide whether to call the victim at trial not favorable or material to the defense); United States v. Padilla, No. CR 09-3598 JB, 2010 WL 4337819, at *8 (D.N.M. Sept. 3, 2010)(Browning, J.)(requiring the United States to disclose confidential sources' identities before trial where the identification would likely aid the defendants and provide valuable impeachment information, but requiring that the defense not disclose the identities to outside parties); United States v. Aguilar, No. CR 09-3207 JB, 2010 WL 2977708, at *6 (D.N.M. June 28, 2010)(Browning, J.)(concluding, under Brady and Giglio, that the United States must disclose a confidential informant's identity where the CI occupied a unique position to testify to conversations regarding a drug transaction and where the defendant might not access that information through other means, but requiring that the defendant not disclose the CI's identity, and not requiring the disclosure of more information than the CI's name, because the United States and the defendant did not plan to call the CI as a witness).

### 3.  The Jencks Act.

In Jencks v. United States, the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." Jencks v. United States, 353 U.S. at 672. In so holding, the Supreme Court recognizes that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671.  Congress later codified <u>Jencks v. United States</u>' holding in 18 U.S.C. § 3500.

<u>See</u> <u>United States v. Kimoto</u>, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act,

18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in <u>Jencks v.</u>

<u>United States</u>, 353 U.S. 657").

> Section 3500 of Title 18 of the United States Code provides:
>
> **(a)** In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
>
> **(b)** After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a), (b).   "The Jencks Act requires the government to disclose to criminal

defendants any statement made by a government witness that is 'in the possession of the United

States' once that witness has testified."   <u>United States v. Lujan</u>, 530 F. Supp. 2d 1224, 1232

(D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a)-(b)).  <u>Cf</u>. <u>United States v. Rodella</u>, 2015

WL 711931, at *42-43 (noting that the Jencks Act does not apply to statements that a defense

witness made).  The Jencks Act "manifests the general statutory aim to restrict the use of such

statements to impeachment."  <u>Palermo v. United States</u>, 360 U.S. 343, 349 (1959).  The Jencks

Act's purpose is "not only to protect Government files from unwarranted disclosure but also to

allow defendants materials usable for the purposes of impeachment."  <u>United States v. Smaldone</u>,

544 F.2d 456, 460 (10th Cir. 1976)(citing <u>Palermo v. United States</u>, 360 U.S. at 352).  The Jencks

Act defines statements specifically:

> **(e)** The term "statement," as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means --
>
>> **(1)** a written statement made by said witness and signed or otherwise adopted or approved by him;
>>
>> **(2)** a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>>
>> **(3)** a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).  The Tenth Circuit has held: "Interview notes could be 'statements' under the

[Jencks] Act if they are substantially verbatim."  <u>United States v. Smith</u>, 984 F.2d 1084, 1086 (10th

Cir. 1993).  At least one district court within the Tenth Circuit has distinguished interview notes

from reports that "embody only the agent's epitomization, interpretation, or impression of an

interview," finding that the latter are not producible under the Jencks Act.  <u>United States v.</u>

<u>Jackson</u>, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.).  In <u>United States v. Lujan</u>, the

Honorable Robert C. Brack, now-Senior United States District Judge for the District of New

Mexico, explained that rough interview notes may be discoverable under the Jencks Act when a

defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes

contained exculpatory evidence not included in any formal interview report provided to the

defense."  530 F. Supp. 2d at 1266.  Judge Brack went on to hold that, "[b]ecause the contents of

rough interview notes may in some cases be subject to disclosure and because the potential

impeachment value of the notes may not become evident until trial," the United States must

preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500. 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act). See also United States v. Tarango, 760 F. Supp. 2d 1163, 1164, 1167 (D.N.M. 2009)(Browning, J.)(stating that the United States must produce FBI agents' reports, after the United States' witnesses testified at trial, to the extent that those reports contain statements from witnesses who testified at trial).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy. See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."). To satisfy this burden, the defendant need not prove that particular materials are within the Jencks Act's scope, as the documents are not in the defendant's possession, but, rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)). The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements. See United States v. Smith, 984 F.2d at 1086. For example, in United States v. Smith, the Tenth Circuit concluded that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had

interviewed her before testifying, and the defense counsel moved for production of the notes. <u>See</u> 984 F.2d at 1085-86. Once the defendant makes a prima facie showing that a witness statement exists which may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement. <u>See</u> <u>United States v. Smith</u>, 984 F.2d at 1086.

## <u>LAW REGARDING VICAR AND RICO</u>

RICO prohibits specific activities when they are committed in connection with a pattern of racketeering activity. <u>See</u>, <u>e.g.</u>, 18 U.S.C. § 1962(b) ("It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."). RICO defines a "pattern of racketeering activity" to "require[] at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Racketeering activity includes "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance" that is a state law felony, 18 U.S.C. § 1961(1)(A), and "any act which is indictable under any" one of myriad federal statutes, 18 U.S.C. § 1961(1)(B)-(G).

A VICAR violation requires an underlying state law offense, <u>i.e.</u>, someone "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do." 18 U.S.C. § 1959(a). Committing and conspiring to commit assault with intent to inflict serious bodily injury do not

violate VICAR.   See United States v. DeLeon, 318 F. Supp. 3d 1272, 1275 (D.N.M. 2018)(Browning, J.)(citing 18 U.S.C. § 1959(a)).   The underlying state law offense becomes a federal VICAR violation only when it is committed: (i) "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity"; or (ii) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."   18 U.S.C. § 1959(a). VICAR does not incorporate the state offense's statute of limitations.   See United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 2323236, at *2 (D.N.M. May 22, 2018)(Browning, J.)(citing United States v. Licavoli, 725 F.2d 1040, 1046-47 (6th Cir. 1984); United States v. Davis, 576 F.2d 1065, 1066-67 (3d Cir. 1978); United States v. Brown, 555 F.2d 407, 418 n.22 (5th Cir. 1977)).

VICAR employs RICO's definition of racketeering activity.   See 18 U.S.C. § 1961(1) (defining racketeering activity for RICO purposes); 18 U.S.C. § 1959(b)(1) (stating that, under VICAR, racketeering activity "has the meaning set forth in section 1961 of this title").   To succeed on a VICAR charge, the United States must show that the enterprise and not the individual defendant committed a pattern of racketeering activity.  United States v. DeLeon, No. CR 15-4268 JB, 2017 WL 3054511, at *106 (D.N.M. June 30, 2017)(Browning, J.).   Moreover, the evidence must establish "that the enterprise's members, acting for the enterprise, engage in racketeering activity," but not "that the members have knowledge that each member will advance the activity or have an agreement to commit the activity."  United States v. Baca, No. CR 16-1613 JB, 2019 WL 399919, at *1 (D.N.M. Jan. 31, 2019)(citing 18 U.S.C. § 1959).   The United States must demonstrate that, at the time of the charged offense, the enterprise "was . . . engaging in

racketeering activity in a systematic way." United States v. Baca, 323 F. Supp. 3d 1292, 1298 (D.N.M. 2018)(Browning, J.). "The best way -- and, perhaps, the only way -- to prove that [an enterprise] was engaged in racketeering activity when the conduct charged . . . occurred . . . is to introduce evidence of roughly contemporaneous instances of racketeering activity in which the [enterprise] engaged." United States v. DeLeon, 323 F.R.D. 672, 691 (D.N.M. 2017)(Browning, J.).

RICO states that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(1). VICAR employs a slightly narrower definition of the term "enterprise" such that it "includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). "An association-in-fact requires: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit those associated with the enterprise to pursue the enterprise's purpose." United States v. Kamahele, 748 F.3d 984, 1003 (10th Cir. 2014). See Boyle v. United States, 556 U.S. 938, 948 (2009)("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."); id. ("While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.").

The Court has addressed other issues related to VICAR. See, e.g., United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 4100949, at *1-6 (D.N.M. Aug. 28,

2018)(Browning, J.)(determining that an as-applied challenge to VICAR's constitutionality is a "contradiction in terms" but permitting the defendant to bring in the future a facial challenge to the statute); United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 4279442, at *2 (D.N.M. April 18, 2018)(Browning, J.)("The Court does not believe that enterprise evidence is subject to rule 404(b)(2)'s notice requirement in a criminal case.").  The Court has also concluded:

> That conspiring to commit murder "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" violates VICAR is immaterial for rule 802(d)(2)(E) purposes.  18 U.S.C. § 1959. The inquiry under rule 801(d)(2)(E) is whether a statement was made during and in furtherance of a conspiracy, but a VICAR violation is not, itself, a conspiracy even though it may have a conspiracy as its underlying offense.

United States v. DeLeon, 287 F. Supp. 3d 1187, 1255 (D.N.M. 2018)(Browning, J.).

## RELEVANT LAW REGARDING THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

The Fifth Amendment's self-incrimination clause states: "No person shall be . . . compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V. Statements that a defendant makes during a law-enforcement officer's custodial interrogation are generally not admissible as evidence against that defendant if the declarant has not received the warnings that Miranda, 384 U.S. at 436, requires.  See Dickerson v. United States, 530 U.S. 428, 444 (2000); United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008).  Miranda's requirements, however, are limited.  "Police officers need not administer Miranda warnings to everyone they question." United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008).  Rather, "Miranda applies only to 'custodial interrogation[s].'"  United States v. Jones, 523 F.3d at 1239 (quoting Miranda, 384 U.S. at 444).

In other words, "Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" United States v. Chee, 514 F.3d at 112 (quoting United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)). Any questioning by law enforcement officers "reasonably likely to elicit an incriminating response" constitutes an interrogation. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). The "in custody" requirement is satisfied only when a suspect's "'freedom of action is curtailed to the degree associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984)quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). See United States v. Jones, 523 F.3d at 1239. Further, "'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. Rogers, 391 F.3d 1165, 1171 (10th Cir. 2004)(quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). In determining whether an interrogation was custodial, the Court must "determine whether 'a reasonable [person] in the suspect's position would have understood the situation as the . . . functional equivalent of formal arrest.'" United States v. Chee, 514 F.3d at 1112 (alterations in United States v. Chee)(quoting Berkemer v. McCarty, 468 U.S. at 442).

The Tenth Circuit, in recognizing that an examination of the circumstances' totality is fact intensive, has instructed district courts to consider a number of non-exhaustive factors in determining whether a custodial interrogation took place. See United States v. Jones, 523 F.3d at 1240. Those factors include: (i) whether the suspect is informed that he or she may end the interview at will, or is not required to answer questions; (ii) whether the interview's nature is likely to create a coercive environment from which a suspect would not feel free to leave, such as where

there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect. See United States v. Jones, 523 F.3d at 1240 (citing United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)). Several factors indicate police domination of the encounter: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) an officer's displaying of weapons; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory. See United States v. Jones, 523 F.3d at 1240. The Tenth Circuit has been deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole rather than exclusively relying on some enumerated factors while ignoring others. See United States v. Jones, 523 F.3d at 1240.

In several cases, the Court has addressed whether a custodial interrogation occurred. See, e.g., United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating that a defendant in handcuffs was in custody, but that no interrogation occurred when the officer did not ask the defendant any questions reasonably likely to elicit an incriminating response); United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding that law enforcement officers interrogated a defendant when they asked him questions, but that the interrogation was not custodial, because the officers informed the defendant that he was not under arrest and could stop the interview; because the officers did not engage in accusatory questioning; and, because, although multiple officers joined the questioning, they separated the defendant from those individuals who would provide him moral support, and the defendant could see an officer's firearm, the officers did not physically contact the defendant or suggest that the defendant had to

comply); id. at 1362-63 (concluding that the defendant was not in custody when law enforcement officers informed him that he did not need to answer their questions; when the officers did not engage in accusatory, prolonged questioning and asked few questions; when the defendant of his own volition separated himself from those who could lend moral support; and when the officers did not physically or orally suggest that the defendant must comply with their requests); United States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurred where the defendant was advised of his rights, made the incriminating statements after making his telephone call, admitted that he received no pressure to waive his rights, and was not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interviewed the defendant in surroundings familiar to him, informed him of his rights, engaged in no coercive conduct, and gave the defendant a choice to speak with them and sign an advice of rights form).

## ANALYSIS

The Court will not grant A. Cordova a new trial. The Court concludes that: (i) despite A. Cordova's contentions, the weight of the evidence supports the verdict; (ii) A. Cordova cannot protect his silence in the CNM conversation through the Fifth Amendment, because A. Cordova did not invoke the right to silence during the conversation; (iii) the United States did not commit constitutional prosecutorial error in discussing the CNM conversation; (iv) the United States' late disclosure of the CNM 302 Report and its nondisclosure of Acee's comments regarding M. Montoya during the CNM conversation and of A. Cordova's silence in response to those comments violate rule 16, but the violations are harmless; (v) the United States' failure to disclose that Acee

excluded from the CNM 302 Report his comments regarding M. Montoya during the CNM conversation and of A. Cordova's silence in response to those comments does not violate <u>Brady</u> and <u>Giglio</u>, because nondisclosure is not prejudicial; and (vi) the United States committed prosecutorial error by not disclosing Acee's comments and A. Cordova's silence in response during the CNM conversation, but the United States did not commit prosecutorial error in characterizing the silence, structuring its closing, investigating the Dix murder, or characterizing M. Montoya and C. Garcia's November 29, 2015, conversation, and all the alleged errors are harmless.  Accordingly, the Court denies A. Cordova's Motion.

I. **BECAUSE THE COURT DEEMS THAT THE EVIDENCE AT TRIAL SUPPORTS THE JURY'S VERDICT, THE COURT WILL NOT GRANT A. CORDOVA A NEW TRIAL ON GROUNDS THAT THE VERDICT IS CONTRARY TO THE <u>WEIGHT OF THE EVIDENCE</u>.**

The Court will not grant A. Cordova a new trial on the grounds that the verdict is contrary to the weight of the evidence.  In reaching this decision, the Court makes credibility and evidentiary determinations.  The Court does not see this case as the exceptional situation requiring a new trial.

A. **ALTHOUGH PHYSICAL EVIDENCE DOES NOT CONNECT A. CORDOVA TO THE DIX MURDER, EVIDENCE FROM TRIAL SUPPORTS THAT, ON FEBRUARY 4, 2005, A. CORDOVA KILLED DIX WITH A FIREARM.**

Sufficient evidence connects A. Cordova to Dix' death to support the conclusions that A. Cordova intentionally or with the knowledge that his acts would kill Dix caused Dix' death, and that he caused the death with a firearm.  The Jury had to have reached both conclusions to find A. Cordova guilty on the Counts charged.  On Count 2, the VICAR charge, the Court directed the Jury on VICAR's second element -- that A. Cordova committed murder, <u>see</u> Court's Final Jury Instructions Instruction No. 23, at 26 filed July 23, 2018 (Doc. 880)("Jury Instructions") -- that it

must find that A. Cordova killed Dix; that the killing happened in New Mexico on or around February 4, 2005; and, to find first degree murder, that "[t]he killing was with the deliberate intention to take away the life of Mr. Dix," or, to find second degree murder, that A. Cordova "knew that his acts created a strong probability of death or great bodily harm to Mr. Dix," Jury Instructions Instruction No. 27, at 34.  On Count 3, the Court directed the Jury that it must find that A. Cordova "used or carried a firearm," that he "did so during and in relation to the murder of Mr. Dix," that he "caused the death of Mr. Dix through the use of the firearm," and that "[t]he offense occurred on or about February 4, 2005."  Jury Instructions Instruction No. 30, at 40.  The Court does not see that a "'miscarriage of justice'" occurred in the Jury's decision to find these elements satisfied.  United States v. Thomas, 2016 WL 9819560, at *8 (quoting United States v. Evans, 42 F.3d at 593).

A. Cordova's arguments against the verdict focus heavily on some cooperators' -- M. Montoya's, Gallegos', B. Cordova's, and Morales' -- credibility.   See Motion at 1-12.  A.Cordova's allegations do not make the cooperators incredible.  First, that M. Montoya, Gallegos, B. Cordova, and Morales have criminal histories, and received personal benefits from testifying, does not make the testimony wholly unreliable.  See Motion at 1-4, 7-12.  The Tenth Circuit has noted that a "guilty plea does not automatically make a witness incredible."  United States v. Dewberry, 790 F.3d 1022, 1029 (10th Cir. 2015)(rejecting an argument that "the witnesses testified out of self-interest because they were offered plea deals," because "this is common in criminal prosecutions and does not necessarily render testimony incredible," and stating that the Tenth Circuit implied the same in United States v. Whitney, 229 F.3d 1296, 1306 (10th Cir. 2000)).  Here, these cooperators' plea agreements and Kastigar letters may draw their credibility into

question, but they do not automatically make incredible the testimony. Moreover, the cooperators' criminal histories lent their testimony about the SNM credence, and, as the United States indicates in the Response, see Response at 6-12, the cooperators took considerable risk in testifying. Throughout the trial, the SNM-member witnesses testified that, for the SNM, cooperating with law enforcement opens a door to a "greenlight" to kill the cooperator. E.g., M. Rodriguez Tr. at 36:12-17 (Armijo, M. Rodriguez); Martinez Tr. at 60:23-61:2 (Martinez, Castellano); G. Archuleta Tr. at 10:3-5 (Beck, G. Archuleta). These cooperators were motivated to avoid further contact with the SNM, and not to jeopardize their sentencing reductions and the protection that the United States promised by lying.

Second, that M. Montoya told people that he committed the Dix murder does not necessarily destroy his credibility. M. Montoya testified that he told other SNM members about the crime to build his reputation, see M. Montoya Tr. at 82:7-15 (Castellano, M. Montoya), and that he omitted A. Cordova's name so as not to risk implicating A. Cordova, see M. Montoya Tr. at 83:2-6 (M. Montoya). Time and again the SNM members corroborated violent crimes' significance to an SNM member's reputation, and the commonality within the SNM of such stories about crimes. See, e.g., M. Rodriguez Tr. at 98:4-7 (M. Rodriguez); id. at 107:1-108:2 (Armijo, M. Rodriguez); G. Archuleta Tr. at 47:19-48:3 (Beck, G. Archuleta); July 18 Tr. at 164:4-24 (Armijo, Lovato); id. at 176:3-24 (Armijo, Lovato); Munoz Tr. at 61:23-62:23 (Armijo, Munoz).

Third, that M. Montoya's trial testimony deviated from his accounts to the FBI does not render his testimony deserving of little weight. See Motion at 4. At trial, M. Montoya clarified his statements about the vehicles' positioning: M. Montoya explained that the FBI report incorrectly recorded the orientation and described that the vehicles "were T-boned, sideways," M.

Montoya Tr. at 247:17 (M. Montoya), but that the occupants were looking at each other, see M. Montoya Tr. at 247:10-248:5 (Castellano, M. Montoya). Moreover, no one at trial remembered February 4, 2005's events perfectly. The Court does not expect M. Montoya to recite all the details precisely, and accepts that some variation in testimony does not make incredible a story about a night over ten years ago and during which M. Montoya was high. See M. Montoya Tr. at 162:4-8 (Morrissey, M. Montoya).

Fourth, the Court cannot conclude that M. Montoya lied about the November 29, 2015, conversation with C. Garcia such that the recording could improperly affect the Jury's verdict. As A. Cordova admits, the audio recording is extremely low quality. See Motion at 5 n.1. The Court has attempted to decipher the conversation, but the large unintelligible sections surrounding M. Montoya's and C. Garcia's discussion of A. Cordova make following the conversation's thread difficult, and they make it particularly difficult considering M. Montoya admitted that C. Garcia was high, rambling, and speaking in code. See Montoya Tr. at 86:5-6 (M. Montoya); id. at 86:17-19 (M. Montoya). The Court cannot say that M. Montoya lied about the conversation's significance to him. At trial, M. Montoya, after first hearing the recording, recounted its contents, and then, later, after the FBI refreshed his recollection about it, he offered the same account of C. Garcia worrying about A. Cordova talking. See M. Montoya Tr. at 86:17-19 (Castellano, M. Montoya); id. at 87:4-7 (M. Montoya); id. at 241:13-20 (Castellano, M. Montoya). A. Cordova offers a different spin on the conversation, but, given the recording's quality, A. Cordova cannot proffer a definitive interpretation. See Motion at 6-7.

Fifth, the Court similarly disagrees with A. Cordova's accusations against Gallegos, B. Cordova, and Morales. A. Cordova contends that Gallegos drew his Dix murder story from the

discovery tablet; that B. Cordova had previously lied about a murder suspect and did not mention A. Cordova's involvement in the Dix murder until soon before trial; and that Morales offered only ambiguous comments on A. Cordova's guilt. See Motion at 7-12. A. Cordova accuses Gallegos of using the discovery tablet to familiarize himself with the cases' facts without citing any evidence to support the accusations. See Motion at 8-9. While A. Cordova offers a possibility, a vague hypothesis does not reduce Gallegos' apparently credible evidence to nothing. A. Cordova's allegations regarding B. Cordova fail, because B. Cordova admitted that he wrongly accused S. Rodriguez of Chavez' murder, and explained his accusation's basis on his suspicions about the timing of Chavez' and S. Rodriguez' deaths. See July 17 B. Cordova Tr. at 74:20-75:5 (Morrissey, B. Cordova); id. at 75:10-17 (Morrissey, B. Cordova). B. Cordova also told the FBI as early as 2016, that M. Montoya, C. Garcia, and A. Cordova all were involved in the Dix murder. See July 17 B. Cordova Tr. at 128:14-129:16 (Castellano, B. Cordova). Last, Morales' statements regarding A. Cordova responding, "You know how I do it" to Morales' compliment on the Dix murder, Morales Tr. at 37:7-22 (Beck, Morales), and recounting of A. Cordova calling him a "rat," see Morales Tr. at 39:1-17 (Beck, Morales); id. at 39:20-22 (Beck, Morales); id. at 99:23-24 (Morrissey); id. at 100:12 (Morrissey); id. at 99:23-100:7 (Morrissey, Morales), credibly implicate A. Cordova in the Dix murder although they are not direct accusations. Morales apparently and credibly understood A. Cordova's statements as admitting to the Dix murder, and threatening Morales for tattling to the FBI. A. Cordova proffers speculative alternatives to Morales' interpretation of events, but such speculation amounts to alternative theories and not a "miscarriage of justice." United States v. Thomas, 2016 WL 9819560, at *8 (quoting United States v. Evans, 42 F.3d at 593).

A. Cordova complains too of the recorded conversation between C. Garcia, Duran, and Baca, and avers that the conversation shows only C. Garcia's familiarity with A. Cordova. See Motion at 12-13. The Court agrees with the United States that the conversation's strength and relevance lie in what A. Cordova admits the fact reveals. See Response at 12-13. Witnesses testified that A. Cordova worked closely with C. Garcia, see M. Montoya Tr. at 253:23-254:2 (Castellano, M. Montoya); G. Archuleta Tr. at 40:25-41:3 (G. Archuleta); id. at 41:4-10 (Beck, G. Archuleta); July 17 B. Cordova Tr. at 23:18-24:3 (Castellano, B. Cordova); Morales Tr. at 31:5-23 (Beck, Morales), and the conversation, in which C. Garcia narrates A. Cordova's struggles with psoriasis, see Garcia, Duran, Baca Tr. at 2, illustrates a familiarity to the point of detailed knowledge regarding A. Cordova's medical problems. Neale confirmed A. Cordova's struggles with psoriasis. See Neale Tr. at 11:11-12:5 (Castellano, Neale). Such a relationship increases the probability that C. Garcia asked A. Cordova to commit a murder.

A. Cordova also attacks Acee's credibility, and points to the holes in the CNM 302 Report and the impossibility that A. Cordova could cooperate with the FBI. See Motion at 29-30. The Court does not deem either allegation sufficient to justify disregarding Acee's testimony. Acee testified at trial to mentioning M. Montoya during the CNM conversation, but omitted from the CNM 302 Report these statements and A. Cordova's silence in response. Compare CNM 302 Report at 1, with Acee Tr. at 95:19-23 (Acee). That Acee excluded some information from the report does not make his trial testimony incredible. The remainder of Acee's testimony, for instance, follows the CNM 302 Report. Compare CNM 302 Report at 1, with Acee Tr. at 95:6-96:5 (Acee, Castellano). A. Cordova also misses the mark with his argument about A. Cordova's inability to work with the FBI. The transcript shows Acee trailing off and excusing himself for

interrupting counsel, and not Acee stopping his train of thought before mentioning A. Cordova cooperating.  See Acee Tr. at 191:3-19 (Acee).  Moreover, as the United States indicates, see Response at 20-21, A. Cordova could have cooperated against C. Garcia in relation to the Dix murder, controverted M. Montoya's information, or offered new or other information against the SNM.

Moreover, the evidence together conveys a coherent and credible story about A. Cordova using a firearm to intentionally kill Dix on the evening of February 4, 2005.  Several witnesses testified to C. Garcia and the SNM wanting Dix dead after Dix shot C. Garcia in the stomach, see Romero Tr. at 40:25-41:8 (Romero); Lujan Tr. at 4:4-14 (Morrissey, Lujan); M. Montoya Tr. at 48:8-50:11 (Castellano, M. Montoya); id. at 50:12-51:5 (Castellano, M. Montoya); id. at 156:10-22 (Morrissey, M. Montoya); July 17 B. Cordova Tr. at 21:19-22:4 (Castellano, B. Cordova); id. at 22:5-11 (Castellano, B. Cordova); Morales Tr. at 28:19-24 (Beck, Morales); July 13 Tr. at 259:6-11 (Beck, Sullivan); id. at 260:7-11 (Sullivan); id. at 274:5-9 (Beck, Sullivan); Gonzalez Tr. at 10:18-10:4 (Castellano, Gonzalez), and to the SNM rules requiring retaliation against people who disrespect SNM members, see Romero Tr. at 18:17-19:15 (Beck, Romero); G. Archuleta Tr. at 28:17-22 (Beck, G. Archuleta); id. at 29:12-16 (G. Archuleta); Lujan Tr. at 10:7-11:6 (Beck, Lujan).  C. Garcia solicited several SNM members, including Romero, B. Cordova, and Morales to kill Dix.  See Romero Tr. at 41:19-42:5 (Romero, Beck); id. at 43:14-18 (Romero); July 17 B. Cordova Tr. at 23:7-9 (Castellano, B. Cordova); Morales Tr. at 29:12-30:4 (Beck, Morales). M. Montoya knew C. Garcia, see, e.g., Morales Tr. at 32:23-33:7 (Beck, M. Montoya); id. at 33:8-13 (Beck, Morales), and A. Cordova too worked closely with C. Garcia, see M. Montoya Tr. at 253:23-254:2 (Castellano, M. Montoya); G. Archuleta Tr. at 40:25-41:3 (G. Archuleta); id. at 41:4-

10 (Beck, G. Archuleta); July 17 B. Cordova Tr. at 23:18-24:3 (Castellano, B. Cordova); Morales Tr. at 31:5-23 (Beck, Morales). C. Garcia knew A. Cordova well enough to have detailed information about his psoriasis. See Garcia, Duran, Baca Tr. at 2.

M. Montoya agreed to kill Dix but procrastinated in committing the act. See M. Montoya Tr. at 51:8-22 (Castellano, M. Montoya); id. at 53:3-18 (Castellano, M. Montoya); id. at 62:18-63:2 (Castellano, M. Montoya). During M. Montoya's half-hearted attempts to kill Dix, law enforcement seized from him a gun that C. Garcia had provided. See M. Montoya Tr. at 51:23-52:17 (Castellano, M. Montoya); July 13 Tr. at 85:25-86:19 (Castellano, Lerner). As M. Montoya committed relatively few violent acts for the SNM and relied heavily on his skills in drug trafficking to maintain his position in the SNM, see Montoya Tr. at 149:14-23 (Morrissey, M. Montoya), M. Montoya credibly needed A. Cordova's help to complete the task of murdering Dix.

After M. Montoya paired with A. Cordova to kill Dix, see M. Montoya Tr. at 53:3-18 (Castellano, M. Montoya); id. at 62:18-63:2 (Castellano, M. Montoya); Gallegos Tr. at 36:20-25 (Armijo, Gallegos); id. at 37:2-5 (Armijo, Gallegos); id. at 37:11-13 (Armijo, Gallegos), C. Garcia removed himself from suspicion in the murder by visiting Las Vegas for the Super Bowl, see M. Montoya Tr. at 63:3-25 (Castellano, M. Montoya); G. Archuleta Tr. at 40:10-16 (G. Archuleta); id. at 40:17-20 (Beck, G. Archuleta); Neale Tr. at 23:24-24:2 (Castellano, Neale); Calbert Tr. at 4:13-16 (Morrisey, Calbert). On February 4, 2005, M. Montoya and A. Cordova found Dix at a Chevron station. See M. Montoya Tr. at 64:1-15 (Castellano, M. Montoya); id. at 137:8-10 (Morrissey, M. Montoya); id. at 79:7-8 (M. Montoya); Gallegos Tr. at 69:25-70:4 (Morrissey, Gallegos). They followed Dix' green van to a home and waited until he emerged, at which point A. Cordova opened fire on Dix and his car, and hit him four times, including once fatally in the

head behind the ear.  See M. Montoya Tr. at 65:21-65:16 (Castellano, M. Montoya); id. at 67:23-68:3 (Castellano, M. Montoya); id. at 68:23-69:13 (Castellano, M. Montoya); id. at 69:16-20 (Castellano, M. Montoya); id. at 70:12-21 (Castellano, M. Montoya); id. at 175:11-22 (Morrissey, M. Montoya); id. at 70:22-71:1 (Castellano, M. Montoya); July 17 B. Cordova Tr. at 27:13-29:3 (Castellano, B. Cordova); id. at 22:13-16 (B. Cordova); id. at 28:18-29:3 (Castellano, B. Cordova); id. at 29:5-16 (Castellano, B. Cordova); Gallegos Tr. at 37:17-23 (Armijo, Gallegos); Nine Tr. at 15:7-12 (Nine); Michael Tinker Tr. at 4:1-11 (Michael Tinker, Beck); Mikail Tinker Tr. at 3:20-5:2 (Morrissey, Mikail Tinker).  The bullets that hit Dix traveled relatively straight across his body, see Nine Tr. at 20:6-11 (Armijo, Nine); id. at 22:12-16 (Nine); id. at 24:11-21 (Armijo, Nine); id. at 26:23-27:8 (Nine); id. at 27:16-21 (Nine) and hit the van at a relatively perpendicular and straight angle, see Haag Tr. at 39:10-16 (Haag).  Dix died in the van, and it rolled across the street and into the Tinkers' front fence where it came to rest with its shattered glass and bullet holes.  See M. Montoya Tr. at 70:22-71:6 (Castellano, M. Montoya); Muro Tr. at 13:22-14:8 (Muro); id. at 18:15-19 (Muro); July 12 Tr. at 32:22-33:3 (Funes); id. at 33:15-21 (Armijo, FunesFunes); id. at 35:22-36:15 (Armijo, Funes); id. at 41:16-22 (Jacobs); July 13 Tr. at 87:5-88:13 (Castellano, Lerner); id. at 131:17-132:9 (Armijo, Blackmon); id. at 134:6-7 (Blackmon); id. at 134:22-135:20 (Armijo, Blackmon); Michael Tinker Tr. at 8:3-9:2 (Beck, Tinker); id. at 11:10-12:22 (Beck, Tinker); Mikail Tinker Tr. at 8:12-9:10 (Morrissey, Mikail Tinker).  M. Montoya and A. Cordova drove away slowly, see M. Montoya Tr. at 70:20-71:1 (Castellano, M. Montoya), and, when they crossed the river, they stopped and threw their guns into the water, see M. Montoya Tr. at 76:2-9 (Castellano, M. Montoya); Gallegos Tr. at 38:1-3 (Armijo, Gallegos); id. at 38:20-21 (Armijo, Gallegos).  C. Garcia later paid M. Montoya and A. Cordova for the murder in drugs and cash.

See M. Montoya Tr. at 81:4-19 (Castellano, M. Montoya); id. at 81:25-82:6 (Castellano, M. Montoya); Gallegos Tr. at 38:12-14 (Armijo, Gallegos).

That no physical evidence sets A. Cordova at the scene does not force apart the narrative. Haag testified that M. Montoya's testimony aligns with the physical evidence, see Haag Tr. at 54:25-55:19 (Haag), and no physical evidence affirmatively disproves A. Cordova's presence at the scene either. Although the Tinkers heard, for instance, no car at the scene, they may not have heard a car driving slowly. See Mikail Tinker Tr. at 12:23-13:4 (Morrissey, Mikail Tinker)(describing hearing no cars other than the van).

Although neither M. Montoya's statements about killing Dix, see July 18 Tr. at 161:10-14 (Morrissey, Lovato)(describing that M. Montoya recounted him and his wife killing Dix); Lujan Tr. at 7:2-7 (Morrissey, Lujan)(stating that M. Montoya explained that he walked up and killed Dix); J. Montoya Tr. at 5:21-24 (Morrissey, J. Montoya)(describing that M. Montoya recounted killing Dix), nor A. Cordova's statements about shooting Dix in close quarters, see Gallegos Tr. at 71:6-15 (Morrissey, Gallegos)(describing that A. Cordova indicated that he stood and shot Dix in his head); July 17 B. Cordova Tr. at 123:23-124:11 (Castellano, B. Cordova)(indicating that A. Cordova alleged to have shot Dix in the back of his head), hold up to the physical evidence of the bullet-hole ridden van or align with all testimony at trial, the stories do not wholly undermine the verdict. The SNM's premium on violence suggests such stories impress SNM members. See, e.g., M. Rodriguez Tr. at 98:407 (M. Rodriguez); id. at 107:1-108:2 (Armijo, M. Rodriguez); G. Archuleta Tr. at 47:19-48:3 (Beck, G. Archuleta); July 18 Tr. at 164:4-24 (Armijo, Lovato); id. at 176:3-24 (Armijo, Lovato); Munoz Tr. at 61:23-62:23 (Armijo, Munoz). The evidence credibly supports that M. Montoya and/or A. Cordova dramatized the killing and, with both A. Cordova

and M. Montoya potentially bragging, no single person stands impeached to such a degree to make the decision against the preponderance of the evidence. Moreover, as A. Cordova indicated to Gallegos and B. Cordova, Dix received a shot to the head. See, e.g., Nine Tr. at 22:2-5 (Nine).

Developments after the Dix murder corroborate each other to support this story, even if the developments each standing alone welcome skepticism. M. Montoya recounted a conversation with C. Garcia in 2015, in which C. Garcia expressed concern that A. Cordova had spoken to an outside party about "jale" -- i.e., the Dix murder. M. Montoya Tr. at 84:10-89:11 (Castellano, M. Montoya). Other SNM members confirmed M. Montoya's interpretation of the word "jale" as referring to putting in work for the SNM and to specifically committing a violent assault. See M. Rodriguez Tr. at 23:22-24:3 (Armijo, M. Rodriguez); Martinez Tr. at 48:8-21 (Castellano, Martinez); G. Archuleta Tr. at 6:25-7:4 (Beck, G. Archuleta); Morales Tr. at 9:14-16 (Beck, Morales). M. Montoya established credibility with the FBI by going to other considerable lengths in taking down the SNM, including helping to foil the Mercantel murder conspiracy, see Acee Tr. at 69:14-18 (Castellano, Acee), and, in 2016, M. Montoya told Lovato that he felt guilty for telling the FBI about A. Cordova's help with the Dix murder, see July 18 Tr. at 175:14-23 (Armijo, Lovato). G. Archuleta understood C. Garcia as having boasted about having had Dix killed. See Tr. at 40:17-20 (Beck, G. Archuleta). B. Cordova remembered M. Montoya praising A. Cordova for not hesitating to shoot Dix, see July 17 B. Cordova Tr. at 31:9-34:8 (Castellano, B. Cordova), and told the FBI as early as 2016 that M. Montoya, C. Garcia, and A. Cordova were involved in the Dix murder, see July 17 B. Cordova Tr. at 128:14-129:16 (Castellano, B. Cordova). A. Cordova recounted the murder to B. Cordova and to Gallegos. See, e.g., July 17 B. Cordova Tr. at 28:18-29:3 (Castellano, B. Cordova); Gallegos Tr. at 36:20-25 (Armijo, Gallegos). A. Cordova

accepted Morales' compliment on the Dix murder by stating, "You know how I do it," see Morales Tr. at 37:7-22 (Beck, Morales), and later shouted threats to Morales for being a rat and speaking with the FBI, see Morales Tr. at 39:1-17 (Beck, Morales); id. at 39:20-22 (Beck, Morales). A. Cordova also did not act confused or otherwise defend himself when Acee began discussing M. Montoya at CNM. See Acee Tr. at 191:3-19 (Acee).

Evidence exists to undermine M. Montoya's account of the Dix murder. For instance, Littlefield's testimony on finding nothing in M. Montoya's car conflicts with Lerner's testimony about finding C. Garcia's gun. Compare July 18 Tr. at 77:21-78:2 (Beck, Littlefield), with July 13 Tr. at 85:25-86:19 (Castellano, Lerner). M. Montoya told multiple people that he killed Dix. See, e.g., July 18 Tr. at 161:10-14 (Morrissey, Lovato); Lujan Tr. at 7:2-7 (Morrissey, Lujan); J. Montoya Tr. at 5:21-24 (Morrissey, J. Montoya). Aguilar asserted that he knew everyone close to A. Cordova Jr. and suggested that his not knowing Gallegos means Gallegos was not friends with A. Cordova Jr. as Gallegos testified. See Aguilar Tr. at 14:5-17 (Morrissey, Aguilar). Mikail Tinker alleged that, after hearing the gunshots, she saw somebody walking swiftly away from the van and the house, see Mikail Tinker Tr. at 9:17-22:2 (Morrissey, Mikail Tinker), and observed no vehicles in the vicinity other than the van, see Mikail Tinker Tr. at 12:23-13:4 (Morrissey, Mikail Tinker).

The evidence pointing against A. Cordova's involvement in the Dix murder does not weigh so heavily, however, as to make this case an exceptional circumstance requiring a new trial. See United States v. Guzman-Martinez, 2004 WL 7338099, at *1 (quoting United States v. Mounkes, 204 F.3d at 1027). Such evidence weakens certainty in the narrative for the Dix murder recounted above, but it does not so strongly preponderate against the evidence to counsel the Court to grant

a new trial.  See United States v. Thomas, 2016 WL 9819560, at *8 (quoting United States v. Evans, 42 F.3d at 593); United States v. Quintanilla, 193 F.3d at 1146 (citing Tibbs v. Florida, 457 U.S. 31, 37-38 & n.11 (1982); United States v. Sinclair, 109 F.3d at 1531); United States v. Guzman-Martinez, 2004 WL 7338099, at *1 (quoting United States v. Mounkes, 204 F.3d at 1027).  A strong narrative still exists on which the Jury could convict A. Cordova.  Accordingly, the Court concludes that the Jury's conclusions that A. Cordova killed Dix on February 4, 2005, with the intention of taking Dix' life or at least with the knowledge that Dix would likely die, and that A. Cordova used a firearm while attacking Dix and caused the death with the firearm are not against the weight of the evidence.

**B.    GIVEN THE WITNESS TESTIMONY ABOUT C. GARCIA'S AND DIX' RELATIONSHIP, THE CONSEQUENCES OF DISRESPECTING SNM MEMBERS, AND THE EVENTS PRECEDING THE DIX MURDER, THE CONCLUSION THAT THE DIX MURDER RELATED TO THE ENTERPRISE IS NOT AGAINST THE WEIGHT OF THE EVIDENCE.**

The Jury convicted A. Cordova on Count 2's VICAR charge and specifically found that A. Cordova's "general purpose in committing murder was as consideration for a promise or agreement to pay anything of pecuniary value from the charged enterprise," but not "for the purpose of gaining entrance to, or maintaining, or increasing position in the enterprise."  Verdict at 1-2.  Cf. 18 U.S.C. § 1959 (providing that VICAR applies to "[w]hoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise").  The Court does not deem this verdict against the weight of the evidence.  The parties introduced sufficient evidence for the Jury to find that A. Cordova committed the Dix murder for value from the SNM.

Preliminarily, the Court concludes that, and A. Cordova does not contest that, sufficient evidence suggests that A. Cordova committed the Dix murder in consideration for a promise of something of pecuniary value. "'[I]n consideration for,' as used in both prongs of § 1958(a) means consideration in the traditional sense of bargained for exchange. The two uses of 'as consideration for' in the statute cover the two murder-for-hire situations: payment now or a promise or agreement to pay in the future." United States v. Wicklund, 114 F.3d 151, 154 (10th Cir. 1997)(quoting 18 U.S.C. § 1958(a)). Trial testimony shows that A. Cordova joined M. Montoya in the murder, see M. Montoya Tr. at 62:18-63:2 (Castellano, M. Montoya)(describing C. Garcia pairing A. Cordova and M. Montoya for the murder); but cf. Gallegos Tr. at 37:2 (Gallegos)(describing M. Montoya hiring A. Cordova), and received payment in drugs and cash, see M. Montoya Tr. at 81:4-19 (Castellano, M. Montoya); id. at 81:25-82:6 (Castellano, M. Montoya); Gallegos Tr. at 38:14 (Gallegos). The Jury's conclusion that A. Cordova murdered Dix for pecuniary value is not against this evidence's weight.

In attacking the Jury's verdict on VICAR's motive element, A. Cordova emphasizes that C. Garcia alone made the decision to kill Dix and paid for the death, and that no evidence shows the SNM ordered him to kill Dix or made the decision to kill Dix. See Motion at 13-14; Reply at 10. The Court, however, disagrees with A. Cordova's arguments that, for the facts to satisfy VICAR's motive requirement, evidence must demonstrate the SNM's explicit authorization for the killing. See Motion at 13-14. The Court deems sufficient evidence that A. Cordova performed an act of the SNM as consideration for a promise "to pay anything of pecuniary value." 18 U.S.C. § 1959. The Court could not locate a Tenth Circuit case explicating the motive requirement's first option -- the receipt of pecuniary value from the enterprise. For the second

option -- the attempt to enter, maintain, or increase a position in an enterprise -- however, the Tenth Circuit deems key the expectations the enterprise fosters for members to perform the gang's acts: "[T]hat the crime was 'committed as an integral aspect of membership in [the enterprise]' is sufficient to establish this element of a § 1959(a) offense." United States v. Smith, 413 F.3d 1253, 1277 (10th Cir. 2005)(quoting United States v. Thai, 29 F.3d 785, 817 (2d Cir. 1994)). The Tenth Circuit agrees "with the [United States Court of Appeals for the] Second Circuit that 'the motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" United States v. Smith, 413 F.3d at 1278 (quoting United States v. Dhinsa, 243 F.3d 635, 671 (2d Cir. 2001)). Analogously, performing an act integral to the enterprise even without the enterprise's expressly ordering the act pursuant to a promise of an item of pecuniary value satisfies the first motive option. For instance, in United States v. Holt, 751 F. App'x 820, 826-27 (6th Cir. 2018), an opinion written by the Honorable Joan Larsen, United States Circuit Judge for the United States Court of Appeals for the Sixth Circuit, and joined by the Honorable Karen Moore, United States Circuit Judge for the Sixth Circuit, and the Honorable Alice Batchelder, United States Circuit Judge for the Sixth Circuit, Judge Larsen concludes that, where a gang member who regularly organized robberies for a gang specializing in robbery and engaging in robbery as a racketeering activity organized a robbery, that robbery qualified as a gang robbery, and that a non-gang member who participated in the crime expecting to receive a split of the proceeds committed the act in expectation of pecuniary value from the gang. See United States v. Holt, 751 F. App'x at 826-27.

Here, sufficient evidence shows that the Dix murder was an SNM killing. Some direct evidence suggests the SNM's approval for killing Dix. B. Cordova's testimony suggests that the SNM wanted Dix hit after he shot C. Garcia and had previously greenlighted him. See July 17 B. Cordova Tr. at 22:5-11 (Castellano, B. Cordova).

Even without relying on B. Cordova's testimony, however, the testimony at trial sufficiently depicts the murder as the SNM's act. Violence is integral to the gang and its power. SNM members spoke to the requirement that other members retaliate for disrespect by responding with violence themselves, allowing other SNM members to retaliate, or hiring others to commit the violence. See, e.g., M. Rodriguez Tr. at 35:18-21 (Armijo, M. Rodriguez); G. Archuleta Tr. at 28:17-22 (Beck, G. Archuleta), id. at 29:12-16 (G. Archuleta); Morales Tr. at 15:10-14 (Beck, Morales). This violence maintains the SNM's control over the New Mexico criminal underworld. See, e.g., July 17 B. Cordova Tr. at 11:14-17 (B. Cordova). The SNM also engages in violence as a racketeering activity; B. Cordova, for instance, admitted to various crimes, including waterboarding, intimidating a jury, domestic abuse, and drug trafficking for the SNM. See July 17 B. Cordova Tr. at 80:21-81:8 (B. Cordova); id. at 82:20-83:7 (Morrissey, B. Cordova); id. at 89:12-91:1 (Morrisey, B. Cordova); id. at 93:3-7 (Morrissey, B. Cordova).

Evidence further establishes the Dix murder as an SNM killing. When Dix shot C. Garcia, see, e.g., Romero Tr. at 18:17-19:15 (Beck, Romero); M. Montoya Tr. at 48:8-50:11 (Castellano, M. Montoya); Lujan Tr. at 4:4-14 (Morrissey, Lujan); July 13 Tr. at 259:6-11 (Beck, Sullivan), a major SNM drug dealer, see, e.g., Gonzalez Tr. at 10:18-10:4 (Castellano, Gonzalez), the SNM viewed the assault as an affront to the entire gang, see Romero Tr. at 40:25-41:8 (Romero); Lujan Tr. at 10:7-11:6 (Beck, Lujan); July 17 B. Cordova Tr. at 21:19-22:4 (Castellano, B. Cordova); M.

Montoya Tr. at 157:5-16 (Morrissey, M. Montoya). As C. Garcia sought to have Dix killed, C. Garcia did not solicit just anyone for the task but spoke first to SNM members, and A. Cordova later worked with M. Montoya, another SNM member. See Romero Tr. at 41:19-42:5 (Romero, Beck); id. at 43:14-18 (Romero); July 17 B. Cordova Tr. at 23:7-9 (Castellano, B. Cordova); Lujan Tr. at 4:15-17 (Morrissey, Lujan); Morales Tr. at 29:12-30:4 (Beck, Morales). Moreover, C. Garcia did not ask just any non-gang member to join M. Montoya; although A. Cordova did not belong to the SNM, witnesses attested to his close ties to and support for the gang's activities, even to the extent that Lujan testified to believing A. Cordova belonged to the SNM. See Lujan Tr. at 19:15-25 (Morrissey, Lujan). See also Morales Tr. at 31:5-23 (Beck, Morales); id. at 32:1-4 (Beck, Morales); Munoz Tr. at 30:12-17 (Armijo, Munoz); M. Rodriguez Tr. at 31:11-13 (M. Rodriguez, Armijo); Romero Tr. at 45:17-23 (Romero); G. Archuleta Tr. at 40:25-41:3 (G. Archuleta); id. at 41:4-10 (Beck, G. Archuleta); July 17 B. Cordova Tr. at 23:18-24:3 (Castellano, B. Cordova); id. at 25:16-18 (B. Cordova); id. at 26:6-13 (Castellano, B. Cordova). B. Cordova's testimony that M. Montoya, in discussing A. Cordova, understood the Dix murder to exemplify A. Cordova's support for the SNM, see July 17 B. Cordova Tr. at 31:9-34:8 (Castellano, B. Cordova, Morrisey, Court), illustrates a belief that A. Cordova fired on Dix for the SNM.

Accordingly, the Court believes no miscarriage of justice occurred exists in the Jury finding that A. Cordova killed Dix in exchange for something of pecuniary value from the SNM. The evidence sufficiently reflects A. Cordova receiving payment for the murder and committing the murder on the SNM's behalf. That the SNM as an enterprise did not order A. Cordova's actions or payment does not undermine the finding when A. Cordova received payment for the enterprise's act.

### C. WITNESS TESTIMONY REGARDING THE SNM'S DRUG TRAFFICKING AND VIOLENT ACTS ESTABLISHES THAT A VERDICT CONCLUDING THAT THE SNM ENGAGED IN RACKETEERING ACTS AROUND FEBRUARY 4, 2005, IS NOT AGAINST THE WEIGHT OF THE EVIDENCE.

The Court instructed the Jury that, to find A. Cordova guilty on Count 2's VICAR charge, it must find that "[t]he charged enterprise engaged in 'racketeering activity' as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), on or about February 4, 2005." Jury Instructions Instruction No. 23, at 26. The Court will not grant A. Cordova a new trial on his contentions that the United States did not establish specific racketeering events around the Dix murder's date. See Motion at 14. The Court concludes that the Jury could find consistent with the evidence that the SNM engaged in racketeering activities on and around February 4, 2005.

The Court disagrees with A. Cordova that the United States must prove a "*specific*" racketeering event on or around February 4, 2005. See Motion at 14 (emphasis in Motion). The United States must have shown evidence of racketeering activities around that time. The Court explained in a previous opinion in this case what the United States must show to establish this VICAR element:

> The Court overrules the Objection. VICAR does not contain an express temporal requirement for an enterprise's existence or engagement in racketeering activity, but the statute contains a de facto temporal requirement. To establish VICAR's purpose element, the United States must prove that a defendant committed a violent crime "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" 18 U.S.C. § 1959(a). If no enterprise exists or if no enterprise is engaged in racketeering activity, then it is impossible to receive "anything of pecuniary value" or "a promise or agreement to pay, anything of pecuniary value" from an "enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). Joining an enterprise engaged in racketeering activity and "maintaining or increasing position in" such an enterprise is likewise impossible. 18 U.S.C. § 1959(a). Thus, outside

exceptional circumstances that are not implicated by the evidence in this case, establishing VICAR's purpose element requires the United States to prove that an enterprise both existed and engaged in racketeering activity when a defendant committed a crime of violence.

        To be clear, VICAR does not require the United States to prove that the SNM committed specific racketeering acts on or about February 4, 2005. The United States needs only to show that the SNM was, at that time, engaging in racketeering activity in a systematic way. Just as the Dallas Cowboys is an enterprise engaged in professional football year-round even though the football season begins in the fall and ends in the winter, an enterprise can be engaged in racketeering activity over an extended period of time without continuously committing racketeering acts. In other words, the United States must show that the SNM was in the racketeering business on or about February 4th, 2005, but it does not need to show that the SNM engaged in a racketeering act on or about that date.

United States v. Baca, 323 F. Supp. 3d at 1297-98 (footnotes omitted). Cf. United States v. DeLeon, 323 F.R.D. at 691 ("The best way -- and, perhaps, the only way -- to prove that the SNM was engaged in racketeering activity when the conduct charged . . . occurred . . . is to introduce evidence of roughly contemporaneous instances of racketeering activity in which the SNM engaged.").

The United States presented adequate evidence from which the Jury could conclude that the SNM engaged in racketeering activities around the time of the Dix murder. "Racketeering activity includes 'any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance' that is a state-law felony." United States v. DeLeon, 291 F. Supp. 3d 1283, 1311 (D.N.M. 2017)(Browning, J.)(quoting 18 U.S.C. § 1961(1)(A)). Munoz described the SNM as an active gang dealing drugs in 2005. See Munoz Tr. at 60:16-23 (Armijo, Munoz). Witnesses testified to C. Garcia's role as a major drug dealer for the SNM, see, e.g., Gonzalez Tr. at 10:18-10:4 (Castellano, Gonzalez), and his role trafficking drugs around February 4, 2005, see, e.g., M.

Montoya Tr. at 50:12-51:5 (Castellano, M. Montoya)(describing agreeing to kill Dix to fulfill his drug debt to C. Garcia); Romero Tr. at 40:21-24 (Romero)(stating that, around 2005, he purchased crack cocaine and heroin from C. Garcia); July 17 B. Cordova Tr. at 20:10-16 (Castellano, B. Cordova)(describing trafficking drugs for C. Garcia in 2005); July 18 Tr. at 170:2-8 (Armijo, Lovato)(recounting C. Garcia actively and successfully dealing drugs in 2005). According to Morales, between 2004 and 2006, he also dealt drugs and sent the proceeds to incarcerated SNM members. See Morales Tr. at 39:1-3 (Beck, Morales). This drug dealing alone shows ongoing racketeering activity around the Dix murder's time. The witnesses also established, however, a history of racketeering activity spanning from the SNM's founding through the day of the trial, and nothing suggests a break around February 4, 2005. Cf. July 13 Draft Tr. at 90:11-25 (Castellano, Lerner)(describing uncovering multiple grams of crack cocaine and powder cocaine in C. Garcia's home after Dix shot C. Garcia in 2001). Neither M. Montoya nor Romero could remember a time during which the SNM had not involved itself in drug trafficking. See M. Montoya Tr. at 29:15-30:1 (M. Montoya, Castellano); Romero Tr. at 19:24-20:5 (Beck, Romero). Roark described the SNM as continuously engaged in murders, assaults, and drug activity within the prison system. See Roark Tr. at 14:20-15:3 (Armijo, Roark). M. Rodriguez testified more specifically that, in 2004 and 2005, the SNM engaged in "violent stabbings, drug introduction into the New Mexico prison system, murder, extortion, bribery, a lot of violence," M. Rodriguez Tr. at 58:24-59:1 (M. Rodriguez), and drug trafficking outside prison, see M. Rodriguez Tr. at 59:2-6 (Armijo, M. Rodriguez). From this evidence, nothing suggests an injustice in the Jury's finding that the SNM engaged in racketeering activities on and around February 4, 2005.

**D. SIMILAR WITNESS TESTIMONY ON THE SNM'S DRUG TRAFFICKING ESTABLISHES THAT A VERDICT CONCLUDING THAT THE SNM ENGAGED IN INTERSTATE COMMERCE AROUND FEBRUARY 4, 2005, IS NOT AGAINST THE WEIGHT OF THE EVIDENCE.**

The Court instructed the jury that it could find A. Cordova guilty of the VICAR charge only if it found that "[t]he charged enterprise engaged in, or its activities affected, interstate commerce, on or about February 4, 2005." Jury Instructions Instruction No. 23, at 26. The Court will not grant A. Cordova a new trial based on his arguments that the Jury's finding that this element was satisfied was against the weight of the evidence. See Motion at 14. The Court decides that sufficient evidence exists that the Jury could reach its finding.

Preliminarily, the Court reasons that, like VICAR's racketeering-activity element, the interstate commerce element incorporates a de facto temporal requirement but does not require that the United States produce evidence of specific acts affecting interstate commerce. For VICAR's purposes, Congress defines an "enterprise" as "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959. The Court adheres to its reasoning on the racketeering activity element, see United States v. Baca, 323 F. Supp. 3d at 1297-98, and deems the same reasoning applicable to the interstate commerce element. The interstate commerce element incorporates a de facto temporal requirement. To receive "anything of pecuniary value," or "a promise or agreement to pay, anything of pecuniary value" from an "enterprise engaged in racketeering activity," or to join, or maintain or increase a position in, an enterprise engaged in racketeering activity, 18 U.S.C. § 1959(a), an enterprise consisting of some group of individuals affecting interstate or

foreign commerce must exist when the defendant acts. See United States v. Baca, 323 F. Supp. 3d at 1297. As with the racketeering activity element, the United States does not, however, need to establish specific acts affecting interstate commerce on or about February 4, 2005. The Court follows its vision of an enterprise as analogous to a football team "engaged in professional football year-round even though the football season begins in the fall and ends in the winter." United States v. Baca, 323 F. Supp. 3d at 1298. The United States must have shown that the SNM engaged in an interstate "business" on or about February 4, 2005. United States v. Baca, 323 F. Supp. 3d at 1298.

Evidence that the SNM engaged in activity with only a de minimis effect on interstate commerce suffices to establish such business. See United States v. Garcia, 793 F.3d 1194, 1210 (10th Cir. 2015)(citing Courts of Appeals that have reached this conclusion, and listing United States v. Cornell, 780 F.3d 616, 621-23 (4th Cir. 2015); United States v. Delgado, 401 F.3d 290, 297 (5th Cir. 2005); United States v. Shryock, 342 F.3d 948, 984 & n.6 (9th Cir. 2003); United States v. Espinoza, 52 F. App'x 846, 848-49 (7th Cir. 2002); United States v. Marino, 277 F.3d 11, 34-35 (1st Cir. 2002); United States v. Riddle, 249 F.3d 529, 537 (6th Cir. 2001); United States v. Miller, 116 F.3d 641, 673-74 (2d Cir. 1997); United States v. Beasley, 72 F.3d 1518, 1526 (11th Cir. 1996); United States v. Maloney, 71 F.3d 645, 663 (7th Cir. 1995)). "[T]he Supreme Court [has] reiterated that 'when a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.'" United States v. Cornell, 780 F.3d at 622 (quoting Gonzales v. Raich, 545 U.S. 1, 17 (2005)). See United States v. DeLeon, 2018 WL 4100949, at *6 ("[W]here a 'class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." (quoting

Perez v. United States, 402 U.S. 146, 154 (1971))).  The Supreme Court emphasized the de minimis requirement as it expounded on the interstate commerce element in the Hobbs Act, 18 U.S.C. § 1951:

> [T]o satisfy the Act's commerce element, it is enough that a defendant knowingly stole or attempted to steal drugs or drug proceeds, for, as a matter of law, the market for illegal drugs is "commerce over which the United States has jurisdiction."  And it makes no difference under our cases that any actual or threatened effect on commerce in a particular case is minimal.

Taylor v. United States, 136 S. Ct. 2074, 2081 (2016).

The United States can satisfy the interstate commerce element by showing that the SNM engaged in drug trafficking on or about February 4, 2005.  Congress has declared drug trafficking to "have a substantial and direct effect upon interstate commerce."  21 U.S.C. § 801(3).  See 21 U.S.C. § 801(3), (5)-(7).  An enterprise's drug trafficking, even if de minimis, necessarily satisfies the interstate commerce element.  The Supreme Court has noted:

> The production, possession, and distribution of controlled substances constitute a "class of activities" that in the aggregate substantially affect interstate commerce[.] . . . Congress possesses the authority to regulate . . . the production, possession, and distribution of controlled substances even when those activities occur entirely within the boundaries of a single State.

Taylor v. United States, 136 S. Ct. at 2080.

As discussed in the Analysis' previous Subsection on the SNM's racketeering activity, the United States produced evidence supporting that, through 2004 and 2005, the SNM engaged in drug trafficking.  C. Garcia filled a major role trafficking drugs for the SNM, and continued in this role on and around February 4, 2005.  See, e.g., Gonzalez Tr. at 10:18-10:4 (Castellano, Gonzalez); M. Montoya Tr. at 50:12-51:5 (Castellano, M. Montoya); Romero Tr. at 40:21-24 (Romero); July 17 B. Cordova Tr. at 20:10-16 (Castellano, B. Cordova); July 18 Tr. at 170:2-8 (Armijo, Lovato).

Morales and Munoz both testified to also dealing drugs for the SNM during this period. See Morales Tr. at 39:1-3 (Beck, Morales); Munoz Tr. at 60:16-23 (Armijo, Munoz). No one can seriously question that the SNM continuously pursued this drug trafficking. Other witnesses testified to the SNM's routine engagement in such activities. See, e.g., M. Montoya Tr. at 29:15-30:1 (M. Montoya, Castellano); Romero Tr. at 19:24-20:5 (Beck, Romero); Roark Tr. at 14:20-15:3 (Armijo, Roark); M. Rodriguez Tr. at 58:24-59:1 (M. Rodriguez); id. at 59:2-6 (Armijo, M. Rodriguez). This case does not present that exceptional case warranting a new trial.

## II.     THE UNITED STATES COMMITTED NO CONSTITUTIONAL ERROR IN COMMENTING ON A. CORDOVA'S SILENCE.

The Court disagrees with A. Cordova's contentions that the United States committed constitutional error in commenting on A. Cordova's silence during the CNM conversation. See Motion at 15-18; Reply at 8. Although the United States invoked A. Cordova's silence as substantive evidence of A. Cordova's guilt, see, e.g., Closing Tr. at 103:12-14 (Beck)("You know, the most important corroboration in this case is perhaps not what is said, but what is left unsaid."); id. at 104:7-8 (Beck)("So you've got corroboration from the defendant himself."), the Court concludes that A. Cordova did not invoke his right to silence during the CNM conversation. A. Cordova, accordingly, cannot rely on the Fifth Amendment to obtain a new trial.

In the Tenth Circuit, a prosecutor cannot comment for substantive purposes on a defendant's silence even when that silence occurred during a non-custodial interrogation. See United States v. Burson, 952 F.2d 1196, 1200-02 (10th Cir. 1991). Cf. Salinas v. Texas, 570 U.S. 178, 183 (2013)(declining to decide whether the Fifth Amendment prohibits commenting on non-custodial interviews); United States v. Chimal, 976 F.2d 608, 611 (10th Cir. 1992)(stating that "a prosecutor may use a defendant's pre-arrest silence to impeach the defendant's credibility"

(quoting Jenkins v. Anderson, 447 U.S. 231, 238-40 (1980))). To obtain Fifth Amendment protection for such comments, however, the defendant must have invoked the right to silence during the interview at which the silence occurred. See Salinas v. Texas, 570 U.S. at 183. A defendant invokes this right with an unambiguous statement, see Berghuis v. Thompkins, 560 U.S. 370, 381-82 (2010), that "is 'sufficiently clear that a reasonable police officer in the circumstances would understand the statement to be a request for [the right to silence],'" United States v. Nelson, 450 F.3d 1201, 1212 (10th Cir. 2006)(quoting Davis v. United States, 512 U.S. 452, 459 (1994)); cf. Berghuis v. Thompkins, 560 U.S. at 381-82 (adopting Davis v. United States' standard for invocation).

As a preliminary matter, the Court notes that the CNM conversation was not a custodial interrogation. The Court relies for evidence of the conversation on only the CNM 302 Report and Acee's testimony, because A. Cordova does not put forth any further evidence. This evidence establishes that an interrogation occurred, because Acee and the other officers asked A. Cordova questions. See United States v. Begay, 310 F. Supp. 3d at 1358-59 (concluding that law enforcement officers interrogated a defendant when they asked him questions).

The report and testimony also show, however, that A. Cordova was not in custody. In reaching this conclusion, the Court considers: (i) whether Acee and the other officers informed A. Cordova that he might end the interview at will, or was not required to answer questions; (ii) whether the interview's nature was likely to create a coercive environment from which A. Cordova would not have felt free to leave; and (iii) whether Acee and the other officers dominated the encounter. See United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d at 1518). No evidence speaks to whether the officers informed A. Cordova that he could

leave the conversation or could refuse to answer their questions. See, e.g., Motion at 17. A. Cordova and the officers, however, parted ways after the conversation. See Acee Tr. at 95:6-15 (Acee); id. at 95:17-19 (Acee). Nothing indicates that the conversation lasted for a prolonged period, or that the FBI agents exhibited coercive physical or verbal behavior. See United States v. Begay, 310 F. Supp. 3d at 1362-63 (emphasizing that the officers did not engage in coercive physical behavior or suggest that the defendant must comply with their requests). Although Acee implied that A. Cordova knew M. Montoya and engaged with him in criminal activity, see Acee Tr. at 191:3-19 (Acee), through the conversation's bulk, the officers did not accuse A. Cordova, but focused on the SNM investigation and the FBI's desire to work with A. Cordova, see CNM 302 Report at 1; Acee Tr. at 95:19-23 (Acee); id. at 96:1-5 (Acee). The FBI agents and task force officers indicated that they sought to dismantle the SNM and to interview people with SNM associations, and did not indicate that they particularly targeted A. Cordova. See United States v. Begay, 310 F. Supp. 3d at 1358-59 (considering that the officers did not engage in accusatory questioning). A. Cordova has not suggested that the officers used physical contact or coercive language. See United States v. Jones, 523 F.3d at 1240 (directing courts in deciding whether the police dominate an encounter to consider physical contact, and use of language or vocal tones suggesting that compliance is compulsory). Although two FBI agents and two task force officers attended the scene, and no one who could give A. Cordova moral support joined the conversation, the conversation occurred on a campus and began outside a welding building both of with which A. Cordova presumably had familiarity. See United States v. Jones, 523 F.3d at 1240 (listing as factors to consider: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple

officers).  See also  United States v. Lemon, 714 F. App'x 851, 858 (10th Cir. 2017)(unpublished)("Fourth, the investigators interviewed Defendant, not in an unfamiliar environment, but in Defendant's own work place where he had spent numerous hours every week for almost two years."); United States v. Krehbiel, 378 F. App'x 832, 835 (10th Cir. 2010)(unpublished)("We further note that the questioning took place in a motel room which Mr. Krehbiel had visited in the past; the site of the questioning was thus 'neutral' and did not occur at an isolated, nonpublic space such as at the police department."); United States v. Jones, 411 F. Supp. 2d at 1268-72 (deeming no Fifth Amendment violation where, among other things, police interviewed the defendant in surroundings familiar to him).  No evidence suggests that the officers handcuffed A. Cordova or made him move to a private, police-controlled environment.  See Garcia v. Figueroa, 401 F. App'x 369, 371 (10th Cir. 2010)(unpublished)(deeming no custody where "Mr. Garcia was told at the beginning of the interview that he was not required to answer any questions, he was not restrained, and the detective made no threats, but spoke to Mr. Garcia calmly"); United States v. Lamy, 521 F.3d 1257, 1264 (10th Cir. 2008)("Moreover, the record does not suggest that Lamy was ever handcuffed, and his position in the passenger seat of the vehicle suggests a lack of arrest.").  The conversation occurred on CNM's campus, and the officers contacted A. Cordova as he finished a welding session.  See Acee Tr. at 95:6-15 (Acee).  They did not isolate him by excluding third-party observers.  See United States v. Jones, 523 F.3d at 1240 (advising courts to consider whether law enforcement officers isolated a suspect).

The Court concludes, however, that, during the conversation, however, A. Cordova, did not invoke his right against self-incrimination.  A. Cordova rests his contentions on the theory that the interview was a custodial interrogation.  See Motion at 16-18.  He offers no argument that he

invoked the Fifth Amendment's privilege, and no evidence suggests that he made such an invocation. Acee describes his impressions from discussing M. Montoya:

> He didn't deny it. There were a few things. That was the strongest. When I walked away, I was shocked. I said -- I was talking to the other agent and the two detectives. I'm, like, "He never denied it." He tried to put distance between himself and being an actual SNM member. He looked shocked when . . . I said, "You know we got Mario M. Montoya; right? Mario is with us." And I said, "Well, you wouldn't know that because that's not known yet, but Mario is working. And you're going to see." And I thought he didn't believe me. I was trying to convince him to work. But that was -- I'm sorry to interrupt, sir. That was -- yeah, I walked away thinking, man, we've stood out here and talked, and he's not saying, "Hey, you got the wrong guy. What are you talking about?" None of that.

Acee Tr. at 191:3-19 (Acee). No evidence indicates that A. Cordova said anything -- either about his relations with M. Montoya nor about the Fifth Amendment nor even about not wanting to talk to Acee and the other officers. The Court cannot say that A. Cordova made an invocation enabling him to rely on the Fifth Amendment to obtain a new trial, and the Court denies his request.

### III. THE UNITED STATES VIOLATED RULE 16 BY NOT DISCLOSING A. CORDOVA'S SILENCE AT THE CNM CONVERSATION AND NOT EARLIER DISCLOSING THE CNM 302 REPORT, BUT THE ERRORS ARE HARMLESS.

The Court concludes that the United States violated rule 16, but that its violations are harmless. The United States should have earlier disclosed the CNM 302 Report and should have disclosed A. Cordova's silence responding to Acee's comments regarding M. Montoya. Neither violation, however, affects A. Cordova's substantial rights.

First, the United States violated rule 16 by failing to give A. Cordova the CNM 302 Report before June 18, 2018. See Letter from Fred Federici to Brock Benjamin at 1. Rule 16 of the Federal Rules of Criminal Procedure provides: "Upon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a

government agent if the government intends to use the statement at trial." Fed. R. Crim. P. 16(a)(1)(A)-(E). The Court deemed A. Cordova to have requested and the Court ordered the United States to produce all information to which rule 16 applies, <u>see</u> Discovery Order at 1-2, and, more than once, A. Cordova requested his statements from his CNM conversation, <u>see</u> Nov. Letter at 1; Feb. 2 Email. Rule 16 does not contain a temporal requirement for the disclosures, but it contains a continuing duty to disclose:

> A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if: **(1)** the evidence or material is subject to discovery or inspection under this rule; and **(2)** the other party previously requested, or the court ordered, its production.

Fed. R. Civ. P. 16. This duty suggests that the rule contemplates an ongoing and near-contemporaneous disclosure of the information in the United States' possession.

The United States has not indicated that it did not have the CNM 302 Report when the Court and A. Cordova requested it. Acee dates the CNM 302 Report March 16, 2016, so the United States likely possessed the report long before A. Cordova's requests. <u>See</u> CNM 302 Report at 1. The United States provides no explanation for not earlier providing the report. Accordingly, the United States violated rule 16 by not disclosing the CNM 302 Report until A. Cordova brought the United States' failure to disclose to the Court's attention in June, 2018. <u>See</u> Letter from Fred Federici to Brock Benjamin, et al. (dated June 18, 2018), filed August 21, 2018 (Doc. 903-11).

Second, the United States violated rule 16 by not disclosing to A. Cordova the full substance of the CNM conversation, including A. Cordova's responses to Acee's comments regarding M. Montoya. Rule 16 requires that "the government . . . disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends

to use the statement at trial." Fed. R. Crim. P. 16(a)(1)(A)-(E). The United States does not contest some elements of this rule. See generally Response. Neither party, for instance, debates that A. Cordova would have known that Acee and the other officers were law enforcement officers, or that, because the officers questioned A. Cordova, an interrogation occurred. See CNM 302 Report at 1.

The parties disagree, however, whether the United States disclosed to A. Cordova all the requisite information. See Motion at 19-26; Response at 18-20; Reply at 8-9. Specifically, Acee did not record in the CNM 302 Report that he mentioned M. Montoya's cooperation or A. Cordova's reaction to these statements, and the United States did not otherwise provide this information. Compare CNM 302 Report at 1, with Acee Tr. at 96:1-5 (Acee); id. at 96:17-18 (Castellano, Acee). The United States argues that Acee typically does not record his impressions in his 302 reports, and that the information in dispute reflects only Acee's comment and A. Cordova's absence of comment. See Response at 18-20.

The Court disagrees with the United States that it had no duty to disclose this information. Nothing in rule 16 suggests that the rule does not encompass silence or that the United States must disclose only those statements its officers record. See Fed. R. Crim. P. 16(a)(1)(A). Rather, rule 16 requires the disclosure of the substance of the defendant's "statements." Fed. R. Crim. P. 16(a)(1)(A). Courts have regularly and historically understood silence's value as a statement in some circumstances. See, e.g., Bland v. Sirmons, 459 F.3d 999, 1022 (10th Cir. 2006)("Witnesses who testify in court, including criminal defendants, may generally 'be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.'" (quoting Jenkins v. Anderson, 447 U.S. 231, 239 (1980))); Wauqua v. Cowley, 1 F.3d 1250, 1993

WL 279768, at *1 (10th Cir. 1993)(unpublished table opinion)("Mr. Davis' statement to the state's witness, Officer Wyatt, was that the Petitioner had 'done the shooting.' . . . [T]he statement was made in the presence of the Petitioner who failed to deny the statement.  As the Petitioner adopted the statement through his silence, it is an admission of a party opponent."); United States v. McElroy, 697 F.2d 459, 463 (2d Cir. 1982)(concluding that the United States should have disclosed under Rule 16(a)(1)(A) that the defendant invoked his right to silence); United States v. Franklin, No. 03-10151-01-WEB, 2004 WL 2713086, at *3 (D. Kan. Aug. 26, 2004)(Brown, J.)("'A party may manifest adoption of a statement in any number of ways, including [through] words, conduct, or silence.'" quoting United States v. Robinson, 275 F.3d 371, 383 (4th Cir. 2001)); United States v. Quiroz, 228 F. Supp. 2d 1259, 1264 (D. Kan. 2002)(Robinson, J.)(discussing post-arrest silence's substantive uses for establishing guilt, impeachment, and rebutting closing argument).

This case presents a paradigm for treating some silences as statements.  The United States persuasively and not unreasonably characterized A. Cordova's silence as a direct, substantive corroboration of the trial's evidence.  A. Cordova's silence was treated as an adoption of Acee's insinuations; what was "left unsaid," Closing Tr. at 103 1214 (Beck), is, for the United States, "corroboration from the defendant himself," Closing Tr. at 104:7-8 (Beck).

Moreover, rule 16 ensures a defendant receives adequate information on which to make suppression, plea, and trial decisions.

> A principal purpose of discovery is to advise defense counsel what the defendant faces in standing trial; it permits a more accurate evaluation of the factors to be weighed in considering a disposition of the charges without trial.  The requirement that the statement be disclosed prior to trial, rather than waiting until the trial, also contributes to efficiency of administration.  It is during the pretrial stage that the defendant usually decides whether to plead guilty.

Fed. R. Crim. P. 16 advisory committee's notes. The rule promises defendants and their attorneys access to information otherwise inaccessible, limits surprise, and increases opportunity to contest constitutional error. See United States v. McElroy, 697 F.2d at 463 ("[T]he amendment reflects the drafters' studied conclusion that pretrial discovery of oral statements serves significantly to protect the defendant's right to a fair trial. Pretrial discovery prevents the defendant from being unfairly surprised with his statements at trial and enhances the ability of defense counsel to suppress inadmissible statements."); United States v. Lewis, 511 F.2d 798, 802 (D.C. Cir. 1975)(given "the traumatic circumstances of arrest[,] the memory of a defendant as to exactly what occurred may well be hazy and defective. Even where a defendant's memory is crystal clear, it is not every defendant who chooses to tell his own attorney all that he remembers."). Permitting the United States to avoid disclosing statements, because no one recorded a statement, "would only encourage investigators and prosecutors who sought the advantage of surprise at trial to avoid reducing their recollections of a defendant's statements to writing, thus frustrating the purpose of Rule 16(a)," United States v. Lewis, 511 F.2d at 802, and limiting statements to affirmative verbal assertions would frustrate the purposes of obtaining unknown and inaccessible information, reducing surprise, and encouraging pre-trial constitutional challenges, see United States v. McElroy, 697 F.2d at 463 ("[S]tatements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 . . . (1966) are most likely to be identified and suppressed if they are made available to counsel prior to trial. In short, Rule 16 discovery is an important guarantor of simple fairness to defendants.").

Rule 16(a)(1)(A)'s limiting factor is the United States' intent to use the statement at trial. The United States must disclose the defendant's statements, but does not need to closely

recapitulate the defendant's every line, sentence, and silence.  Approaching and entering trial, the United States should know which statements matter to it.  The United States must disclose these details at the defendant's request.  The United States cannot sit with these hidden facts ready to pounce on the defendant's counter-arguments with undisclosed information.

The United States here did not conform with these disclosure requirements.  That the United States could reference the relevant information at trial suggests that the United States possessed the information in some form.  The United States does not even contend that it provided A. Cordova the information.  See Response at 18-20.  In a footnote, it asserts that it met with A. Cordova and with Acee on two occasions, including one after the United States provided the CNM 302 Report, and "laid out a great deal of its evidence to defense counsel during this meeting." Response at 19 n.1.  These meetings do not equate to disclosure.  A. Cordova's counsel could not have known what to inquire unless given some direction about what occurred at the CNM conversation.  Nowhere does the CNM 302 Report mention Acee's comments about M. Montoya or A. Cordova's lack of response, see CNM 302 Report at 1, and the United States does not indicate that it disclosed this information to A. Cordova in the meetings.  That the United States confines these arguments to a footnote implies to the Court the United States' awareness that it did not at any time convey these facts.

Last, the Court reasons that the United States almost certainly intended to use the comments regarding M. Montoya and the silence at trial.  The United States at most implies that it did not intend to use this information.  See Response at 19-20.  The United States notes that it began the line of questioning because of A. Cordova's attacks on Acee in his cross-examination, but the United States does not raise this point to address rule 16 itself but rather to attack A. Cordova's

analogy between this case and <u>United States v. Arcentales</u>, 532 F.2d 1046, 1050 (5th Cir. 1976).

The United States did not use the information on direct in its case-in-chief, but rule 16(a)(1)(A)

contains no limiting language about the government's "case-in-chief" like, for instance,

16(b)(1)(A). <u>Compare</u> Fed. R. Crim. P. 16(a)(1)(A), <u>with</u> 16(b)(1)(A) (requiring, in some

circumstances, that the defendant disclose information if "the defendant intends to use the item in

the defendant's case-in-chief at trial"). As the United States' closing evidences, however, the

inferences from A. Cordova's silence to Acee's alleged accusations have strong argumentative

force. The United States must have had some sense that it would likely use the information if

needed on redirect, even if the United States came to that realization the night before trial. <u>Cf.</u>

<u>United States v. Arcentales</u>, 532 F.2d at 1050 (describing as prejudicial nondisclosure when

attorneys are "lying in wait with statements that could impeach the defendant if he decided to

testify"). The Court, accordingly, concludes that the United States had a duty to disclose the

disputed information.

Both the late disclosure and the failure to disclose, however, are harmless. Rule 16 permits

the Court broad discretion in assigning sanctions for rule 16 violations. The rule states:

If a party fails to comply with this rule, the court may:

**(A)** order that party to permit the discovery or inspection; specify its time,
place, and manner; and prescribe other just terms and conditions;

**(B)** grant a continuance;

**(C)** prohibit that party from introducing the undisclosed evidence; or

**(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(D)(2). "In determining whether to grant a mistrial, a district judge must first

determine whether an error has occurred and, if so, whether that error impaired the 'defendant's

right to a fair and impartial trial.'" United States v. Martinez, 455 F.3d 1127, 1129 (10th Cir. 2006)(quoting United States v. Stiger, 413 F.3d 1185, 1194 (10th Cir. 2005)). A defendant must show that he or she "was deprived of substantial rights." United States v. Jensen, 608 F.2d 1349, 1357 (10th Cir. 1979)(citing Fed. R. Crim. P. 52(a); Wright v. United States, 301 F.2d 412, 414 (10th Cir. 1962)). See United States v. Vinas, 910 F.3d 52, 60-61 (2d Cir. 2018)("A violation of Rule 16 does not automatically entitle a defendant to a new trial. A defendant seeking a new trial 'must show that the failure to disclose caused him substantial prejudice.'" (quoting United States v. Stevens, 985 F.2d 1175, 1181 (2d Cir. 1993); and citing United States v. Lee, 834 F.3d 145, 158 (2d Cir. 2016); United States v. McElroy, 697 F.2d at 465). See also United States v. Vinas, 910 F.3d 52, 60-61 (2d Cir. 2018)(considering in determining harmlessness "the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the strength of the government's untainted proof" (quoting United States v. Stevens, 985 F.2d at 1181))); United States v. Scott, 7 F.3d 1046 (10th Cir. 1993)(directing courts to consider whether the violation would influence the verdict).

First, the Court deems the United States' late disclosure of the CNM 302 Report harmless. The United States offers no reason for its late disclosure. The Court does not, however, believe that timely disclosure would change the Jury's verdict. The parties discussed the CNM 302 Report and its contents at trial. See, e.g., Acee Tr. at 95:6-15 (Acee); id. at 197:19-23 (Castellano, Acee). The CNM 302 Report's contents -- that Acee approached A. Cordova about the SNM -- as illustrated by the Court's discussion of the evidence in the Analysis' Subsection I-A, touches little of, if at all of,the trial's core evidentiary issues. The Court does not see how having earlier the CNM 302 Report would cause A. Cordova to adjust his trial strategy. Moreover, disclosing the

CNM 302 Report without A. Cordova having notice that the report lacked relevant information would not address A. Cordova's complaints regarding the nondisclosure. Cf. Motion at 27 ("More importantly, the Court should not reward the government's 'end-run' around Mr. Cordova's Fifth Amendment rights by hiding the potential suppression issue.").

Second, the Court decides that the nondisclosure of Acee's comments and A. Cordova's silence is harmless. The United States offers no reason for not producing the evidence, and the evidence suggesting that A. Cordova incriminated himself weighs heavily in the United States' favor. Nevertheless, disclosure would almost certainly not have changed the Jury's verdict. As discussed in the Analysis' Section II above, that the United States mentioned A. Cordova's silence infringes no constitutional rights. Even if the United States had disclosed the information, the United States almost certainly could and would still have referenced it at trial. A. Cordova has little to no evidence to combat the United States' arguments about his silence. Although a chance exists that A. Cordova could have discovered additional evidence or developed a strategy to counter the evidence, considerable evidence would still support a guilty verdict. The Analysis' Subsection I-A on the evidence connecting A. Cordova to the Dix murder recounts this evidence. Realistically, A. Cordova might have approached differently his decision not to enter a plea agreement had the United States disclosed the information about his silence, but that possibility does not warrant a new trial. Accordingly, the Court will not grant a new trial for the United States' rule 16 violations.

IV. **THAT ACEE EXCLUDED EVIDENCE FROM THE CNM 302 REPORT PROVIDES IMPEACHMENT MATERIAL, BUT THE UNITED STATES' NONDISCLOSURE IS NOT PREJUDICIAL.**

The Court also denies A. Cordova's requests for a new trial under <u>Brady</u> and <u>Giglio</u>.  <u>See</u> Motion at 27-28; Reply at 8.  Acee excluded information from the CNM 302 Report that is impeachment information.  The information does not, however, prejudice A. Cordova.

The Court deems the first two <u>Brady</u>/<u>Giglio</u> elements satisfied.  "'To establish a *Brady* violation, [1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.'"  <u>Crosby v. Fox</u>, No. 18-1334, 2018 WL 6444001, at *4 (10th Cir. Dec. 10, 2018)(quoting <u>United States v. Durham</u>, 902 F.3d 1180, 1221 (10th Cir. 2018)).  First, the Court agrees with A. Cordova that he could use Acee's failure to include the comments about M. Montoya and A. Cordova's silence to impeach Acee.  <u>See</u> Motion at 27-28.  Such information undermines Acee's credibility.  That Acee excludes information from the CNM 302 Report opens the possibility that Acee excludes other facts from his reports and testimony.  Second, as discussed in the Analysis' Section III, the United States did not disclose this information or information from which A. Cordova could infer Acee's omission.

Third, the United States' nondisclosure did not prejudice A. Cordova.  "Under the third element, 'evidence is material and its nondisclosure prejudicial only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  <u>Crosby v. Fox</u>, 2018 WL 6444001, at *4 (quoting <u>United States v. Durham</u>, 902 F.3d at 1221).  The Court doubts whether A. Cordova would have elicited at trial that Acee excluded A. Cordova's incriminating silence from the CNM 302 Report.  Although impeaching Acee with this information supports A. Cordova's theory that the United States inadequately and unfairly investigated and prepared its case against him, <u>see</u>, <u>e.g.</u>, July 18 Tr. at 323:1 (Acton);

Foster Tr. at 115:1-10 (Castellano, Foster), the information prejudices A. Cordova. It discusses A. Cordova's incriminating non-responsiveness. Moreover, the information would not change the trial's outcome. That Acee excluded the information emerged at trial after Acee testified to talking to A. Cordova about M. Montoya, see Acee Tr. at 197:19-23 (Castellano, Acee), and Acee offered credible testimony that he does not routinely record his impressions in his 302 reports, see Acee Tr. at 197:19-23 (Castellano, Acee). Neither the impeachment nor A. Cordova's attempts to question the United States' investigation persuaded the Jury. Moreover, the majority of the evidentiary issues turn on the cooperators' credibility and not the United States' credibility. Acee is a highly effective and credible witness, knowing what to relate and knowing when not to fight. The Jury concluded that sufficient corroborating evidence existed to find A. Cordova guilty, and, even if A. Cordova prepared more questions impeaching Acee, the Court does not see a reasonable probability of this impeachment evidence changing the Jury's conclusion. Accordingly, the Court denies the new trial request.

## V. THE UNITED STATES ERRED IN ELICITING A. CORDOVA'S SILENCE AT THE CNM CONVERSATION WITHOUT EARLIER DISCLOSING THE EVIDENCE, BUT THE UNITED STATES DID NOT ERR IN ITS CHARACTERIZATION OF THE CNM CONVERSATION, ITS STRUCTURING OF ITS CLOSING AND REBUTTAL, ITS INVESTIGATION, OR ITS CHARACTERIZATION OF THE NOVEMBER 29, 2015, CONVERSATION, AND, EVEN IF THE UNITED STATES ERRED, ALL THESE NON-CONSTITUTIONAL ERRORS ARE HARMLESS.

The Court will not grant A. Cordova a new trial on the United States' alleged non-constitutional prosecutorial errors. The United States committed prosecutorial misconduct in eliciting A. Cordova's silence but not disclosing the evidence pursuant to rule 16. The alleged errors do not, however, constitute prosecutorial misconduct. Moreover, all the alleged errors are harmless.

When prosecutorial misconduct involves no specific constitutional right, a court analyzes the alleged misconduct "under the standard for due process violations set forth in Donnelly v. DeChristoforo, 416 U.S. 637 (1974). That is, a prosecutor's conduct, if improper, violates due process only where the actions 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" United States v. Gault, No. CIV 99-1135 JP/KBM, 2000 WL 36739586, at *6 (D.N.M. Dec. 6, 2000)(Molzen, M.J.)(quoting Donnelly v. DeChristoforo, 416 U.S. at 643). The Tenth Circuit has adopted a two-step process for analyzing such alleged non-constitutional prosecutorial errors. See United States v. Fleming, 667 F.3d 1098, 1103 (10th Cir. 2011). First, a court should determine whether the prosecutor acted improperly. See United States v. Fleming, 667 F.3d at 1103 (citing United States v. Irvin, 656 F.3d 1151, 1171 (10th Cir. 2011)). Second, a court should ask whether the improper conduct was "'harmless beyond a reasonable doubt.'" United States v. Fleming, 667 F.3d at 1103 quoting United States v. Irvin, 656 F.3d at 1171). The harmless beyond a reasonable doubt standard is met unless the misconduct would have

influenced the jury's verdict.  See United States v. Green, 435 F.3d 1265, 1267-68 (10th Cir. 2006)(citing United States v. Gabaldon, 91 F.3d 91, 94 (10th Cir. 1996)).  "'In assessing whether the misconduct [influenced the jury's verdict] we consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case.'"  United States v. Green, 435 F.3d at 1267-68 quoting United States v. Gabaldon, 91 F.3d at 94).

> Relevant to the issue of whether the defendant was denied a fair trial are: (i) the curative measures taken by the trial judge, *United States v. Green*, 435 F.3d 1265, 1268 (10th Cir. 2006), *cert. denied*, 547 U.S. 1122 (2006); (ii) the extent of the misconduct, *id.*; (iii) the "role of the misconduct within the case", *id.*; (iv) "whether the prosecutor acted in bad faith," *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004), *cert. denied*, 562 U.S. 1052 (2010), *see also*, *United States v. Kamahele*, 748 F.3d 984, 1016 (10th Cir. 2014)("record does not suggest bad faith when the prosecutor asked the agent" a question that elicited inadmissible testimony about the contents of a backpack); and (v) whether the misconduct was "merely 'singular and isolated,'" *United States v. Ivy*, 83 F.3d 1266, 1288 (10th Cir. 1996), *cert. denied*, 519 U.S. 901 (1996)(quoting from *United States v. Pena*, 930 F.2d 1486, 1491 (10th Cir. 1991)).

United States v. Bramley, No. CR-13-063-F, 2015 WL 12852048, at *13 (W.D. Okla. Sept. 16, 2015)(Friot, J.).  "[W]hen a defendant fails to object to an allegedly improper statement during trial, ' . . . the defendant rather than the Government . . . bears the burden of persuasion with respect to prejudice.'"  United States v. Fleming, 667 F.3d at 1103 (quoting United States v. Solon, 596 F.3d 1206, 1212 (10th Cir. 2010)).  )).

**A. THE UNITED STATES' NONDISCLOSURE OF ACEE'S COMMENTS AND A. CORDOVA'S SILENCE IS IMPROPER, BUT IT IS HARMLESS BECAUSE DISCLOSURE WOULD NOT HAVE PREVENTED THE EVIDENCE'S INTRODUCTION AND BECAUSE THE JURY WOULD HAVE STILL CONVICTED A. CORDOVA.**

The Court will not grant a new trial on the United States' nondisclosure of A. Cordova's silence in response to Acee's statements about M. Montoya. See Motion at 15. A. Cordova incorporates his arguments about the United States' violation of Brady and Giglio into his arguments about the United States' prosecutorial error. See Motion at 15. As indicated in Section IV, the Court does not deem the United States to have violated Brady and Giglio. As the Court addressed in the Analysis' Section III on the United States' rule 16 violations, however, the United States violated its duty to disclose the evidence about A. Cordova's silence. Although the United States could properly use A. Cordova's self-incrimination to bolster Acee's decision to charge A. Cordova, see Acee Tr. at 190:21-191:22 (Acee); id. at 191:20-24 (Castellano, Acee); id. at 192:3-7 (Castellano, Acee), the United States did not act properly in relying on information that it should have disclosed under rule 16, see, e.g., United States v. Heath, 580 F.2d 1011, 1032 (10th Cir. 1978)(deeming a rule 16 violation to be prosecutorial error).

The error is, however, harmless. As the Court discussed previously in the Analysis' Section III, the Jury would have reached the same verdict even had the United States disclosed the information. The United States could constitutionally comment on A. Cordova's silence and considerable evidence supports the Jury's verdict. Moreover, although A. Cordova emphasizes the harm that the nondisclosure caused in preventing him from impeaching Acee, see Motion at 15, as the Court also addressed in the Analysis' Section IV, that the nondisclosure inhibited A. Cordova's impeachment strategy had no effect on the verdict. Accordingly, the error is harmless.

**B.  REASONABLE INFERENCES SUPPORT THE UNITED STATES' CHARACTERIZATION OF A. CORDOVA'S SILENCE, AND ANY MISCONDUCT IS HARMLESS, BECAUSE THE COURT DIRECTED THE JURY NOT TO CONSIDER CLOSINGS AS EVIDENCE AND BECAUSE THE UNITED STATES' CLOSING STATEMENTS WOULD NOT HAVE INFLUENCED THE VERDICT.**

The Court will not grant a new trial based on how the United States characterized in closing A. Cordova's silence during the CNM conversation.  See Motion at 15.  First, the Court disagrees with A. Cordova that the United States mischaracterized the testimony.  See Motion at 15.  The United States asserted: "You know, the most important corroboration in this case is perhaps not what is said, but what is left unsaid," Closing Tr. at 103 1214 (Beck), and "[s]o you've got corroboration from the defendant himself," Closing Tr. at 104:7-8 (Beck).  The United States summarized Acee's testimony:

> He didn't deny it.  There were a few things.  That was the strongest.  When I walked away, I was shocked.  I said -- I was talking to the other agent and the two detectives.  I'm like, he never denied it.  I walked away thinking, man, we've stood out here and talked, and he's not saying, ["]Hey, you got the wrong guy.  What are you talking about?["]  None of that.

Closing Tr. at 103:24-104:6 (Beck).  Acee testified:

> He didn't deny it.  There were a few things.  That was the strongest.  When I walked away, I was shocked.  I said -- I was talking to the other agent and the two detectives.  I'm, like, "He never denied it."  He tried to put distance between himself and being an actual SNM member.  He looked shocked when . . . I said, "You know we got Mario M. Montoya; right?  Mario is with us."  And I said, "Well, you wouldn't know that because that's not known yet, but Mario is working.  And you're going to see."  And I thought he didn't believe me.  I was trying to convince him to work.  But that was -- I'm sorry to interrupt, sir.  That was -- yeah, I walked away thinking, man, we've stood out here and talked, and he's not saying, ["]Hey, you got the wrong guy.  What are you talking about?["]  None of that.

Acee Tr. at 191:3-19 (Acee).  Although the United States may have exaggerated the strength of Acee's testimony about A. Cordova's silence at CNM, see Closing Tr. at 103 1214 (Beck); id. at

104:7-8 (Beck); id. at 103:24-104:6 (Beck), the United States could "'draw reasonable inferences from evidence presented at trial,'" Underwood v. Royal, 894 F.3d 1154, 1167 (10th Cir. 2018(quoting Thornburg v. Mullin, 422 F.3d 1113, 1131 (10th Cir. 2005)), and a reasonable person could infer that A. Cordova's failure to distance himself from M. Montoya and the crimes committed with him, unlike how A. Cordova separated himself from the SNM, see Acee Tr. at 96:1-5 (Acee), implicated A. Cordova in the Dix murder. Acee's testimony on which the United States relies, moreover, reasonably amounts to his expressing his impression that A. Cordova implicated himself. See Acee Tr. at 191:3-19 (Acee). The United States did not mischaracterize the testimony in its closing.

Further, the United States' statements are harmless. The Court gave the Jury a limiting instruction explaining that the closings are arguments and not presentations of fact. See Jury Instructions Instruction No. 4, at 5. Specifically, the Court instructed:

> The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations that the lawyers agreed to.

> Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And my comments and questions are not evidence.

Jury Instructions Instruction No. 4, at 5. Cf. Tenth Circuit Criminal Pattern Jury Instructions, Instruction No.1.06, at 11 (2011)(giving the same instruction). See United States v. Rogers, 556 F.3d 1130, 1141 (10th Cir. 2009)("[T]he jury was properly instructed that closing arguments are not evidence and that Defendant should only be convicted on the basis of evidence submitted at trial[.]"). The Court presumes that the Jury followed its instructions. See United States v. Fleming, 667 F.3d at 1106 ("We consistently have stated that 'we presume the jury follows its

instructions.'"). Although the United States' statement played a key role in concluding the United States' rebuttal, nothing suggests that the United States intended to engage in misconduct. The Jury heard Acee's initial testimony and could compare it with the United States' arguments. Moreover, as the Court outlines in the Analysis' Subsection I-A addressing A. Cordova's arguments about the evidence, considerable evidence suggests A. Cordova's guilt. The Jury could decide A. Cordova's guilt without referencing A. Cordova's silence, and the United States made these statements after eight days of trial and after it summarized a string of other evidence corroborating M. Montoya's statements. The Court, accordingly, will not grant a new trial on grounds that the United States mischaracterized Acee's testimony.

### C. THE UNITED STATES COULD AND DID STRUCTURE ITS CLOSING AND REBUTTAL WITHIN THE COURT'S TIME CONSTRAINTS, AND, EVEN IF THE UNITED STATES ACTED IMPROPERLY, THE CONDUCT IS HARMLESS, BECAUSE A DIFFERENT STRUCTURE FOR THE CLOSING WOULD NOT INFLUENCE THE VERDICT.

The Court also will not grant A. Cordova a new trial for the United States' structuring of its closing and rebuttal. See Motion at 18. First, the Court does not find the decision to structure the closing and rebuttal in such a manner to rise to prosecutorial misconduct. In closing and rebuttal, the United States remained within the two-and-a-half hours the Court allotted it. See Draft Transcript of Hearing at 56:6-7 (taken June 14, 2018)(Court). The United States also properly responded to A. Cordova's arguments that no independent evidence tied him to the Dix murder; after admitting that the case depended on cooperators' testimony and corroboration, the United States summarized the evidence corroborating M. Montoya's testimony. See Closing Tr. at 66:9-21 (Beck). To support his attack on the United States' organization, A. Cordova relies on a California Court of Appeals case with no precedential effect in this Court and in which the

California Court of Appeals relies wholly on California precedent. See Motion at 18 (citing People v. Robinson, 37 Cal. Rptr. 2d 183, 189 (Cal. Ct. App. 1995)(citing People v. Hill, 426 P.2d 908 (Cal. 1967); People v. Bandhauer, 426 P.2d 900 (Cal. 1967)),). The Court will not create an arbitrary rule controlling closing and rebuttal time without federal precedent and does not find persuasive the arbitrary California rule regarding the organization for closing arguments. See People v. Robinson, 37 Cal. Rptr. 2d at 189 ("It does *not* permit the prosecutor to give a perfunctory (three and one-half reporter transcript pages) opening argument designed to preclude effective defense reply, and then give a 'rebuttal' argument -- immune from defense reply -- 10 times longer (35 reporter transcript pages) than his opening argument."). See also People v. Bandhauer, 426 P.2d at 905 ("[W]e believe that scrupulous regard for complete impartiality and fairness dictates that the extent of the argument on each side at the trial on the issue of penalty should be equal and that each side should have an opportunity to rebut the argument of the other."). Moreover, the rebuttal's length here surpasses the closing's length by slightly more than two times the number of pages; the closing consists of around sixteen transcript pages and the rebuttal rests closer to forty transcript pages. See Closing Tr. at 2:13-20:14 (Armijo); id. at 66:9-106:13 (Beck); People v. Bandhauer, 426 P.2d at 905. This difference is far less than the ten-times difference between the closing and rebuttal in People v. Robinson. See People v. Robinson, 37 Cal. Rptr. 2d at 189. Other than complain regarding the United States' referencing A. Cordova's silence, A. Cordova does not specify what misconduct the United States' closing structure involved. The alleged error regarding the silence constitutes a potential misconduct separate from how the United States organized its closing and rebuttal. The Court's conclusion about the structuring rests on principles different than its decisions about the comments in rebuttal.

Even if the United States acted improperly, the structuring of its closing and rebuttal is harmless error. The Jury sat through eight days of evidence before listening to the closings. The United States, in closing, summarized the evidence that the Jury had seen and heard, and the Jury presumably understood such statements represented argument only. See United States v. Fleming, 667 F.3d at 1106. Nothing suggests the length of the rebuttal alone would change the Jury's conclusions after these eight days of evidence, and A. Cordova presents no evidence suggesting why the Jury would have reached a different verdict had the United States differently concluded the trial. Accordingly, the Court cannot say that a new trial is warranted.

### D. THE UNITED STATES COULD CHOOSE HOW IT PURSUED THE INVESTIGATION AND ORGANIZED ITS CASE, AND ANY MISCONDUCT IS HARMLESS, BECAUSE THE JURY DID NOT DOUBT THE UNITED STATES' INVESTIGATION ENOUGH TO ACQUIT A. CORDOVA.

The Court similarly disagrees with A. Cordova's arguments for a new trial based on the United States' investigation and presentation of its case. See Motion at 18-19. First, A. Cordova's unsupported accusations about the United States' investigation do not convince the Court that the United States erred. See Motion at 18-19. The United States may proceed with its trial strategy and preparation as it sees fit within the procedural rules extant to protect defendants' rights. Pre-trial procedural rules exist to ensure that the United States does not proceed to trial without evidence, and A. Cordova had opportunities to challenge the United States' actions, if he believed the requisite evidence did not exist against him. The evidence against him began accumulating in 2016, and A. Cordova introduces no evidence or arguments here suggesting that the United States violated his constitutional rights in proceeding to trial. See Acee Tr. at 72:18-73:1 (Castellano, Acee). In the Motion, A. Cordova attempts to relitigate his trial theory that the United States' sub-

par investigation resulted in targeting the wrong man.  <u>See</u> Motion at 18.  The Court does not see this contention as showing prosecutorial misconduct.

The United States may develop and deploy its own trial strategy.  That the United States did not call Mikail Tinker does not amount to misconduct, because nothing requires that the United States put on evidence unfavorable to its case.  <u>Contra</u> Motion at 18.  The entire adversary court system is founded on assumptions to the contrary.  Similarly, the United States may interview witnesses at its own pace and forego avenues of investigation it deems fruitless.  With several days of evidence supporting its case's theory, the United States could decide that the footprint and the blood did not aid its case.  <u>Contra</u> Motion at 18-19.  That the United States did not interview eyewitnesses until a month before trial likely reflects its attempts to balance indictments against forty-plus SNM members and associates, and to try the seven-week and five-week <u>DeLeon</u> trials. <u>Contra</u> Motion at 18.

Second, any errors that the United States committed are harmless.  A. Cordova presented Mikail Tinker's testimony, <u>see</u>, <u>e.g.</u>, Mikail Tinker Tr. at 3:17-19 (Morrissey, Mikail Tinker), and indicated where he believed the United States' investigation fell short, <u>see</u>, <u>e.g.</u>, July 18 Tr. at 323:1 (Acton); Foster Tr. at 115:1-10 (Castellano, Foster).  The Jury not only found A. Cordova guilty based on considerable evidence, but the Jury rejected A. Cordova's contentions about Mikail Tinker's observations, the footprint, and the blood.  <u>Cf.</u> Foster Tr. at 25:11-26:22 (Acton, Foster); <u>id</u>. at 115:1-10 (Castellano, Foster).  The Jury, accordingly, issued its verdict knowing that the United States did not pursue certain avenues of investigation and after having heard Mikail Tinker's testimony.  A new trial would make no difference, and the error is harmless.

**E.    THE UNITED STATES COULD ARGUE WITHOUT ERROR THAT THE RECORDING OF THE NOVEMBER 29, 2015, CONVERSATION MEANT WHAT M. MONTOYA TESTIFIED IT MEANT, AND ANY MISCONDUCT WAS HARMLESS, BECAUSE THE CLOSING WAS NOT EVIDENCE AND BECAUSE THE JURY COULD DECIDE HOW TO INTERPRET THE RECORDING.**

Last, the Court will not grant A. Cordova a new trial based on the United States' arguments about M. Montoya's and C. Garcia's November 29, 2015 conversation.  See Motion at 19.  First, A. Cordova's arguments do not convince the Court that the United States acted improperly.  See Motion at 19.  Although "[a] prosecutor may comment on and draw reasonable inferences from evidence presented at trial," Thornburg v. Mullin, 422 F.3d at 1131, arguing "prejudicial facts not in evidence" is one type of prosecutorial misconduct, Underwood v. Royal, 894 F.3d at 1167.  The United States argued in closing:

> [Y]ou're going to hear the name "Antone" several times.  You should probably also be able to hear the word "jale," which, as you know, is a word for a job, and the name Ray Arguello.  (Tape played.)  Remember that was put in context for you that Antone's name was brought up in relationship to another individual that -- you heard testimony, that the defendant on his jail calls admits that he knows.  And the concern was that Antone was telling him about a jale that he did.  The jale that he did was the murder of Shane Dix. And that's why Chris Garcia is concerned about it, and he's talking to the other person that would know about the jale, Mario Montoya.

Closing Tr. at 19:3-16 (Armijo).  The United States does not fabricate evidence.  As the Court noted in the Analysis' Subsection I-A on the evidence tying A. Cordova to the Dix murder, the Court has listened repeatedly to the recording and cannot say that the United States should have understood the recording to blatantly contradict M. Montoya's testimony recounting its substance.  The United States could reasonably infer that M. Montoya accurately recounted the conversation and could reiterate M. Montoya's account.  See Thornburg v. Mullin, 422 F.3d at 1131.

Moreover, any error is harmless. The Court presumes that the Jury followed its direction to treat closings as arguments and not as evidence. See Jury Instructions Instruction No. 4, at 5; United States v. Rogers, 556 F.3d at 114; United States v. Fleming, 667 F.3d at 1106. Although, through M. Montoya's testimony and its closing, the United States offered more than a single and isolated reference to the recording, see United States v. Rogers, 556 F.3d at 1141 ("Finally, the comment regarding Officer Lindsey's cross was singular and isolated." (citing United States v. Oberle, 136 F.3d 1414, 1421 (10th Cir. 1998))), the recording emerges from the trial as an evidentiary item engendering conflicting interpretations, see United States v. Green, 435 F.3d at 1267-68 (directing courts to consider "the extent of the misconduct, and the role of the misconduct within the case"). After hearing the recording, the Jury could plausibly agree that the conversation aligned with the United States' comments in closing, and, if the Jury disagreed, it could conclude, as A. Cordova has, that the United States misunderstood the recording. Moreover, as discussed in the Analysis' Section I, evidence aside from the recording supports and corroborates M. Montoya's story. The verdict likely would not have changed had the Jury not heard the United States' statements in closing. The error is harmless beyond a reasonable doubt. Accordingly, having concluded not to grant A. Cordova a new trial on any grounds argued in the Motion, the Court denies the Motion.

**IT IS ORDERED** that the Defendant Anthony Cordova's Motion for New Trial, filed August 21, 2018 (Doc. 903), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew M. Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Theresa M. Duncan
Duncan Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Christopher W. Adams
The Law Office of Christohper W. Adams, P.C.
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Manuel Jacob Armijo*

Louis E. Lopez, Jr.
Louis Lopez Law -- Attorney at Law
El Paso, Texas

    *Attorney for Defendant Frederico Munoz*

Donald F. Kochersberger, III
Business Law Southwest, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Sergio Loya Rodriguez*

Susan Burgess-Farrell
Barry G. Porter
Burgess & Porter Law, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

--and--

R. Scott Reisch
Reisch Law Firm, LLC
Denver, Colorado

    *Attorneys for Defendant Vincent Garduño*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

    *Attorney for Defendant Mandel Lon Parker*

James Baiamonte
Law Office of James P. Baiamonte Esq.
Albuquerque, New Mexico

--and--

Ahmad Assed
Ahmad Assed & Associates
Albuquerque, New Mexico

*Attorneys for Defendant Daniel Archuleta*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

*Attorneys for Defendant Daniel Sanchez*

Marcia A. Morrissey
Law Office of Marcia A. Morrissey
Santa Monica, California

--and--

Gregory M. Acton
Acton Law Firm P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Anthony Cordova*

Scott Moran Davidson
The Law Office of Scott M. Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*