# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                  No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup,"
CHRISTOPHER GARCIA,
SERGIO LOYA RORDIGUEZ, a.k.a
"Churro,"
MANUEL BENITO, a.k.a. "Panther,"
VINCENT GARDUÑO a.k.a. "Fatal,"
MANDEL LON PARKER, a.k.a.
"Chuco,"
DANIEL ARCHULETA, a.k.a. "Smurf,"
DANIEL SANCHEZ, a.k.a. "Dan Dan,"
ANTHONY CORDOVA, a.k.a. "Antone,"
and ARTURO ARNULFO GARCIA,
a.k.a. "Shotgun,"

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Anthony Cordova's Motion to Compel Discovery, filed February 5, 2018, 2018 (Doc. 506)("Motion"). The Court held a Hearing on June 14, 2018. The primary issue is whether telephone recordings of inmates in the United States of America's Marshals Services' ("U.S. Marshals Service") custody are in the Plaintiff United States of America's custody, control, or possession for rule 16 of the Federal Rules of Criminal Procedure purposes. The Court concludes that an inmate's telephone recordings are in the custody, control, or possession of the United States when that inmate makes the telephone call while in the U.S. Marshals Services' custody, because the U.S. Marshals Service is a federal agency closely aligned with the United States such that the United States can acquire the recordings simply by asking. Defendant Anthony Cordova makes six other discovery

requests, and the Court grants them in part and denies them in the part.  See infra § I, at 20-23.

Accordingly, the Court orders the United States to: (i) provide Cordova the Bates number for a

report with statements that Cordova made to law enforcement on March 16, 2016; (ii) ask the

Bernalillo County Sheriff's Office ("BCSO") for records relating to its April 28, 2016 search of

Cordova's residence; (iii) inform Cordova who destroyed records of Mario Montoya's

conversation with his wife regarding the Max Gutierrez, Jr. murder; who authorized the

destruction, when the records were destroyed, and who provided the United States with answers

to those questions; (iv) provide Cordova with copies of the Shane Dix homicide crime scene

video and diagrams; and (v) provide Cordova with recordings of telephone calls made by

Richard Gallegos while in the U.S. Marshals Service's custody from mid-July 2016 to present.

All other requests are denied.

## FACTUAL BACKGROUND

The Court takes its background facts from the Superseding Indictment, filed March 9,

2017 (Doc. 372)("Indictment").  The Court does not set forth these facts as findings or for their

truth.  The Court recognizes that the factual background is largely United States of America's

version of events and that the Defendants are all presumed innocent.

This case deals with the crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly

committed through its members.  See Indictment ¶¶ 1, 3, at 1-2.  The SNM, through its members,

operated in the District of New Mexico at all relevant times, and its members engaged in acts of

violence and other criminal activities, "including, murder, kidnapping, attempted murder,

conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Indictment ¶ 1, at 2.

The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections

1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the

activities of which affected interstate and foreign commerce." Indictment ¶ 2, at 2. The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2.

The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Indictment ¶ 3, at 2. During the riot, thirty-three inmates were killed, and over 200 were injured. See Indictment ¶ 3, at 2. After the PNM riot, the SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment ¶ 4, at 2. The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment ¶ 4, at 2-3. The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment ¶¶ 3, 5, at 2-3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and the profit from narcotics trafficking. See Indictment ¶ 5, at 3. Members who fail "to show continued loyalty to the gang" may be assaulted or murdered. Indictment at 4. The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment ¶ 6, at 3. If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show its power. See Indictment ¶ 6, at 3. The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment ¶ 7, at 4. The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival

gang or member, [and] to gain notoriety and show its superiority over others." Indictment ¶ 7, at 4. "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], homosexuals, or sex offenders." Indictment ¶ 8, at 4. To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and murder. See Indictment ¶¶ 6-8, at 3-4. The SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment ¶ 7, at 4. The SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department officials inspired the Federal Bureau of Investigation's ("FBI") present investigation. See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

The Indictment alleges that Cordova violated the Violent Crimes in Aid of Racketeering statute, 18 U.S.C. § 1959 ("VICAR"), by murdering Shane Dix. See Indictment at 53. The Indictment also alleges that Cordova violated 18 U.S.C. § 924(c) and § 924(j)(1), respectively, using a firearm during a violent crime and using a firearm to cause a person's death, during that murder. See Indictment at 53-54. According to the Indictment, those offenses took place on February 4, 2005, in Bernalillo County, New Mexico. See Indictment at 53.

## PROCEDURAL BACKGROUND

### 1. The Motion.

In the Motion, Cordova asserts that he has requested discoverable information that the United States has not produced. See Motion at 2. Specifically, Cordova seeks to compel discovery for the following:

> 1. Any statements made by Anthony Cordova to law enforcement on or about March 16, 2016, at Central New Mexico Community College,

including a designation of the persons present at the time Mr. Cordova made any statements;

2.      Any statements made by Anthony Cordova subsequent to his arrest on April 28, 2016, and a designation of any person(s) present at the time any statements were made;

3.      Audio recording, photographs and/or video tapes of the execution of the search warrant at the residence of Mr. Cordova on April 28, 2016, beginning at 0538 hours, and any documentation of the execution search warrant authored by TFO Anthony Medrano or any other law enforcement personnel present during the search warrant. In addition, we seek disclosure of any documentation showing the specific location and condition of all evidence seized from Mr. Cordova's home on April 28, 2016 and the identity of the person(s) who seized each item of evidence, as well as reports documenting the collection and securing of such evidence. This includes forensic evidence, examination reports and testing results related to the "seven rounds of 380 ammunition" seized at Mr. Cordova's home on April 28, 2016[;]

4.      A report and any audio or video recording of an interview of Mario Montoya referenced in the interview of Sergeant Maestas and Chief Deputy Cunningham on March 3, 2016. See Exh. 2 (Baca 368-69)[;]

5.      A copy of a conversation between Mario Montoya and his wife regarding the murder of Max Gutierrez, Jr., that was recorded by the New Mexico Department of Corrections and implicates Montoya in the killing of Gutierrez. See Exh. 3 (DeLeon 13865, 14640)[;]

6.      A copy of the crime scene video and the crime scene diagram regarding the Shane Dix homicide on February 4 or February 5, 2006[;]

7.      All recordings of telephone calls made by Richard Gallegos from mid-July 2016 to the present.

Motion at 2-3.

        **2.      The Response.**

        The United States responds.   See United States' Response to Defendant Anthony Cordova's Motion to Compel Specific Discovery [506], filed March 26, 2018 (Doc. 548) ("Response").   In the Response, the United States addresses each of Cordova's discovery

requests. See Response at 2-3. Regarding Cordova's first request -- for "any statements made by Anthony Cordova to law enforcement on or about March 16, 2016, at Central New Mexico Community College" -- the United States asserts that it has already disclosed the relevant reports and that no other reports exist. Regarding Cordova's second request -- for statements that Cordova made following his April 28, 2016 arrest -- the United States asserts that it does not have reports related to this request, and that the FBI "confirmed that no reports exist." Response at 2. Regarding Cordova's third request -- for audio recordings, photographs, and/or video tapes of the April 28, 2016, search warrant execution -- the United States asserts that it has already disclosed reports relating to the search and that the seized ammunition was never tested. See Response at 2-3. The United States adds that it will, however, disclose photographs and sketches of the scene. See Response at 3. Regarding Cordova's fourth request -- for any reports, audio, and/or video for the March 3, 2016, Mario Montoya interview -- the United States asserts that it has no such documents and that the BCSO confirmed that such documents exist. See Response at 3. Regarding the United States' fifth request -- for audio recordings of a conversation between Mario Montoya and his wife -- the United States asserts that it has no such recording, and that the New Mexico Corrections Department confirms that no such recordings exist. See Response at 3. Regarding Cordova's sixth request -- for video and/or a crime scene diagram related to the Dix homicide -- the United States asserts that it has no such documents and that the BCSO confirms that no such documents exist. See Response at 3. Regarding Cordova's seventh request -- telephone call recordings that Richard Gallegos made from mid-July, 2016 to the present -- the United States asserts that it has already disclosed those items and will continue to disclose them as it receives them. See Response at 3.

3. **The Reply**.

Cordova replies. See Anthony Cordova's Sealed Reply to Response to his Motion to Compel Specific Discovery, filed April 9, 2018 (Doc. 567)("Reply"). Cordova contends that, despite the United States' contention that it disclosed all its reports related to Cordova's March 16, 2016, statements to law enforcement, he cannot locate such reports in the discovery materials that the United States provided to him, and he requests that the United States identify Bates numbers for those reports. See Reply at 1. Cordova states that it "accepts" the United States' representation that it has no reports relating to Cordova's post-arrest statements. Reply at 2. Cordova contends that the United States does not adequately address his third request -- for documents relating to the search of Cordova's residence -- and requests that the Court order the United States to produce "a CD described as 'Property Type 27' -- 'Recordings-AudioVisual'" and an audio recording of the search. Reply at 2. Regarding his fourth request, "the failure of the experienced homicide investigators at the San Bernalillo Sheriff's Department to write a report about their interview of a person suspected of the homicide they were investigating is difficult to countenance." Reply at 2. Accordingly, Cordova requests that the Court "require the government to determine: (1) whether any report(s), notes or audio or video recordings of this interview of Montoya were prepared by the Bernalillo County Sheriff's Department; (2) whether any such reports or recordings were destroyed or lost; (3) when the materials were destroyed or lost; (4) if any such items were destroyed, the identity of the person who authorized their destruction; and ([5]) if these items were lost, the identity of the person responsible for the loss." Reply at 2-3. Cordova requests, in the alternative, that the Court hold an evidentiary hearing "so that the circumstances of the destruction or loss of this evidence can be determined." Reply at 3 (alteration added). Regarding Cordova's fifth request, Cordova contends that the recording of a

conversation between Montoya and his wife "clearly did exist at one time," and therefore "requests that the Court order the government to determine and disclose: (1) when the recording was destroyed or lost; and (2) who authorized its destruction or was responsible for its loss. Alternatively, we request that the Court hold an evidentiary hearing at which these questions can be addressed." Reply at 3-4. Regarding Cordova's sixth request, Cordova asserts that discovery documents indicate that a VHS tape was entered into evidence, and that the United States should determine whether the crime scene diagram was lost or destroyed, when, and by whom. See Reply at 4. Regarding Cordova's seventh request, Cordova requests that the Court order the United States to "immediately request" Gallegos' telephone call recordings so that they can be disclosed to Cordova. Reply at 4.

**4.      The Hearing.**

The Court held a hearing. See Transcript of the Hearing (taken June 14, 2018), filed July 3, 2018 (Doc. 771)("Tr."). At the hearing, the United States reaffirmed that it had already provided the document relating to Cordova's first request, but that it would provide Cordova with the document's Bates number. See Tr. at 109:2-110:6 (Court, Beck, Morrissey). Cordova moved to his third request -- for audio, photographs, and video tapes from the search warrant execution -- and the United States said that those documents are catalogued on a BCSO evidence form, and so the United States would check with the BCSO to get copies for Cordova. See Tr. at 113:1-20 (Morrissey, Court, Beck). Regarding Cordova's fourth request -- for reports and/or recordings relating to an interview with Montoya -- the Court noted that the United States asserts that those documents do not exist and that it does not know what more it could do. See Tr. at 114:10-5 (Court, Morrissey). Moving onto Cordova's fifth request -- for the audio recordings of Montoya and his wife -- the United States stated that "I'll make the request of the Corrections

Department, but based on my experience . . . we're not going to find out that information."  Tr. at 116:18-22 (Beck).  The United States also agreed to provide answers to Cordova's questions relating to that recording, <u>viz</u>, who destroyed the material, when it was destroyed, who authorized the destruction, and who provided the answers to these questions.  <u>See</u> Tr. at 117:7-24 (Court, Beck).  Regarding Cordova's sixth request -- for a copy of the crime scene video and diagram -- the United States asserted that it will provide Cordova with that material.  <u>See</u> Tr. at 118:1-15 (Morrissey, Court, Beck).

The parties then moved to Cordova's seventh and final request -- for recordings of telephone calls that Gallegos made from mid-July, 2016, to the present.  <u>See</u> Tr. at 118:16-23 (Morrissey).  The United States contends that the telephone call recordings are not in its custody, control, or possession.  <u>See</u> Tr. at 119:10-11 (Beck).  Cordova said that he does not understand why the United States cannot deliver the recorded telephone calls given that Gallegos has been in the U.S. Marshals' custody.  <u>See</u> Tr. at 120:9-19 (Morrissey).  The Court stated that it would figure that, "if the U.S. Marshals have a contract . . . with the detention facility, that's probably under the Marshals' possession, custody or control" and that, under <u>Giglio v. United States</u>, 405 U.S. 150 (1972)("<u>Giglio</u>") and <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)("<u>Brady</u>"), "if it's in a Government agency, it's your obligation to go get it."  Tr. at 120:20-121:1 (Court).  The United States disagreed, stating that it has typically subpoenaed the U.S. Marshals Service for telephone call recordings, which indicates that the material is not in the United States' possession, custody, or control.  <u>See</u> Tr. at 121:2-19 (Beck).  The Court stated:

> Well, for the present time I'm going to order the Government to produce these telephone calls by Richard Gallegos.  If you want to present some authority that documents that are not in the possession -- that are in the possession of the U.S. Marshals or a contractor of theirs is not within your possession, custody, or control, then I'll rethink it.  But I think at the present time it sounds to me like

being in the possession of the U.S. Marshals' contractor would be in the Government's possession, custody, or control.

Tr. at 122:10-20 (Court).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES

The United States' duty to disclose in criminal cases arises from at least three sources: (i) rule 16 of the Federal Rules of Criminal Procedure; (ii) the Due Process Clause of the Fifth Amendment to the Constitution of the United States of America; and (iii) the Jencks Act, 18 U.S.C. § 3500. Put roughly, rule 16 requires the United States to disclose items material to the defense, items it intends to use in its case-in-chief, and items it obtained from the defendant. See Fed. R. Crim. P. 16. The Due Process Clause requires the United States to furnish information in its possession that is favorable to the accused. Finally, the Jencks Act requires the United States to disclose statements that its witnesses made if those statements are in the United States' possession and relate to those witnesses' trial testimony, after those witnesses have testified at trial.

**1.    Rule 16.**

Rule 16 of the Federal Rules of Criminal Procedure provides:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

    (i)      the item is material to preparing the defense;

    (ii)     the government intends to use the item in its case-in-chief at trial; or

    (iii)    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Criminal defendants may not, however, embark on a "broad or blind fishing expedition among documents possessed by the Government."  Jencks v. United States, 353 U.S. 657, 667 (1957)(quoting Gordon v. United States, 344 U.S. 414, 419 (1953)).  Rule 16(a)(2) provides, in part, that rule 16 "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."  Fed. R. Crim. P. 16(a)(2).  The Supreme Court of the United States has interpreted the term "defense" in this statute as referring to "an argument in response to the prosecution's case in chief."  United States v. Armstrong, 517 U.S. 456, 462 (1996)("[W]e conclude that in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief.").  Additionally, rule 16 does not require the United States to produce "reports, memoranda, or other internal government documents. . . [or] statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500."  Fed. R. Crim. P. 16 (a)(2).

    **2.**      **Due Process Clause.**

"The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment."  United States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *5 (D.N.M. 2011)(Browning, J.).  In Brady, the Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  In Giglio, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See Giglio, 405 U.S. at 153; United States v. Torres, 569 F.3d

1277, 1282 (10th Cir. 2009)("Impeachment evidence is considered exculpatory for <u>Brady</u> purposes."); <u>Douglas v. Workman</u>, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985))); <u>United States v. Abello-Silva</u>, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined <u>Brady</u> and clarified that it is not necessary that a defendant request exculpatory evidence: "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995)(quoting <u>United States v. Bagley</u>, 473 U.S. at 682). <u>See</u> <u>Douglas v. Workman</u>, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); <u>United States v. Summers</u>, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request."). "[T]he Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can have sufficient time to investigate their backgrounds for impeachment information." <u>United States v. Ashley</u>, 274 F. App'x 693, 697 (10th Cir. 2008)(unpublished).[1] <u>See</u> <u>Weatherford v. Bursey</u>, 429

---

[1]<u>United States v. Ashley</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. <u>See</u> 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

U.S. 545, 559 (1977)("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably."); United States v. Harmon, 871 F. Supp. 2d. 1125, 1149 (D.N.M. 2012)(Browning, J.).

<b>a. Timing of the Disclosure.</b>

The prosecution's obligation to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue.  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady v. Maryland."  United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009).  The United States Court of Appeals for the Tenth Circuit has recognized that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  United States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)).  The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the

---

In this circuit, unpublished orders are not binding precedent, . . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Ashley has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054. On the other hand, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056. Courts should, "[w]hen assessing the materiality of Giglio information, . . . consider the significance of the suppressed evidence in relation to the entire record." United States v. Gonzalez-Montoya, 161 F.3d 643, 650 (10th Cir. 1998).

When a prosecutor's obligations under Brady are triggered, however, they "continue[] throughout the judicial process." Douglas v. Workman, 560 F.3d at 1173. For instance, the obligation to disclose material under Brady can arise during trial. See United States v. Headman, 594 F.3d 1179, 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway."). Additionally, the disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady to an allegation that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal); United States v. Harry, No. CR 10-1915 JB, 2013 WL 684671, at *5 (D.N.M. 2013)(Browning, J.).

> ### b.     **Material Exculpatory Evidence.**

The holding in Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." 373 U.S. at 87. "Evidence is material

only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also found that "[d]uplicative impeachment evidence is not material." Douglas v. Workman, 560 F.3d at 1173. "To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989)).

The burden is on the United States to produce exculpatory materials; the burden is not on the defendant to first note that such materials exist. See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6. The United States' good or bad faith is irrelevant. See Brady, 373 U.S. at 87; United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982)("Under Brady, the good or bad faith of government agents is irrelevant."). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of

evidence." <u>Kyles v. Whitley</u>, 514 U.S. at 439.  The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation exists only "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial."  <u>Kyles v. Whitley</u>, 514 U.S. at 433 (internal quotation marks omitted).  On the other hand, "[t]he Constitution, as interpreted in <u>Brady</u>, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  <u>Smith v. Sec'y of N.M. Dep't of Corr.</u>, 50 F.3d 801, 823 (10th Cir. 1995).  Additionally, "[t]he constitution does not grant criminal defendants the right to embark on a broad or blind fishing expedition among documents possessed by the" United States.  <u>United States v. Mayes</u>, 917 F.2d 457, 461 (10th Cir. 1990)(quoting <u>Jencks v. United States</u>, 353 U.S. at 667); <u>United States v. Harry</u>, 2013 WL 684671, at *8.

<strong>c.</strong>     <strong><u>Evidence Must Be in the United States' Possession.</u></strong>

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'"  <u>United States v. Tierney</u>, 947 F.2d 854, 864 (8th Cir. 1991)(quoting <u>United States v. Beaver</u>, 524 F.2d 963, 966 (5th Cir. 1975)).  <u>Accord United States v. Kraemer</u>, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); <u>United States v. Badonie</u>, No. CR 03-2062, 2005 WL 2312480, at *3 (D.N.M. Aug. 29, 2005)(Browning, J.).  On the other hand, "a prosecutor's office cannot get around <u>Brady</u> by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case."  <u>Carey v. Duckworth</u>, 738 F.2d 875, 878 (7th Cir. 1984).  Under <u>Brady</u>, "[a] prosecutor must disclose information of which it has knowledge and access."  <u>United States v. Padilla</u>, 2011 WL 1103876, at *7 (citing <u>United States v. Bryan</u>, 868 F.2d 1032, 1037 (9th Cir. 1989)).  "A prosecutor may have a duty to search

files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Johnson, No. 96-40082-02-SAC, 1997 WL 447681, at *3 (D. Kan. June 9, 1997)(Crow, J.)). See United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992). A prosecutor does not have a duty, however, to obtain evidence from third parties. See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady does not oblige the government to obtain evidence from third parties). See also United States v. Huerta-Rodriguez, No. CR 09-3206, 2010 WL 3834061, at *4, 10 (D.N.M. Aug. 12, 2010)(Browning, J.)(noting that the United States cannot be compelled to produce the New Mexico State Police officers' personnel files, because the New Mexico State Police, which was not a party to the case, possessed the files, and the United States was able to review the files only at the New Mexico State Police office, and could not remove or photocopy any documents without a subpoena); United States v. Badonie, 2005 WL 2312480, at *3 (denying a motion to compel, because the New Mexico State Police possessed the documents, and the United States did not possess the documents which a defendant sought to be produced, even though the United States "could get the information [Defendant] Badonie seeks merely by requesting them"); United States v. Harry, 2013 WL 684671, at *8.

### 3. The Jencks Act.

In Jencks v. United States, the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." 353 U.S. at 672. In so holding, the Supreme Court recognizes that the

rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671. Congress later codified Jencks v. United States' holding in 18 U.S.C. § 3500.

See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

**(a)** In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)** After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a), (b). "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified." United States v. Lujan, 530 F. Supp. 2d 1224, 1232 (D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a)-(b)). The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment." Palermo v. United States, 360 U.S. 343, 349 (1959). The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes

of impeachment." United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo

v. United States, 360 U.S. at 352). The Jencks Act defines statements specifically:

> **(e)** The term "statement," as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means--
>
> > **(1)** a written statement made by said witness and signed or otherwise adopted or approved by him;
> >
> > **(2)** a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
> >
> > **(3)** a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). The Tenth Circuit has held: "Interview notes could be 'statements' under

the [Jencks] Act if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086

(10th Cir. 1993). At least one district court within the Tenth Circuit has distinguished interview

notes from reports that "embody only the agent's epitomization, interpretation, or impression of

an interview," finding that the latter are not producible under the Jencks Act. United States v.

Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.). In United States v. Lujan, the

Honorable Robert C. Brack, United States District Judge for the District of New Mexico,

explained that rough interview notes may be discoverable under the Jencks Act when a defendant

makes "at least . . . a colorable claim that an investigator's discarded rough notes contained

exculpatory evidence not included in any formal interview report provided to the defense." 530

F. Supp. 2d at 1266. Judge Brack went on to hold that, "[b]ecause the contents of rough

interview notes may in some cases be subject to disclosure and because the potential

impeachment value of the notes may not become evident until trial," the United States must

preserve its rough interview notes "made by law enforcement agents during interview of

potential witnesses" under 18 U.S.C. § 3500. 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy. See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."). To satisfy this burden, the defendant need not prove that particular materials are within the Jencks Act's scope, as the documents are not in the defendant's possession, but, rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)). The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements. See United States v. Smith, 984 F.2d at 1086. For example, in United States v. Smith, the Tenth Circuit concluded that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had interviewed her before testifying, and the defense counsel moved for production of the notes. See 984 F.2d at 1085-86. Once the defendant makes a prima facie showing that a witness statement exists which may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement. United States v. Smith, 984 F.2d at 1086.

The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be disclosed to the defendants after the agents testify at trial. See United States v. Goxcon-Chagal, No. CR 11-2002, 2012 WL 3249473, at *2, 6 (D.N.M. Aug. 4, 2012)(Browning, J.). In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce FBI agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contains statements from witnesses who testified at trial. See 760 F. Supp. 2d at 1164, 1167; United States v. Harry, 2013 WL 684671, at *11.

## ANALYSIS

The Court denies Cordova's first through sixth requests as moot, because the parties resolved those requests at the Hearing. Regarding the remaining request -- for audio recordings of an inmate in the U.S. Marshals Service's custody -- the Court concludes that the United States has possession, custody, or control of those recordings, because the U.S. Marshals Service is a federal agency closely aligned with the United States such that the United States can acquire the recordings simply by asking for them. Accordingly, the Court grants the Motion in part and denies it in part.

## I. THE COURT DENIES IN PART AND GRANTS IN PART CORDOVA'S FIRST REQUEST, DENIES CORDOVA'S SECOND THROUGH FIFTH REQUESTS, AND GRANTS CORDOVA'S SIXTH REQUEST.

Cordova's first request is for the United States to provide "[a]ny statements made by Anthony Cordova to law enforcement on or about March 16, 2016, at Central New Mexico Community College, including a designation of the persons present at the time Mr. Cordova made any statements." Motion at 2. In his Reply, Cordova stated that, if the United States

insists that it already provided this document, it should provide Cordova with that document's

Bates number. See Reply at 1. At the Hearing, the United States stated that it provided a 302

Report with those statements and asserted that it would provide Cordova with the 302 Report's

Bates number. See Tr. at 109:2-110:6 (Court, Beck, Morrissey). The Court thus grants in part

and denies in part Cordova's first request; the Court denies Cordova's document production

request but grants his request for 302 Report's Bates number.

Cordova's second request is for "[a]ny statements made by Anthony Cordova subsequent

to his arrest on April 28, 2016, and a designation of any person(s) present at the time any

statements were made." Motion at 2. At the Hearing, Cordova stated that he already resolved

one of his seven requests. See Tr. at 106:22-21 (Morrissey). The Court presumes that Cordova

meant that he had resolved his second request, because he did not argue in favor of that request.

See Tr. at 113:1-20 (Morrissey, Court, Beck)(skipping from the Motion's first request to the

Motion's third request). The Court therefore denies Cordova's second request as moot.

> Cordova's third request is for
>
> Audio recording, photographs and/or video tapes of the execution of the search
> warrant at the residence of Mr. Cordova on April 28, 2016, beginning at 0538
> hours, and any documentation of the execution search warrant authored
> by . . . Anthony Medrano or any other law enforcement personnel present during
> the search warrant. In addition, we seek disclosure of any documentation
> showing the specific location and condition of all evidence seized from Mr.
> Cordova's home on April 28, 2016 and the identity of the person(s) who seized
> each item of evidence, as well as reports documenting the collection and securing
> of such evidence. This includes forensic evidence, examination reports and
> testing results related to the "seven rounds of 380 ammunition" seized at Mr.
> Cordova's home on April 28, 2016.

Motion at 2. At the Hearing, the United States asserted that those documents are catalogued on a

BCSO evidence form, and so the United States would check with that office to get copies for

Cordova. See Tr. at 113:1-20 (Morrissey, Court, Beck). Cordova was satisfied with that

response.  See Tr. at 113:22 (Morrissey).  The Court therefore denies Cordova's third request, but orders the United States to ask the BCSO for the requested documents and provide anything it receives to Cordova.

Cordova's fourth request is for "[a] report and any audio or video recording of an interview of Mario Montoya referenced in the interview of Sergeant Maestas and Chief Deputy Cunningham on March 3, 2016."  Motion at 3.  In its Response, the United States asserts that it has no such documents and that the BCSO confirmed that no such documents exist.  See Response at 3.  At the Hearing, the Court noted the United States' assertions that those documents do not exist and stated that it did not know what more it could do.  See Tr. at 114:10-5 (Court, Morrissey).  Cordova did not request that the Court or the United States take further actions on this matter.  See Tr. at 114:22-115:5 (Morrissey)("[I]f that's it, that's it.").  The Court therefore denies Cordova's fourth request.

Cordova's fifth request is for "[a] copy of a conversation between Mario Montoya and his wife regarding the murder of Max Gutierrez, Jr., that was recorded by the New Mexico Department of Corrections and implicates Montoya in the killing of Gutierrez."  Motion at 3.  At the Hearing, the United States asserted that it would ask the New Mexico Corrections Department for that recording.  See Tr. at 116:18-22 (Beck)("I'll make the request of the Corrections Department, but based on my experience . . . we're not going to find out that information.").  The Court therefore denies the fifth request, but, as it stated in the hearing, see Tr. at 117:7-24 (Court, Beck), the Court orders the United States to provide Cordova with any information it obtains -- and to identify the information's source -- regarding who destroyed the material, when was the material destroyed, who authorized the material's destruction, and who provided the United States the answers to those questions.

Cordova's sixth request was for "[a] copy of the crime scene video and the crime scene diagram regarding the Dix homicide on February 4 or February 5, 2006." Motion at 3. The United States agreed to provide Cordova with those materials. See Tr. at 118:1-15 (Morrissey, Court, Beck). The Court therefore grants the sixth request and orders that the United States provide Cordova with a copy of the Dix homicide crime scene video and diagram.

## II.     THE COURT ORDERS THE UNITED STATES TO PRODUCE GALLEGOS' TELEPHONE RECORDINGS, BECAUSE THE UNITED STATES CONTROLS EVIDENCE THAT THE U.S. MARSHALS SERVICE POSSESSES.

Under rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure, the United States must provide evidence to Cordova if Cordova requests that evidence, the evidence is "within the government's possession, custody, or control," and it "is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). The United States does not dispute that the recordings of Gallegos' telephone calls that Cordova requests are material, but it contends that it does not have possession, custody, or control, of those recordings, because the U.S. Marshals Service possesses them, see Tr. at 119:10-11 (Beck), and the U.S. Marshals Service is "not part of the prosecution team," Tr. at 121:16-20 (Beck).

The test for Cordova's rule 16 request is not whether the U.S. Marshals Service is part of the prosecution team, but whether the documents are in the United States' possession, custody, or control. The United States has possession, custody, or control over the recordings, because the Court is confident that the United States can acquire the recordings by simply asking for them. In both the criminal and civil contexts, the Court has "used a pragmatic, function test" whether a party has possession, custody, or control over documents. United States v. DeLeon, No. CR 15-4268 JB, 2017 WL 2271430, at *50 (D.N.M. Feb. 8, 2017)(Browning, J.). Consequently, "[i]f the attorney responding to the requests for production can pick up the

telephone and get the information from a third-party, the documents are effectively in the responding party's 'control.'" United States v. DeLeon, 2017 WL 2271430, at *50 (citing United States v. 2121 Celeste Road SW, Albuquerque, N.M., 307 F.R.D. 572, 590 (D.N.M. 2015)(Browning, J.)).

To be sure, the Court has concluded that the United States had no duty to secure documents from third parties even when the United States could probably get the documents by just asking. For example, the Court concluded that the probability that the Navajo Nation would give the United States documents upon request does not amount to custody or control:

> The United States may have an obligation to seek information from "closely aligned" United States agencies, but its obligation does not require it to seek information from other governments. United States v. Johnson, 1997 U.S. Dist. LEXIS 11586[,] at *8 (quoting United States v. Brooks, 966 F.2d at 1503). Likewise, the case law has not extended the *Brady v. Maryland* duty to require the government to secure information from third parties. See United States v. Combs, 267 F.3d at 1173 (observing that Brady does not oblige the government to obtain evidence from third parties); United States v. Anderson, Case Nos. 03-3009-JWL, 98-20030-01-JWL, 2003 U.S. Dist. LEXIS 19213, *29 (Lungstrum, J.). These documents, which are not in the United States' possession, are not discoverable under rule 16.

> It may be true that the United States could get the information Badonie seeks merely by requesting them. But there is also the possibility that the Navajo Nation could decline. To order the United States to do something that it does not have the power to do blurs the bright line obligations that *Brady v. Maryland* imposes on prosecutors.

United States v. Badonie, 2005 WL 2312480, at *3. The Court also concluded similarly regarding documents that the Gallup Public Schools possessed:

> The Court believes that, as to the school records, such information is not in the United States' possession, custody, or control pursuant to rule 16, and that the law does not require the United States to produce such information. That the United States might ask for the requested information, and that there is a chance, although not a certainty, that the requested entities might comply with the United States' request does not equate to possession, custody, or control. The United

States has no obligation to secure evidence in the possession of third parties on Fred's behalf.

United States v. Fred, No. CR-05-801 JB, 2006 WL 4061156, at *3 (D.N.M. Nov. 8, 2006)(Browning, J.).

By contrast, in United States v. DeLeon, the Court ruled that the documents in the New Mexico Corrections Department's possession were effectively in the United States' possession, custody, or control, because the case's "unique facts" indicate that the United States can easily get those documents:

> This entire federal investigation appears to have begun when SNM allegedly threatened to kill the New Mexico Secretary of Corrections. . . . The New Mexico Corrections Department is jumping at the chance to help the prosecution. Under these circumstances, the Court can confidently say that the New Mexico Corrections Department's records . . . are under the AUSA's control.

United States v. DeLeon, 2017 WL 2271430, at *50.[2]

---

[2]At the Hearing in this case, the United States argued that documents possessed by other federal agencies are not the United States' possession and stated that it

> looked at this [issue] . . . in the second [United States v. DeLeon] trial, [regarding] Leroy Lucero's Bureau of Prisons file. And [the Court determined] that was not in our possession, custody, or control. That was something that the defense team had to go out and do a FOIA request for. Because the different branches are not, I don't believe, automatically within on your custody or control.

Tr. at 121:25-7 (Beck). The United States may have been referring to a dispute over the New Mexico Corrections Department's medical records of Defendant Edward Troup and Billy Garcia. That issue is different from this one, because the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA") rules prevented the New Mexico Corrections Department from sharing those documents. United States v. Deleon, No. CR 15-4268 JB, 2018 WL 2013988, at *4 (D.N.M. Apr. 30, 2018)(Browning, J.). "Consequently, the United States cannot obtain health records that NMCD possesses by picking up the telephone, so those records are not within the United States' 'possession, custody, or control.'" 2018 WL 2013988, at *4 (quoting Fed. R. Crim. P. 16(a)(1)(E)).

Similarly, here, the circumstances indicate that the United States is a phone call away from the requested telephone recordings. The United States and the U.S. Marshals Service are both federal agencies who regularly work closely together and have worked closely in this case detaining and transporting Defendants.[3] The United States asserted that it has sought documents from the U.S. Marshals Service via subpoenas. See Tr. at 121:8-16 (Beck). Nonetheless, the Court is confident that the U.S. Marshals Service will be happy to comply with the United States' request even if the request is not a subpoena. See United States v. 2121 Celeste Rd. SW, Albuquerque, N.M., 307 F.R.D. at 590 ("Simply put, if a person, corporation, or a person's attorney or agent can pick up a telephone and secure the document, that individual or entity controls it.").

To be clear, the Court's pragmatic, functional approach -- i.e., that a document is in a party's possession, custody, or control if it can get it with a phone call -- applies to specific discovery requests under rule 16 of the Federal Rules of Criminal Procedure. See United States v. Bryan, 868 F.2d at 1036 ("[T]he scope of the government's obligation under Rule 16(a)(1)(C) should turn on the extent to which the prosecutor has knowledge of and access to the documents

_____

[3]The closeness of the U.S. Marshals Service, the Assistant U.S. Attorneys, and the FBI's Bryan Acee has troubled the Court at times. The Court expects and appreciates the U.S. Marshals Service's rational, dispassionate views. See Memorandum Opinion and Order at 7-10, filed August 19, 2018 (Doc. 858)(recounting the Court's correspondence with the U.S. Marshals Service regarding trial logistics in Albuquerque and Las Cruces). The Court could not have done what it did in this case without the hard work and cooperation of the United States Marshals Service. The Court will always be grateful to former U.S. Marshal Conrad Candelaria for his work. At times in this case, however, the U.S. Marshals Service seemed to have been working unusually close with the United States Attorneys such that they seemed partisan. The Court has been told that the new Marshal, Sonia Chavez, who comes out of the FBI, was Acee's superior before she left. Also, the Court recently agreed with the U.S. Marshals Service that its officers could wear their uniforms in court when there is no jury on the understanding that they would wear suits when a jury is present. Yet, at trial, the Deputy U.S. Marshal who brokered this agreement was in uniform opening doors for jurors and hovering near the U.S. Attorney table, helping coordinate the United States Attorney's witnesses.

sought by the defendant in each case."); United States v. DeLeon, 2017 WL 2271430, at *49

("Under Brady, '[a] prosecutor must disclose information of which it has knowledge and

access'" (quoting United States v. Padilla, 2011 WL 1103876, at *7)). There is no affirmative

duty under Brady and Giglio, however, for the United States to seek exculpatory evidence from

third parties that a defendant has not asked for and the United States does not know exists, unless

the third party worked closely with the United States on a case's investigation and/or

prosecution. Under Brady and Giglio, the United States must disclose evidence that is useful to

the defense in impeaching government witnesses, even if the evidence is not inherently

exculpatory. See Giglio, 405 U.S. at 153; United States v. Torres, 569 F.3d at 1282

("Impeachment evidence is considered exculpatory for Brady purposes."). The United States has

no duty to find and provide discovery that it does not possess. See United States v. Tierney, 947

F.2d at 864 ("It is well settled that there is no 'affirmative duty upon the government to take

action to discover information which it does not possess.'" (quoting United States v. Beaver, 524

F.2d at 966)). The United States has a duty to search other agencies' files, if those agencies are

closely aligned with the prosecution. See United States v. Brooks, 966 F.2d at 1503 ("The cases

finding a duty to search have involved files maintained by branches of government 'closely

aligned with the prosecution.'" (quoting United States ex rel. Fairman, 769 F.2d 386, 391 (7th

Cir. 1985)); United States v. Padilla, 2011 WL 1103876, at *7 (stating that a prosecutor may

have a duty to search other agencies' files when that other agency is closely aligned with the

prosecution). Requiring the United States to search other agencies' files when those agencies are

closely aligned with the prosecution or investigation is meant in part to prevent the United States

from ducking its Brady obligations by "keeping itself in ignorance, or by compartmentalizing

information about different aspects of a case." Carey v. Duckworth, 738 F.2d at 878. When it

comes to <u>Brady</u> obligations in the Tenth Circuit, "the central inquiry in determining whether an individual or agency is part of the prosecution is how closely the person or agency worked with the prosecutor's office on a particular investigation." <u>Tiscareno v. Anderson</u>, 639 F.3d 1016, 1022 (10th Cir. 2011)(citing <u>Smith v. Sec'y of New Mexico Dep't of Corr.</u>, 50 F.3d at 824, <u>reh'g granted, opinion vacated in part on other grounds,</u> 421 F. App'x 842 (10th Cir. 2011)(unpublished)).[4] Although the Court expresses its misgivings about the closeness between

---

[4]To be sure, other United States Circuit Courts of Appeals have indicated that the United States possesses information that other federal agencies possess. The United States Court of Appeals for the Ninth Circuit, for instance, holds that "agency involvement in the investigation to be a sufficient, but not necessary, factor to show that the prosecution was in 'possession' of the agency's information," but that the United States may be in possession of materials that a related agency, such as the Bureau of Prisons, holds. <u>United States v. Santiago</u>, 46 F.3d 885, 893-94 (9th Cir. 1995)("[T]he fact that the Bureau of Prisons and the United States Attorney's Offices are both branches of the Department of Justice would facilitate access by federal prosecutors to prison files."). The United States Court of Appeals for the Seventh Circuit ruled that the U.S. Marshals Service specifically is closely aligned with the prosecution, even if not involved in the investigation:

> [I]t is impossible to say in good conscience that the U.S. Marshal's Service was not 'part of the team' that was participating in the prosecution, even if the role of the Marshal's Service was to keep the defendants in custody rather than to go out on the streets and collect evidence.

<u>United States v. Wilson</u>, 237 F.3d 827, 832 (7th Cir. 2001). <u>But</u> <u>see</u> <u>United States v. Linder</u>, No. 12 CR 22, 2013 WL 812382, at *59 (N.D. Ill. Mar. 5, 2013)(Kendall, J.)(considering whether the United States Marshals Service's actions aligned the agency with the prosecution); <u>Chandras v. McGinnis</u>, No. 01 CIV. 2519 (LBS), 2002 WL 31946711, at *8 (E.D.N.Y. Nov. 13, 2002)(Sand, J.)(disagreeing with the <u>United States v. Wilson</u> and concluding that, "[i]n the absence of regular contact with the prosecution or any investigative or prosecutorial responsibility, however, imputing knowledge of these government agents to the prosecution threatens to stretch the relevant phrase from the recent Supreme Court cases -- 'acting on the government's behalf in the case -- beyond its breaking point").

There is some caselaw in the Tenth Circuit indicating that, for <u>Brady</u> purposes, a federal agency need not be involved in the investigation for its documents to be in the possession of the prosecution. In 1995, the Tenth Circuit stated: "Because the prosecution had actual knowledge of the fact that these two arms of the State were investigating this case, it is reasonable to impute the knowledge possessed by each entity to the prosecution under *Brady*." <u>Smith v. Sec'y of New Mexico Dep't of Corr.</u>, 50 F.3d at 825. In 1999, the Tenth Circuit stated: "Information possessed

the United States and the U.S. Marshals Service in this case, see supra n.2, the Court does not know enough about that relationship to determine whether the U.S. Marshals Service assisted in the investigation and prosecution such that the United States would have an affirmative duty to search the U.S. Marshals Service's records for exculpatory evidence.  In any case, where a defendant requests specific exculpatory documents from the United States under Brady and Giglio, and the United States can get those documents from a third party with a phone call, determining whether that third party worked closely with the United States on the case's investigation and prosecution is not a necessary step.  Here, Cordova asks the United States for specific exculpatory recordings that the U.S. Marshals Service possesses, and the United States controls those recordings, because it can get them just by asking.

**IT IS ORDERED** that Defendant Anthony Cordova's Motion to Compel Discovery, filed February 5, 2018 (Doc. 506), is granted in part and denied in part.  The Court orders Plaintiff United States of America to: (i) provide Defendant Anthony Cordova the Bates number for a report with statements that Cordova made to law enforcement on March 16, 2016; (ii) ask the Bernalillo County Sheriff's Office for records relating to its April 28, 2016, search of Cordova's residence; (iii) inform Cordova who destroyed records of Mario Montoya's

_____

by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case."  United States v. Beers, 189 F.3d 1297, 1304 (10th Cir. 1999)(citing Smith v. Sec'y of New Mexico Dep't of Corr., 50 F.3d at 825 (10th Cir. 1995)).  In 2011, however, the Tenth Circuit revisited Smith v. Sec'y of New Mexico Dep't of Corr., stating that "*Smith* stands for the proposition that the prosecutor must turn over exculpatory evidence gathered by cooperating investigative agencies and personnel." Tiscareno v. Anderson, 639 F.3d at 1021 (10th Cir. 2011)(citing Smith v. Sec'y of New Mexico Dep't of Corr., 50 F.3d at 824-25)).  "Determining whether an agent of the government is sufficiently involved in a 'particular criminal venture' is a fact-based inquiry which defies broad generalizations." Tiscareno v. Anderson, 639 F.3d at 1021.  "Thus, the central inquiry in determining whether an individual or agency is part of the prosecution is how closely the person or agency worked with the prosecutor's office on a particular investigation."  Tiscareno v. Anderson, 639 F.3d at 1022 (citing Smith v. Sec'y of New Mexico Dep't of Corr., 50 F.3d at 824).

conversation with his wife regarding the Max Gutierrez, Jr. murder, who authorized the destruction, when the records were destroyed, and who provided the United States with answers to those questions; (iv) provide Cordova with copies of the Shane Dix homicide crime scene video and diagrams; and (v) provide Cordova with recordings of telephone calls that Richard Gallegos made while in the U.S. Marshals Service's custody from mid-July 2016 to present.  All other requests are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 USC § 515
Albuquerque, New Mexico

--and--

John C. Anderson
  United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for the Plaintiff*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

*Attorneys for Defendant Anthony Ray Baca*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

*Attorney for Defendant Manuel Jacob Armijo*

Louis E. Lopez, Jr.
El Paso, Texas

*Attorney for Defendant Frederico Munoz*

Donald F. Kochersberger, III
Business Law Southwest, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Sergio Loya Rodriguez*

Susan Burgess-Farrell
Barry G. Porter
Burgess & Porter Law, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

--and--

R. Scott Reisch
Reisch Law Firm, LLC
Denver, Colorado

     *Attorneys for Defendant Vincent Garduno*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

     *Attorney for Defendant Mandel Lon Parker*

James Baiamonte
Albuquerque, New Mexico

--and--

Ahmad Assed
Ahmad Assed & Associates
Albuquerque, New Mexico

     *Attorneys for Defendant Daniel Archuleta*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for Defendant Daniel Sanchez*

Marcia A. Morrissey
Santa Monica, California

--and--

Gregory M. Acton
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Cordova*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Laura E. Udall
Cooper & Udall, PC
Tucson, Arizona

--and--

Billy R. Blackburn
Albuquerque, New Mexico

    *Attorneys for Defendant Arturo Arnulfo Garcia*