# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                     No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup";
CHRISTOPHER GARCIA; MANUEL
JACOB ARMIJO, a.k.a. "Big Jake";
FREDERICO MUNOZ, a.k.a. "Playboy";
SERGIO LOYA RODRIGUEZ, a.k.a
"Churro"; MANUEL BENITO, a.k.a.
"Panther"; VINCENT GARDUÑO, a.k.a.
"Fatal"; MANDEL LON PARKER, a.k.a.
"Chuco"; DANIEL ARCHULETA, a.k.a.
"Smurf"; DANIEL SANCHEZ, a.k.a.
"Dan Dan"; ANTHONY CORDOVA,
a.k.a. "Antone"; and ARTURO
ARNULFO GARCIA, a.k.a. "Shotgun,"

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant Anthony Cordova's Ex

Parte Motion for New Trial, filed August 14, 2019 (Doc. 1108)("Motion"); (ii) the Ex Parte

Supplemental Brief in Support of Ex Parte Rule 33 (B)(1) Motion for New Trial [Doc. 1108], filed

September 11, 2019 (Doc. 1120)("Supplemental Brief"); and (iii) the oral motion for a new trial,

made at the September 16, 2019 sentencing hearing. The primary issues are: (i) whether the Court

should grant the Defendant Anthony Cordova a new trial, because, after trial, Cordova discovered

evidence that Defendant Christopher Garcia, whom the United States presented as having a

murder-for-hire arrangement with Cordova, told Agent Joseph Sainato of the Federal Bureau of

Investigations ("FBI") that Garcia did not ask Cordova to murder Shane Dix and that Garcia never

spoke to Cordova regarding Dix' murder after it happened; (ii) whether Garcia waived his privilege against self-incrimination under the Fifth Amendment to the Constitution of the United States of America, because his additional risk of incrimination is neither substantial nor real; and (iii) whether the Court should require the United States to grant Garcia immunity or grant Cordova a new trial and acquit him if the United States does not grant Garcia immunity, because the United States' selective use of immunity violates Cordova's rights under the Due Process Clause of the Fifth Amendment. The Court denies the Motion, because: (i) Garcia's statements are not newly discovered evidence under United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997), because they are not material, because they are merely impeaching, and because they probably would not change the outcome of the trial; (ii) Garcia did not waive his privilege against self-incrimination under the Fifth Amendment, because his risk of additional incrimination is substantial and real; and (iii) the United States' selective use of immunity does not violate Cordova's due process rights.

## FACTUAL BACKGROUND

The Court recounts the factual background in its Memorandum Opinion and Order at 2-4, 2019 WL 2649835, filed June 27, 2019 (Doc. 1051)("MOO"). The Court incorporates that recitation here.

> The Court takes its background facts from the Superseding Indictment, filed March 9, 2017 (Doc. 372)("Indictment"). The Court does not set forth these facts as findings or for their truth. The Court recognizes that the factual background is largely the Plaintiff United States of America's version of events and that the Defendants who have not pled guilty are all presumed innocent.

> This case deals with the crimes that the . . . [Syndicato de Nuevo Mexico]. . . allegedly committed through its members. See Indictment ¶¶ 1, 3, at 1-2. The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment ¶ 1, at 2.

The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected interstate and foreign commerce." Indictment ¶ 2, at 2. The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2.

The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Indictment ¶ 3, at 2. During the riot, thirty-three inmates were killed, and over 200 were injured. See Indictment ¶ 3, at 2. After the PNM riot, the SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment ¶ 4, at 2. The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for ["]table["]) of leaders who issue orders to subordinate gang members." Indictment ¶ 4, at 2-3. The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment ¶¶ 3, 5, at 2-3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and the profit from narcotics trafficking. See Indictment ¶ 5, at 3. The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment ¶ 6, at 3. If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show its power. See Indictment ¶ 6, at 3. The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment ¶ 7, at 4. The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment ¶ 7, at 4. "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], homosexuals, or sex offenders." Indictment ¶ 8, at 4. To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and murder. See Indictment ¶¶ 6-8, at 3-4. The SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment ¶ 7, at 4. The SNM's recent activities in a conspiracy to murder high ranking New Mexico Corrections Department ["NM Corrections Department"] officials inspired the Federal Bureau of Investigation's [("FBI")] present investigation. See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

MOO at 2-4 (alterations added).

## PROCEDURAL BACKGROUND

The FBI's SNM investigation resulted in this case and three other cases before the Court.

See United States v. DeLeon, No. CR 15-4268 ("DeLeon"); United States v. Varela, No. CR 15-4269; and United States v. Garcia, No. CR 15-4275. United States v. Varela and United States v. Garcia did not go to trial, but the Court held two trials in DeLeon: one four-defendant trial and one seven-defendant trial. The juries of the two trials found eight of the eleven DeLeon Defendants guilty of violating the Violent Crimes in Aid of Racketeering Activity statute, 18 U.S.C. § 1959 ("VICAR"). See DeLeon, No. CR 15-4268, Jury Verdict at 1-3, filed March 12, 2018 (Doc. 1947); DeLeon, No. CR 15-4268, Jury Verdict at 1-5, filed May 25, 2018 (Doc. 2332). Four DeLeon Defendants are charged in this case -- Baca, C. Garcia, Defendant Daniel Sanchez, and Defendant Arturo Arnulfo Garcia. Compare Indictment at 1, with DeLeon, No. CR 15-4268, Second Superseding Indictment at 1, filed March 9, 2017 (Doc. 947).

On April 21, 2016, a Grand Jury returned the original indictment in this case. See Original Indictment at 1, filed April 21, 2016 (Doc. 2). On March 9, 2017, a Grand Jury returned the new indictment, which superseded the original indictment. See Superseding Indictment at 1, filed March 9, 2017 (Doc. 372)("Indictment"). The Indictment lists three counts. See Indictment at 1. Count 1 of the Indictment charges eleven Baca Defendants[1] with engaging in a racketeering conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"). See Indictment at 8-9. Count 2 charges C. Garcia and A.

---

[1]The eleven Baca Defendants charged with violating RICO are Baca, C. Garcia, Defendant Manuel Jacob Armijo, Defendant Frederico Munoz, Defendant Sergio Loya Rodriguez, Defendant Manuel Benito, Defendant Vincent Garduño, Defendant Mandel Lon Parker, Defendant Daniel Archuleta, D. Sanchez, and A. Garcia. See Indictment at 1-2.

Cordova with committing murder on or about February 4, 2005, in violation of VICAR. See Indictment at 54. Count 3 charges A. Cordova with (i) using and carrying a firearm in relation to the crime charged in Count 2, in violation of 18 US.C. § 924(c), (j)(1), respectively; (ii) using a firearm during a violent crime, and (iii) using a firearm to cause a person's death. See Indictment at 53-54.

The Court recounts the procedural history of scheduling orders and discovery requests, the CNM 302 report, and the trial in its Memorandum Opinion and Order. See MOO at *3-29. The Court incorporates that recitation here, omitting only witnesses whose testimony either does not include discussion of Cordova and Garcia, or whose inclusion would be redundant.[2]

---

[2]The omitted witnesses are: Dr. Jeffrey Nine, see MOO at 16-19 (identifying as a forensic pathologist and medical examiner and testifying regarding the autopsy he conducted on the body of C. Dix); Jerry Roark, see MOO at 18 (identifying as a NM Corrections Department officer, and testifying regarding the NM Corrections Department's policies regarding identifying, classifying, and managing gangs and gang members, including SNM); Mario Rodriguez, see MOO at 19-21 (identifying as a former member of SNM, and testifying regarding his association with and later rejection of SNM, his cooperation with the FBI, and SNM terminology, practices, and activities); Roy Martinez, see MOO at 30 (identifying as a former member of SNM, and testifying regarding his membership in and later rejection of SNM, his cooperation with the FBI, his acquaintance with M. Montoya, and his understanding of SNM terminology); Larry Muro, see MOO at 31 (identifying as the primary crime scene investigator at Dix murder scene, and testifying regarding his actions at the crime scene, his storage of evidence, and crime scene photographs of the Dix murder scene); Frederico Munoz, see MOO at 42-44 (identifying as former member of SNM, and testifying regarding his membership in and later rejection of SNM, his cooperation with the United States government, his knowledge of and relationship with C. Garcia, and SNM terminology, practices, and activities); Michael Tinker, see MOO at 45-46 (identifying as a resident of the neighborhood where Dix was shot, and testifying regarding his observations during and immediately after the murder of Dix); Luis Funes, see MOO at 46-47 (identifying as a community service aide, and testifying regarding his receipt of Tinker's 911 call, his observations of the Dix murder scene, and his call to the BCSO); Michael King, see MOO at 49 (identifying as a retired BCSO crime scene unit detective, and narrating a video recording he made at the crime scene, and testifying regarding impounding Dix's vehicle, attempting to establish the bullets' trajectories, and his first conversation with the FBI a couple of days before trial); Kimberly Haag, see MOO at 50 (identifying as a "firearm and tool examiner," and testifying as to the classification and damage to

1.      **Scheduling Orders and Discovery Requests.**

On May 5, 2016, the Honorable Karen B. Molzen, United States Magistrate Judge for the United States District Court of New Mexico, filed the Order, filed May 5, 2016 (Doc. 81)("Discovery Order"), on discovery, in which she states that she sua sponte deems A. Cordova to have requested discovery and orders the United States to provide to A. Cordova all information that rule 16 requires that the United States produce. See Discovery Order at 1-2. In the same Discovery Order, Magistrate Judge Molzen directs the United States to comply with Brady[v. Maryland, 373 U.S. 83 (1963)("Brady")], Giglio[ v. United States, 405 U.S. 150 (1972)("Giglio")], and the Jencks Act, 18 U.S.C. § 3500. See Discovery Order at 4-5. The Court subsequently entered the Scheduling Order, filed November 3, 2016 (Doc. 249), in which it set the United States' discovery deadline for 240 days before trial. See Scheduling Order at 1. Soon afterward, A. Cordova made specific discovery requests to the United States via the Letter from Marcia A. Morrissey to Maria Y. Armijo (dated November 6, 2017), filed August 21, 2018 (Doc. 903-12)("Nov. 6 Letter"). In the Nov. 6 Letter, A. Cordova asks the United States for "any statements made by Anthony Cordova on or about March 16, 2016, at Central New Mexico Community College" and indicates: "This request includes a

---

the bullets and her theories regarding the firearm used and its lack of connection to other crimes); Mikhail Tinker, see MOO at 52 (identifying as a resident of neighborhood where Dix was shot and wife of Michael Tinker, and testifying as to her observations during and immediately after the murder of Dix and a police report she provided to the BCSO at the time of the murder); David Littlefield, see MOO at 52 (identifying as a BCSO employee, and testifying regarding his involvement at the Dix murder scene and his later arrest of M. Montoya on an misdemeanor warrant and subsequent management of Montoya's car); Patrick Charlton, see MOO at 55 (identifying as a retired BCSO lieutenant, and testifying regarding his involvement in the Dix murder investigation and the BCSO's measurements of the bullets' potential trajectories); Matthew McCoy, see MOO at 56 (identifying as a former BCSO sergeant, and testifying regarding his observations at the Dix murder scene and his detention and subsequent pat-down of Snow); Brian Lindley, see MOO at 56-57 (identifying as the chief deputy of BCSO's Criminal Investigations division, and testifying regarding his observations of the Dix murder scene and calls BCSO received about the scene); Sam Giron, see MOO at 58 (identifying Albuquerque Police Department evidence technician and testifying regarding his interactions with A. Cordova's defense team regarding checking out evidence and the status of evidence); Paul Jacobs, see MOO at 59 (identifying as a retired BCSO officer and testifying regarding his observations of the Dix murder scene), and Peter Golden, see MOO at 60 (identifying as a BCSO lieutenant, and testifying regarding rebuilding the cold case file for the Dix murder).

designation of the persons present at the time Mr. Cordova made any statements." Nov. 6 Letter at 1.

In February, 2018, A. Cordova reminded the United States of the information that he sought and advised the United States that he would file a motion seeking the information. See Email from Marcia Morrissey to Maria Armijo (sent February 2, 2018), filed August 21, 2018 (Doc. 903-13)("Feb. 2 Email"). Subsequently, on February 5, 2018, A. Cordova filed the Sealed Motion to Compel Discovery, filed February 5, 2018 (Doc. 506)("Motion to Compel"), in which he requests that the Court issue order that the United States disclose information related to the CNM conversation. See Sealed Motion to Compel Discovery at 4-5, 7. The United States responded that it had already produced all such information in its possession. See United States' Response to Defendant Anthony Cordova's Motion to Compel Specific Discovery [506] at 2, filed March 26, 2018 (Doc. 548). A. Cordova replied that he could not find such information in his records and requested that the Court order the United States to provide a Bates number for any relevant reports. See Anthony Cordova's Sealed Reply to Response to His Motion to Compel Specific Discovery at 1, filed April 9, 2018 (Doc. 567).

A. Cordova raised the issue before the Court at the June 14, 2018, pretrial conference. See Draft Transcript of Hearing at 125:13-23 (taken June 14, 2018)(Morrissey)("June 14 Tr.").[3] The United States repeated that it had produced the requested 302 report. See June 14 Tr. at 127:8-22 (Beck). A. Cordova reiterated that he could not find the report and asked for its Bates number, which the United States promised to provide. See June 14 Tr. at 128:2-17 (Morrissey, Court, Beck). Four days later, on June 18, the United States attached the CNM 302 Report to a letter listing the CNM 302 Report's Bates number. See Letter from Fred Federici to Brock Benjamin, et al. (dated June 18, 2018), filed August 21, 2018 (Doc. 903-11).

## 2.     **The CNM 302 Report.**

Acee dates the CNM 302 Report March 16, 2016. See CNM 302 Report at 1. In the report, Acee records that, on March 16, 2016, he, FBI Special Agent Thomas Neale, and Task Force Officers Mark Myers and Anthony Medrano contacted A. Cordova on CNM's campus outside the welding building, in which A. Cordova had a workshop. See CNM 302 Report at 1. Acee writes that he and Myers explained to A. Cordova their desire to interview SNM associates. See CNM 302 Report at 1. According to Acee, A. Cordova replied that he understood, that

---

[3]The Court's citations to any "draft" transcripts of hearings refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

he had previously been incarcerated with SNM members, and that his activities related to heroin had brought him into contact with the gang, but that he had never been an SNM member. See CNM 302 Report at 1. Acee recounts Cordova's statements that, at the time of the encounter, he was serving probation for a New Mexico heroin trafficking conviction and that, since his son's murder, he had begun to change his life. See CNM 302 Report at 1. Acee records A. Cordova's indication that he had not associated with SNM members in "several years," and his impression that A. Cordova "was cooperative" and "would continue to speak with agents if they had additional questions." CNM 302 Report at 1.

**3.     The Trial.**

The parties agreed to begin the trial on July 9, 2018. See Unopposed Motion for Third Scheduling Order and in Support of Unopposed Motion to Continue at 2, filed June 9, 2017 (Doc. 435). The trial lasted two weeks. The Jury convicted A. Cordova on Counts 2 and 3, see Verdict at 1, and the Court lays out the evidence that A. Cordova attacks in his Motion.

**a.     Brian Acee.**

The United States began its case-in-chief with Acee, who began by introducing SNM characters who were relevant to the trial, and noted C. Garcia as an SNM member whom the United States initially indicted on drug, firearm, and conspiracy-to-commit-murder charges, and later indicted for the Dix murder. See Transcript of Brian Acee at 21:24-22:8 (taken July 11, 2018)(Acee), filed July 13, 2018 (Doc. 826)("Acee Tr."). In response to a picture of C. Garcia, Acee identified scarring on C. Garcia's midsection, see Acee Tr. at 22:19-21 (Acee), allegedly from a gunshot wound, see Acee Tr. at 32:4-6 (Castellano, Acee), and C. Garcia's SNM tattoo, see Acee Tr. at 23:1-5 (Acee, Castellano). Acee testified that Roy Martinez is a former SNM leader. See Acee Tr. at 33:6-7 (Acee). According to Acee, Mario Rodriguez is also an SNM member and was charged with murder-related crimes. See Acee Tr. at 36:4-17 (Acee). Acee mentioned Munoz and Garduño as other SNM members whom the United States charged with a RICO conspiracy. See Acee Tr. at 44:1-10 (Castellano, Acee); id. at 46:20-47:1 (Castellano, Acee). According to Acee, Gerald Archuleta is a former SNM leader whom the United States charged and who agreed to cooperate with the United States. See Acee Tr. at 48:5-49:25 (Castellano, Acee).

Acee explained that federal law enforcement officers arrested forty people in relation to the SNM. See Acee Tr. at 39:23-40:2 (Acee). Acee also noted that, for SNM members, cooperating with the United States meant death. See Acee Tr. at 40:8-16 (Castellano, Acee). Acee admitted that cooperators might work with the United States for reduced sentences or for money. See Acee Tr. at 55:23-56:7 (Acee, Castellano). Acee explained that the FBI paid some cooperators

approximately fifty dollars a month and, for cooperators in prison, reduced their security threat level and increased their visits with family.  See Acee Tr. at 61:14-62:16 (Acee).  Acee noted that former SNM members also received lower security level assignments, because they had renounced the gang.  See Acee Tr. at 65:1-6 (Castellano, Acee).

Acee then described the FBI's relationship with M. Montoya and narrated that the FBI had arrested M. Montoya for drug trafficking.  See Acee Tr. at 66:16-24 (Acee); id. at 67:2-10 (Acee).  According to Acee, after the arrest, M. Montoya agreed to cooperate with the FBI.  See Acee Tr. at 67:11-13 (Castellano, Acee).  Acee described that, during Acee's initial conversation with M. Montoya, M. Montoya and the FBI "verbally wrestl[ed] with each other" until the FBI found M. Montoya an attorney and that, after receiving the attorney, M. Montoya received a Kastigar letter.[4]  See Acee Tr. at 67:17-68:11 (Acee, Castellano).  Acee testified that he mentioned to M. Montoya the possibility of receiving a Kastigar letter and that he also initiated the conversation about the Dix murder.  See Acee Tr. at 100:8-12 (Acee), id. at 141:9 (Acee).  According to Acee, before the conversation with M. Montoya, he had not heard of A. Cordova.  See Acee Tr. at 100:13-15 (Acton, Acee).  Acee explained that, during discussions with M. Montoya about the Dix homicide, M. Montoya mentioned the name "Antone" and that the FBI later identified "Antone" as A. Cordova.  Acee Tr. at 72:18-73:1 (Castellano, Acee).

---

[4]Both the United States and the Defendants have referred to the letters immunizing the United States' witnesses as Kastigar letters, named from Kastigar v. United States, 406 U.S. 441 (1972).  In Kastigar v. United States, 406 U.S. 441 (1972)(Powell, J.), the Supreme Court of the United States concluded that "the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony."  406 U.S. at 443.  That term is apparently a misnomer in this case, because, if the United States v. DeLeon, CR 15-4268 JB, Letter from Maria Armijo to John Samore (dated June 9, 2016), filed May 10, 2018 (Doc. 2246)(Clerk's Exhibit 15)("Cordova Letter"), is representative, Kastigar letters do not afford the United States' witnesses the immunity that Kastigar requires.  Calling those documents Kastigar letters, however, is accurate in a limited sense; those documents explain that permitting the United States to make use of information and pursue investigative leads is necessary "to eliminate the necessity for a Kastigar hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted."  Cordova Letter ¶ 2, at 1.  See Kastigar Hearing, Black's Law Dictionary (10th ed. 2014)("A hearing at which the prosecution must establish by a preponderance of the evidence that the government's evidence derives from proper, nonimmunized sources.).

Acee testified that the FBI then began investigating A. Cordova. See Acee Tr. at 73:18-20 (Castellano, Acee).

Acee described that, during the FBI's investigation of the Dix murder, M. Montoya walked the FBI through the murder's scene. See Acee Tr. at 73:18-74:2 (Castellano, Acee). Acee explained his understanding, based on that walk-through, that, on February 4, 2005, Dix stopped his vehicle near a stop sign, and M. Montoya and A. Cordova stopped in their vehicle in front of Dix' car. See Acee Tr. at 76:2-77:24 (Castellano, Acee); id. at 80:5-7 (Castellano, Acee). Acee described that, after Dix was shot, Dix' car rolled onto a property near it and into a tree. See Acee Tr. at 79:18-21 (Acee). According to Acee, Dix' car stopped on Michael and Mikail Tinkers' property. See Acee Tr. at 85:14-23 (Castellano, Acee).

Acee recounted that, as part of the cooperation, M. Montoya provided the FBI information about the Dix murder, see Acee Tr. at 68:15-18 (Castellano, Acee), and helped to foil the conspiracy to murder Gregg Marcantel,[5] see Acee Tr. at 69:14-18 (Castellano, Acee). According to Acee, as part of the Marcantel murder investigation, M. Montoya recorded and reported on conversations with Baca and C. Garcia. See Acee Tr. at 69:21-70:1 (Acee). Acee described that, as part of the investigation, M. Montoya made controlled drug buys with C. Garcia, and, during one buy, M. Montoya recorded a conversation with C. Garcia in which he and C. Garcia discussed A. Cordova. See Acee Tr. at 72:23-73:2 (Castellano, Acee).

Acee stated that the FBI has since helped M. Montoya relocate to another state, because the SNM retaliates against cooperators. See Acee Tr. at 87:12-21 (Castellano, Acee). According to Acee, the FBI paid for M. Montoya's relocation expenses, including money for fuel, for RV repairs, and for attending trade school. See Acee Tr. at 89:22-89:8 (Acee). Acee testified that he did not know how much money the FBI gave M. Montoya, see Acee Tr. at 143:11-19 (Acton, Acee), but he indicated that $432.00 for gas, $1,601.00 for vehicle maintenance, and $2,900.00 for trade school seemed accurate, see Acee Tr. at 143:20-23 (Acton, Acee); id. at 144:4-13 (Acton, Acee). Acee noted that the FBI gave another cooperator -- Duran -- probably more than $40,000.00. See Acee Tr. at 162:1-7 (Acton, Acee).

Acee explained that, before arresting A. Cordova, Acee spoke with him on CNM's campus. See Acee Tr. at 95:6-15 (Acee). Acee noted that he asked to speak with A. Cordova and introduced himself and other agents. See Acee Tr. at 95:6-15 (Acee). After A. Cordova agreed to talk, Acee told him that the FBI agents were talking to SNM members and dismantling the gang. See Acee Tr. at 95:17-19 (Acee). Acee described that he told A. Cordova that the FBI knew of A. Cordova's association with the SNM, and notified A. Cordova that M. Montoya had agreed to

---

[5]Gregg Marcantel is the former-New Mexico Corrections Secretary. See State Corrections Chief Stepping Down, Albuquerque Journal, https://www.abqjournal.com/867744/nm-corrections-chief-gregg-marcantel-to-step-down.html (last visited March 30, 2019).

cooperate with FBI agents and that the FBI agents also wanted A. Cordova to work with them. See Acee Tr. at 95:19-23 (Acee). Acee depicted that A. Cordova told the officers that, although A. Cordova was not an SNM member, he had been incarcerated with SNM members, had sold drugs for and with SNM members, and had used drugs with them. See Acee Tr. at 96:1-5 (Acee). Acee testified that A. Cordova seemed surprised that M. Montoya had agreed to cooperate with the FBI. See Acee Tr. at 96:17-18 (Castellano, Acee). On cross-examination, Acee testified that A. Cordova mentioned that his son had recently died and that, since that time, he had begun to change his life, and explained that A. Cordova appeared cooperative and willing to speak to FBI agents. See Acee Tr. at 168:21-169:13 (Acton, Acee). Acee admitted that the CNM 302 Report does not contain his impressions that A. Cordova denied participation in or knowledge of the Dix murder, and testified that he does not generally include his impressions in his reports. See Acee Tr. at 197:19-23 (Castellano, Acee).

Acee described that he reviewed the evidence on the Dix murder as soon as the [Bernalillo County Sheriff's Office ("BCSO")] provided him the relevant files. See Acee Tr. at 107:2-7 (Acton, Acee). Nevertheless, Acee commented that, in indicting A. Cordova, the United States relied primarily on M. Montoya's statements. See Acee Tr. at 112:19-21 (Acee). Acee admitted that he looked two weeks before trial at Dix' clothing from the night of the murder. See Acee Tr. at 109:24-110:1 (Acee). Acee stated that the clothing was the first physical evidence other than crime-scene photographs that he had reviewed. See Acee Tr. at 110:2-5 (Acee). Acee testified, however, that he understood that a division of labor existed among law enforcement offices and that he had left analyzing the physical evidence to the BCSO. See Acee Tr. at 182:15-183:3 (Castellano, Acee).

Acee explained that, in deciding to charge A. Cordova, he considered the audio recording of M. Montoya and C. Garcia's conversation, and that he also considered a recording of C. Garcia in which C. Garcia mentioned an A. Cordova with psoriasis.[6] See Acee Tr. at 190:3-20 (Castellano, Acee); id. at 188:14-189:6 (Castellano, Acee). Acee also stated that he considered A. Cordova's response to Acee's comments regarding M. Montoya during the CNM conversation; he described:

CASTELLANO: Related to that, when you talked to the defendant about a month before you arrested him, was there anything from that conversation that also led to your decision to go forward with charges against Mr. Cordova?

---

[6]"Psoriasis is a chronic skin condition caused by an overactive immune system. Symptoms include flaking, inflammation, and thick, white, silvery, or red patches of skin. Psoriasis treatments include steroid creams, occlusion, light therapy and oral medications, such as biologics." Psoriasis Health Center, WebMD, https://www.webmd.com/skin-problems-and-treatments/psoriasis/default.htm (last visited April 2, 2019).

ACEE: [A. Cordova] didn't deny it. There were a few things. That was the strongest. When I walked away, I was shocked. I said -- I was talking to the other agent and the two detectives. I'm, like, "He never denied it." He tried to put distance between himself and being an actual SNM member. He looked shocked when . . . I said, "You know we got Mario M. Montoya; right? Mario is with us." And I said, "Well, you wouldn't know that because that's not known yet, but Mario is working. And you're going to see." And I thought he didn't believe me. I was trying to convince him to work. But that was -- I'm sorry to interrupt, sir. That was -- yeah, I walked away thinking, man, we've stood out here and talked, and he's not saying, "Hey, you got the wrong guy. What are you talking about?" None of that.

And I thought he didn't believe me. I was trying to convince him to work. But that was -- I'm sorry to interrupt, sir. That was -- yeah, I walked away thinking, man, we've stood out here and talked, and he's not saying, "Hey, you got the wrong guy. What are you talking about?" None of that.

CASTELLANO: And just to be clear, so the jury knows, he also didn't say, "Yes, I was involved," either; right?

ACEE: Absolutely. And I hope I didn't represent 24 that. No, he did not.

CASTELLANO: I just wanted to make sure. Not only he didn't admit it, but he also didn't deny it?

ACEE: Correct.

Acee Tr. at 190:21-192:2. See id. at 192:3-7 (Castellano, Acee).

b. **Julian Romero.**

Julian Romero admitted that he had been an SNM member and was involved in founding the SNM. See Transcript of Excerpt of Testimony of Julian Romero Tr. at 4:3-7 (taken July 12, 2018)(Romero), filed July 13, 2018 (Doc. 831)("Romero Tr."); id. at 9:13-14 (Beck, Romero). Romero stated that, in 2016, he agreed to cooperate with the FBI. See Romero Tr. at 26:11-23 (Beck, Romero). According to Romero, the SNM has always been involved with drugs, because drugs fuel its power. See Romero Tr. at 19:24-20:5 (Beck, Romero). Romero testified that he knows C. Garcia and described him as an SNM member and a big drug dealer. See Romero Tr. at 40:11-15 (Romero); id. at 45:10-12 (Romero). Romero explained that, around 2004, he purchased crack cocaine and heroin from C. Garcia. See Romero Tr. at 40:21-24 (Romero). Romero testified

that, in 2004, C. Garcia was on crutches, because he had been shot in the stomach. See Romero Tr. at 40:25-41:8 (Romero). According to Romero, the SNM will retaliate against any person who disrespects an SNM member. See Romero Tr. at 18:17-19:15 (Beck, Romero). Romero explained that C. Garcia offered to pay Romero for killing Dix and that Romero refused to commit the murder. See Romero Tr. at 41:19-42:5 (Romero, Beck); id. at 43:14-18 (Romero). Romero testified that he also knew A. Cordova, but that A. Cordova was not an SNM member. See Romero Tr. at 45:17-23 (Romero).

c. **Mario Montoya.**

M. Montoya stated that he no longer identifies as an SNM member but acknowledged that he belonged to the SNM for most of his life and joined in 1993 or 1994. See Transcript of Excerpt of Testimony of Mario M. Montoya at 4:11-14 (taken July 12-13, 2018)(M. Montoya), filed July 17, 2018 (Doc. 843)("M. Montoya Tr."). M. Montoya stated that he knew C. Garcia, another SNM member, from prison and from years of routinely purchasing drugs from him. See M. Montoya Tr. at 24:24-25:15 (M. Montoya, Castellano). M. Montoya described that he purchased drugs from C. Garcia as recently as the fall of 2015. See M. Montoya Tr. at 27:4-6 (M. Montoya, Castellano). According to M. Montoya, during 2015, M. Montoya was both using drugs and dealing drugs for the SNM. See M. Montoya Tr. at 29:15-20 (M. Montoya, Castellano). M. Montoya stated that he could not think of a time since he became a member when the SNM did not deal drugs. See M. Montoya Tr. at 29:15-30:1 (M. Montoya, Castellano). M. Montoya admitted to a history of smuggling drugs, involving his romantic partners in drug smuggling, domestic abuse, car theft, aliases, and other crimes. See M. Montoya Tr. at 131:11-152:21 (Morrissey, M. Montoya).

M. Montoya recounted his September 11, 2015, arrest for selling drugs. See M. Montoya Tr. at 30:2-32:4 (Castellano, M. Montoya, Morrissey, Court); id. at 34:3-37:23 (Castellano, M. Montoya, Morrissey, Court). M. Montoya described that, between the arrest and his plea, M. Montoya agreed to cooperate with the FBI's SNM investigation. See M. Montoya Tr. at 38:2-11 (M. Montoya, Castellano). According to M. Montoya, he agreed to engage in wiretapped telephone calls with SNM members and in controlled drug buys, including buys from C. Garcia. See M. Montoya Tr. at 38:11-40:8 (M. Montoya, Castellano). M. Montoya explained that he also gave the FBI information on SNM activities, including information on the Dix murder and his role in it. See M. Montoya Tr. at 40:17-25 (Castellano, M. Montoya). M. Montoya explained that, before sharing this information, the FBI appointed him a lawyer and provided him a Kastigar letter, in which he received protection from prosecution in exchange for truthful information. See M. Montoya Tr. at 41:1-16 (Castellano, M. Montoya). M. Montoya explained that his plea agreement provides that the United States will advise the Court during sentencing to consider M. Montoya's cooperation. See M.

Montoya Tr. at 44:19-45:4 (Castellano, M. Montoya). M. Montoya explained that he wanted to tell the FBI the truth to get past his involvement with the SNM and admitted that the <u>Kastigar</u> letter gives him a "really good deal," because it permits him to tell the truth without facing charges. M. Montoya Tr. at 129:17 (M. Montoya). <u>See id.</u> at 129:4-20 (Morrissey, M. Montoya). M. Montoya conceded that he essentially got a pass on the Dix murder, <u>see</u> M. Montoya Tr. at 129:24-130:10 (Morrissey, M. Montoya), and that he disclosed to the FBI a lifetime of crime, <u>see</u> M. Montoya Tr. at 102:16-17 (Morrissey, M. Montoya). M. Montoya stated that he also received benefits for cooperating with the FBI: "vocation training," money for relocation, and money for cooperating. M. Montoya Tr. at 89:22-90:3 (M. Montoya). M. Montoya expressed his concern that the SNM will retaliate for his cooperation with the FBI. <u>See</u> M. Montoya Tr. at 91:8-15 (Castellano, M. Montoya).

M. Montoya described C. Garcia's past with Dix, explaining that, in 2001, Dix shot C. Garcia and recounting that C. Garcia initially told M. Montoya that he would allow Dix to think that C. Garcia would overlook the incident. <u>See</u> M. Montoya Tr. at 48:8-50:11 (Castellano, M. Montoya). M. Montoya narrated that, after Dix left incarceration and when M. Montoya owed C. Garcia considerable money for drugs, C. Garcia asked M. Montoya to "take care" of Dix, M. Montoya Tr. at 50:18-19 (M. Montoya), <u>i.e.</u>, shoot, Dix for him, <u>see</u> M. Montoya Tr. at 50:12-51:5 (Castellano, M. Montoya). According to M. Montoya, C. Garcia wanted Dix shot in retaliation for Dix' shooting him in the stomach in a fight over a female. <u>See</u> M. Montoya Tr. at 156:10-22 (Morrissey, M. Montoya). M. Montoya characterized the Dix murder as authorized by the SNM, because shooting C. Garcia was an attack on SNM. <u>See</u> M. Montoya Tr. at 157:5-16 (Morrissey, M. Montoya).

M. Montoya stated that he agreed to C. Garcia's request and that, following that conversation, C. Garcia gave M. Montoya a gun and proceeded to persistently ask M. Montoya about his plans for the murder. <u>See</u> M. Montoya Tr. at 51:8-22 (Castellano, M. Montoya). M. Montoya noted that, during a traffic stop, law enforcement officers seized the first gun that C. Garcia gave him. <u>See</u> M. Montoya Tr. at 51:23-52:17 (Castellano, M. Montoya). M. Montoya described that C. Garcia started getting annoyed when M. Montoya delayed the murder and C. Garcia eventually partnered him with A. Cordova to commit the act. <u>See</u> M. Montoya Tr. at 53:3-18 (Castellano, M. Montoya); <u>id.</u> at 62:18-63:2 (Castellano, M. Montoya). M. Montoya indicated that he had seen A. Cordova at C. Garcia's house before the Dix murder. <u>See</u> M. Montoya Tr. at 253:23-254:2 (Castellano, M. Montoya). M. Montoya explained that A. Cordova was not an SNM member but that he got along with the SNM and worked with the gang. <u>See</u> M. Montoya Tr. at 254:20-24 (M. Montoya). According to M. Montoya, C. Garcia informed M. Montoya and A. Cordova that he would attend a Super Bowl party in Las Vegas, Nevada, where cameras would record his comings and goings, and wanted the Dix murder

completed before he returned.  See M.  Montoya Tr. at 63:3-25 (Castellano, M. Montoya).

M. Montoya admitted that he has some memory problems, but insisted that he remembers important events, like the Dix murder.  See M. Montoya Tr. at 97:10-98:3 (Morrissey, M. Montoya).  M. Montoya admitted that he might not remember some events, because he was on crack, but insisted that the drug does not cause him to remember events that did not happen.  See M. Montoya Tr. at 162:4-8 (Morrissey, M. Montoya).  M. Montoya recounted that, on the night of the Dix murder, A. Cordova and M. Montoya drove around town in A. Cordova's maroon Pontiac while smoking crack, and located Dix at a Chevron station on Isleta Boulevard.  See M. Montoya Tr. at 64:1-15 (Castellano, M. Montoya); id. at 137:8-10 (Morrissey, M. Montoya); id. at 79:7-8 (M. Montoya).  M. Montoya conceded that he does not remember how many nights he drove with A. Cordova looking for Dix, see M. Montoya Tr. at 98:17-22 (M. Montoya, Morrissey), and stated that he may have previously told an investigator that he may have been in a car with A. Cordova more than one night, see M. Montoya Tr. at 99:18-100:1 (Morrissey, M. Montoya).  M. Montoya described that he and A. Cordova asked Dix if he could get them drugs; that Dix indicated that he would call an individual named Michael Snow about obtaining drugs; and that both Dix and A. Cordova spoke with Snow on the telephone.  See M. Montoya Tr. at 65:21-66:16 (Castellano, M. Montoya). M. Montoya testified to pumping gas while A. Cordova approached Dix, but stated that he did not remember previously telling the FBI or others this fact.  See M. Montoya Tr. at 116:2-14 (Morrissey, M. Montoya).  According to M. Montoya, Dix indicated that he would retrieve the drugs from Snow, and A. Cordova, who was sitting in the Pontiac's passenger seat, told M. Montoya that he knew where Dix would go and to follow him.  See M. Montoya Tr. at 67:23-68:3 (Castellano, M. Montoya).  On cross-examination, M. Montoya agreed that he had earlier recounted to the FBI that he and A. Cordova visited a friend's trailer before going to the Chevron station, and M. Montoya stated that he remembers going to the trailer but not finding Dix there.  See M. Montoya Tr. at 113:23-115:10 (Morrissey, M. Montoya); id. at 251:4-15 (Castellano, M. Montoya).

M. Montoya described that eventually M. Montoya and A. Cordova found Dix in the van that he had been driving, and M. Montoya stopped their car immediately in front of the van.  See M. Montoya Tr. at 68:23-69:13 (Castellano, M. Montoya).  M. Montoya positioned the car directly in front of Dix' van so the cars formed a "T."  See M. Montoya Tr. at 69:16-20 (Castellano, M.  Montoya). On cross-examination, M. Montoya conceded that he initially told the FBI that the cars' headlights shone at each other, but M. Montoya insisted that he corrected that statement through his lawyer.  See M. Montoya Tr. at 123:4-12 (Morrissey, M. Montoya).  M. Montoya asserted that the cars could not have directly faced each other, because he and A. Cordova drove down the road and did not enter the driveway in which Dix' car sat.  See M. Montoya Tr. at 124:15-24 (Morrissey, M.

Montoya).  M. Montoya insisted that the FBI report that contained his original statement was incorrect and that the vehicles "were T-boned, sideways," M. Montoya Tr. at 247:17, but that the occupants were looking at each other, see M. Montoya Tr. at 247:10-248:5 (Castellano, M. Montoya).

M. Montoya recounted that A. Cordova then inquired of Dix who was with him, and, when Dix answered that no one was accompanying him, A. Cordova fired at Dix.  See M. Montoya Tr. at 70:12-21 (Castellano, M. Montoya).  M. Montoya testified that A. Cordova remained in the car while shooting Dix.  See M. Montoya Tr. at 175:11-22 (Morrissey, M. Montoya).  M. Montoya described that A. Cordova fired a lot of shots, then paused, during which time M. Montoya "was about to take off," and then A. Cordova started shooting again.  See M. Montoya Tr. at 70:18-21 (M. Montoya).  According to M. Montoya, A. Cordova then told M. Montoya to drive; M. Montoya drove them from the scene slowly, around fifteen miles per hour, and when he looked back at the van, he saw its headlights move across the street.  See M. Montoya Tr. at 70:22-71:6 (Castellano, M. Montoya).  M. Montoya stated that, as they crossed the Rio Grande, A. Cordova told M.  Montoya to stop and threw both their guns into the river.  See M. Montoya Tr. at 76:2-9 (Castellano, M. Montoya).  According to M. Montoya, C. Garcia had given both A. Cordova and M. Montoya their guns.  See M. Montoya Tr. at 76:14-77:12 (Castellano, M. Montoya).  On cross-examination, M. Montoya admitted that the 302 report that A. Cordova's counsel showed him reflects that M. Montoya told the FBI that C. Garcia gave M. Montoya and A. Cordova a Buick Sedan to drive for the Dix murder, but M. Montoya contended that he did not make those statements to the FBI.  See M. Montoya Tr. at 113:5-22 (Morrissey, M. Montoya).

M. Montoya described that, after that night, A. Cordova told M. Montoya that he got rid of the Pontiac and that C. Garcia had purchased A. Cordova a new truck.  See M. Montoya Tr. at 80:1-7 (M. Montoya).  M. Montoya explained that he told C. Garcia about the Dix murder, see M. Montoya Tr. at 80:20-81:3 (M. Montoya, Castellano), and that C. Garcia fulfilled his promise to pay M. Montoya by giving him one thousand dollars and drugs, see M. Montoya Tr. at 81:4-19 (Castellano, M. Montoya).  According to M. Montoya, C. Garcia also paid A. Cordova in cash and drugs.  See M. Montoya Tr. at 81:25-82:6 (Castellano, M. Montoya).  M. Montoya testified that he did not recall whether he had previously told someone that A. Cordova also received money from C. Garcia.  See M. Montoya Tr. at 127:6-9 (Morrissey, M. Montoya).  On cross-examination, M. Montoya agreed that the 302 report that A. Cordova's counsel showed him reflects that M.  Montoya initially told the FBI that, after the murder, A. Cordova drove M. Montoya home and left in the Buick which Garcia had given him, but M. Montoya contends that the FBI incorrectly recorded that account.  See M. Montoya Tr. at 125:9-18 (Morrissey, M. Montoya).  On cross-examination, M. Montoya conceded that he made a correction to the FBI reports; according to M.  Montoya, he changed the statement that he had killed Dix to reflect that he aided and abetted the Dix

murder.  See M. Montoya Tr. at 213:25-214:15 (M. Montoya, Morrissey).  M. Montoya insisted that he made also other corrections, including to the description of the vehicles' positions.  See M. Montoya Tr. at 214:8-12 (M. Montoya).

M. Montoya admitted that he told the FBI that the SNM punishes people who take credit for crimes that they have not committed.  See M. Montoya Tr. at 172:10-173:24 (Morrissey, M. Montoya).  M. Montoya explained that, after the Dix murder, he bragged about the crime to promote himself in the SNM.  See M. Montoya Tr. at 82:7-15 (Castellano, M. Montoya).  M. Montoya stated that he did not mention A. Cordova's name, because he preferred not to get someone else in trouble.  See M. Montoya Tr. at 83:2-6 (M. Montoya).  M. Montoya admitted that he told different people different stories, see M. Montoya Tr. at 83:19-23 (M. Montoya), and that he let people believe that he killed Dix, see M. Montoya Tr. at 165:21-24 (M. Montoya); id. at 159:8-11 (Morrissey, M. Montoya).  M. Montoya denied telling Benji Montano, an SNM member, about the Dix murder, but admitted telling Jerry Montoya, another SNM member, stories about the murder.  See M. Montoya Tr. at 153:6-155:22 (Morrissey, M. Montoya).  M. Montoya indicated that he told Robert Lovato, an SNM member, a story about killing Dix with an AK-47. See M. Montoya Tr. at 166:5-14 (Morrissey, M. Montoya).  M. Montoya testified that he would tell not Baca about the murder via a telephone call, but stated that he would tell Baca about the murder, because Baca is an SNM leader.  See M. Montoya Tr. at 169:3-19 (Morrissey, M. Montoya).  M. Montoya later testified after hearing a tape recording of a conversation between him, Duran, and Baca that he had spoken with Baca about the Dix murder, see M. Montoya Tr. at 226:25-229:18 (M. Montoya, Morrissey), and explained that, when he spoke about the Dix murder with Baca, he did it to build Baca's trust and get information for the FBI, see M. Montoya Tr. at 245:4-6 (M. Montoya).

M. Montoya also explained that, in 2015, he and C. Garcia had a conversation in which C.Garcia expressed concern that A. Cordova had spoken to an outside party about the Dix murder.  See M. Montoya Tr. at 84:10-89:11 (Castellano, M. Montoya).  M. Montoya indicated that C. Garcia shared his concerns that A. Cordova had spoken to Ray Arguello about doing jale, a violent crime, for the SNM.  See M. Montoya Tr. at 89:7-9 (Castellano, M. Montoya).  The United States played the recording of the conversation.  See M. Montoya Tr. at 86:13 (tape).  See also Recording of Nov. 29, 2015 M. Montoya and Garcia Conversation at 28:00-29:00, filed August 21, 2018 (on file with Court).[7]  M. Montoya later could not remember what he told the FBI about the conversation, so the United States refreshed his memory with Acee's observations from the recording.  See M. Montoya Tr. at 239:2-241:12 (Castellano, M. Montoya, Morrissey, Court).  M. Montoya added that, in the recording, C. Garcia spoke in

_____

[7]The Court notes that the recording is difficult to understand and partially inaudible.  See generally Recording of Nov. 29, 2015 Montoya and Garcia Conversation.

code by referencing another individual who had not kept secret a gang crime.  See M. Montoya Tr. at 242:3-16 (Castellano, M. Montoya).

**d.      Gerald Archuleta.**

G. Archuleta testified that he joined the SNM around 1989.  See Transcript of Excerpt of Testimony of Gerald G. Archuleta at 5:11-14 (taken July 17, 2018)(Beck, G. Archuleta), filed July 19, 2018 (Doc. 850)("G. Archuleta Tr."). G. Archuleta described the SNM's terms, rules, and activities, explaining that an SNM member with drugs inside a prison is expected to distribute the drugs to other SNM members and that people bringing drugs into a prison are expected to pay the SNM members in that facility or face assault.  See G. Archuleta Tr. at 12:8-21 (Beck, G. Archuleta).  G. Archuleta stated that the SNM also sells drugs outside prisons, and that G. Archuleta has sold drugs for the SNM.  See Tr. at 13:9-15 (Beck, G. Archuleta).  G. Archuleta explained that an SNM member's reputation depends on violence and respect, see G. Archuleta Tr. at 28:17-22 (Beck, G. Archuleta), and that anyone who disrespects the SNM will be targeted for assault or even execution, see G. Archuleta Tr. at 29:12-16 (G. Archuleta).  G. Archuleta defined "jale" or "putting in work" as doing a range of activities for the SNM.  G. Archuleta Tr. at 6:25-7:4 (Beck, G. Archuleta).  According to G. Archuleta, the penalty for cooperating with law enforcement is "execution."  G. Archuleta Tr. at 10:5 (G. Archuleta).  See id. at 10:3-5 (Beck, G. Archuleta).  G. Archuleta explained that an SNM member who brags about a crime that they did not commit will face consequences, such as assault or even execution.  See G. Archuleta Tr. at 45:21-47:3 (Morrissey, G. Archuleta).  G. Archuleta conceded that SNM members speak about their crimes to each other and might discuss crimes that they committed with non-SNM members, whom the SNM sometimes uses for such tasks.  See G. Archuleta Tr. at 47:19-48:3 (Beck, G.  Archuleta).

G. Archuleta explained that he began cooperating with the FBI when he returned to New Mexico from the State of Tennessee.  See G. Archuleta Tr. at 32:16-22 (Beck, G. Archuleta).  He explained that he left New Mexico, because he wanted a life outside the SNM for his son.  See G.  Archuleta Tr. at 32:24-33:10 (G. Archuleta).  G. Archuleta admitted that C. Garcia provided him Suboxone when he lived in Tennessee.  See G. Archuleta Tr. at 58:9-10 (Morrissey, G. Archuleta). G. Archuleta testified that he understood that, in his plea agreement, he agreed to cooperate truthfully and that, in exchange for truthful information, he might receive a downward departure in his sentence.  See G. Archuleta Tr. at 36:3-22 (Beck, G. Archuleta).  G. Archuleta explained that he received $2,400.00 from the FBI and a

discovery tablet,[8] and that, pending trial, he reset the discovery tablet to access the internet. See G. Archuleta Tr. at 37:8-38:4 (Beck, G. Archuleta).

G. Archuleta stated that, when outside prison, he went to C. Garcia for drugs. See G. Archuleta Tr. at 13:19-24 (Beck, G. Archuleta). G. Archuleta described that he saw C. Garcia in May, 2005. See G. Archuleta Tr. at 39:21-40:8 (Beck, G. Archuleta). G. Archuleta described that, at that time, C. Garcia had a picture of himself and his brother in Las Vegas, and that C. Garcia stated that they were in Las Vegas when Dix was killed and commented: "That's how you do it; right, brother?" G. Archuleta Tr. at 40:10-16 (G. Archuleta). G. Archuleta explained that he interpreted the comment as C. Garcia boasting about having Dix killed. See G. Archuleta Tr. at 40:17-20 (Beck, G. Archuleta).

G. Archuleta identified A. Cordova as an SNM associate who was frequently with C. Garcia and doing what C. Garcia needed. See G. Archuleta Tr. at 40:25-41:3 (G. Archuleta). G. Archuleta described that he had seen A. Cordova at C. Garcia's house and delivering drugs for C. Garcia when C. Garcia could not make the delivery. See G. Archuleta Tr. at 41:4-10 (Beck, G. Archuleta). G. Archuleta described that when FBI officers first asked him about an "Antone" who sold drugs, he thought of Antone Valdez, but that, when the FBI officers mentioned C. Garcia, he realized that they meant A. Cordova. G. Archuleta Tr. at 43:5-44:3 (Beck, G. Archuleta). G. Archuleta also testified that he knew B. Cordova as another SNM member. See G. Archuleta Tr. at 48:13-16 (Beck, G. Archuleta).

e.    **Billy Cordova.**

B. Cordova identified himself as a former SNM member. See Transcript of Excerpt of Testimony of Billy Cordova at 3:18-20 (taken July 16, 2018)(B. Cordova), filed July 19, 2018 (Doc. 851)("July 16 B. Cordova Tr."). B. Cordova explained that he trafficked drugs for the SNM while he was outside prison, and that he sent money and drugs to SNM members who were in prison. See July 16 B. Cordova Tr. at 15:8-23 (Castellano, B. Cordova). B. Cordova testified that he

---

[8]The United States provided each Defendant in the various SNM cases discovery tablets on which they could electronically view the cases' paperwork and evidence. See Acee Tr. at 60:6-11 (Acee). The United States did this to minimize the amount of paperwork that the Defendants might pass between them. See Acee Tr. at 60:2-11 (Castellano, Acee). The discovery tablets contained around 80,000 pages of discovery, and hundreds to thousands of hours of recordings. See Acee Tr. at 60:12-20 (Castellano, Acee). The discovery tablets included police reports and all other discovery. See Acee Tr. at 60:21-61:2 (Castellano, Acee). Only the Defendants received discovery tablets; people who only cooperated did not receive anything. See Acee Tr. at 61:3-8 (Castellano, Acee). If a Defendant abused the discovery tablet, the United States seized the device. See Acee Tr. at 61:5-8 (Castellano, Acee).

knew C. Garcia from trafficking drugs for him. See July 16 B. Cordova Tr. at 16:8-18 (Castellano, B. Cordova).

B. Cordova testified that he cooperated, because he was tired of "the gang life." Transcript of Excerpt of Testimony of Billy Cordova at 9:1 (taken July 17, 2018), filed July 19, 2018 (Doc. 852)(B. Cordova)("July 17 B. Cordova Tr."). B. Cordova confirmed that, when he started talking to the FBI in 2016, he faced a state seven-year sentence for manslaughter and also faced federal charges. See July 17 B. Cordova Tr. at 57:11-58:8 (Castellano, B. Cordova). B. Cordova admitted to various crimes, including waterboarding, intimidating a jury, domestic abuse, and drug trafficking. See July 17 B. Cordova Tr. at 80:21-81:8 (B. Cordova); id. at 82:20-83:7 (Morrissey, B. Cordova); id. at 89:12-91:1 (Morrissey, B. Cordova); id. at 93:3-7 (Morrissey, B. Cordova). B. Cordova stated that, with the Kastigar letter, the United States would not prosecute him for the crimes he committed with the SNM. See July 17 B. Cordova Tr. at 105:5-11 (Morrisey, B. Cordova). B. Cordova described that, for his cooperation, he received $950.00 from the FBI in total, including $650.00 in general payments, $100.00 for food, and $200.00 for telephone expenses. See July 17 B. Cordova Tr. at 13:6-10 (Morrisey, B. Cordova). B. Cordova confirmed that, in exchange for his cooperation, the United States would, through witness protection, also give him money, a job, and a home. See July 17 B. Cordova Tr. at 108:12-109:4 (Morrissey, B. Cordova). B. Cordova stated that, now that he has cooperated with the FBI, the SNM has targeted him for death. See July 17 B. Cordova Tr. at 117:11-12 (Morrissey, B. Cordova). B. Cordova explained the SNM targets anyone who attacks an SNM member. See July 17 B. Cordova Tr. at 12:15-20 (Castellano, B. Cordova).

B. Cordova stated that, soon after agreeing to cooperate, he engaged in wiretaps for the FBI. See July 17 B. Cordova Tr. at 9:9-15 (B. Cordova). B. Cordova also admitted that he told the FBI about his suspicions regarding another murder -- that he believed S. Rodriguez had killed a man named Sammy Chavez -- and explained that he believed this accusation, because S. Rodriguez died after Chavez died. See July 17 B. Cordova Tr. at 74:22-75:5 (Morrissey, B. Cordova). B. Cordova stated that he had not known know that S. Rodriguez was incarcerated and incapable of committing the murder at the time of Chavez' death. See July 17 B. Cordova Tr. at 75:10-17 (Morrissey, B. Cordova).

B. Cordova described that, in 2004 and 2005, he was trafficking drugs for C. Garcia. See July 17 B. Cordova Tr. at 20:10-16 (Castellano, B. Cordova). B. Cordova explained that, around that time, in 2004, the SNM greenlighted -- sanctioned killing -- Dix for encouraging people not to join the SNM. See July 17 B. Cordova Tr. at 20:17-21:22 (Castellano, B. Cardova). B. Cordova also described that Dix had committed acts of violence toward SNM members, like C. Garcia. See July 17 B. Cordova Tr. at 21:19-22:4 (Castellano, B. Cordova). According to B. Cordova, after Dix shot C. Garcia, the SNM actively sought to kill Dix, whereas,

before the incident with C. Garcia, the SNM sanctioned killing Dix if the circumstances permitted.  See July 17 B. Cordova Tr. at 22:5-11 (Castellano, B. Cordova).

According to B. Cordova, in 2004, C. Garcia asked him to kill Dix.  See July 17 B. Cordova Tr. at 23:7-9 (Castellano, B. Cordova).  B. Cordova narrated that he agreed to do the task but was incarcerated before he could commit the murder.  See July 17 B. Cordova Tr. at 23:10-13 (Castellano, B. Cordova).  B. Cordova remembered expecting cash and respect for murdering Dix.  See July 17 B. Cordova Tr. at 23:14-17 (Castellano, B. Cordova).

B. Cordova testified that he knew A. Cordova as C. Garcia's "runner," i.e., an individual who would do tasks for an SNM member.  July 17 B. Cordova Tr. at 23:18-24:3 (Castellano, B. Cordova).  B. Cordova explained that he often met with A. Cordova to purchase C. Garcia's drugs.  See July 17 B. Cordova Tr. at 25:16-18 (B. Cordova).  B. Cordova described A. Cordova as an SNM associate who supported the SNM's activities.  See July 17 B. Cordova Tr. at 26:6-13 (Castellano, B. Cordova).

B. Cordova testified that, during a drug buy with A. Cordova and while reassuring A. Cordova that Dix' gang would not trouble his crack house, A. Cordova described the Dix murder.  See Tr. at 27:13-29:3 (Castellano, B. Cordova); id. at 22:13-16 (B. Cordova).  According to B. Cordova, A. Cordova described waiting outside the house for Dix, pulling up to Dix' car, and shooting him himself.  See July 17 B. Cordova Tr. at 28:18-29:3 (Castellano, B. Cordova).  B. Cordova described that A. Cordova mentioned that M. Montoya conspired with him, that Dix drove a green minivan, and that A. Cordova gave Dix a final shot behind the ear.  See July 17 B. Cordova Tr. at 29:5-16 (Castellano, B. Cordova).  B. Cordova conveyed that A. Cordova described shooting Dix in the back of the head.  See July 17 B. Cordova Tr. at 123:23-124:11 (Castellano, B. Cordova).  B. Cordova recounted that, according to A. Cordova, Dix' gang did not like Dix and had set him up for the murder.  See July 17 B. Cordova Tr. at 30:2-5 (Castellano, B. Cordova).  B. Cordova then described a conversation with M. Montoya about Dix.  See July 17 B. Cordova Tr. at 30:6-10 (Castellano, B. Cordova).  B. Cordova explained that, in 2010, after M. Montoya bonded B. Cordova from jail, M. Montoya praised A. Cordova to B. Cordova for supporting the SNM and not hesitating before shooting Dix.   See July 17 B. Cordova Tr. at 31:9-34:8 (Castellano, B. Cordova, Morrisey, Court).

On cross-examination, B. Cordova stated that he told the FBI about the green light on Dix for the first time on June 28, 2018.  See July 17 B. Cordova Tr. at 62:4-7 (Morrissey, B. Cordova).  B. Cordova described that the SNM's full force against Dix emerged after he shot C. Garcia.  See July 17 B. Cordova Tr. at 63:1-4 (B. Cordova).  On redirect, B. Cordova testified to first telling the FBI about C. Garcia's, M. Montoya's, and A. Cordova's involvement in the Dix murder on July

12, 2016. <u>See</u> July 17 B. Cordova Tr. at 128:14-129:16 (Castellano, B. Cordova). B. Cordova also stated that, in 2016, he told the FBI about C. Garcia, and that C. Garcia's and Dix' fight started over a woman. <u>See</u> July 17 B. Cordova Tr. at 138:11-20 (Castellano, B. Cordova).

        **f.**    <u>**Richard Gallegos**</u>**.**

        Gallegos testified that he is not an SNM member but is a former member of a different gang in Albuquerque, New Mexico -- the West Side Locos. <u>See</u> Transcript of Excerpt of Testimony of Richard Gallegos at 6:9-15 (taken July 17, 2018)(Armijo, Gallegos), filed July 19, 2018 (Doc. 853)("Gallegos Tr."). Gallegos stated that he was, however, an SNM associate. <u>See</u> Gallegos Tr. at 18:20-21 (Armijo, Gallegos). Gallegos explained that he had murdered someone for the SNM's purposes, although he was not an SNM member. <u>See</u> Gallegos Tr. at 105:19-106:4 (Armijo, Gallegos). Gallegos admitted that he was charged with murder, which carried a death penalty or life in prison, <u>see</u> Gallegos Tr. at 81:7-9 (Morrissey, Gallegos), and that, after being charged, he started cooperating with the FBI, <u>see</u> Tr. at 82:2-4 (Morrissey, Gallegos). Gallegos explained that he received a reduced sentence and now faces between ten and fifteen years. <u>See</u> Tr. at 40:1-10 (Armijo, Gallegos). Gallegos admitted that he shared information with the FBI to get points with the FBI agents. <u>See</u> Gallegos Tr. at 88:1-14 (Morrissey, Gallegos). Gallegos testified that, in summer 2016, he received discovery tablet that including among its content the charges against A. Cordova, and that he had the discovery tablet until February, 2017. <u>See</u> Gallegos Tr. at 79:23-80:15 (Morrissey, Gallegos).

        Gallegos testified that he knew A. Cordova's son -- Anthony Cordova, Jr., <u>see</u> Gallegos Tr. at 6:18-23 (Armijo, Gallegos), but that A. Cordova Jr., has died, <u>see</u> Gallegos Tr. at 9:8-10 (Armijo, Gallegos). Gallegos testified that he knew A. Cordova, Jr.'s name, but that he and others called him "Gordy." <u>See</u> Gallegos Tr. at 46:16-22 (Morrissey, Gallegos). According to Gallegos, A. Cordova Jr. was a year older than him, and their mutual street gang included over a hundred people. <u>See</u> Gallegos Tr. at 46:23-47:9 (Morrissey, Gallegos).

        Gallegos explained that A. Cordova also belonged to the West Side Locos, <u>see</u> Gallegos Tr. at 8:22-23 (Armijo, Gallegos), and that Gallegos met A. Cordova personally on April 28, 2016, <u>see</u> Gallegos Tr. at 14:7-15:4 (Armijo, Gallegos). Gallegos admitted that he did not recognize A. Cordova when he was first in the cell with him, that he had not personally known him previously, <u>see</u> Gallegos Tr. at 64:14-25 (Morrissey, Gallegos), and, that, during a telephone call after he initially entered prison, he asked who A. Cordova was, <u>see</u> Gallegos Tr. at 46:9-12 (Morrissey, Gallegos). Gallegos testified that, after he asked the question, he remembered the name "A. Cordova." <u>See</u> Gallegos Tr. at 103:6-7 (Morrissey, Gallegos). Gallegos stated that, while incarcerated, he told multiple people via

telephone that he and A. Cordova were the only individuals in the institution who were not SNM members, see Gallegos Tr. at 66:17-67:2 (Morrissey, Gallegos), but Gallegos testified that older SNM members called A. Cordova "brother," see Gallegos Tr. at 38:22-39:9 (Armijo, Gallegos). Gallegos described sharing a cell with A. Cordova for four months in Torrance County jail. See Gallegos Tr. at 16:1-14 (Armijo, Gallegos). According to Gallegos, while in the jail, he worked with A. Cordova and a third man to bring drugs into the jail. See Gallegos Tr. at 16:25-17:18 (Armijo, Gallegos).

Gallegos noted that he had previously met C. Garcia, who he knew to be an SNM member, through his cousin. See Gallegos Tr. at 15:10-25 (Armijo, Gallegos). Gallegos testified that he asked A. Cordova why C. Garcia was on A. Cordova's case, and that A. Cordova explained that C. Garcia had ordered a hit on Dix and hired M. Montoya to commit the murder. See Gallegos Tr. at 36:20-25 (Armijo, Gallegos). According to Gallegos, A. Cordova stated that M. Montoya hired A. Cordova to make the hit and that, if C. Garcia cooperated, A. Cordova would be convicted. See Gallegos Tr. at 37:2-5 (Armijo, Gallegos); id. at 37:11-13 (Armijo, Gallegos). Gallegos recounted that A. Cordova described initially driving the car and then switching driving with M. Montoya, following Dix to a house in Albuquerque, New Mexico, waiting for Dix to leave the house, and then shooting Dix. See Gallegos Tr. at 37:17-23 (Armijo, Gallegos). Gallegos explained that A. Cordova described shooting Dix by making a shooting gesture and standing up from his bed. See Gallegos Tr. at 71:6-15 (Morrissey, Gallegos). Gallegos admitted that he first told the FBI that A. Cordova reported that M. Montoya hired him to kill Dix. See Gallegos Tr. at 69:23-69:1 (Morrissey, Gallegos). Gallegos also noted that he originally told the FBI that A. Cordova reported following Dix to a gasoline station or to a convenience store. See Gallegos Tr. at 69:25-70:4 (Morrissey, Gallegos). According to Gallegos, A. Cordova stated that, after the murder, he threw his firearm in the Rio Grande. See Gallegos Tr. at 38:1-3 (Armijo, Gallegos); id. at 38:20-21 (Armijo, Gallegos). Gallegos described that A. Cordova stated that he received drugs as payment for the Dix murder. See Gallegos Tr. at 38:12-14 (Armijo, Gallegos).

**g.** **Steven Morales.**

Morales testified that he identifies as a former SNM member and that he joined the gang around 1999 to 2000. See Transcript of Excerpt of Testimony of Steven Morales at 3:20-25 (taken July 16, 2018)(Beck, Morales), filed July 19, 2018 (Doc. 854)("Morales Tr."). Morales testified generally on the SNM, noting, for instance, that putting in work for the SNM means "drawing blood, stabbing and killing." Morales Tr. at 9:14-15 (Beck). See id. at 9:14-16 (Beck, Morales). Morales also explained that, if an SNM member is disrespected, the SNM expects

members to retaliate for that disrespect or to have another member retaliate. See Morales Tr. at 15:10-14 (Beck, Morales).

Morales stated that he agreed to cooperate with the United States in 2017 and that he approached the United States about cooperating. See Morales Tr. at 23:21-24:1 (Beck, Morales). Morales explained that he felt that he needed to step away from the SNM. See Morales Tr. at 24:3-6 (Morales). Morales confirmed that New Mexico dismissed homicide charges against him when he agreed to cooperate with the FBI. See Morales Tr. at 26:13-21 (Beck, Morales). Morales stated that he has not been signed as a confidential human source with the FBI, has not received money for his cooperation, but has received a discovery tablet. See Morales Tr. at 26:22-27:4 (Beck, Morales). Morales admitted that his plea agreement provides that, if he cooperates, he may receive a reduced sentence. See Morales Tr. at 77:9-11 (Morrissey, Morales). Morales indicated that he hopes to be released from prison and that the Court will sentence him to less than twenty years. See Morales Tr. at 78:5-12 (Morrissey, Morales).

Morales has known C. Garcia in and out of prison. See Morales Tr. at 27:5-14 (Beck, Morales). Morales explained that, between 2004 and 2006, he was dealing drugs and sending money to SNM members who were in prison. See Morales Tr. at 39:1-3 (Beck, Morales). Morales stated that, around 2004, he was buying drugs from C. Garcia, and retrieving several ounces to a pound of drugs every other week. See Morales Tr. at 28:1-15 (Beck, Morales). During that year, Morales observed C. Garcia's gunshot wound. See Morales Tr. at 28:19-24 (Beck, Morales).

According to Morales, C. Garcia asked Morales to kill Dix in exchange for a pound of heroin and $5,000.00. See Morales Tr. at 29:12-30:4 (Beck, Morales). Morales explained that C. Garcia offered to get him a gun if he required one to murder Dix. See Morales Tr. at 64:21-65:4 (Morrissey, Morales). Morales explained that he tried to set up Dix to kill him, but that Dix did not fall for Morales' trick. See Morales Tr. at 30:8-10 (Beck, Morales). Morales confirmed that he planned to and intended to kill Dix. See Morales Tr. at 67:13-16 (Morrissey, Morales).

Morales stated that he knows A. Cordova. See Morales Tr. at 30:20-22 (Beck, Morales). Morales explained that he had seen A. Cordova at C. Garcia's house and that some SNM members considered A. Cordova an SNM associate. See Morales Tr. at 31:5-23 (Beck, Morales). Morales identified C. Garcia and some powerful SNM members as among those SNM members who consider A. Cordova an associate. See Morales Tr. at 32:1-4 (Beck, Morales). Morales described that he also knows M. Montoya and that M. Montoya formerly worked with C. Garcia. See Morales Tr. at 32:23-33:7 (Beck, M. Montoya). Morales explained that, in 2004 and 2005, he would see M. Montoya at C. Garcia's house. See Tr. at 33:8-13 (Beck, Morales).

Morales explained that, in 2016, he was housed in a jail with A. Cordova. See Morales Tr. at 33:17-25 (Beck, Morales). Morales indicated that they discussed each other's cases. See Morales Tr. at 37:7-10 (Morales). According to Morales, after Morales complimented A. Cordova on the Dix murder, A. Cordova said "[y]ou know how I do it," which Morales understood to mean that A. Cordova committed the murder. Morales Tr. at 37:7-22 (Beck, Morales). Morales confirmed that he has spoken with the FBI multiple times about this case, but that he did not tell the FBI about the conversation with A. Cordova until May 31, 2018. See Morales Tr. at 81:3-8 (Morrissey, Morales). Morales indicated that he realized the significance of seeing A. Cordova at C. Garcia's house after an interview with the FBI. See Morales Tr. at 82:5-7 (Morrissey, Morales).

Morales also testified that A. Cordova yelled at him: "Fucking rat. Stop snitching, rat." Morales Tr. at 39:1-17 (Beck, Morales). Morales explained that a rat is someone who cooperates with law enforcement, as Morales was doing. See Morales Tr. at 39:20-22 (Beck, Morales). Morales denied that the 302 report in which the FBI recorded A. Cordova's yelling accurately recorded word-for-word that A. Cordova stated: "What's up, you fucking rat," Morales Tr. at 99:23-24 (Morrissey), and "You're a rata," Morales Tr. at 100:12 (Morrissey). See Morales Tr. at 99:23-100:7 (Morrissey, Morales).

### h. **Tom Neale.**

Tom Neale, an FBI agent, testified that a monitored call among C. Garcia, Duran, and Baca revealed discussion of the name Antone, and that the FBI recorded the call. See Transcript of Excerpt of Testimony of Tom Neale at 8:19-9:6 (taken July 17, 2018)(Castellano, Neale), filed July 19, 2018 (Doc. 856)("Neale Tr."). In the recording, Baca asks C. Garcia about an "Antone," and C. Garcia responds "Antone? You know, you know who it is? It's Antone ah, the homie, Antone ah Cordova." Transcript of Recording at 2 (taken April 15, 2016), filed August 21, 2018 (Doc. 903-7)("Garcia, Duran, Baca Tr."). C. Garcia continues, prompting "you remember him no, from the west side?" and mentions that A. Cordova "says I know [Baca]." Garcia, Duran, Baca Tr. at 2. After this statement, Baca asks "[h]ow is he doing out there?" and C. Garcia describes A. Cordova's problems with psoriasis and his Suboxone use. Garcia, Duran, Baca Tr. at 2. Neale identified C. Garcia's and Baca's voices in the conversation, and testified that Duran captured the conversation on a wiretapped cellular telephone. See Neale Tr. at 10:2-22 (Castellano, Neale). Neale testified that, during the conversation, he also heard mention of psoriasis, of someone from the West Side, and of the name Ray Arguello, and that he had learned previously that A. Cordova had psoriasis. See Neale Tr. at 11:11-12:5 (Castellano, Neale).

Neale also confirmed that the 2005 Super Bowl was on February 6, 2005, see Neale Tr. at 23:24-24:2 (Castellano, Neale), and also testified that he searched

for A. Cordova's registered vehicles and discovered that he owned a 1990 maroon Pontiac sedan, see Neale Tr. at 21:23-22:7 (Castellano, Neale). Neale testified that he searched A. Cordova's car records, which reflect that the 1990 maroon Pontiac sedan was registered to A. Cordova from February 13, 2004, see Neale Tr. at 23:18 (Neale), to February 28, 2005, see Neale Tr. at 31:4-9 (Castellano, Neale). Neale testified that, from his review of A. Cordova's telephone calls, Neale concluded that A. Cordova knows Arguello from Albuquerque. See Neale Tr. at 18:24-19:2 (Castellano, Neale). Neale described that this fact has significance, because in M. Montoya's conversation with C. Garcia, C. Garcia mentioned A. Cordova discussing jale with Arguello. See Neale Tr. at 31:10-24 (Castellano, Neale).

### i.   **Nathan Lerner.**

Nathan Lerner testified that, on and around February 19, 2004, the BCSO employed him in its narcotics unit. See Draft Transcript of Trial at 84:11-85:6 (taken July 13, 2018)(Castellano, Lerner)("July 13 Tr."). Lerner recounted that, on February 19, 2004, he encountered C. Garcia after an incident in which someone shot C. Garcia. See July 13 Tr. at 85:7-13 (Castellano, Lerner). Lerner noted that he received the call, because the BCSO suspected C. Garcia of trafficking drugs. See July 13 Tr. at 85:14-17 (Castellano, Lerner). Lerner then described that, on December 26, 2004, he encountered M. Montoya after an arrest that revealed items including "a mask, duct tape," and a gun in M. Montoya's car. July 13 Tr. at 86:19 (Lerner). See July 13 Tr. at 85:25-86:19 (Castellano, Lerner). Lerner narrated that later, on February 4, 2005, he received a call to a crime scene, and discovered a vehicle still running and crashed into a fence, and the driver slumped over. See July 13 Tr. at 87:5-88:13 (Castellano, Lerner). Lerner recalled seeing no footprints at the scene, see July 13 Tr. at 88:22-24 (Castellano, Lerner), but, on cross-examination, Lerner clarified that he meant that he saw no footprints on the pavement or near the car, see July 13 Tr. at 99:3-9 (Lerner, Acton). Lerner affirmed that he did not document any suspects during his time at the crime scene. See July 13 Tr. at 120:12-17 (Acton, Lerner). Lerner also testified that he had responded to several calls at C. Garcia's house and that, during a search of C. Garcia's house after C. Garcia was shot, the BCSO discovered multiple grams of crack cocaine and powder cocaine. See July 13 Tr. at 90:11-25 (Castellano, Lerner). Lerner further remembered pulling over C. Garcia at a traffic stop and documenting C. Garcia's tattoos, including an SNM tattoo. See July 13 Tr. at 91:4-92:5 (Castellano, Lerner). Lerner testified that, while working with the BCSO, he did not have any memorable interactions with A. Cordova. See July 13 Tr. at 120:21-24 (Acton, Lerner).

### j.   **Brandon Blackmon.**

Brandon Blackmon testified that, on February 4, 2005, he was a detective in the Criminal Investigations Division's Gang Unit at the BCSO. See July 13 Tr. at 127:24-128:6 (Armijo, Blackmon). Blackmon recalled that, around

8:35 p.m. on February 4, 2005, he heard on the radio a call about a car crash in a neighborhood.  <u>See</u> July 13 Tr. at 129:1-25 (Armijo, Blackmon).  He described that he went to the scene when he heard that the car's driver had suffered multiple gunshot wounds.  <u>See</u> July 13 Tr. at 130:19-25 (Blackmon).  Blackmon recounted that he saw a green van that had run into a fence and that the car was still running.  <u>See</u> July 13 Tr. at 131:17-132:9 (Armijo, Blackmon).  Blackmon described seeing multiple bullet holes in the driver's door; the driver slumped in the front seat, covered in blood; and the passenger-side sliding door's glass shattered.  <u>See</u> July 13 Tr. at 134:6-7 (Blackmon); <u>id</u>. at 134:22-135:20 (Armijo, Blackmon).  Blackmon described that, based on the nearby homeowners' reports, the BCSO assumed that the culprit was on foot nearby.  <u>See</u> July 13 Tr. at 137:2-11 (Blackmon).  Blackmon described that he later learned that the victim was Dix, whom Blackmon had transported to a jail several months earlier.  <u>See</u> July 13 Tr. at 139:17-141:4 (Armijo, Blackmon).  Blackmon testified that, during his time with the BCSO, he knew that the neighborhood in which the BCSO found Dix' car had problems with drug trafficking and gang membership.  <u>See</u> July 13 Tr. at 141:20-142:2 (Armijo, Blackmon).

**k.**     <u>**Michael Sullivan.**</u>

Michael Sullivan testified that he met Dix, because he sold Dix drugs, and that he encountered him again in prison in 2001.  <u>See</u> July 13 Tr. at 254:15-255:6 (Beck, Sullivan); <u>id</u>. at 255:11-13 (Sullivan, Beck).  Sullivan testified that Dix belonged to a gang centered in Albuquerque's South Valley.  <u>See</u> July 13 Tr. at 256:3-7 (Beck, Sullivan).  Sullivan described that, in 2004, he again ran into Dix and stayed with him for a couple weeks in what amounted to a drug house.  <u>See</u> July 13 Tr. at 256:10-19 (Beck, Sullivan).  Sullivan mentioned that he also knew C. Garcia from parties when they were younger.  <u>See</u> July 13 Tr. at 258:11-14 (Beck, Sullivan).  Sullivan noted that Dix told him about shooting C. Garcia, <u>see</u> July 13 Tr. at 259:6-11 (Beck, Sullivan), and Sullivan remembered being informed that C. Garcia wanted Dix killed and asked Sullivan to kill Dix, <u>see</u> July 13 Tr. at 260:7-11 (Sullivan); <u>id</u>. at 274:5-9 (Beck, Sullivan).

l.    **Brian Acee July 17, 2018.**

Acee returned to the stand and testified that M. Montoya told him after the conversation with C. Garcia: "[Arguella] told Chris Garcia that Antone was talking about Dix." Transcript of Excerpt of Testimony of Bryan Acee at 7:15-16 (taken July 17, 2018)(Acee), filed July 19, 2018 (Doc. 849)("Acee July 17 Tr."). Acee explained, regarding M. Montoya's conversation with Baca in which M. Montoya admitted to murdering Dix, that the FBI encouraged M. Montoya to speak with Baca. See Acee July 17 Tr. at 7:20-8:13 (Castellano, Acee). Acee also clarified that M. Montoya knew that the FBI had wiretapped his telephone and that the FBI listened to that conversation. See Acee July 17 Tr. at 8:11-17 (Castellano, Acee). Acee explained that, during the conversation, M. Montoya was outside the prison on a telephone call and Duran was inside the prison, and that neither knew that the other was cooperating. See Acee July 17 Tr. at 9:10-10:8 (Castellano, Acee).

m.    **David Littlefield.**

David Littlefield testified that he works for the BCSO and that, in February, 2005, he worked in the BCSO's Field Services Division as a patrol officer. See Draft Transcript of Hearing at 75:21-76:6 (taken July 18, 2018)(Littlefield)("July 18 Tr."). According to Littlefield, he had some involvement in the Dix murder investigation. See July 18 Tr. at 61:23-62:1 (Acton, Littlefield). Littlefield recounted that, at the crime scene on February 4, 2005, he taped off the perimeter and, at a superior's direction, searched for a red Toyota Camry. See July 18 Tr. at 65:6-16 (Littlefield). Littlefield also indicated that, on December 26, 2004, he arrested M. Montoya on an outstanding misdemeanor warrant. See July 18 Tr. at 70:5-71:4 (Littlefield). Littlefield explained that, after the arrest, he directed M. Montoya's car to another person to inventory. See July 18 Tr. at 76:22-77:1 (Acton, Littlefield). Littlefield confirmed that, in his report, he noted finding nothing in M. Montoya's car before the inventory. See July 18 Tr. at 77:21-78:2 (Beck, Littlefield).

n.    **Robert Lovato.**

Lovato explained that, in 1998, he became an SNM member by committing a murder. See July 18 Tr. at 162:5-17 (Armijo, Lovato). Lovato confirmed that he has now provided the FBI information about the SNM and M. Montoya. See July 18 Tr. at 158:3-8 (Morrissey, Lovato). Lovato confirmed that SNM members may discuss crimes with which they have not been charged and sometimes do not mention their accomplices, although the SNM frowns on such discussions. See July 18 Tr. at 164:4-24 (Armijo, Lovato). Lovato testified that he would not be surprised if, in describing a crime, an SNM member did not mention an accomplice, and explained that murder, particularly murder through a close encounter, like a

shot to the head, enhanced one's status in the SNM. See July 18 Tr. at 176:3-24 (Armijo, Lovato).

Lovato testified that he knew M. Montoya and that the two men had been incarcerated together on multiple occasions. See July 18 Tr. at 158:19-159:1 (Morrissey, Lovato). According to Lovato, M. Montoya took credit for killing Dix, and recounted that C. Garcia paid M. Montoya about half a kilogram of cocaine for the murder and that Snow witnessed the crime. See July 18 Tr. at 159:4-160:4 (Morrissey, Lovato). Lovato explained that M. Montoya told him that he killed Dix with an AK-47. See July 18 Tr. at 161:10-14 (Morrissey, Lovato). Lovato remembered telling the FBI that M. Montoya's conveyed that his wife assisted him with the murder. See July 18 Tr. at 160:5-22 (Morrissey, Lovato). Lovato described that, although SNM members should not brag about their crimes or discuss crimes for which they had not been charged, when M. Montoya shared the story about the Dix murder, M. Montoya and Lovato were close, and M. Montoya knew that Lovato would not share the story. See July 18 Tr. at 177:22-178:23 (Morrissey, Lovato).

Lovato stated that A. Cordova was not an SNM member and that he had never heard of A. Cordova's involvement in the Dix murder. See July 18 Tr. at 161:1-9 (Morrissey, Lovato). Lovato testified that he knows C. Garcia as an SNM member who possesses power, because he has money and drugs. See July 18 Tr. at 168:16-169:17 (Armijo, Lovato). Lovato noted that, in 2005, C. Garcia was successfully dealing drugs. See July 18 Tr. at 170:2-8 (Armijo, Lovato). Lovato testified that, in 2016, M. Montoya shared that he felt guilty for telling the FBI about A. Cordova's help with the Dix murder. See July 18 Tr. at 175:14-23 (Armijo, Lovato).

o.    **Timothy Hix.**

Timothy Hix introduced himself as a BCSO patrol sergeant and explained that he had some involvement with the Dix murder investigation. See July 18 Tr. at 181:14-182:3 (Acton, Hix). Hix described that, although he was not one of the initial detectives on the case, he inherited the case on February 24, 2005. See July 18 Tr. at 182:9-23 (Hix, Acton). Hix remembered joining the execution of one search warrant related to the Dix murder. See July 18 Tr. at 183:19-184:25 (Hix, Acton). Hix testified that, during that search -- which was of Snow's house -- Hix secured the residence. See July 18 Tr. at 185:3-10 (Hix, Acton).

Hix also explained that, years later, the BCSO interviewed him to reconstruct the Dix murder investigation. See July 18 Tr. at 187:4-8 (Acton, Hix). Hix described that he discussed the search warrant and a later interview that the BCSO had with C. Garcia. See July 18 Tr. at 187:24-188:4 (Hix). Hix indicated that C. Garcia drew the BCSO's attention, because the BCSO suspected that Dix had previously shot C. Garcia, but Hix confirmed that the interview with C. Garcia

was the only interview that Hix conducted in the investigation.  See July 18 Tr. at 188:8-18 (Hix, Acton).  He testified that C. Garcia denied involvement in the murder, but gave only rumors about who was involved, and agreed that the report reflects that no one wanted to talk about the murder.  See July 18 Tr. at 194:8-195:21 (Beck, Hix).  Hix recounted that, around 2010, he had no leads on the Dix murder and gave the file to the BCSO's Criminal Investigations Division's Homicide Unit.  See July 18 Tr. at 192:18-25 (Hix).

p.  **Vincent Aguilar.**

Vincent Aguilar testified that he was best friends with A. Cordova Jr., whom he met when he was approximately sixteen years old.  See Transcript of Excerpt of Testimony at 4:9-15 (taken July 18, 2018)(Aguilar), filed July 20, 2018 (Doc. 864)("Aguilar Tr.").  Aguilar testified that he did not recognize Gallegos and had not seen him associated with the West Side gang to which they allegedly both belonged.  See Aguilar Tr. at 6:3-12 (Morrissey, Aguilar).  Aguilar admitted, however, that he does not know all West Side gang members.  See Aguilar Tr. at 13:11-12 (Armijo, Aguilar).  Aguilar asserted that he knew everyone close to A. Cordova Jr., and that because he did not know Gallegos, Gallegos likely was not friends with A. Cordova Jr.  See Aguilar Tr. at 14:5-17 (Morrissey, Aguilar).

q.  **Samuel Gonzalez.**

Samuel Gonzalez testified that he knew A. Cordova from incarceration and knew him not to be affiliated with a gang.  See Transcript of Excerpt of Testimony of Samuel Gonzalez at 4:14-5:2 (taken July 18, 2018)(Morrissey, Gonzalez), filed July 20, 2018 (Doc. 865)("Gonzalez Tr.").  Gonzalez testified that he knew that C. Garcia was supposed to kill Dix for disrespecting Archuleta, that C. Garcia had more motivation to kill Dix after Dix shot him, and that C. Garcia was a big SNM drug dealer.  See Gonzalez Tr. at 10:18-11:4 (Castellano, Gonzalez).

r.  **Benji Montano.**

Benji Montano testified that he knows M. Montoya and that M. Montoya declared that he killed Dix for C. Garcia.  See Transcript of Excerpt of Testimony of Benji Montano at 3:21-4:6 (taken July 18, 2018)(Morrissey, Montano), filed July 20, 2018 (Doc. 867)("Montano Tr.").  Montano described that M. Montoya made this statement in 2013, or 2014, while they were neighbors in prison in Las Cruces, New Mexico.  See Montano Tr. at 4:9-14 (Morrissey, Montano).  Montano testified that he knew M. Montoya to be an SNM member.  See Montano Tr. at 8:20-21 (Armijo, Montano).

s.      **David Calbert.**

        David Calbert testified that, after being arrested and charged in this case, he was housed with C. Garcia, whom Calbert identified as an SNM member.  See Transcript of Excerpt of Testimony of David Calbert at 4:6-12 (taken July 19, 2018)(Morrissey, Calbert), filed July 20, 2018 (Doc. 869)("Calbert Tr."). According to Calbert, C. Garcia shared that he had M. Montoya "smoke[, i.e., kill] Shane Dix" while C. Garcia was in Las Vegas.  Calbert Tr. at 4:14 (Morrissey). See id. at 4:13-16 (Morrisey, Calbert).  Calbert testified that M. Montoya was not housed with Calbert and C. Garcia when C. Garcia shared that information, see Calbert Tr. at 7:24-8:1 (Beck, Calbert), and that, at that time, C. Garcia worried about M. Montoya cooperating with the FBI, see Calbert Tr. at 8:23-9:4 (Beck, Calbert).  Calbert clarified that many people worried about M. Montoya, because they believed that M. Montoya had killed Dix, and because M. Montoya was not incarcerated.  See Calbert Tr. at 11:3-8 (Morrissey, Calbert).

        t.      **Leonard Lujan.**

        Leonard Lujan testified that M. Montoya connected him with the SNM.  See Transcript of Excerpt of Testimony Leonard Lujan at 7:15-17 (taken July 19, 2018)(Morrissey, Lujan), filed September 20, 2018 (Doc. 871)("Lujan Tr.").  Lujan testified to telling a law enforcement interviewer that Dix shot C. Garcia in the stomach.  See Lujan Tr. at 4:4-14 (Morrissey, Lujan).  Lujan also commented that he told the interviewer that C. Garcia paid M. Montoya to kill Dix.  See Lujan Tr. at 4:15-17 (Morrissey, Lujan).  Lujan confirmed that C. Garcia was a well-known drug dealer for the SNM.  See Lujan Tr. at 10:4-6 (Beck, Lujan).  Lujan explained that the news of C. Garcia's shooting made its rounds through the SNM, because the SNM members were discussing a member of another gang shooting one of their own.  See Lujan Tr. at 10:7-11:6 (Beck, Lujan).  Lujan confirmed that, within the SNM, people widely believed that M. Montoya killed Dix.  See Lujan Tr. at 11:7-9 (Beck, Lujan).

        Lujan confirmed that M. Montoya and he grew up together, and trusted each other, and described that, three weeks after the Dix murder, M. Montoya shared that he had killed Dix.  See Lujan Tr. at 4:4-4:6 (Morrissey, Lujan); id. at 5:16-19 (Morrissey, Lujan).  Lujan testified that he vaguely remembered telling the FBI interviewer that M. Montoya described walking up to Dix and shooting.  See Lujan Tr. at 7:2-7 (Morrissey, Lujan).

        Lujan testified that he knew A. Cordova as an SNM member.  See Lujan Tr. at 13:13-14:6 (Beck, Lujan).  Lujan stated that he has not been around the SNM since 2008 and would not know what A. Cordova has been doing during that time. See Lujan Tr. at 17:7-12 (Beck, Lujan).  Lujan explained that he identified A. Cordova as an SNM member, because A. Cordova associated with the SNM

members while in prison. See Lujan Tr. at 19:15-25 (Morrissey, Lujan). Lujan testified that he has never mentioned to the FBI A. Cordova's name in connection with the Dix murder. See Tr. at 26:15-18 (Morrissey, Lujan).

       **u.**       **Jerry Montoya.**

       J. Montoya identified himself as a former SNM member, see Transcript of Excerpt of Testimony of Jerry Montoya at 8:5-7 (taken July 19, 2018)(Beck, J. Montoya), filed July 20, 2018 (Doc. 872)("J. Montoya Tr."), and confirmed that, in his plea agreement, he agreed to tell the truth at trial in exchange for the possibility of a lesser sentence, see J. Montoya Tr. at 27:1-9 (Beck. J. Montoya). J. Montoya testified that, around 2006 or 2007, M. Montoya shared with him that M. Montoya had killed Dix for C. Garcia. See J. Montoya Tr. at 5:21-24 (Morrissey, J. Montoya). J. Montoya commented that he suspected M. Montoya of bragging to boost his reputation within the SNM. See J. Montoya Tr. at 11:8-12 (Beck, J. Montoya). J. Montoya indicated that M. Montoya would earn that respect by stating that he committed the murder. See J. Montoya Tr. at 13:17-23 (Beck, J. Montoya). J. Montoya stated that the SNM would look more highly on an individual who walked up to and shot someone than on someone who shot an individual from a car. See J. Montoya Tr. at 14:17-15:1 (Beck, J. Montoya).

       J. Montoya also noted that C. Garcia commented on being in Las Vegas when Dix was murdered. See J. Montoya Tr. at 6:4-7 (Morrissey, J. Montoya). J. Montoya identified A. Cordova as an SNM associate and indicated that he and A. Cordova met when charged in this case. See J. Montoya Tr. at 6:12-7:1 (Morrissey, J. Montoya). J. Montoya indicated that A. Cordova associated particularly with C. Garcia and M. Montoya. See J. Montoya Tr. at 9:19-24 (Beck, J. Montoya). J. Montoya noted that he had no knowledge of A. Cordova's involvement in the Dix murder other than that A. Cordova requested to see J. Montoya's discovery tablet with the evidence against A. Cordova. See J. Montoya Tr. at 7:2-13 (Morrisey, J. Montoya).

       **v.**       **Joseph Allen Foster.**

       Joseph Allen Foster testified that he is a "crime scene investigator and reconstructionist." Transcript of Excerpt of Testimony at 3:17-18 (taken July 19, 2018)(Foster), filed July 20, 2018 (Doc. 870)("Foster Tr."). Foster opined that M. Montoya's testimony was inconsistent with the physical evidence. See Foster Tr. at 70:17-23 (Acton, Foster). Foster explained that he has reviewed the crime scene photographs, autopsy report, latent fingerprint report, firearm and tool mark report, some FBI reports, and the physical crime scene. See Foster Tr. at 9:14-10:2 (Foster). Foster testified that a bullet casing found dented at the crime scene may have been dented when a person stepped on it, see Foster Tr. at 16:8-20:7 (Acton, Foster), and noted that four of the eight casings recovered showed some minimal

damage, see Foster Tr. at 20:8-20 (Acton, Foster). Foster indicated that the BCSO tested the casings for fingerprints, but not for DNA, although he could not answer whether DNA results would be useful thirteen years after the crime. See Foster Tr. at 75:15-76:1 (Foster, Castellano). Foster also generally described shoe sole impressions' usefulness and opined that a footprint found at the crime scene had been made after a car passed through the area. See Foster Tr. at 24:20-27:25 (Acton, Foster). Foster stated, however, that the footprint could not have been from the shooter, because it did not align with the casings. See Foster Tr. at 102:11-13 (Castellano, Foster).

Foster identified a spot on the asphalt as blood and indicated that law enforcement should test such blood to determine to whom it belongs. See Foster Tr. at 35:16-36:5 (Acton, Foster). Foster noted that the alleged blood did not align with the van's path into the fence and that no evidence suggested that blood had dripped from the van. See Foster Tr. at 36:7-37:6 (Foster). Foster admitted that the BCSO had not identified that the spot on the road is blood, but he noted that the BCSO never tested the spot, although it marked the spot as blood and collected a sample. See Foster Tr. at 115:1-10 (Castellano, Foster).

Foster also explained that, based on where the van window's glass fell, he determined that Dix' van had been positioned slightly before a stop sign and angled slightly toward the southeast when the shooter fired. See Foster Tr. at 30:4-31:17 (Foster). Regarding the topography, Foster testified that that Dix would not have sat long at the stop sign, and that, as soon as Dix' foot left the brake, the van would roll downhill. See Foster Tr. at 48:9-52:3 (Acton, Foster). Foster described that casings from High Point firearms fall to the right and that the casings at the crime scene appeared eight-to-ten feet from the van. See Foster Tr. at 33:16-35:9 (Acton, Foster). Foster continued, noting that the casings fell parallel to Dix' van. See Foster Tr. at 51:6-11 (Foster). Foster noted that the firearm likely spit the casings only a couple feet. See Foster Tr. at 42:1-7 (Acton, Foster). Foster then discussed the process by which the investigators would estimate the angle at which the bullets hit the van and criticized the investigators' application of the process. See Foster Tr. at 52:4-58:11 (Acton, Foster). Foster admitted, however, that the gunshot hole on the driver's door was damaged and that this deformation interfered with the investigators' projecting the bullet's trajectory, see Foster Tr. at 86:4-13 (Castellano, Foster), and that, if the shooter aimed from a car, the casings would have landed on the road as they did at the crime scene, see Foster Tr. at 87:8-12 (Castellano, Foster).

Based on his review of the scene and the evidence, Foster criticized the FBI's re-creation of the crime scene and of the vehicles' locations the night of the murder. See Foster Tr. at 61:21-62:4 (Foster); id. at 62:20-63:2 (Foster); id. at 63:8-19 (Foster); id. at 64:12-16 (Foster). Foster confirmed, however, that, if the FBI had moved the vehicles in its re-creation closer, the re-creation would better align

with the bullet's projected trajectories.  See Foster Tr. at 93:6-15 (Castellano, Foster).  Foster admitted that M. Montoya's being on crack the night of the murder might have distorted his perception of and memory of the vehicles' locations.  See Foster Tr. at 89:11-15 (Castellano, Foster).

Foster contended that M. Montoya's testimony that A. Cordova never left their car does not align with the probable angle at which the bullets hit the van; according to Foster, if A. Cordova shot from the car, the bullets would have hit the van at a higher angle than the evidence suggests.  See Foster Tr. at 66:13-67:3 (Foster).  Foster also indicated that M. Montoya's testimony that the shots occurred in two rounds did not fit the evidence, because, if the car moved between the rounds, the shooter would have had to shift angles to shoot, and because the investigators recovered only eight casings.  See Foster Tr. at 67:19-68:9 (Foster).  According to Foster, the impact on the van's door is the only indication that the shooter may have moved while shooting.  See Foster Tr. at 69:9-19 (Foster).  Foster stated that he saw no physical evidence of a second vehicle at the crime scene, and opined that M. Montoya's testimony about his and A. Cordova's car conflicted with the Tinkers' statements.  See Foster Tr. at 59:25-60:7 (Foster, Acton); id. at 119:7-10 (Foster).  Foster confirmed, nevertheless, that, if M. Montoya and A. Cordova left the scene slowly, the Tinkers would not have heard an engine revving.  See Foster Tr. at 127:1-4 (Castellano, Foster).

w.  **Michael Haag.**

The United States then put on the stand two rebuttal witnesses, and called first an expert  -- Michael Haag, who introduced himself as the "senior forensic scientist with the crime laboratory" for the City of Albuquerque (the "Crime Lab").  Transcript of Excerpt of Testimony of Michael Haag at 4:16-17 (taken July 20, 2018)(Haag), filed July 25, 2018 (Doc. 882)("Haag Tr.").  See id. at 4:13-19 (Haag, Castellano).  Haag testified that, in his experience, the Crime Lab generally does not test casings for fingerprints or for DNA, because the tests have low success rates.  See Haag Tr. at 21:15-20 (Haag).  He explained that law enforcement must always make choices in testing and prioritize what substances to test, because the testing creates backlogs in the laboratories.  See Haag Tr. at 80:21-81:10 (Haag).  Haag noted that he understood that, in this case, investigators had examined the casings for fingerprints.  See Haag Tr. at 21:21-23 (Castellano, Haag).  Haag admitted that he had some bias, because his wife did the case's firearm analysis.  See Haag Tr. at 57:19-25 (Acton, Haag).  Haag noted that he has seen the crime scene himself, and that the topography appears flat and insignificant to his analysis.  See Haag Tr. at 22:12-21 (Haag, Castellano).  Haag opined that the area has decent visibility.  See Haag Tr. at 23:9-12 (Haag).  Haag commented that casings can be damaged in various ways, including from being stepped on, run over, or damaged by a firearm during a jam.  See Haag Tr. at 29:5-10 (Haag).  He described that to

clear a firearm jam, the shooter would need to shake the damaged casing from the firearm.  See Haag Tr. at 75:17-25 (Haag).

Haag presented a PowerPoint presentation that he assembled based on the physical evidence and in consideration of the trial testimony.  See Haag Tr. at 36:9-12 (Haag).  He opined that he could not rule out M. Montoya's testimony.  See Haag Tr. at 54:25-55:19 (Haag).  Haag used the shattered glass as a rough estimation for the van window's location and noted that such glass cannot give a precise location, because it breaks into pieces that fall at different rates.  See Haag Tr. at 46:11-47:1 (Haag).  Haag generally agreed with Foster about the location of Dix' van, see Haag Tr. at 49:5-6 (Haag), and, based on the bullets' projected trajectory, Haag offered an approximation for where the shots originated, see Haag Tr. at 50:11-51:1 (Haag, Castellano).  Haag agreed that, in determining the trajectory, the parties could consider only photographs, because the BCSO made no measurements of projected trajectories.  See Haag Tr. at 64:4-65:4 (Acton, Haag).  Haag noted that the bullets' projected trajectories were relatively perpendicular to the van and angled slightly from front to back.  See Haag Tr. at 39:10-16 (Haag).  Haag testified that the bullets' trajectories were consistent with M. Montoya and A. Cordova's vehicle moving slightly forward during the shooting.  See Haag Tr. at 40:6-18 (Haag).  He offered that, given the slight variation for the bullets' actual trajectories, the physical evidence could align with M. Montoya's testimony that he moved the car slightly between A. Cordova's two rounds of shots, see Haag Tr. at 71:18-72:25 (Haag), but Haag agreed that the shooter likely did not move much but remained largely stationary, see Haag Tr. at 65:20-66:14 (Haag).  Haag indicated that the trajectories' relatively horizontal nature suggests that the shooter did not shoot while standing upright.  See Haag Tr. at 41:13-42:11 (Haag).  According to Haag, the shooter could have fired from any position as long as the firearm was relatively low.  See Haag Tr. at 41:14-19 (Haag).  Haag agreed that the physical evidence could align with someone squatting on the ground to shoot, then standing up and walking away from the scene.  See Haag Tr. at 83:21-84:2 (Haag).  Haag stated that, in his analysis, he did not consider the alleged bloodspot, because he did not know what the substance was.  See Haag Tr. at 45:6-19 (Castellano, Haag).  Haag additionally noted that M. Montoya's description that the vehicles' headlights shone at each other could be true for a variety of positions that the vehicles may have occupied.  See Haag Tr. at 51:16-52:4 (Haag, Castellano).  Haag qualified that he presents a potential orientation for the objects at issue and does not opine what definitively occurred.  See Haag Tr. at 53:7-16 (Haag).  Haag confirmed that he has previously seen crime scenes that displayed no evidence of a vehicle's presence although a vehicle had been at the scene.  See Haag Tr. at 54:10-16 (Haag).

x. **Andrea Taylor.**

Andrea Taylor introduced herself as the former captain of the BCSO's Criminal Investigations Division and current Area Commander for the South Valley. See Transcript of Excerpt of Testimony of Andrea Taylor at 3:21-4:10 (taken July 20, 2018)(Armijo, Taylor), filed July 25, 2018 (Doc. 882)("Taylor Tr."). Taylor stated that, in 2005, she worked in the BCSO's undercover narcotics division and was aware of the Dix murder. See Taylor Tr. at 5:5-12 (Armijo, Taylor). According to Taylor, she later worked with the FBI to identify cold cases potentially linked to the SNM. See Taylor Tr. at 6:5-11 (Armijo, Taylor). Taylor indicated that, in 2016, she began searching for the box with the Dix murder file. See Taylor Tr. at 17:4-7 (Taylor). Taylor described that, in 2017, she found the Dix murder file in a Bankers Box. See Taylor Tr. at 6:15-7:2 (Armijo, Taylor). Taylor noted that she identified the box as related to the Dix murder based on a sticky note that she observed on the box that recorded a tip that indicated that M. Montoya killed Dix. See Taylor Tr. at 13:7-14 (Morrisey, Taylor). Taylor described that the box contained video tapes, cassette tapes, notes, and some paperwork. See Taylor Tr. at 14:12-22 (Morrisey, Taylor). According to Taylor, after discovering the box, she gave it to the FBI. See Taylor Tr. at 23:5-9 (Morrissey, Taylor).

y. **Closing and Rebuttal.**

The United States offered a shorter closing, see Transcript of Closing Arguments at 2:13-20:14 (taken July 23, 2018)(Armijo), filed August 1, 2018 (Doc. 891)("Closing Tr."), than it did a rebuttal, see Closing Tr. at 66:9-106:13 (Beck). In closing, the United States discussed the recorded conversation between M. Montoya and C. Garcia:

> [Y]ou're going to hear the name "Antone" several times. You should probably also be able to hear the word "jale," which, as you know, is a word for a job, and the name Ray Arguello. (Tape played.) Remember that was put in context for you that Antone's name was brought up in relationship to another individual that -- you heard testimony, that the defendant on his jail calls admits that he knows. And the concern was that Antone was telling him about a jale that he did. The jale that he did was the murder of Shane Dix. And that's why Chris Garcia is concerned about it, and he's talking to the other person that would know about the jale, Mario Montoya.

Closing Tr. at 19:3-16 (Armijo). The United States also highlighted Cordova's silence in response to Acee's comments about Montoya during the CNM conversation and argued: "You know, the

most important corroboration in this case is perhaps not what is said, but what is left unsaid." Closing Tr. at 103:12-14 (Beck). The United States quoted Acee's testimony about his comments regarding Montoya and Cordova's silence in response and then summarized: "So you've got corroboration from the defendant himself." Closing Tr. at 104:7-8 (Beck).

        **z.**        **Jury Verdict.**

The Jury convicted Cordova on Count 2's VICAR charge. <u>See</u> Jury Verdict at 1. The Jury specifically found that Cordova's "general purpose in committing murder was as consideration for a promise or agreement to pay anything of pecuniary value from the charged enterprise," but not "for the purpose of gaining entrance to, or maintaining, or increasing position in the enterprise." Jury Verdict at 1-2. The Jury also convicted Cordova on Count 3's charge of causing Dix' death "through use or possession of a firearm." Jury Verdict at 2.

        **4.**        **The First Motion for a New Trial.**

On August 21, 2018 Cordova filed a Motion for New Trial. <u>See</u> Motion at 1. A. Cordova asks the Court for a new trial. <u>See</u> First Motion at 1. To support his request for a new trial, Cordova makes three arguments: (i) that the verdict is contrary to the weight of the evidence, <u>see</u> First Motion at 1; (ii) that the United States committed prosecutorial errors warranting a new trial, <u>see</u> First Motion at 14; and (iii) that the United States violated rule 16 because (a) the United States did not produce the CNM report until three weeks before trial, and (b) Acee did not explain his comment that Cordova' silence left Acee with the sense that Cordova had committed the murder, <u>see</u> First Motion at 19-27.

To support his first argument, that the verdict is contrary to the weight of the evidence, Cordova calls into question the credibility of several witnesses and casts doubt upon other

evidence.  See First Motion at 4-7.  Cordova contends that Montoya, Gallegos, B. Cordova, and Morales cooperated with the United States and testified against him so the United States would reduce their sentences or dismiss charges against them.  See First Motion at 7-11.  Cordova further argues that Montoya, B. Cordova, and Morales provided unreliable testimony that was inconsistent or fabricated.  See First Motion at 9-12.  He then argues that the conversation between Garcia, Duran, and Baca demonstrates only that Garcia knew Cordova.  See First Motion at 12-14.  Finally, he argues that no physical evidence connected him to the crime or the crime to SNM activity.  See First Motion at 13-14.

To support his second argument, that the United States committed prosecutorial errors, Cordova argues that the United States hid the evidence -- that he was silent in response to Acee's accusations about the Dix murder -- until redirect.  See First Motion at 15.  Cordova claims that the United States committed a prosecutorial error by violating his Fifth Amendment to the Constitution of the United States of America rights when they mentioned his silence, which he claims occurred while he was in custodial interrogation, during their closing argument.  See First Motion at 15-18.  Cordova also notes that Acee did not testify that he accused Cordova of committing the murder, and that this omission leaves open the possibility, for instance, that he accused Cordova of knowing about the murder.  See First Motion at 15.  Cordova further argues that the United States' closing argument mischaracterized the conversation between Montoya and Garcia to Cordova's detriment, and hampered his ability to make an effective closing argument. See First Motion at 18-19.  Finally, Cordova lists examples of the United States' litigation shortcuts to demonstrate that the United States' strategy was to get a conviction, not justice.   See First Motion at 19.

To support his third argument, that the United States violated rule 16, Cordova calls attention to the CNM 302 Report. <u>See</u> First Motion at 19. Cordova contends that, in the CNM 302 Report, Acee does not describe his comments to Cordova that left him with the impression that Cordova committed the Dix murder. <u>See</u> First Motion at 20. Cordova argues that he did not become aware of this allegation until the United States' redirect, <u>see</u> First Motion at 21-22, and that had the United States disclosed this information, Cordova could have asked the Court to preclude it. <u>See</u> First Motion at 24-25. Cordova accuses the United States of violating rule 16, because it (i) did not produce the CNM 302 report until three weeks before trial despite having it since 2016, <u>see</u> First Motion at 23, 27; and (ii) used Acee's statement and the resulting silence despite Acee not recording the silence in the CNM 302 report. <u>See</u> First Motion at 23. Cordova argues, under <u>Brady</u> and <u>Giglio</u>, that the United States was obligated to inform Cordova that Acee did not record Cordova's silence, because that information "impugns" Acee's honesty and impeaches him. First Motion at 28. Moreover, Cordova argues, Acee also was dishonest when he testified that he wanted Cordova to work with the FBI despite knowing Cordova would be unable to do so due to Montoya's cooperation, and that these instances of dishonesty attack the weight of the evidence. <u>See</u> First Motion at 29.

    5.      **The Response**.

    The United States first contends that Cordova's arguments do not warrant a new trial in light of his admissions and the other evidence at trial. <u>See</u> Response at 3. The United States responds to Cordova's first argument that the witnesses' self-interest did rendered them so untrustworthy as to be incredible. <u>See</u> Response at 3-4, 6. The United States argues that, contrary to Cordova's allegations, Montoya, Gallegos, and B. Cordova all either had something to lose, or

at least nothing to gain, by cooperating.  <u>See</u> Response at 6-10.  The United States further counters Cordova's allegations about Montoya's, B. Cordova's, and Morales' unreliable testimony.  <u>See</u> Motion at 7-12.  Finally, the United States argues that the recording of Garcia, Duran, and Baca corroborates the cooperators' testimony, because it shows that Garcia knew Cordova, and that Garcia, Baca, and Cordova associated with each other.  <u>See</u> Response at 12-13.  According to the United States, the evidence shows that Cordova knew Garcia well enough that Garcia trusted Cordova with the murder and illuminates why Montoya named Cordova as his accomplice.  <u>See</u> Response at 12-13.

The United States argues that, although Cordova indicates that no physical evidence ties Montoya to the crime scene, no evidence ties either Montoya or Cordova to the scene other than their admissions and Montoya's statements.  <u>See</u> Response at 13.  The United States further offers that Haag's testimony supports Montoya's story, because Haag indicates that Montoya presents a plausible story in light of the physical evidence.  <u>See</u> Response at 13.  The United States then summarizes evidence that connects the Dix murder to the SNM and shows that the SNM was trafficking drugs around the time of the murder.  <u>See</u> Response at 14-15.  The United States notes that this evidence also illustrates that the SNM engaged in interstate commerce.  <u>See</u> Response at 15.  According to the United States, the SNM affected commerce through selling drugs, using the mail and telephone systems, traveling between states, and sending drugs to G. Archuleta in Tennessee.  <u>See</u> Response at 15.

The United States finally argues that it did not commit prosecutorial errors that warrant a new trial.  It argues that the line of questioning about the CNM conversation arose in response to Cordova's cross-examination.  <u>See</u> Response at 15.  The United States contends it did not

mischaracterize Acee's testimony about the conversation, because "[t]he evidence established that Agent Acee accused the defendant of being involved with the murder," Response at 15-16, and, moreover, mentioning Cordova's silence was not a violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)("<u>Miranda</u>"), because Cordova was voluntarily cooperating with Acee and not in custodial interrogation at the time of the silent response, <u>see</u> Response at 16-17. The United States also argues that Cordova's complaints about its structure for its closing argument and rebuttal are not convincing, because he cites as authority only a State of California case, and because the United States stayed within its allotted total closing and rebuttal time. <u>See</u> Response at 17. The United States counters Cordova's arguments about its investigation and explains that it had no need for the physical evidence that Cordova suggests it ignored. <u>See</u> Response at 18.

The United States also takes the stance that Cordova cannot support his rule 16 argument, because Cordova made no statement to Acee about the Dix murder, because the questioning arose on redirect after Cordova asked Acee whether he pursued Cordova based only on Montoya's word, and because Acee testified that he normally does not document his impressions in his reports. <u>See</u> Response at 19-20. Moreover, according to the United States, Cordova has not demonstrated prejudice from the non-disclosure, because this case is not close. <u>See</u> Response at 20. The United States also disputes Cordova's contentions that it violated <u>Brady</u> and, according to the United States, Cordova admits that the United States complied with <u>Brady</u> by disclosing the CNM 302 Report. <u>See</u> Response at 20. The United States summarizes Cordova's argument's gist as that Acee could not have put Cordova to work cooperating when Montoya had already agreed to cooperate. <u>See</u> Response at 20. The United States notes that Cordova overlooks that he could have cooperated by controverting false information from Montoya, could have cooperated against

C. Garcia, or could have provided information about the SNM's other criminal activity. See Response at 20-21. The United States emphasizes that, at the time Acee approached Cordova, Garcia had not yet agreed to cooperate. See Response at 21.

The United States indicates that its closing arguments are not improper, because Acee did not improperly record his conversation with Cordova, because no Fifth Amendment protection adheres to the CNM conversation, and because, even if the United States committed prosecutorial misconduct, such conduct is harmless. See Response at 21. The United States further notes that, at trial, Cordova objected to "virtually none" of the issues he raises in the Motion at trial and, accordingly, he must meet the plain-error standard to obtain a new trial. See Response at 21-22. The United States concludes by asking the Court to deny Cordova a hearing on the Motion, because he is not entitled to a new trial as a matter of law. See Response at 22.

**6.    The Reply.**

Cordova replies to the United States' Response. See Defendant Anthony Cordova's Sealed Reply to the United States Sealed Response to Anthony Cordova's Motion for New Trial, filed October 30, 2018 (Doc. 927)("Reply"). Cordova reiterate that the verdict was dependent solely on self-interested cooperators, not any physical evidence. Reply at 1. Cordova reiterates that the United States conflates verdicts-against-the-weight-of-the-evidence and insufficiency-of-the evidence challenges, and that, in a verdict-against-the-weight-of-the-evidence challenge, the Court has discretion to weigh the evidence and make evidentiary determinations. See Response at 5-7. Cordova summarizes contradictory testimony from Mikail Tinker, Montoya, B. Cordova, and Gallegos. See Reply at 2.

Cordova reiterates that the United States did not provide the CNM 302 Report until three weeks before trial, well after the Court issued the Scheduling Order and Cordova's Motion to Compel. See Response at 7. Cordova contends that the CNM 302 Report is misleading, because it does not reveal Acee's accusations regarding the Dix murder nor that Cordova did not respond to the accusations. See Response at 7. Cordova complains that he did not hear of this evidence until redirect and that the United States admits that it would not have used the evidence if Cordova had not suggested on cross-examination that the United States charged Cordova without sufficient evidence. See Response at 8. Cordova reiterates that the cross-examination does not excuse not disclosing this evidence pursuant to rule 16, the Discovery Order, and the Brady and Giglio requirements, and that introducing the evidence violates the Fifth Amendment. See Response at 8. Cordova contends that the Federal Rules of Evidence treat silence as a statement and that the Court should consider his silence as a statement. See Response at 8-9.

Cordova also repeats that no evidence connects the Dix murder to the SNM. See Response at 10. Cordova contends that Garcia alone connected Dix to the SNM. See Response at 10. Cordova summarizes that Garcia authorized the killing and compensated people for the killing, and that the SNM as an entity did not order the killing or consider the killing related to the SNM. See Response at 11.

7. **The MOO.**

The Court denies the motion for a new trial. MOO at 2. First, the Court concludes that the weight of the evidence supports the verdict, despite Cordova's allegations to the contrary. See MOO at 65. Second, the Court concludes that Cordova did not invoke his Miranda right to silence during his conversation with Acee, and therefore the Fifth Amendment does not protect his

statement of silence.  <u>See</u>  MOO at 87.  Third, the Court concludes that, although the United States'

non-disclosure of the Cordova's silence in the CNM 302 report and the United States' delay in

providing the CNM 302 report were violations of rule 16, these violations were harmless errors.

<u>See</u> MOO at 92.  Fourth, the Court concludes that, although Acee excluded impeachment

information from the CNM 302 Report, the absence of the information was not prejudicial to

Cordova.  <u>See</u> MOO at 99.  Fifth, the Court concludes that, although the United States committed

prosecutorial misconduct by eliciting testimony about Cordova's silence but not disclosing the

evidence in accordance with rule 16, no other errors rise to the level of prosecutorial misconduct

and, moreover, all the alleged errors are harmless.  <u>See</u> MOO at 101.

### 8.     The Second Motion for a New Trial.

Cordova moves for a new trial under rule 33(b)(1) of the Federal Rules of Criminal

Proecure based on newly discovered evidence: Garcia, whom the United States alleges hired

Cordova to murder Dix, told the FBI after trial that he had never talked to Cordova about the

murder.  <u>See</u> Motion at 1.  Cordova alleges that this new evidence refutes his VICAR conviction's

murder-for-hire element.  <u>See</u> Motion at 1. Cordova asserts that he meets the legal standards for a

rule 33 motion that the Tenth Circuit established in <u>United States v. Sinclair</u>.  <u>See</u> Motion at 1-2

(citing <u>United States v. Sinclair</u>, 109 F.3d at 1531).

Cordova argues that he discovered the evidence after trial.  <u>See</u>  Motion at 7.  He states that

Garcia did not provide this information to the FBI until May 8, 2019, after Cordova was convicted

and two days before Garcia's sentencing.  <u>See</u> Motion at 7.   Cordova explains that, although he

tried to call Garcia to testify at trial to demonstrate that Garcia made an agreement with only

Montoya to kill Dix, Garcia exercised his right not to testify.  <u>See</u> Motion at 7.  Cordova concludes

that, because Garcia did not even give the statements until May 8, 2019, Cordova was unaware of Garcia's statements until after the jury convicted Cordova. See Motion at 7.

Cordova acknowledges, however, courts' skepticism at "a convicted co-conspirator com[ing] forward after trial with exculpatory evidence." Motion at 7. Cordova notes, however, that relevant Tenth Circuit cases all have dealt with evidence that the defendant discovered before or during trial, and not after trial. See Motion at 8 (citing United States v. Muldrow, 19 F.3d 1332, 1339 (10th Cir. 1994); United States v. DiBernardo, 880 F.2d 1216, 1224-25 (11th Cir. 1989); United States v. Metz, 652 F.2d 478, 480 (5th Cir. 1981); United States v. Quintanilla, 193 F.3d 1139, 1145 (10th Cir. 1999); United States v. Moore, 108 F.3d 270 (10th Cir. 1997)). Cordova acknowledges the courts' concern that permitting this information could incentivize a co-defendant to try to take the blame for the other co-defendants, but he argues this concern is inapplicable to his case, because Garcia already pled guilty and did not take additional responsibility in his statements than he already had taken in his guilty plea. See Motion at 9. Cordova next argues that Garcia was not trying to exonerate Cordova with his statements and, in fact, tried to prevent Cordova from learning about these statements; therefore, this case and Garcia's statements should not fall under the applicable case law. See Motion at 9. Cordova further argues that Garcia's only motivation behind his interview was to improve his security conditions within the Bureau of Prisons ("BOP"). See Motion at 9.

Cordova next argues that the Court must consider what constitutes "being aware of the proposed testimony" in the context of rule 33 of the Federal Rules of Criminal Procedure, and, thus, the Court should not interpret Cordova's awareness of his innocence to mean that he should have been aware of any evidence that demonstrates a co-conspirator also was aware of Cordova's

innocence.  <u>See</u> Motion at 10. Cordova distinguishes between exonerating "information" and "testimony," noting that Cordova simultaneously can know that he is innocent while not knowing Garcia's "proposed *testimony*."  <u>See</u> Motion at 10 (emphasis in original).  Cordova concludes that Garcia's testimony is new evidence, because Cordova was not aware of what Garcia would say. <u>See</u> Motion at 10.

Turning to <u>United States v. Sinclair</u>'s second element, Cordova argues that his failure to learn of the new evidence was not because of a lack of diligence: he tried to have Garcia testify. <u>See</u> Motion at 11.  Turning to <u>United States v. Sinclair</u>'s third element, Cordova argues that Garcia's statement is not merely impeaching, because it negates his VICAR conviction essential "purpose element" -- that Cordova killed Dix in exchange for a promise or agreement of payment. Motion at 11.  Turning to <u>United States v. Sinclair</u>'s fourth element, Cordova argues that the newly discovered evidence is material to principal issues, because the jury convicted Cordova of VICAR murder, concluding that the purpose of Dix' murder either was "as consideration for a promise or [was an] agreement to pay anything of pecuniary value from the charged enterprise."  Motion at 11.  Cordova argues that this newly discovered testimony proves that there was neither consideration nor a bargained-for exchange for Dix' murder.  Motion at 11.   Cordova thus concludes that the "consideration for a promise or agreement to pay something of pecuniary value" element of his VICAR conviction is unsupported, which renders the newly discovered evidence material to the principal issues involved.  <u>See</u> Motion at 12-13.  Turning to <u>United States v. Sinclair</u>'s fifth element, Cordova argues that the United States' evidence for the "purpose" element of VICAR is weak and that Garcia's new testimony "precludes a finding that Cordova killed Dix as consideration for a promise or agreement to pay anything of pecuniary value," therefore making

it likely Cordova will be acquitted in a new trial. Motion at 13-15. Cordova concludes by requesting that the Court grant his rule 33 motion, stating that a new trial would serve the interest of justice. See Motion at 15.

### 9. **The Hearing.**

Cordova began by noting that the jury's verdict rested upon its finding that Garcia hired Cordova to kill Dix. See Draft Transcript of Hearing at 5:8-9 (taken August 16, 2019)(Acton)("Aug. 16 Tr."). Cordova argued that he has information contradicting this finding from a conversation that Garcia had with the FBI, a meeting which he believes Garcia arranged to improve his conditions in the BOP. See Aug. 16 Tr. at 5:18-6:6 (Acton). Cordova argued that, during that meeting, Garcia stated that he never asked Cordova to kill Dix, nor did Cordova and Garcia talk about the murder after it happened. See Aug. 16 Tr. at 6:8-16 (Acton). Cordova noted that he believes Garcia had two debriefs with the FBI. See Aug. 16 Tr. at 6:17-19 (Acton). Cordova argued that, without the VICAR charge that gives the Court jurisdiction, Cordova would be sentenced in state court and, thus, would not be subject to life imprisonment. See Aug. 16 Tr. at 7:12-24 (Acton). He explained that there are two ways a person who committed murder can be connected to a racketeering organization for the purposes of the VICAR charge: the person is either a member or a person trying to obtain membership, or the person is a hitman. See Aug. 16 Tr. at 8:1-9 (Acton). He noted that, although the jury found that Cordova met the second criterion, there is no evidence that there was an agreement to commit murder, as required under federal law. See Aug. 16 Tr. at 8:24-9:5 (Acton). Cordova argued that the murder-for-hire element is an essential element of the crime that the United States proved by only speculation, but that Garcia's new statements refute that speculation. See Aug. 16 Tr. at 9:10-18 (Acton). Cordova stated that he

combed through caselaw to find an analogous case and that, in every case in which the court "decide[d] that there should not be a new trial because they're saying it's not newly discovered, they can [] point to very specific things that the defendant new during trial." Aug. 16 Tr. at 10:14-22 (Acton). Cordova argued that his knowledge during trial was limited to Garcia's guilty plea. See Aug. 16 Tr. at 10:23-11:1 (Acton). He noted that Garcia's guilty plea stated that he made an agreement with one other person to kill Dix, which compelled Cordova to ask Garcia to testify, because Cordova thought that Montoya was the one other person who conspired with Garcia. See Aug. 16 Tr. at 11:1-14 (Acton).

Cordova turned back to caselaw, stating that he could not find a case that says that, "if you're a co-conspirator, and you're innocent, then the person that's supposedly your co-conspirator[,] you're going to know[,] because you're innocent[,] then the co-conspirator also knows you['re] innocent," is sufficient to conclude that the defendant had this knowledge during the trial. Aug. 16 Tr. at 12:3-6. See Aug. 16 Tr. at 12:3-12 (Acton). The closest case he found is United States v. Jasin, 280 F.3d 355, 362 n.7 (3d Cir. 2002), in which the United States Court of Appeals for the Third Circuit dropped a footnote stating that its conclusion was based on the premise that the defendant was aware of the declarant's trial testimony and that if the defendant was unaware of the testimony at trial, then that testimony would be newly discovered evidence and the basis for a new trial grant. See Aug. 16 Tr. at 12:23-13:11 (Acton). Cordova stated that, in contrast to United States v. Jasin, Cordova was not aware of the substance of Garcia's statements beyond knowing that Garcia had conspired with one other individual to kill Dix. See Aug. 16 Tr. at 13:15-18 (Acton)(citing United States v. Jasin, 280 F.3d at 355).

Moreover, Cordova argued, the concern that a co-conspirator with nothing to lose would

try to clear his co-conspirator's name is a credibility issue.  See Aug. 16 Tr. at 14:2-9 (Acton).

Cordova argued that, looking further at Garcia's motivation, it is not "in dispute" that Garcia was

trying to prevent Cordova from getting this information, and that Garcia's motivation was to secure

better prison conditions.  See Aug. 16 Tr. at 14:11-15 (Acton).  He added that he thinks that the

fact the Garcia is suggesting that Cordova killed Dix only adds to Garcia's credibility. See Aug.

16 Tr. at 15:8-10  (Acton).  He concluded by reiterating that these statements are so important,

because they could destroy an element of the VICAR case and remove the case from the Court's

jurisdiction.  See Aug. 16 Tr. at 15:13-18 (Acton).

The United States responded.  See Aug. 16 Tr. at 16:2-3 (Castellano).  First, the United

States tried to undermine Cordova's reliance on Garcia's plea agreement by noting that Garcia

wanted to say as little as possible in the plea agreement and, thus, the final plea agreement was the

final iteration out of many drafts.  See Aug. 16 Tr. at 16:4-13 (Castellano).  The United States

conceded that Cordova can prove the first two United States v. Sinclair elements -- that Cordova

discovered the evidence after trial and that a lack of diligence did not cause him to discover the

evidence after trial.  See Aug. 16 Tr. at 17:3-8 (Castellano).  Further, the United States conceded,

Cordova attempted to get Garcia to testify on Cordova's behalf.  See Aug. 16 Tr. at 17:8-9

(Castellano).  The United States contended that Cordova will have a more difficult time meeting

the last three elements.  See Aug. 16 Tr. at 17:16-17 (Castellano).  First, the United States argued,

Cordova does not meet the requirement that the newly discovered evidence is more than merely

impeaching.  See Aug. 16 Tr. at 17:19 (Acton).  It noted that, because the evidence would not be

permissible at trial and because Garcia invoked his right to silence at trial, the most that Cordova

"could do is ask Mr. Montoya isn't it [true] that Mr. Garcia did not really put [you] and [Cordova]

together for purposes of this murder." Aug. 16 Tr. at 18:1-5 (Castellano).  See Aug. 16 Tr. at 17:25-18:5 (Castellano).  The United States noted that the Court could permit the statement only as an impeachment question to Montoya, and, further, the statement would open the door to Cordova's drug dealing, which could tie him to the murder and to Garcia corroborating Montoya's statement that Cordova talked about Dix' murder.  See Aug. 16 Tr. at 19:5-8 (Castellano).  The United States then moved to the next element, that the newly discovered evidence probably would result in an acquittal.  See Aug. 16 Tr. at 19:15-22 (Castellano).  The United States argued that the newly discovered evidence does not meet the "probable" standard, because the jury could infer from other evidence, such as Romero's testimony that he refused an offer of money from Garcia in exchange for killing Dix, that the case is a murder-for-hire.  See Aug. 16 Tr. at 20:7-16 (Castellano).  The United States affirmed that the newly discovered evidence does not change its theory of the case, because Garcia purposefully shielded himself from knowledge about the murder, and because Montoya talked about killing Dix with Cordova, and there was enough other evidence for a jury to infer it was a murder-for-hire.  See Aug. 16 Tr. at 21:10-24 (Castellano).

Moreover, the United States argued, Cordova and Garcia had a relationship, which the jury could use as evidence to support that Cordova murdered Dix in exchange for something from Garcia.  See Aug. 16 Tr. at 23:8-13 (Castellano).  The United States listed other testimonies that support the murder-for-hire theory of the case, concluding with Gallegos stating that Cordova received drugs for Dix' murder.  See Aug. 16 Tr. at 23:14-25:1 (Castellano).  The United States then described Morales' testimony, which it says corroborates Montoya's account, and Haag's testimony, in which he concluded that Montoya's account was plausible.  See Aug. 16 Tr. at 26:2-27:12 (Castellano).  The United States noted that Montoya has already been impeached, but

that the jury ultimately found Montoya credible.  See Aug. 16 Tr. at 26:15-21 (Castellano).  Thus, the United States concluded, the newly discovered evidence is not material and is merely impeaching.  See Aug. 16 Tr. at 26:24-27:5 (Castellano).  Responding to Cordova, the United States acknowledged that Garcia may have been immunized in limited circumstances, and that the United States may have promised to not pursue additional charges against Garcia based on the facts forming the basis of the indictment.  See Aug. 16 Tr. at 28:17-29:10 (Acton, Court, Castellano).  The United States noted that its promise does not relieve Garcia of all criminal liability, because he could still be charged for that crime under state law in state court.  See Aug. 16 Tr. at 29:19-25 (Castellano).  The United States affirmed that Garcia's motivation for his statement was to be admitted into the gang drop-out program.  See Aug. 16 Tr. at 30:1-3 (Castellano).

Cordova clarified whether Garcia had a Kastigar[9] letter, which the United States admits it did not know.  See Aug. 16 Tr. at 30:17-31:3 (Acton, Court, Castellano).  The United States stated that, even if Garcia had a Kastigar letter, the letter would protect only the statements that he gave at the time and that any testimony would be "fair game."  Aug. 16 Tr. at 31:5 (Castellano).  See id. at 31:5 (Castellano).  Cordova suggested that the Court could admit Garcia's statement through Sainato under the residual clause of the hearsay exceptions. See Aug. 16 Tr. at 31:16-32:9 (Acton, Court).  The Court was skeptical that Cordova could compel Sainato to be on the stand and, that even if Sainato testified, his testimony would be merely impeaching.  See Aug. 16 Tr. at 32:3-12

---

[9]Crawford v. Washington holds that testimonial hearsay is inadmissible at a criminal trial when offered against a defendant unless the hearsay declarant is unavailable and the defendant had a previous opportunity to cross-examine the declarant. See 541 U.S. 36, 53-54 (2004).

(Court).  The Court concluded that the evidence likely would not be admitted at a new trial, and if it was, it would be solely impeaching information.  See Aug. 16 Tr. at 34:12-17 (Court).

        10.      **The Sentencing Hearing**.

        The Court called Cordova's case.  See Draft Transcript of Hearing at 3:1-3 (taken September 13, 2019)(Court)("Tr.").[10]  The Court stated that Cordova's offense level is 43 and he has a criminal history of VI, which means that the United States Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2018)("Guidelines") mandates a term of life without parole.  Tr. at 4:8-17 (Acton, Court).  Cordova argued that the Court should not proceed with sentencing that day but instead that the Court should grant him a new trial.  See Tr. at 5:4-9 (Acton).  Cordova stated that, at the last hearing, there was a dispute whether the Court could admit the newly discovered evidence at a new trial and that he submitted a brief addressing why this evidence could come in for the truth of the matter asserted.  See Tr. at 5:9-21 (Acton).  The Court acknowledged that it received and reviewed Cordova's brief.  See Tr. at 5:24-6:2 (Court).

        Cordova argued that, if the Court grants a new trial, Montoya would still be under the immunity that the United States granted him.  See Tr. at 6:5-8 (Acton).  Cordova then argued that Garcia's testimony exonerates Cordova of the VICAR charge and of the using-a-weapon charge.  See Tr. at 6:16-25 (Acton).  Thus, Cordova argued, the Court no longer has jurisdiction because the promise-to-pay element is not met.  See Tr. at 7:5-10 (Acton).  Cordova stated that, although the new evidence could come in as direct evidence if the United States granted Montoya immunity, the Court cannot decide the Motion based on its speculation whether the United States will grant

_____

        [10]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

immunity.  See Tr. at 7:12-20 (Acton).  See Tr. at 7:14-25 (Acton).  Cordova stated that, even though the Court does not have statutory authority to immunize Montoya, the Court should not let this due process violation occur without remedy.  See Tr. at 8:8-12 (Acton).  The Court expressed skepticism that there is a constitutional due process issue.  See Tr. at 8:19-24 (Court).  Cordova then noted that other courts have found a due process problem, but the Court noted that Cordova's cited cases refer to the United States substantially interfering with a defense witness' decision to testify, which "doesn't seem to be the situation here."  Tr. at 9:13-14 (Court).  See Tr. at 8:25-9:3 (Acton).  The Court stated that granting the relief that Cordova is advocating for "would go greatly beyond anything that's been done before."  Tr. at 9:21-23 (Acton, Court).  Cordova then stated that, while United States v. Serano does not address the same issue as Cordova's case, it also does not suggest that its facts are the only facts out of which a constitutional due process violation could arise.  See Tr. at 10:1-3 (Acton).  Cordova argued all the Courts of Appeals have concluded that, if the United States selectively immunizes its witnesses, "Congress needs to provide that same mechanism to the accused" to not "tilt the scales in the [United States'] favor or [] distort the fact finding process."  Tr. at 10:23-11:87 (Acton).  Cordova argued that, even though the Court cannot grant immunity, it can force the Government into granting Garcia immunity by means of dismissal.  See Tr. at 10:3-11:11 (Court).

Cordova stated that the United States' immunization of Montoya has created a due process problem in this case.  See Tr. at 11:15-18 (Acton).  Cordova stated Garcia's testimony contradicts Montoya's trial testimony, because Montoya was only able to speculate that Cordova was paid for Dix' murder.  See Tr. at 12:1-13:3 (Acton). Cordova argued that, because Montoya was granted immunity to testify, a new trial should be granted, and Garcia also should receive immunity.  See

Tr. at 13:3-14:3 (Acton). Cordova turned to rule 804(B) of the Federal Rules of Evidence, which is the exception to the rule against hearsay when the declarant is unavailable as a witness, arguing that this rule makes Garcia's statements admissible as a statement against interest. <u>See</u> Tr. at 14:3-18 (Acton). Cordova argued that <u>Lopez v. United States</u> adds weight to his argument because this case and <u>Lopez v. United States</u> are factually similar. <u>See</u> Tr. at 14:4-11 (Acton). Cordova then argued that whether Garcia is granted immunity or not, Garcia's statements come in under rule 804(B)(3) as a statement against interest. <u>See</u> Tr. at 14:12-16 (Acton). Cordova explained that no reasonable person would make these statements unless they were true. <u>See</u> Tr. at 14:22-23 (Acton). The Court stated that it does not know if the statements referring to Cordova qualify as statements against interest. <u>See</u> Tr. at 14:24-15:1 (Court). Cordova rebutted this by stating that the Honorable Justice Antonin Scalia, then- Associate Justice to the United States Supreme Court, wrote that a "declarant's statement does not magically transform from a statement against penal interests into one that is inadmissible merely because the declarant names another person or implicates a possible co-defendant." Tr. at 15:2-9 (Acton). Cordova argued that Garcia implicates himself in this testimony and that, according to Justice Scalia, statements that give context should be permitted. <u>See</u> Tr. at 16:2-14 (Acton).

Cordova reiterated that Garcia was not trying to exonerate Cordova and that, in fact, Garcia's attorneys tried to keep these statements a secret from Cordova's attorneys. <u>See</u> Tr. at 17:5-15 (Acton). Turning to the issue of credibility, Cordova noted that, although the United States Court of Appeals for the Fourth Circuit concluded that the courts should not be concerned with the declarant's credibility, in <u>Losano</u>, the court stated that courts should look at the declarant's credibility. <u>See</u> Tr. at 18:7-19 (Acton). Cordova argued that these statements are reconcilable if

you look at the declarant's credibility in context -- "what matters if that you can have somebody who maybe you don't find believable or trustworthy, but is in the circumstances where they would be expected to tell the truth." Tr. at 18:20-22 (Acton). See Tr. at 18:7-24 (Acton). Cordova then argued that Montoya perjured himself to avoid being prosecuted for Dix' murder and that, compared to Montoya, Garcia had no incentive to make those statements. See Tr. at 18:24-19:9 (Acton). Cordova noted that there are other circumstances that give Garcia's statements credibility: he came forward before sentencing and he answered the questions over his attorney's objections. See Tr. at 19:4-11 (Acton). Cordova reiterated that Garcia's statements are admissible under rule 804(B)(3) as statements against penal interest, and that the Court should require the United States to immunize Garcia and grant Cordova a new trial or should dismiss the case. See Tr. at 19:25-20:22 (Acton). The Court and Cordova agreed that if Garcia's statements are inadmissible, there is no reason to grant a new trial. See Tr. at 21:20-23 (Court, Morrissey).

Cordova argued that it is premature to decide whether Garcia's statements would be admissible at a new trial, because the facts may change between now and trial. See Tr. at 21:11-19 (Morrissey); id. at 21:3-6 (Morrissey). Cordova noted that the facts in front of the Court warrant a new trial, see Tr. at 21:8-25 (Morrisey), and that the only information that contradicts those facts is Garcia's plea agreement, which states that he hired a single person to kill Dix, the heroin, and "a picture of a Suburban that just happened to be outside Mr. Cordova's residence when they issued a search warrant." Tr. at 22:5-7 (Morrissey). See Tr. at 21:5-22:3 (Morrissey). Cordova argued that Garcia's statements undermine the confidence in the jury's verdict, because Garcia said that he did not ask Cordova to murder Dix or pay Cordova to murder Dix. See Tr. at 23:21-25 (Acton).

The United States responded to Cordova's arguments in favor of a new trial, first by stating that Count 3, which is causing death through use or possession of a firearm and of which the jury found Cordova guilty, is not dependent on Count 2. See Tr. at 24:9-14 (Castellano). The United States then stated that immunization for Garcia in a new trial is not an issue that is ripe today, because "that issue never comes up unless and until the Court grants a new trial." Tr. at 24:6-8 (Castellano). See id. at 25:6-12 (Castellano). The Court responded that it understands Cordova's request to be something like a remittitur – that, if the Government refuses to grant immunity to Garcia, then the charges should be dismissed. See Tr. at 25:13-16 (Court). The Court disagreed with the United States' characterization, and it stated that Cordova is asking the Court to grant the new trial and then ask the United States to decide on immunizing Garcia. See Tr. at 25:4-8 (Court). The United States argued that the Court already has indicated it is inclined to deny the new trial motion based on the newly discovered evidence, which means that Cordova already has lost the new trial motion unless Cordova persuaded the Court otherwise. See Tr. at 25:17-20 (Castellano). The Court asked the United States if it would immunize Garcia if the Court granted a new trial. See Tr. at 26:3-8 (Court). The United States said that "it would be unlikely" to grant Garcia immunity, because "[t]here is no reason to grant immunity to Mr. Garcia." Tr. at 26:9-10 (Castellano). See Tr. at 26:12-14 (Castellano).

The United States presented Garcia's Kastigar letter as its Exhibit 1. See Tr. at 26:21-27:4 (Castellano, Court). The United States provided the letter to show that Garcia was not granted full immunity -- the United States granted Garcia immunity only from "the statements he made at the time of the debrief if he was truthful" and "the Government's case-in-chief against him." Tr. at 25:8-10 (Castellano); id. at 25:11-14 (Castellano). See id. at 27:5-10 (Castellano). The United

States clarified that Garcia would not have protection against anything he says at a new trial and that the United States could cross-examine Garcia about anything he says at trial.  See Tr. at 28:5-25 (Castellano, Court).  The United States affirmed that Garcia is "not immunized from statements that he would be subpoenaed by for trial by the defendant and then make on the stand." Tr. at 28:15-19 (Court, Castellano).  The United States highlighted the evidence against Cordova at trial -- that Cordova said to Garcia, "'Remember that thing I did for you'" and that three or four other witnesses corroborated that Dix' murder was a murder-for-hire, which Cordova knew about, because he knew Garcia.  Tr. at 28:5 (Castellano).  See Tr. at 29:1-13 (Castellano).  The United States noted that Garcia confirmed Montoya's trial testimony, which was that Cordova had been talking about Dix' murder and that he should not have been talking about Dix' murder.  See Tr. at 28:20-24 (Castellano).

The United States argued that Garcia could face jeopardy at the State level and that Garcia could still exercise his Fifth Amendment right not to incriminate himself.  See Tr. at 29:6-14 (Castellano).  The United States then argued that Garcia's statements do not qualify as statements against interest under rule 804(b)(3), because, assuming Garcia is unavailable for trial, the statements are not against Garcia's interest and are not sufficiently corroborated.  See Tr. at 29:15-20 (Castellano).  Arguing the against-interest issue, the United States noted that the two statements Cordova wants the Court to admit are from different paragraphs,  see Tr. at 29:20-23 (Castellano), and that Garcia's statement that he asked Montoya to kill Dix also is in a different paragraph,  see Tr. at 30:2-4 (Castellano).  The United States further noted that when Garcia asked Cordova to "'rock Dix,'" he did not necessarily mean to kill Dix.  Tr. at 30:1 (Castellano).  See id. at 29:25-30:2 (Castellano).  The United States noted that Garcia also states that "he does not know

for sure who killed Dix or reiterated that he called for the murder." Tr. at 30:9-11 (Castellano). The United States, therefore, argued: "[T]he statement -- Garcia stated he never asked Cordova to kill Dix or murder Dix -- is not against Mr. Garcia's interests." Tr. at 30:11-13 (Castellano).

The United States argued that the Supreme Court of the United States in <u>Williamson v. United States</u>, 512 U.S. 594 (1994), concluded that "the exception to the hearsay rule for statements against penal interests does not allow for the admission of non self-inculpatory statements, even if they're made within a broader narrative that is generally self-inculpatory." Tr. at 30:6-14 (Castellano). The United States argued that, when Cordova cited Justice Scalia's opinion, he was citing to a concurrence that no other justices joined, and in which Justice Scalia agreed with the Supreme Court that "statement" does not mean "an extended declaration." Tr. at 31:4-5 (Castellano). <u>See</u> Tr. at 30:24-31:2 (Castellano). Thus, admitting the statement against Garcia's penal interest would not mean admitting the statements that Cordova wants admitted, which were made at a different time during the debrief. <u>See</u> Tr. at 31:12-17 (Castellano).

The United States next argued that, to determine corroboration, the Court must look at a number of factors, including "whether the declarant had at the time of the making of the statement pled guilty or was still exposed to prosecution for making the statement." Tr. at 31:20-32:3 (Castellano)(citing <u>United States v. Sanchez</u>, No. CR 02-2283 JB WL 27384948 (D.N.M. Oct. 3, 2003)(Browning, J.). The United States said that this factor weighs in its favor, because "Garcia was not really facing any penal interests unless he lied and we could prove that." Tr. 32:4-5 (Castellano). The United States argued that the Court must look at whether the declarant was motivated to lie when making his statement. <u>See</u> Tr. at 32:6-8 (Castellano). Garcia was motivated to lie, the United States argues, because he was trying to be admitted to a gang dropout program,

and because he "was still looking out for his friend because they had been close." Tr. at 32:12-23 (Castellano).

The United States turned to another factor that the Court must consider -- the relationship between the declarant and the accused. See Tr. at 33:4-6 (Castellano). The United States argued that, in United States v. Baca, the denial of Cordova's first new trial motion, the Court concluded that Cordova sold drugs for Garcia, and that this conclusion shows that Cordova and Garcia had a friendship sufficiently close to motivate Garcia to lie. See Tr. at 32:13-22 (Castellano). The United States addressed the final factor -- the nature and strength of independent evidence relevant to the conduct -- and contended that there is nothing beyond the statement itself that corroborates the statement. See Tr. at 33:7-14 (Castellano). The United States argued further that Garcia contradicts his own statement somewhat by indicating that Cordova told him to order favors for "that thing he did for Mr. Garcia, meaning the murder." Tr. at 33:20-21 (Castellano). See id. at 33:16-21 (Castellano). The United States also argued that, because the debrief is the first time in which Garcia said he never hired Cordova to murder Dix and that the debrief occurred after a guilty verdict, these statements are uncorroborated. See Tr. at 33:1-6 (Castellano). Thus, the United States argued, the Court cannot admit Garcia's statements as statements against penal interest, because the statements are not corroborated. See Tr. at 33:9-11 (Castellano). The United States reiterated that the Court cannot admit Garcia's statements: "it's nothing more than a statement that can be asked to cross-examine a witness and it doesn't change the nature of the case." Tr. at 34:7-10 (Castellano).

Cordova argued that he has information that, during the debrief, Garcia never reported that Cordova said he did something for Garcia, but instead, Garcia said that his time in custody with

Cordova strengthened his feeling that Cordova was not involved in Dix' murder.  See Tr. at 36:15-37:3 (Morrissey).  The United States argued that these facts are irrelevant to the analysis, because the issue is whether a statement against interests is sufficiently corroborated so that the Court can admit it under rule 804(b)(3) as a statement against interests.  See Tr. at 37:18-38:8 (Castellano, Court).  Cordova then argued that, in contrast to the United States' earlier statement, Count 3 is dependent upon Count 2.  See Tr. at 38:11-24 (Acton).  Cordova summarized his arguments: the Court should grant the new trial, because the Court should admit the newly discovered evidence for the truth of the matter asserted as a statement against penal interests, and because Cordova should be able to immunize his witness just like the United States immunized its witness.  See Tr. at 41:22-42:15 (Acton, Court).

The Court noted that the United States will not immunize Garcia, and thus, Cordova is asking for a dismissal and not for a new trial.  See Tr. at 41:23-42:1 (Court).  Cordova reiterated that 18 U.S.C. § 6002 and § 6003 are unconstitutional as applied to Cordova, because he is not allowed to immunize his witnesses, while the United States can immunize their witnesses.  See Tr. at 42:24-43:9 (Acton, Court).  The Court emphasized that this argument, again, is asking the Court to order a new trial and then dismiss it, because there is a due process violation.  See Tr. at 42:12-22 (Acton).  Cordova then argued that Lopez v. United States, Williamson v. United States, and rule 804(b)(3) make Garcia's statements admissible, and that the hearsay rule would allow Sainato to testify as to what Garcia told him.  See Tr. at 45:2-25 (Acton).  Cordova stated that he is facing a life sentence for a crime he did not commit and asked the Court to take time to consider these issues.  See Tr. at 45:18-46:6 (Acton).  The Court clarified that the motion for a new trial is denied.  See Tr. at 46:19-21 (Court).

9.     **The Supplemental Brief**

Cordova submits a brief in support of his Motion "to provide legal authority" that the Court could admit Garcia's interview statements for the truth of the matter asserted in a new trial.  <u>See</u> Ex Parte Supplemental Brief in Support of Ex Parte Rule 33(b)(1) Motion for New Trial at 1, filed September 11, 2019 (Doc. 1120)("Supplemental Brief").  Cordova provides the statement he seeks to introduce at a new trial: "Garcia . . . asked Mario Montoya to kill Dix.  Garcia stated that he never asked Cordova to murder Dix, nor did Cordova ever talk to Garcia about the murder after it happened."  Supplemental Brief at 2 (citing Garcia FD-302 May 8, 2019 at 2, filed September 11, 2019 (Doc. 1108-4)("May 8 302")).

Cordova begins by arguing that "[T]wo 'important constitutional values'" support Cordova's request that Garcia testify at a new trial: "'(1) a witness' privilege not to incriminate himself, and (2) a defendant's right to establish a defense.'"  Supplemental Brief at 3 (quoting <u>United States v. Rivas Macias</u>, 537 F.3d 1271, 1276-77 (10th Cir. 2008)).  Cordova acknowledges that Garcia's invocation of his right to not incriminate himself supplants his right to establish a defense.  <u>See</u> Supplemental Brief at 3.  He notes, however, that Garcia "'must factually establish that the risks of incrimination resulting from [his] compelled testimonial communications to be substantial and real, not merely trifling or imaginary, hazards of incrimination.'"  Supplemental Brief at 3 (quoting <u>United States v. Schmidt</u>, 816 F.2d 1477, 1481(10th Cir. 1987)(internal quotations omitted).  Cordova argues that Garcia's risk of incrimination is not substantial or real, but merely trifling.  <u>See</u> Supplemental Brief at 3.  Cordova acknowledges that the Court dismissed a murder VICAR charge against Garcia without prejudice, but argues that, because Garcia confessed to conspiring to murder Dix and offering someone money to kill Dix, "any exposure to

continued jeopardy for the Dix murder would come *not* from what he might say at a new trial, but rather from what he has already confessed to in his plea agreement and at his plea hearing." Supplemental Brief at 4 (emphasis in original).

Cordova then argues that the Court should not decide this Motion based on speculation that Garcia may invoke his right against self-incrimination at a new trial. See Supplemental Brief at 5. Cordova notes that, although Garcia invoked this right at the last trial, he also communicated with the FBI about his part in Dix' murder. See Supplemental Brief at 5. Thus, Cordova argues, the Court cannot be sure that Garcia will invoke this right during a new trial. See Supplemental Brief at 5.

Cordova then addresses that Garcia gave these statements under a grant of immunity under Kastigar v. United States, 406 U.S. 401 (1972). See Supplemental Brief at 5 (citing May 8 302 at 1). Cordova argues that the Court can compel Garcia to testify, even if Garcia asserts his right against self-incrimination, because the United States granted Garcia immunity from prosecution. See Supplemental Brief at 5 (citing May 8 302 at 1 (stating that Garcia provided information "[u]nder the protection of Kastigar")). Cordova notes that this "immunity is effective as against both federal *and* state criminal prosecutions." Supplemental Brief at 5 (citing United States v. Balsys, 524 U.S. 666, 683 (1998)(emphasis in Supplemental Brief). Cordova acknowledges that he does not have access to the Kastigar v. United States documents and does not know whether the United States compelled Garcia to "debrief," but argues that, nonetheless, the United States cannot use Garcia's 302 statements against him. Supplemental Brief at 5-6. Thus, Cordova argues, the Court should require Garcia to testify at a new trial. See Supplemental Brief at 6.

Cordova then argues that, if the United States does not immunize Garcia, the Court should

grant Cordova a new trial and then acquit him, because of a due process violation.  See Supplemental Brief at 6.  Cordova notes that both the United States interfering with a "defense witness's decision to testify" and the United States' "selective use of immunity to distort the fact-finding process" may violate a defendant's due process.  Supplemental Brief at 6 (first quoting United States v. Serrano, 406 F.3d 1208, 1217 (10th Cir. 2005); second citing United States v. Meda, 812 F.3d 502, 518 (6th Cir. 2015); United States v. Chapman, 765 F.3 d720, 731 (7th Cir. 2014); United States v. Quinn, 728 F.3d 243, 238 (3d Cir. 2013)(en banc); United States v. Straub, 538 F.3d 1147, 1158 (9th Cir. 2008); United States v. Diaz, 176 F.3d 52, 115 (2d Cir. 1999); United States v. Abbas, 74 F.3d 506 (4th Cir. 1996); United States v. Angiulo, 897 F.2d 1169, 1192 (1st Cir. 1990); United States v. Hooks, 848 F.2d 785, 802 (7th Cir. 1988)).  Cordova argues that, because the United States granted immunity to Montoya to testify that Cordova received payment for killing Dix, if the United States does not grant immunity to Garcia to testify that he never spoke to Cordova about the murder, then "the immunization statutes (18 U.S.C. § 6002-03) are unconstitutional *as applied* to Cordova."  Supplemental Brief at 8 (citing Earl v. United States, 361 F.2d 531, 534 n.1 (D.C. Cir. 1966))(emphasis in original).  Cordova states: "The relief in this scenario is not for the Court to grant Garcia immunity, but rather to dismiss the indictment or enter a judgment of acquittal."  Supplemental Brief at 8 (citing United States v. Quinn, 728 F.3d at 248; United States v. Anguilo, 897 F.2d at 1191).  Cordova suggests that the Court grant a new trial for Cordova to present Garcia's statements, and then that the Court dismiss the indictment or acquit Cordova if the United States does not immunize Garcia.  See Supplemental Brief at 8.

Cordova then addresses the rule that permits Garcia's statement to be considered for its truth, which is the rule that permits statements against a party's interest.  See Supplemental Brief

at 8 (citing Fed. R. Evid. 804(b)).[11] Cordova analogizes a Tenth Circuit case, <u>United States v.</u> <u>Lopez</u>, 777 F.2d 543 (10th Cir. 1985), in which a co-defendant's attorney testified that his own client had made statements exonerating Lopez, because the co-defendant made these statements in front of Lopez and because the co-defendant was unavailable for trial. <u>See</u> Supplemental Brief at 9-10 (citing <u>United States v. Lopez</u>, 777 F.2d at 543). The Tenth Circuit concluded that a reasonable person in the co-defendant's position would not have made statements that shifted the liability to himself "'unless he believed them to be true.'" Supplemental Brief at 9 (quoting <u>United States v. Lopez</u>, 777 F.3d at 554). Cordova acknowledges that <u>United States v. Lopez</u> is distinguishable from Cordova's case, because the <u>United States v. Lopez</u> statements were made before trial, but he minimizes this distinction by noting that Garcia gave these statements before

---

[11]Cordova excerpts rule 804(b) in his brief.

The following are not excluded by the rule against hearsay if the defendant is unavailable as a witness.

. . . .

(3) *Statement against Interest*. A statement that:

    (A)     a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, . . . it . . . had so great a tendency . . . to expose the declarant to . . . criminal liability; and

    (B)     is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3)(A), (B).

he was sentenced and before the United States agreed to drop the Dix murder count.  See Supplemental Brief at 10-11.[12]  Thus, Cordova argues, Garcia's statements are against his penal interest.  See Supplemental Brief at 11.

Cordova argues that the Supreme Court case, Williamson v. United States, 512 U.S. at 594, authorizes the Court to admit Garcia's statements at a new trial.  See Supplemental Brief at 11.  In Williamson v. United States, the Supreme Court concluded that self-inculpatory statements were admissible, but "the entire narrative" was not permissible.  Supplemental Brief at 11 (citing Williamson v. United States, 512 U.S. at 601).  Cordova argues, however, that Williamson v. United States encourages a fact-specific analysis to determine whether a statement is self-inculpatory.  See Supplemental Brief at 11 (citing Williamson v. United States, 512 U.S. at 603).  Thus, Cordova argues, Garcia's statement that he asked Montoya to kill Dix gives the necessary context to his statement that he did not ask Cordova to kill Dix, and the two statements are therefore inextricable.  See Supplemental Brief at 11.  Thus, he argues, the Court must allow both statements in together.  See Supplemental Brief at 11.

Cordova acknowledges that, to be permissible evidence, the statements must "be supported by corroborating circumstances that clearly indicate [their] trustworthiness," so he offers that

_____

[12]The United States and Garcia agreed that, at the time of sentencing, the United States would dismiss the Count 2, Dix' murder, of the Superseding Indictment, filed March 9, 2017 (Doc. 371).  See Plea Agreement, filed January 25, 2015 (Doc. 503).  The Honorable Kevin R. Sweazea, United States Magistrate Judge for the United States District Court for the District of New Mexico, accepted the plea, noting that Count 2 of the Superseding Indictment would be dismissed at the time of sentencing.  See Plea Minute Sheet at 1, filed January 25, 2018 (Doc. 504).  At sentencing, the Court imposed a sentence on Garcia related to Count 1 of the Superseding Indictment and counts of superseding indictments in related cases, but the Court did not impose a sentence as to Count 2 of the Superseding Indictment.  See Sentencing Minute Sheet at 1, filed May 10, 2019 (Doc. 1052).

support.  Supplemental Brief at 12 (citing Fed. R. Evid. 804(b)(3)(B)).  He argues that the only reason that the Court could doubt the trustworthiness of Garcia's statements is if the Court believes Garcia made these statements to exonerate Cordova.  See Supplemental Brief at 12-13 (citing Ledet v. United States, 297 F.2d 737, 739 (5th Cir. 1962)).  This Court has considered, among other factors, the declarant's credibility when deciding statements' trustworthiness.  See Supplemental Brief at 13 (citing United States v. Baca, No. 16-cr-1613 JB, 2019 U.S. Dist. LEXIS 90321, at *63 (Browning, J.)).  Cordova notes that the Court stated at the Motion hearing that "it was unlikely to find circumstantial guarantees of trustworthiness '*in this case*.'"  Supplemental Brief at 14 (emphasis in original).  Cordova argues that, even if the Court does not find Garcia trustworthy, rule 804(b)(3)(B) "'requires *not* a determination that the declarant is credible, but a finding that the circumstances clearly indicate that the statement was not fabricated.'"  Supplemental Brief at 14 (quoting United States v. Lozado, 776 F.3d 1119, 1131 (10th Cir. 2015)(emphasis added in Supplemental Brief)).  Cordova emphasizes that, not only is there no evidence that contradicts Garcia's statements, no evidence suggests that Garcia was trying to exonerate Cordova.  See Supplemental Brief at 14-15).  Garcia gave the interview to secure himself better prison conditions.  See Supplemental Brief at 15.  Moreover, his attorney objected to questions about Dix' murder in the first part of the interview, and, in the second part of the interview, Garcia stated that he thought Cordova was involved in the murder, which implicates Cordova instead of exonerates him.  See Supplemental Brief at 15.

Cordova then argues that the United States' principal witness, Montoya, gave inconsistent testimony, in contrast to Garcia, whose testimony is consistent.  See Supplemental Brief at 16. Cordova also notes that Montoya never testified to "any agreement or promise by Garcia (or

anyone else) to pay Cordova for the murder." Supplemental Brief at 17. Cordova again analogizes to United States v. Lopez, in which the Tenth Circuit concluded that the totality of the case's facts, including a lack of physical evidence, corroborated the evidence. See Supplemental Brief at 17 (citing United States v. Lopez, 777 F.2d at 554). Cordova argues that the totality of his case's facts, including a lack of physical evidence, compel the Court to permit the newly discovered evidence. See Supplemental Brief at 17.

### LAW REGARDING MOTIONS FOR A NEW TRIAL

Rule 33 of the Federal Rules of Criminal Procedure provides:

**(a)** **Defendant's Motion.** Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b)** **Time to File.**

> **(1)** **Newly Discovered Evidence.** Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

> **(2)** **Other Grounds.** Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33 (bolded in original). Under rule 33, the district court has discretion to grant a new trial if the interests of justice require one. See Fed. R. Crim. P. 33(a). See also United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999). "A motion for a new trial is not," however, "regarded with favor and should only be granted with great caution." United States v. Sinclair, 109 F.3d 1427, 1531 (10th Cir. 1997)(citing United States v. Chatman, 994 F.2d 1510, 1518 (10th Cir. 1997)). "'[A] defendant may not invoke rule 33 when he or she has pled guilty.'" United

States v. Christy, 883 F. Supp. 2d 1040, 1047 (D.N.M. 2012)(Browning, J.)(quoting United States v. Lambert, 603 F.3d 808, 809 (10th Cir. 1979)).

"The Tenth Circuit has further stated that when 'deciding a motion for new trial, the [trial] court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" United States v. Thomas, No. 13-CR-01874 MV, 2016 WL 9819560, at *8 (D.N.M. Aug. 5, 2016)(Vázquez, J.)(quoting United States v. Evans, 42 F.3d 586, 593 (10th Cir. 1994)). "'The power to grant a new trial on the ground that the verdict is against the weight of the evidence should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.'" United States v. Guzman-Martinez, No. CR 03-2118 RB, 2004 WL 7338099, at *1 (D.N.M. March 10, 2004)(Brack, J.)(quoting United States v. Mounkes, 204 F.3d 1024, 1027 (10th Cir. 2000)).

The Court has previously addressed motions for new trials under rule 33 in various cases. See, e.g., United States v. Folse, No. CR 15-2485 JB, 2018 WL 6047415, at *20-22 (D.N.M. Nov. 19, 2018)(Browning, J.)(denying a motion for a new trial and a request for additional discovery where the defendant did not produce evidence that, with additional discovery, he could show that the United States destroyed evidence and, despite having earlier had notice that alleged deficiencies might exist in the United States' evidence, he did not seek evidence of such information); United States v. Neha, No. CR 04-1677 JB, 2006 WL 4062889, at *2-4 (D.N.M. June 26, 2006)(Browning, J.)(denying a new trial motion where the defendant complained of the United States' brief references to his criminal history and of the United States' comment to the

jury that the Court altered a co-conspirator's statement, and where the weight of the evidence supported the verdict).

Rule 33 permits a defendant to move for a new trial in the event of newly discovered evidence if the defendant presents that motion within three years of the verdict of guilt. See Fed. R. Crim. P. 33(b)(1). Ordinarily, a defendant seeking a new trial under rule 33(b)(1) must satisfy a five-part test for newly discovered evidence that the Tenth Circuit outlined in United States v. Sinclair. See 109 F.3d at 1531. The defendant must show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

United States v. Sinclair, 109 F.3d at 1531 (internal quotation marks omitted)(quoting United States v. Stevens, 978 F.2d 565, 570 (10th Cir. 1992)). See United States v. Quintanilla, 193 F.3d at 1147 (discussing United States v. Sinclair's rule 33 test). See also United States v. Velarde, No. CR 98-391 JB, 2008 WL 5993210, at *31-44 (D.N.M. May 16, 2008)(Browning, J.)(permitting a new trial in a sexual assault case where, after the trial, the defendant uncovered evidence that the alleged victim had accused other individuals of sexual assault). "Under Sinclair, a court cannot grant a new trial on the discovery of new impeachment evidence." United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711931, at *33 (D.N.M. Feb. 2, 2015)(Browning, J.)(citing United States v. Sinclair, 109 F.3d at 1531).

## LAW REGARDING VICAR AND RICO

RICO prohibits specific activities when they are committed in connection with a pattern of racketeering activity. See, e.g., 18 U.S.C. § 1962(b) ("It shall be unlawful for any person through

a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.").   RICO defines a "pattern of racketeering activity" to "require[] at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).   Racketeering activity includes "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance" that is a state law felony, 18 U.S.C. § 1961(1)(A), and "any act which is indictable under any" one of myriad federal statutes, 18 U.S.C. § 1961(1)(B)-(G).

A VICAR violation requires an underlying state law offense, i.e., someone "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do."  18 U.S.C. § 1959(a). Committing and conspiring to commit assault with intent to inflict serious bodily injury do not violate VICAR.   See United States v. DeLeon, 318 F. Supp. 3d 1272, 1275 (D.N.M. 2018)(Browning, J.)(citing 18 U.S.C. § 1959(a)).   The underlying state law offense becomes a federal VICAR violation only when it is committed: (i) "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity"; or (ii) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."   18 U.S.C. § 1959(a). VICAR does not incorporate the state offense's statute of limitations.   See United States v.

DeLeon, No. CR 15-4268 JB, 2018 WL 2323236, at *2 (D.N.M. May 22, 2018)(Browning, J.)(citing United States v. Licavoli, 725 F.2d 1040, 1046-47 (6th Cir. 1984); United States v. Davis, 576 F.2d 1065, 1066-67 (3d Cir. 1978); United States v. Brown, 555 F.2d 407, 418 n.22 (5th Cir. 1977)).

VICAR employs RICO's definition of racketeering activity. See 18 U.S.C. § 1961(1) (defining racketeering activity for RICO purposes); 18 U.S.C. § 1959(b)(1) (stating that, under VICAR, racketeering activity "has the meaning set forth in section 1961 of this title"). To succeed on a VICAR charge, the United States must show that the enterprise and not the individual defendant committed a pattern of racketeering activity. United States v. DeLeon, No. CR 15-4268 JB, 2017 WL 3054511, at *106 (D.N.M. June 30, 2017)(Browning, J.). Moreover, the evidence must establish "that the enterprise's members, acting for the enterprise, engage in racketeering activity," but not "that the members have knowledge that each member will advance the activity or have an agreement to commit the activity." United States v. Baca, No. CR 16-1613 JB, 2019 WL 399919, at *1 (D.N.M. Jan. 31, 2019)(citing 18 U.S.C. § 1959). The United States must demonstrate that, at the time of the charged offense, the enterprise "was . . . engaging in racketeering activity in a systematic way." United States v. Baca, 323 F. Supp. 3d 1292, 1298 (D.N.M. 2018)(Browning, J.). "The best way -- and, perhaps, the only way -- to prove that [an enterprise] was engaged in racketeering activity when the conduct charged . . . occurred . . . is to introduce evidence of roughly contemporaneous instances of racketeering activity in which the [enterprise] engaged." United States v. DeLeon, 323 F.R.D. 672, 691 (D.N.M. 2017)(Browning, J.).

RICO states that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(1). VICAR employs a slightly narrower definition of the term "enterprise" such that it "includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). "An association-in-fact requires: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit those associated with the enterprise to pursue the enterprise's purpose." United States v. Kamahele, 748 F.3d 984, 1003 (10th Cir. 2014). See Boyle v. United States, 556 U.S. 938, 948 (2009)("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."); id. ("While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.").

The Court has addressed other issues related to VICAR. See, e.g., United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 4100949, at *1-6 (D.N.M. Aug. 28, 2018)(Browning, J.)(determining that an as-applied challenge to VICAR's constitutionality is a "contradiction in terms" but permitting the defendant to bring in the future a facial challenge to the statute); United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 4279442, at *2 (D.N.M. April 18, 2018)(Browning, J.)("The Court does not believe that enterprise evidence is subject to rule 404(b)(2)'s notice requirement in a criminal case."). The Court has also concluded:

> That conspiring to commit murder "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity"

violates VICAR is immaterial for rule 802(d)(2)(E) purposes. 18 U.S.C. § 1959. The inquiry under rule 801(d)(2)(E) is whether a statement was made during and in furtherance of a conspiracy, but a VICAR violation is not, itself, a conspiracy even though it may have a conspiracy as its underlying offense.

United States v. DeLeon, 287 F. Supp. 3d 1187, 1255 (D.N.M. 2018)(Browning, J.).

## RELEVANT LAW REGARDING THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

The Fifth Amendment's self-incrimination clause states: "No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Statements that a defendant makes during a law-enforcement officer's custodial interrogation are generally not admissible as evidence against that defendant if the declarant has not received the warnings that Miranda, 384 U.S. at 436, requires. See Dickerson v. United States, 530 U.S. 428, 444 (2000); United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008). Miranda's requirements, however, are limited. "Police officers need not administer Miranda warnings to everyone they question." United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008). Rather, "Miranda applies only to 'custodial interrogation[s].'" United States v. Jones, 523 F.3d at 1239 (quoting Miranda, 384 U.S. at 444).

In other words, "Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" United States v. Chee, 514 F.3d at 112 (quoting United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)). Any questioning by law enforcement officers "reasonably likely to elicit an incriminating response" constitutes an interrogation. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). The "in custody" requirement is satisfied only when a suspect's "'freedom of action is curtailed to the degree associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984)(quoting

California v. Beheler, 463 U.S. 1121, 1125 (1983)).  See United States v. Jones, 523 F.3d at 1239.

Further, "'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. Rogers, 391 F.3d 1165, 1171 (10th Cir. 2004)(quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).  In determining whether an interrogation was custodial, the Court must "determine whether 'a reasonable [person] in the suspect's position would have understood the situation as the . . . functional equivalent of formal arrest.'" United States v. Chee, 514 F.3d at 1112 (alterations in United States v. Chee)(quoting Berkemer v. McCarty, 468 U.S. at 442).

The Tenth Circuit, in recognizing that an examination of the circumstances' totality is fact intensive, has instructed district courts to consider a number of non-exhaustive factors in determining whether a custodial interrogation took place.  See United States v. Jones, 523 F.3d at 1240.  Those factors include: (i) whether the suspect is informed that he or she may end the interview at will, or is not required to answer questions; (ii) whether the interview's nature is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect.  See United States v. Jones, 523 F.3d at 1240 (citing United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)).  Several factors indicate police domination of the encounter: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) an officer's displaying of weapons; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory.  See United States

v. Jones, 523 F.3d at 1240. The Tenth Circuit has been deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole rather than exclusively relying on some enumerated factors while ignoring others. See United States v. Jones, 523 F.3d at 1240.

In several cases, the Court has addressed whether a custodial interrogation occurred. See, e.g., United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating that a defendant in handcuffs was in custody, but that no interrogation occurred when the officer did not ask the defendant any questions reasonably likely to elicit an incriminating response); United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding that law enforcement officers interrogated a defendant when they asked him questions, but that the interrogation was not custodial, because the officers informed the defendant that he was not under arrest and could stop the interview; because the officers did not engage in accusatory questioning; and, because, although multiple officers joined the questioning, they separated the defendant from those individuals who would provide him moral support, and the defendant could see an officer's firearm, the officers did not physically contact the defendant or suggest that the defendant had to comply); id. at 1362-63 (concluding that the defendant was not in custody when law enforcement officers informed him that he did not need to answer their questions; when the officers did not engage in accusatory, prolonged questioning and asked few questions; when the defendant of his own volition separated himself from those who could lend moral support; and when the officers did not physically or orally suggest that the defendant must comply with their requests); United States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurred where the defendant

was advised of his rights, made the incriminating statements after making his telephone call, admitted that he received no pressure to waive his rights, and was not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interviewed the defendant in surroundings familiar to him, informed him of his rights, engaged in no coercive conduct, and gave the defendant a choice to speak with them and sign an advice of rights form).

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." United States v. Christy, 2011 WL 5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802). Under rule 801(c) of the Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999)(Carnes, J.). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)(Hartz, J.)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See United States v. DeLeon, 287 F. Supp. 3d at 1235-36.

## LAW REGARDING STATEMENT AGAINST INTEREST

Under rule 804(b)(3) of the Federal Rules of Evidence, an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest." United States v. Lozado, 776 F.3d 1119, 1125 (10th Cir. 2015)(citing Williamson v. United States, 512 U.S., 594, 599-600). A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true." Fed. R. Evid. 804(b)(3)(A). Moreover, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3)(B).

Rule 804(b)(3) embodies "'the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.'" United States v. Smalls, 605 F.3d at 780-81 (quoting Williamson v. United States, 512 U.S. at 599). The Tenth Circuit has said: "We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend." United States v. Smalls, 605 F.3d at 783. That sort of statement is admissible, however, only to the extent that it inculpates the declarant, because "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." Williamson v. United States, 512 U.S. at 600. See United States v. DeLeon, 287 F. Supp. 3d at 1240.

<u>**ANALYSIS**</u>

The Court will not grant Cordova a new trial. The Court concludes that Garcia's statements do not satisfy the five-part test for newly discovered evidence under <u>United States v. Sinclair</u>. They are merely impeaching evidence that probably would not produce an acquittal in a new trial. Moreover, even if the Court granted Cordova a new trial, Garcia's testimony would be inadmissible, because it does not fall under the statement-against-penal-interest exception to hearsay evidence. The Court further concludes that Garcia did not waive his Fifth Amendment privilege against self-incrimination nor does Cordova's right to present a full and meaningful defense overcome Garcia's Fifth Amendment privilege against self-incrimination, and thus, the Court will not deny Garcia's Fifth Amendment privilege against self-incrimination. Finally, the Court concludes that, because the United States did not violate Cordova's due process rights by its selective immunization, it will not compel the United States to immunize Garcia with the consequence of acquitting Cordova on the United States' refusal to immunize Garcia.

**I.    GARCIA'S TESTIMONY DOES NOT QUALIFY AS NEWLY DISCOVERED <u>EVIDENCE UNDER</u> UNITED STATES V. SINCLAIR<u>'S FIVE-FACTOR TEST.</u>**

The Court will not grant Cordova a new trial based on the Garcia's statements. Garcia's statements, which Cordova proffers as newly discovered evidence, are not newly discovered evidence under <u>United States v. Sinclair</u>. To meet the <u>United States v. Sinclair</u> test, Cordova must show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

United States v. Sinclair, 109 F.3d at 1531 (internal quotation marks omitted)(quoting United States v. Stevens, 978 F.2d at 570). Although Cordova's proffered evidence meets factors one, two, and four, it does not meet factors three and five, and, thus, the Court denies that the statements are newly discovered evidence.

### A. GARCIA'S STATEMENTS WERE DISCOVERED AFTER TRIAL AND A LACK OF DUE DILIGENCE DID NOT CAUSE CORDOVA TO LEARN ABOUT THESE STATEMENTS AFTER TRIAL.

To meet the first United States v. Sinclair prong, Cordova must demonstrate that Garcia's statements were discovered after trial. See United States v. Sinclair, 109 F.3d at 1531. Cordova contends that Garcia did not give his statements to the FBI until May 8, 2019, after Cordova was convicted and two days before Garcia's sentencing. See Motion at 7. The United States acknowledges that Cordova meets United States v. Sinclair's first prong. See Aug. 16 Tr. at 17:3-8 (Castellano). Thus, the Court concludes, and the United States concedes, that the new evidence was discovered after trial. See United States v. Velarde, 2008 WL 5993210, at *36.

To meet the second United States v. Sinclair prong, Cordova must demonstrate that his lack of due diligence did not cause his failure to learn of Garcia's statements. See United States v. Sinclair, 109 F.3d at 1531. Cordova's lack of diligence did not cause his failure to learn of Garcia's statements, because these statements, which were not given until after trial, could not have been discovered with due diligence before or during trial. See Motion at 7. Moreover, Cordova attempted to call Garcia to testify, which is an exercise of diligence. Due diligence does not, however, require that a defendant exercise the "highest degree of diligence possible to locate evidence prior to trial; only reasonable diligence is required. This requirement prevents defendants from keeping an evidentiary trump card in the event of a conviction." United States v. Rodella,

2015 WL 711931 at *31. Here, Cordova can be said to have, at the very least, acted with "reasonable diligence," because he attempted to call Garcia as a witness. Compare with United States v. LaVallee, 439 F.3d at 699 (concluding that the defendant did not exercise due diligence when the defendant failed to discover that the victim in a prison beating did not name the defendant as one of the assailants, because the defendant never attempted to interview the victim about the abuse allegations). Further, the United States acknowledges that Cordova meets United States v. Sinclair's second prong. See Aug. 16 Tr. at 17:3-8 (Castellano). Thus, the Court concludes, and the United States concedes, a lack of due diligence did not cause Cordova to discover the statements after trial. See United States v. Velarde, 2008 WL 5993210, at *36.

## B. SOME OF GARCIA'S STATEMENTS ARE MERELY IMPEACHING.

To meet the third United States v. Sinclair prong, Cordova must demonstrate that Garcia's statements are more than merely impeaching. See United States v. Sinclair, 109 F.3d at 1531. Cordova argues that Garcia's statements are more than merely impeaching, because they "negate an essential element" of Cordova's VICAR charge. Motion at 11 (arguing that the statements eviscerate the jury's conclusion that Cordova killed Dix in a murder-for-hire contractual arrangement). Garcia's statement that he did not ask Cordova to kill Dix is not consistent with Montoya's testimony. See Motion at 3 (citing Montoya Trial Excerpts at 2, 4-5, filed August 14, 2019 (Doc. 1108-A)). Thus, Garcia's statement would serve to discredit Montoya's truthfulness. Discrediting a witness' veracity, however, is the definition of impeachment. See United States v. DeLeon, No. CR 15-4268 JB, 2019 WL 5587180, at *203 n.157 (D.N.M. Oct. 29, 2019)(Browning, J.)(citing Definition of Impeach, Black Law's Dictionary (11th ed. 2019)(defining impeach as "[t]o discredit the veracity of (a witness)")). Although Cordova argues

that Garcia's statements "negate an essential element" of his VICAR charge, Garcia's statements would not be dispositive regarding that element and instead would add only another narrative through which the jury would sift. Moreover, other witnesses have already impeached Montoya robustly. See Aug. 16 Tr. at 26:15-21 (Castellano). The jury already has assessed Montoya's credibility and, when weighing Montoya's credibility, the jury was able to take into consideration that other evidence conflicted with Montoya's testimony. See Aug. 16 Tr. at 26:15-21 (Castellano). If the jury concluded that Montoya was credible, they did so with the knowledge that he had motivation to lie and that his testimony was contradicted several times. See United States v. DeLeon, 2019 WL 5587180, at *203. The Court thus concludes that Garcia's statements that he asked Montoya, not Cordova, to kill Dix are merely impeaching and do not meet the third United States v. Sinclair prong.

The Court concludes that Garcia's statement that he did not talk to Cordova about the murder after it happened is not merely impeaching, because it does not contradict earlier testimony. Although there was testimony that Cordova asked Garcia if he remembered that "thing" that he did for Garcia, this statement is open to multiple interpretations, so the Court cannot say that the newly discovered evidence necessarily contradicts this testimony. Tr. at 28:5 (Castellano). Thus, the Court concludes that the statement that Garcia did not talk to Cordova about Dix' murder after it happened is more than merely impeaching.

Neither of Garcia's statements, however, "negates an essential element of the crime, i.e. that Cordova killed Dix as consideration for a promise or agreement to pay something of pecuniary value," NTM at 6, because the statements could be construed as consistent with the theory of the case that Cordova killed Dix as consideration for a car and drugs. First, the statement that Garcia

asked Montoya to kill Dix does not demonstrate a lack of a murder-for-hire arrangement between Garcia and Cordova. In line with Montoya's testimony, see Montoya Trial Excerpts at 2, 4-5, Garcia could have asked Montoya to kill Dix while also having an agreement that Cordova would kill Dix. In Montoya's version of events, the version that the jury chose to believe, Garcia recruited Cordova to help Montoya kill Dix, a version of events that is consistent with Garcia both asking Montoya to kill Dix and having an agreement with Cordova to kill Dix. See Montoya Trial Excerpts at 2 (stating that Garcia "pair[ed]" up Cordova with Montoya to hasten Dix' murder). Second, the statement that Garcia did not ask Cordova to murder Dix and did not talk to Cordova about Dix' murder after it happened, also could be consistent with Cordova and Garcia having a murder-for-hire arrangement. An agreement does not have to be borne out of a verbalized question. In fact, Montoya's testimony states only that Garcia said in front of Cordova that Cordova "knew [Dix], knew where [Dix hung] out, and [Garcia] wanted [Cordova] to go show me around down there, and see if [Cordova and Montoya] couldn't handle it together." Montoya Trial Excerpts at 3. While Garcia never directly asks Cordova to kill Dix in this conversation, Cordova could reasonably interpret Garcia's words -- "see if [Cordova and Montoya] couldn't handle it together" -- to mean that Garcia wanted Cordova and Montoya to kill Dix. Montoya Trial Excerpts at 3. In another FBI interview, two days after Garcia stated that Cordova never talked to him about Dix' murder after it happened, see May 8 302 at 2, Garcia admitted that he and Cordova used code words to communicate about their murder-for-hire arrangement, see May 10 302 at 1, filed August 14, 2019 (Doc. 1108-5)("On various occasions, Cordova would make comments to the effect of 'remember, I did that thing for you,' and Garcia would provide Cordova with a better price on drugs or give the drugs for free. Garcia understood Cordova's insinuation was related to the

homicide of Shane Dix.").  Thus, Cordova and Garcia could have made an arrangement for Cordova to kill Dix using coded language and veiled words, instead of explicitly stating that the agreement was for Cordova to kill Dix.  Moreover, Garcia's statements bolster this interpretation -- within two days of Garcia stating that Cordova did not discuss Dix' murder with Garcia, Garcia stated that Cordova communicated about Dix' murder with coded language.  See May 8 302 at 2; May 10 302 at 1.  Garcia's statement that he did not ask Cordova to murder Dix and Montoya's testimony about Garcia asking Cordova and Montoya to see if they could handle Dix' murder are reconcilable if Garcia differentiates between using explicit and coded language. Thus, it is plausible that Garcia stated that he did not ask Cordova to murder Dix, even if he had made an agreement for Cordova to murder Dix using coded language.

Moreover, the Court is reluctant to draw any conclusion that implies explicit language is required for a conspiracy agreement, because that requirement would be inconsistent with Tenth Circuit caselaw, which does not require an express agreement for racketeering.  See United States v. Kamahele, 748 F.3d at 1006 (stating that the United States can demonstrate an agreement "through 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme'")(quoting United States v. Browne, 505 F.3d 1229, 1264 (11th Cir. 2007)(internal quotation omitted)).  Drawing that conclusion would serve only to reward clever conspirators, who may think they can skirt a RICO or VICAR charge by using coded language.  Thus, the Court concludes that Garcia's statement that he did not ask Cordova to murder Dix could be consistent with Garcia and Cordova having a murder-for-hire agreement.  The Court, therefore, concludes that the statement that Garcia did not ask Cordova or pay Cordova to murder Dix is merely impeaching.

1.      **Garcia's Statements are Not Admissible Through the Opposing-Party Hearsay Exclusion.**

Cordova argues that he can introduce the following statements, excerpted from Garcia's 302 interview with Sainato, through Sainato at a new trial: (i) Garcia stated that he never asked Cordova to murder Dix, nor did Cordova ever talk to Garcia about the murder after it happened; and (ii) Garcia . . . asked Mario Montoya to kill Dix.  See Supplemental Brief at 2 (citing May 8 302 at 2)(ellipsis in Supplemental Brief).  A statement is not hearsay if it is offered against a party, and it was "made by the party in an individual or representative capacity."  Fed. R. Evid. 801(d)(2)(A). By definition, the statements of Sainato, an agent of an opposing party -- the United States -- are excluded from the definition of hearsay because they are the out-of-court statements of an opposing party.

Complications arise where a statement contains an embedded statement attributed to someone else and a party is trying to introduce the embedded statement as an opposing-party statement.  See United States v. DeLeon, 287 F. Supp. at 1257.  Garcia's statements are embedded within Sainato's statements.   Sainato's statements, which contain Garcia's statements, are admissible, under rule 801(d)(2)(A), for their truth only against the United States.  Consequently, that Garcia made those statements could be used against only the United States. They are admissible to show, as to the United States, that Garcia made particular statements.  In contrast, Garcia's statements on their own are not the statements of a party opponent, and thus, are not excluded from the definition of hearsay.

Because Sainato's statements would be admissible against only the United States under rule 801(d)(2)(A), Sainato's statements cannot authenticate -- against Cordova – Garcia's statements that Sainato relates in the 302, unless some other rule permits those statements to be

offered against Cordova.  See Johnson v. Weld Cty., 594 F.3d 1202, 1208 (10th Cir. 2010)(Gorsuch, J.)("Because the district court couldn't consider the hearsay statements of Mr. Bogott, Ms. Burns, or Mr. Willoughby, by necessity it couldn't consider anything contained within them, including Mr. Speckman's alleged party-opponent admissions."); id. at 1209 (concluding that "Mr. Speckman's comments" were not admissible -- notwithstanding assertions that those comments were admissions of a party opponent -- because the only way "to prove the act of Mr. Speckman's comments [wa]s through Mr. Bogott's, Ms. Burns's, and Mr. Willoughby's out-of-court hearsay statements").  Accordingly, Sainato's statements conveying Garcia's statements are admissible, because they are excluded from the definition of hearsay, but they are admissible only against the United States.  See United States v. DeLeon, 287 F. Supp. 3d at 1258.

## 2. Garcia's Statements are Not Admissible Through the Statement-Against-Interest Hearsay Exception.

Cordova argues that Garcia's statements are not merely impeaching and are admissible through Garcia, because they fall within the hearsay exception of a statement against penal interest. See Supplemental Brief at 1 (citing Fed. R. Evid. 804(b)(3)(B)).  The statement-against-interest exception applies when (i) the declarant is unavailable; (ii) a reasonable person in the declarant's position would have made the statement only if it were true, because it is so against the declarant's interest; and (iii) there is sufficient corroborating circumstances to clearly indicate the statement's trustworthiness.  See Fed. R. Evid. 804(b)(3).  The Federal Rules of Evidence define a statement against interest as "[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability" "that a reasonable man in his position would not have made the statement unless he believed it to be true."  Fed R. Evid. 804(b)(3).  The statement must also be "supported by

corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3)(B). Because Garcia has invoked his Fifth Amendment right to silence, the Court concludes that he is unavailable for trial and moves to the second and third elements.

The statement that Garcia did not ask Cordova to murder Dix and did not speak to Cordova about Dix' murder is not against Garcia's interest, because it does not meet the second requirement -- that a reasonable person would make the statement only if the statement was true. See Fed R. Evid. 804(b)(3). In United States v. Smalls, the Tenth Circuit declared that "[w]e may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind—even one of sound mind who is not particularly honest—falsely confessed a murder to an apparent acquaintance or friend." 605 F.3d at 783. See also United States v. DeLeon, 287 F. Supp. 3d at 1256. A reasonable person would tell the FBI that he or she did not ask someone to commit a murder. See Fed R. Evid. 804(b)(3). Thus, this statement does not meet the second element.

Cordova argues that, although this statement is not against Garcia's interest on its face, the Court must conduct a "'careful examination of all the circumstances surrounding the criminal activity involved'" to determine whether the statement is against interest. See Supplemental Brief at 11 (quoting Williamson v. United States, 512 U.S. 594, 604 (1994)). Cordova argues that the statement that he did not ask Cordova to kill Dix "has no relevance to the conversation" "[w]ithout express understanding of Garcia's own responsibility for the crime," but relevance is not the Court's inquiry. The Tenth Circuit has charged the Court only to view statements in context to determine whether they are self-inculpatory. See Williamson v. United States, 512 U.S. at 603.

Accordingly, the Court looks again at the statement that Garcia did not ask Cordova to kill Dix or to talk to Cordova about Dix' murder after the murder. The first part of the sentence, that Garcia did not ask Cordova to kill Dix, remains unchanged by looking at the statement in the context of Garcia arranging for Dix' murder. If anything, the context makes Garica's statement self-exculpatory, because Garcia is shrinking the size of the conspiracy by stating that he asked only Montoya to kill Dix, instead of stating that he asked both Montoya and Cordova. Thus, the circumstances do not render this statement self-inculpatory.

Nor are the statements inextricably tied together so that the admission of one necessitates the admission of another. Garcia's statement that he asked Montoya to kill Dix is a self-contained statement against interest that requires no further explanation; Garcia's statement that he asked Montoya to kill Dix does not change its meaning -- he asked Montoya to kill Dix regardless whether he also asked Cordova to kill Dix. Moreover, Garcia's statement that he asked Montoya to kill Dix does not transform Garcia's statement that he did not ask Cordova to kill Dix into a self-inculpatory statement. Further, these statements are in different paragraphs, which, while not evidence on its own that they are not inseparable, adds weight to the argument that they are separable. See Tr. at 29:20-23 (Castellano)

Cordova heavily relies on United States v. Lopez, 777 F.2d at 543, for the notion that Garcia's statements are self-inculpatory, calling his situation "a remake of the *Lopez* case, only with different actors and a different crime setting." Supplemental Brief at 10 (describing United States v. Lopez as "particularly instructive"). In United States v. Lopez, Lopez had a meeting with a co-defendant, Jaramillo, and Jaramillo's attorney, during which Jaramillo stated that he, not Lopez, had placed boxes of cocaine in the vehicle, that Lopez was unaware that Jaramillo had

placed the boxes into the vehicle, and that he did not discuss the boxes with Lopez before they were arrested. See Supplemental Brief at 10 (citing United States v. Lopez, 777 F.3d at 544). Admitting the statements under the statement-against-interest hearsay exception, the Tenth Circuit stated that "Jaramillo's statements tended to shift criminal liability from Lopez to himself to an extent that a reasonable man in his position would not have made the statements unless he believed them to be true." United States v. Lopez, 777 F.3d at 544. In contrast, while Garcia's statements may lessen Cordova's criminal liability, they do not shift any liability from Cordova to Garcia. Before making these statements, Garcia already admitted to conspiring to murder Dix. See Plea Agreement at 7-8, filed January 25, 2018 (Doc. 503)(admitting to the following overt acts: "**In 2005, I offered to pay another person to kill rival gang member S.D., who had previously shot me,**" and "**[o]n or about February 4, 2005, victim S.D. was shot and killed on my orders**")(bold in original). Thus, he faces no additional criminal liability from specifying which person he asked to kill Dix. The Court concludes that United States v. Lopez is distinguishable from this case.

The Court looks at the second part of the statement -- that Garcia did not speak to Cordova about Dix' murder after it happened. The surrounding circumstances, that Garcia asked Montoya and not Cordova, to murder Dix, do not provide any context that makes this statement self-inculpatory. Again, if anything, Garcia is limiting instead of widening the scope of the conspiracy by refusing to talk about Dix' murder, so this statement is more exculpatory than inculpatory. The Court, thus, concludes that the context does not make these neutral statements self-inculpatory.

The second statement, that Garcia asked Montoya to kill Dix, is decidedly against Garcia's interest, because no reasonable person would tell the FBI that he or she asked someone to commit murder another person if he or she did not do so. See United States v. Lopez, 777 F.2d 543 (10th Cir. 1985)(citing Fed. R. Evid. 804(b)(3)). After the Court has determined that the statement is against penal interest, the Court must assess whether the statement is "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3)(b). Although the Tenth Circuit has not "'squarely addressed how a statement must be corroborated,' [it] has held 'the declarant's credibility and the circumstances of the statement bearing on its truthfulness can both be considerations.'" United States v. Hammers, 924 F.3d 1001, 1011 (10th Cir. 2019)(quoting United States v. Lozado, 776 F.3d at 1128). The Court concludes that, although the corroborating circumstances may indicate the statements' trustworthiness, they do not "clearly indicate the trustworthiness of the statement, itself.'" United States v. Lozado, 776 F.3d 1119.

There are some indications of trustworthiness. For example, Montoya testified that he and Garcia had a murder-for-hire arrangement wherein Montoya was to kill Dix. See Montoya Trial Excerpts at 4-5. See also United States v. Baca, 409 F. Supp. 3d 1041, 1103-05 (D.N.M. 2019)(Browning, J.). Moreover, Garcia already admitted to conspiring to kill Dix, and there is little incentive for him to name Montoya instead of another defendant as a co-conspirator. Garcia, however, was motivated to lie during the FBI interview, because he was attempting to get better accommodations within the BOP. Moreover, the Court determines "whether the defendant's proffered new evidence is credible." United States v. Jordan, 806 F.3d 1244, 1252 (10th Cir. 2015)(quoting United States v. McCullough, 457 F.3d 1150, 1167 (10th Cir. 2006)(internal quotations omitted in United States v. Jordan). The Court is reluctant to deem Garcia's testimony

credible, because the Court has witnessed the type of lying necessary in the SNM to execute and then cover up murders for years. Thus, even if some circumstances corroborate the statement's trustworthiness, the SNM gang's inclination to distort the truth combined with Garcia's motivation to lie cements that the Court cannot conclude that the evidence is "clearly" trustworthy. United States v. Lozado, 776 F.3d 1119. Considering the surrounding circumstances, the Court concludes that the circumstances do not clearly indicate the trustworthiness of the statement. Compare with United States v. Lozado, 776 F.3d 1119.

### C. GARCIA'S STATEMENTS ARE NOT MATERIAL TO THE ISSUES.

To meet the fourth United States v. Sinclair prong, Cordova must demonstrate that Garcia's statement that he asked Montoya to kill Dix is "material to the principal issues involved." United States v. Sinclair, 109 F.3d at 1531. In determining if this factor is met, the Tenth Circuit considers the third and fifth factors -- whether the evidence is merely impeaching and whether the evidence would probably have caused an acquittal. If evidence is impeachment material or if it would not have probably caused a different result, then it generally is not material to a principal issue. See United States v. Shayesteh, 161 F.3d 19, at *6 (10th Cir. Oct. 6, 1998)(table opinion) (unpublished)(noting that, because evidence would not have caused a different result, it was not material to a principal issue); United States v. Quintanilla, 193 F.3d at 1148 (noting that new evidence was not material to a principal issue when it was merely impeachment evidence). This Court has analogized, however, to Brady, and concluded that there are specific instances in which "even merely impeaching evidence can be considered." United States v. Velarde, No. CR 98-391JB, 2008 WL 5993210, at *41 (D.N.M. May 16, 2008)(Browning, J.)(citing United States v. Sipe, 388 F.3d 471, 478 (5th Cir. 2004)(stating that withheld impeachment evidence is material if

it "would seriously undermine the testimony of a key witness on an essential issue")). For example, in United States v. Velarde, the Court concluded that impeaching evidence was material to a principal issue in the case, because the impeaching evidence undermined the credibility of the prosecution witness, whose "credibility was a central theme, if not the central theme, of the defense." 2008 WL 5993210, at *41. In that case, in which the defendant was convicted after the prosecution witness accused him of raping her, evidence surfaced that the prosecution witness had falsely accused adult men of touching her inappropriately. See 2008 WL 5993210, at *42. Because "the United States' case rested primarily on [the prosecution witness'] credibility," which previously had been undermined only by evidence that she chewed gum in class and did not complete her assignments, "the impeachment value of two false allegations of inappropriate touching could have been extraordinary." United States v. Velarde, 2008 WL 5993210, at *41. Thus, this Court concluded that the evidence was material, despite being impeachment evidence. United States v. Velarde, No. CR 98-391JB, 2008 WL 5993210, at *42 (D.N.M. May 16, 2008). The Tenth Circuit also has held that evidence concerning a tangential issue is not material to a principal issue in the case. See United States v. Gwathney, 465 F.3d at 1144-45. In United States v. Gwathney, the Tenth Circuit stated that "[a]bstract bolstering of credibility does not bear directly on the principal issue of the case." 465 F.3d at 1144-45. See United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711931, at *34 (D.N.M. Feb. 2, 2015).

The first statement -- that Garcia asked Montoya to kill Dix -- is not material to this case. The first statement, as discussed supra, is merely impeaching evidence. Because the Tenth Circuit disfavors granting a new trial on merely impeaching evidence, see United States v. Quintanilla, 193 F.3d at 1148, the Court would have to be persuaded that the statement is sufficiently material

to the principal issue to overcome that disfavor. Garcia's statement that he asked Montoya to kill Dix does not bear on the principal issue in this case -- that Cordova and Garcia had a murder-for-hire arrangement that Cordova executed. See NTM at 2. Instead, it relates to whether Montoya and Garcia had a murder-for-hire arrangement. A jury could decide whether Cordova and Garcia had a murder-for-hire arrangement that Cordova executed without mentioning Montoya. See Supplemental Brief at 2 (describing the issues before the jury). Thus, because the jury could discard Garcia's statement that he asked Montoya to kill Dix when deciding Cordova's case, the statement is relevant only to a tangential issue. Because the statement is relevant only to a tangential issue, and not the principal issue, the statement is not material. See United States v. Gwathney, 465 F.3d at 1144-45 (concluding that newly discovered evidence related to a tangential issue is not material under United States v. Sinclair).

The second statement, that Garcia did not ask Cordova to kill Dix and did not speak to Cordova about Dix' murder after it occurred, is not material to this case. Because it would undermine Montoya's credibility by contradicting his testimony that Garcia asked Cordova to kill Dix, see Montoya Trial Excerpts at 4-5, it is merely impeachment evidence. Nonetheless, the Court has concluded that there are circumstances in which impeachment evidence is material to the principal issue in this case, such as when undermining the credibility of a witness is key to the defense. See United States v. Velarde, 2008 WL 5993210, at *41. In contrast, there is an abundance of impeachment evidence against Montoya. See Aug. 16 Tr. at 26:15-21 (Castellano). Thus, Garcia's statements would have added another piece of impeachment evidence to a surfeit of impeachment evidence. The impeachment evidence in this case is related to the key issue -- whether Cordova and Garcia had a murder-for-hire arrangement that Cordova executed.

Regardless, the impeachment evidence is not probative of that issue, because it is merely repetitive impeachment evidence, and thus not material.

Moreover, impeachment evidence must do more than make the defendant's theory of the case more likely for the Court to consider it material under United States v. Sinclair. See United States v. Gwathney, 465 F.3d 1144 ("Impeachment evidence offered by a defendant will almost always . . . at least bolster[ his or her] theory of the case.").  For a piece of evidence to be material, it must be probable that the evidence will change the jury's mind.  See United States v. Velarde, 2008 WL 5993210, at *41 (concluding that Tenth Circuit Brady caselaw is instructive in determining materiality under United States v. Sinclair).  In United States v. Velarde, the impeachment evidence was considered material, because "no other evidence either duplicated or compared to the impact that this evidence could have had in the minds of the jury."  2008 WL 5993210, at *42.  In contrast, the United States presented comparable evidence that demonstrated that Montoya could lie about such grave matters as the murder-for-hire arrangement.  See Aug. 16 Tr. at 26:15-21 (Castellano); Supplemental Brief at 16 (discussing inconsistencies in Montoya's story regarding transportation for Dix' execution).  Moreover, there was other evidence that he could have been motivated to lie about such grave matters.  See Supplemental Brief at 16 (acknowledging that the United States' witnesses, including Montoya, were "highly motivated" and "eager-to-please").  Compare with United States v. Velarde, 2008 WL 5993210, at *42 (concluding that the impeachment evidence could have shown that the prosecution witness had motivation to lie).  Thus, Garcia's statements, while relevant, are not material, as the Tenth Circuit has defined that term for Brady purposes, to the principal issue.

## D.    GARCIA'S STATEMENTS WOULD NOT CHANGE THE CASE'S OUTCOME.

To meet the fifth United States v. Sinclair prong, Cordova must demonstrate that Garcia's statements are "of such a nature that in a new trial it would probably produce an acquittal." United States v. Sinclair, 109 F.3d at 1531.  In assessing whether the newly discovered evidence would probably produce an acquittal, this Court looks at the evidence in the case.  See United States v. Velarde, 2008 WL 5993210, at *42.  In United States v. Velarde, the Court noted that the United States had no physical evidence, and the evidence boiled down to one person's uncorroborated testimony -- the prosecution witness' testimony.  See 2008 WL 5993210, at *43.  The newly discovered evidence not only impeached the prosecution witness, but demonstrated that she had "the knowledge, motive, and capability to falsely accuse" the defendant.  United States v. Velarde, 2008 WL 5993210, at *43.  In contrast, the United States presented corroborating evidence that Cordova had a murder-for-hire arrangement with Garcia and that Cordova executed said arrangement.  See NTM at 3-5.  Cordova summarizes the corroborating evidence as:

> (1) Montoya's allegations that (a) he saw Garcia give Cordova "a stack of cash and some dope" the night Garcia got back from Las Vegas *after* the homicide; and (b) that "a short time after this incident" he saw Garcia and Cordova at Garcia's place in a Suburban and that Cordova told him that Garcia had bought it for him; (2) Richard Gallegos' "belief" that Cordova told him he was paid in heroin for the murder; and (3) SA Tom Neales' testimony that Cordova did in fact mention in a jail call some twelve years after the homicide that he *currently* owns a Suburban.

See NTM at 3-5 (emphasis in original).  Even in Cordova's summary, which is framed to minimize the corroborating evidence, there still exists multiple pieces of corroborating evidence.  Garcia's statements would be an additional piece of evidence through which the jury must sort, and not a piece of evidence that is in opposition to the only piece of evidence.  Garcia's statements do not, however, need to demonstrate that Montoya had the "knowledge, motive, and capability to falsely

accuse" Cordova.  United States v. Velarde, 2008 WL 5993210, at *43.  Cordova's previous impeachments of Montoya demonstrate that he has the knowledge and capability to lie.  See Aug. 16 Tr. at 26:15-21 (Castellano).  Further, Cordova already has acknowledged that Montoya may have been motivated in the testimony he gave at the trial, a fact Cordova presented to the jury.  See Supplemental Brief at 16.  Because the jury already was aware that Montoya may have been motivated to please the United States when he testified, evidence that further supports the idea that Montoya was motivated to please the United States when he testified will not add anything new to a jury's calculus.  Thus, although the newly discovered evidence would bolster an impeachment of Montoya,  the jury has shown that they find Montoya credible, despite previous impeachment efforts.  Thus, more impeachment evidence perhaps could change the jury's thinking, but there is nothing to indicate that such duplicative evidence would probably change the jury's outcome.

## II.  THE COURT WILL NOT DENY GARCIA HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION.

Cordova argues that, although Garcia refused to testify at trial, Garcia may testify at a new trial.  See Supplemental Brief at 3.  Cordova argues that the Court can make its decision based on Garcia testifying at a new trial, because (i) his risk of additional incrimination is not substantial or real; (ii) the United States granted Garcia immunity when he made his statements; and (iii) the Court should not rely on speculation whether Garcia will testify at the new trial.  The Court addresses each argument in turn.

Cordova identifies the tension between two constitutional values: (i) a witness' privilege against self-incrimination; and (ii) a defendant's right to establish a defense through presenting defense witnesses and cross-examining the United States' witnesses.  See United States v. Rivas-Macias, 537 F.3d at 1276-77 n.7.  In recognition of this tension, courts have ensured that a

witness cannot simply recite the familiar Fifth Amendment refrain to circumvent testifying -- a witness must "face 'some authentic danger'" of self-incrimination for the privilege to apply. United States v. Rivas-Macias, 537 F.3d at 1277 (quoting United States v. Castro, 129 F.3d 226, 229; and citing Zicarelli v. N.J. State Comm'n of Investigation, 406 U.S. 472, 478 (1972); Ullman v. United States, 350 U.S. 422, 439 (1956)). The Court must liberally construe the Fifth Amendment privilege, by permitting it to encompass "not only [] 'answers that would in themselves support a conviction,' but also to information that would 'furnish a link in the chain of evidence that could lead to prosecution.'" United States v. Rivas-Macias, 537 F.3d at 1278 (first quoting Hoffman v. United States, 341 U.S. 479, 486 (1951); and then quoting Maness v. Meyers, 419 U.S. 449, 461 (1975)(internal quotations omitted)).

Cordova is asking Garcia to testify about the Dix murder. See Supplemental Brief at 2. Garcia's statements about Dix' murder are admissible against him. See Plea Agreement at 5 (stating that the Plea Agreement's facts are "admissible against the defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial"). In Garcia's Plea Agreement, the United States agreed that Count 2 of the Superseding Indictment, Dix' murder, be dismissed without prejudice. See Plea Agreement at 11. Although the United States agreed "not to bring additional criminal charges against [Garcia] arising out of the facts forming the basis of the present Indictments," Plea Agreement at 10, that agreement is conditional on Garcia meeting continuing obligations spelled out in the Plea Agreement, see Plea Agreement at 11. See also Plea Agreement at 9 (stating that Garcia will "continue to comply with this obligation" to provide the USPO truthful information). Because the United States could bring suit against Garcia for the subject about which Garcia would be testifying, Garcia faces actual danger when

testifying about circumstances around the murder.  See United States v. Rivas-Macias, 537 F.3d at 1277 ("For the privilege to apply, an individual must face 'some authentic danger' of self-incrimination.")(quoting United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997)).  Moreover, the Plea Agreement binds only the United States Attorney's Office for the District of New Mexico, so Garcia is subject to criminal charges for Dix' murder from other "agencies or prosecuting authorities," Plea Agreement at 10-11, and thus faces actual danger from other sources.

Regardless of this risk, the Tenth Circuit instructs district courts to see if any of the three exceptions apply that would render Garcia's Fifth Amendment privilege waived: (i) Garcia failed to assert the Fifth Amendment privilege in a timely manner; (ii) the United States granted Garcia such immunity that he is protected from his compelled answers' use and evidence derived from their use in a later criminal case in which Garcia is a defendant; and (iii) Garcia testified about a subject and then later, in the same proceeding, he asserted his Fifth Amendment privilege to avoid providing details.  See United States v. Rivas-Macias, 537 F.3d at 1280 (citing Maness v. Meyers, 419 U.S. at 466; Lefkowitz v. Turley, 414 U.S. 70, 78 (1973); Mitchell v. United States, 526 U.S. 314, 321 (1999); Rogers v. United States, 340 U.S. 367, 372-73 (1951); United States v. Constantine, 263 F.3d 1122, 1128 n.4 (10th Cir. 2001); United States v. Nunez, 668 F.2d 1116, 1121 n.2 (10th Cir 1981)).  There is no dispute that Garcia asserted his Fifth Amendment privilege, and he also did not testify in either of the SNM trials, so the Court moves to the second and third exceptions.

The Court examines whether Garcia has lost his Fifth Amendment privilege not to self-incriminate, because of the immunity the United States granted him.  See United States v . Rivas-Macias, 527 F.3d at 1280.  If the United States has granted Garcia immunity for the use of

his compelled statements and all evidence derived from those statements in later criminal cases, then the Court would conclude that Garcia's Fifth Amendment privilege is revoked.  See United States v. Rivas-Macias, 537 F.3d at 1280.  But during Garcia's May 8 interview with the FBI, the United States did not grant him transactional immunity.  See Sept. 13 Tr. at 27:19-21 (Castellano). Instead, the United States immunized Garcia only from "the statements he made at the time of the debrief if he was truthful. . . .  [H]e's only immunized in the Government's case-in-chief against him and he can be cross-examined about any of the contents of that, of anything he says at trial." Sept. 13 Tr. at 27:8-13 (Castellano).  See id. at 27:15-18 (Court)(clarifying that the United States did not immunize Garcia from statements for which Cordova would subpoena him in a new trial and to which he would testify on the stand at a new trial).  Because Garcia's immunity is limited and does not cover the testimony that Cordova wants to elicit at a second trial, the Court concludes that the second exception does not apply to Garcia.

The Court looks at the third exception, whether Garcia's previous testimony acts as a waiver, which prevents him from refusing to disclose details about previous statements.  See United States v. Rivas-Macias, 537 F.3d at 1280.  The Tenth Circuit repeatedly has clarified that a plea agreement is not a waiver of the Fifth Amendment privilege to not self-incriminate.  See United States v. Rivas-Macias, 537 F.3d at 1277)("squarely reject[ing] the proposition that an individual waives the Fifth Amendment privilege by pleading guilty to a crime"); United States v. Cassius, 340 F. App'x 444, 447 (10th Cir. 2009)(unpublished)(quoting United States v. Rivas-Macias).[13]  Garcia discussed Dix' murder in the plea agreement.  See Plea Agreement at 6, filed

_____

[13]The Court notes United States v. Mendoza-Haro, 595 F. App'x 829 (2004), which states that a sentencing court relying on a defendant's testimony from a co-defendant's trial did not

January 25, 2018 (Doc. 503)(admitting that Garcia "**offered to pay another person to kill rival gang member S.D.**" and that **"victim S.D. was shot and killed on my orders**"). Garcia also waived his appeal rights in his plea agreement. <u>See</u> Plea Agreement at 10. Garcia did not, however, waive his right to invoke his Fifth Amendment privilege when compelled to provide details about Dix' murder. <u>See generally</u> Plea Agreement. Thus, in accordance with the Tenth Circuit caselaw, the Court concludes that Garcia's plea agreement is not a waiver of his Fifth Amendment privilege.

Cordova argues that the Court should not base its decision whether to grant Cordova a new trial on speculation regarding whether Garcia will invoke his Fifth Amendment privilege to not self-incriminate at the new trial. <u>See</u> Supplemental Brief at 3. Cordova wants the Court to decide the new trial motion based on its assumption that Garcia will testify in the new trial, because either (i) Cordova's right to present a defense will supplant Garcia's Fifth Amendment privilege, as Garcia's risk of additional incrimination is not substantial or real; or (ii) the United States granted Garcia immunity for his statements. Accordingly, in this Memorandum Opinion and Order, the Court assesses whether, if the Court grants a new trial and Garcia elects to invoke his Fifth Amendment Privilege, (i) the Court could conclude that Garcia's risk of incrimination is not substantial and real; and (ii) the Court could conclude that Garcia's immunity dissipates his Fifth

---

violate the defendant's Fifth Amendment privilege, because the defendant testified under a plea agreement, and not under a grant of immunity. The Court acknowledges the dissonance between this case and <u>United States v. Rivas-Macias</u>. <u>United States v. Rivas-Macias</u>,however, is more similar to this case, because it is about a witness testifying in co-defendant's trial, unlike <u>United States v. Mendoza-Haro</u>, which the defendant's testimony was to be used during his own sentencing. Moreover, because the Tenth Circuit in <u>United States v. Mendoza-Haro</u> cites <u>United States v. Rivas-Macias</u> approvingly, and because <u>United States v. Mendoza-Haro</u> is an unpublished opinion, and, thus, persuasive but not technically binding on the Court, the Court relies on the rule articulated in <u>United States v. Rivas-Macias</u>.

Amendment privilege. Moreover, these assessments are not determinative whether the Court should grant a new trial.

III.     **THE COURT WILL NOT ACQUIT CORDOVA ON DUE PROCESS GROUNDS.**

Cordova argues that the Court should grant Cordova a new trial, then acquit Cordova on due process grounds. See Supplemental Brief at 6. Cordova argues that, by immunizing its witness but not immunizing Cordova's witness, the United States violates Cordova's due process rights. See Supplemental Brief at 6. Cordova acknowledges that the Tenth Circuit has concluded that the United States is violating a defendant's due process rights under the immunization statutes, 18 U.S.C. §6002-03, when the United States "substantially interfere[s] with a defense witness's decision to testify," Supplemental Brief at 6 (quoting United States v. Serrano, 406 F.3d at 1217 (alteration in Supplemental Brief)), but has not found other due process violations under the immunization statutes. Accordingly, Cordova urges the Court to adopt caselaw from other Courts of Appeals that expand the potential violations. See Supplemental Brief at 6-7. The Court does not adopt the law of other Courts of Appeals regarding due process violations under the immunization statutes, but instead applies a similar standard articulated, but not adopted, by the Tenth Circuit regarding due process violations under the immunization statutes. The Court concludes that the United States' decision to immunize its witnesses but not Garcia, is not, under Tenth Circuit's articulated standard, a due process violation.

As Cordova acknowledges, district courts do not have the authority to immunize defense witnesses, and Congress gives "'certain officials in the Department of Justice *exclusive authority* to grant immunities.'" Supplemental Brief at 6 (quoting United States v. Serrano, 406 F.3d 1208, 1217 (10th Cir. 2005)(emphasis in Supplemental Brief)). The Court can find a due process

violation, however, where the United States "'substantially interfere[s] with a defense witness's decision to testify.'" Supplemental Brief at 6 (quoting United States v. Serrano, 406 F.3d at 1215-16). Cordova does not attempt to argue that any United States official has substantially interfered with the decision of any defense witness to testify, and the Court is not aware of any interference. Instead, he argues that United States v. Serrano was not exhaustive -- other federal courts have found due process violations and Cordova urges the Court to follow their lead and find a due process violation for selective immunization. See Supplemental Brief at 6-7 (citing United States v. Meda, 812 F.3d 502, 518 (6th Cir. 2015); United States v. Chapman, 765 F.3d 720, 731 (7th Cir. 2014); United States v. Quinn, 728 F.3d 243, 248 (3d Cir. 2014)(en banc); United States v. Straub, 538 F.3d 1147, 1158 (9th Cir. 2008); United States v. Diaz, 176 F.3d 52, 115 (2d. Cir. 1999); United States v. Abbas, 74 F.3d 506 (4th Cir. 1996); United States v. Anguilo, 897 F.2d 1169, 1192 (1st Cir. 1990); United States v. Hooks, 848 F.2d 785, 802 (7th Cir. 1988)). He focuses on Earl v. United States, 361, F.2d 531, 534 n.1. (D.C. Cir. 1966), a case in which the United States Court of Appeals for the District of Columbia Circuit concluded that an argument could be made for an as-applied due process violation so the United States "could not use the immunity statute for its advantage unless Congress made the same mechanism available to the accused." The Court examines Tenth Circuit caselaw to see if the Tenth Circuit has commented on an expansion of due process violations under the immunity statutes, as the District of Columbia Circuit and other Courts of Appeals have.

**A.** **UNDER THE TENTH CIRCUIT'S ARTICULATED APPROACH, THE MAJORITY APPROACH, THE COURT CONCLUDES THAT THE UNITED STATES' SELECTIVE USE OF IMMUNITY DOES NOT VIOLATE CORDOVA'S DUE PROCESS RIGHTS.**

The majority of Courts of Appeals have adopted a standard to determine whether the United States' selective use of immunity violates the due process rights of the defendant that requires a showing that: "[(i) t]he witness's testimony is material, exculpatory, not cumulative, and not obtainable from any other source; and [(ii) t]he government's decision to deny immunity was made with the 'deliberate intention of distorting the fact-finding process.'" William F. Johnson & Jennifer K. Kim, Defense Witness Immunity: The Time Has Come in the 9th Circuit -- Will it Catch On?, Andrews White-Collar Crime Reporter, 2010 WL 697368, at *1. (quoting United States v. Turkish, 623 F.2d 769, 776 (2d Cir. 1980)). The Tenth Circuit, more than once, has articulated the second part of that test in context of determining whether selective use of immunity is a due process violation: if a United States officer deliberately has denied immunity to alter the fact-finding process, the United States must decide whether to grant immunity to right the wrong or watch as the Court acquits the defendant.

> However, in [United States v.]Hunter, [672 F.2d 15, 818 (10th Cir. 1982), abrogation on other grounds recognized in United States v. Call, 129 F.3d 1302, 1404 (10th Cir. 1997), cert. denied, 524 U.S. 906 (1998)),] we left open the possibility 'that where the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process, a court could force the government to choose between conferring immunity or suffering an acquittal.

United States v. LaHue, 261 F.3d 993, 1014 (10th Cir. 2001)(quoting United States v. Hunter, 672 F.2d at 818, and citing United States v. Chalan, 812 F.2d 1302, 1310 (10th Cir. 1987), cert denied 488 U.S. 983 (1988)); United States v. Dalton, 918 F.3d 1117, 1131 (10th Cir. 2019); United States v. Apperson, 441 F.3d 1162, 1203 (10th Cir. 2006). The Tenth Circuit, however, has declined to

expressly adopt this standard.  <u>See</u> <u>United States v. LaHue</u>, 261 F.3d at 1014 ("We need not decide this legal question . . .").  Despite the Tenth Circuit's reluctance to adopt the standard officially, the Tenth Circuit has affirmed a district court case that used the standard, explicitly stating that the district court did not abuse its discretion when it declined to grant immunity, because the defendants did not demonstrate that the United States was deliberately attempting to "distort the fact finding process."  <u>United States v. LaHue</u>, 261 F.3d at 1015.  It affirmed another district court case that used the standard, concluding that the defendant did not provide "factual support for that contention [that the United States' decision to not grant immunity was a deliberate attempt to distort the fact finding process, and i]n the absence of such support, there is no merit to his assertion, and in turn no basis for concluding that the district court abused its discretion in refusing to grant immunity."  <u>United States v. Apperson</u>, 441 F.3d at 1203-04.  Notably in <u>United States v. Apperson</u>, the Tenth Circuit declined to "'sift through th[e] case's voluminous record to find support for the [defendants'] claims,'" 441 F.3d at 1204 (quoting <u>United States v. LaHue</u>, 261 F.3d at 1015), and instead deferred to the district court's ruling.  This statement implies that the Tenth Circuit would have applied the standard itself when making its decision, had it not had the district court's rulings.  Because the Tenth Circuit has repeatedly referenced the standard and affirmed a case based on the standard, the Court concludes that the Tenth Circuit likely would adopt this standard and thus is inclined to apply the standard in this case.

Moreover, the Court believes that applying this standard is the right legal decision. Applying this standard reconciles the tension between allowing the United States to do its prosecutorial job and safeguarding the defendant's due process rights.  Although Congress has given the United States immunization power, courts must check that power to ensure it is being

applied properly. The Tenth Circuit's articulated standard still guards the United States prosecutors against baseless arguments. The standard uses the word "deliberately," which requires defendants to focus on prosecutor's intent, and not only the outcome. Moreover, the word "deliberately" lays a heavy burden atop defendants' shoulders, as they must demonstrate the United States' intent and not the outcome of the United States' immunization. This standard accords with the related presumption of prosecutor regularity, which "'supports prosecutorial decisions and, in the absence of clear evidence to the contrary, . . . presume[s] that [prosecutors] have properly discharged their official duties.'" United States v. Deberry, 430 F.3d 1294, 1299 (10th Cir. 2005)(quoting United States v. Armstrong, 517 U.S. 456, 464 (1996)).

The Tenth Circuit has implied that the presumption of prosecutor regularity, which applies in selective-prosecution claims, is applicable to selective-immunity claims. See United States v. Serrano, 406 F.3d at 1218. In United States v. Serrano, the Tenth Circuit presumed, in the absence of clear evidence in the record that demonstrated that the United States attorney committed misconduct, that "the United States attorney's office has properly discharged its official duties." 406 F.3d at 1218. Although the Tenth Circuit has not explicitly stated that the presumption of prosecutor regularity applies to selective-immunity claims, the presumption of prosecutor regularity is sufficiently analogous to selective-prosecution claims that the Court looks to it for guidance. In selective-prosecution claims, "[t]he defendant is asking the judiciary to exercise power over a 'special province of the executive branch, a province in which, for good reason, the executive possesses broad discretion." United States v. Deberry, 430 F.3d at 1299 (quoting United States v. Armstrong, 517 U.S. at 464)(internal quotation marks omitted in United States v. Deberry). In this selective-immunity claim, Cordova is asking the Court to exercise power over

immunity, an area that Congress has elected to give to the Department of Justice and not to the courts. Although selective-immunity claims are less subject to the concerns that judicial review will "'chill law enforcement by subjecting the prosecutors motives and decisionmaking to outside inquiry,'" which could "reveal[] the Government's enforcement policy" than selective-prosecution claims, United States v. DeBerry, 430 F.3d at 1299 (quoting United States v. Armstrong, 517 U.S. at 464), the Court still could undermine a larger strategic prosecutorial plan by interfering with immunity decisions. Thus, the analogous nature of the two claims guides the Court to ensure that the proposed Tenth Circuit standard accords with the presumption of prosecution regularity. The use of the word "deliberately" in the majority approach accords with the similarly heavy burden -- clear evidence -- that the presumption of prosecutorial regulatory places on defendants. Nonetheless, both doctrines also provide a mechanism for defendants to seek a remedy for due process violations. The Court, thus, concludes that the majority approach is consistent with the presumption of prosecutor regularity, because the two doctrines share similar goals, defendant burdens, and prosecutorial safeguards. Accordingly, the Court applies the Tenth Circuit's proposed test to this case.

The majority approach requires a defendant bringing a selective-immunity claim to show that "the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process." United States v. LaHue, 261 F.3d at 1015 (internal quotations omitted). Most Courts of Appeals have adopted the same proposed test but added an additional requirement -- that the witness testimony is "material, exculpatory, not cumulative, and not obtainable from any other source." William F. Johnson & Jennifer K. Kim, Defense Witness Immunity: The Time Has Come in the 9th Circuit -- Will it Catch On?, Andrews White-Collar Crime Reporter, 2010 WL 697368, at *1

(citing <u>United States v. Turkish</u>, 623 F.2d at 776).  Although the Tenth Circuit has not included

that requirement in its proposed standard,  <u>see</u>, <u>e.g.</u>, <u>United States v. Dalton</u>, 918 F.3d at 1131;

<u>United States v. Apperson</u>, 441 F.3d at 1203,  it has implied in at least two cases that the majority

approach would require the defendant to satisfy that requirement, <u>see</u> <u>United States v. LaHue</u>, 261

F.3d at 1015 (stating that, in part, the defendants do not meet their burden, because they do not

"explain how their testimony would be material, exculpatory, and not cumulative as well as

unavailable from any other source")(citing <u>United States v. Bahadar</u>, 954 F.2d 821, 826 (2d Cir.

1992)(requiring testimony to be material, exculpatory, not cumulative, not available from another

source to meet standard), <u>cert. denied</u>, 506 U.S. 850  (1992); <u>United States v. Ochoa</u>, 124. F.3d

218 (Table), 1887 WL 488738, at *3 (implying the requirement was not met by stating that the

defendant did not meet the burden, in part, because "[t]his testimony, even if believed, would not

have exonerated the defendant and would not have materially challenged the testimony about the

defendant's . . . role").  The Court notes that the most recent Tenth Circuit cases to touch on the

proposed standard have omitted the requirement.  <u>See</u>, <u>e.g.</u>, <u>United States v. Dalton</u>, 918 F.3d at

1131; <u>United States v. Apperson</u>, 441 F.3d at 1203.  Regardless, the Court thinks that the Tenth

Circuit would apply the majority approach, because it has affirmed the district courts in the past

that have applied that approach.  Thus, the Court will apply that requirement.

     Cordova has the burden to demonstrate that Garcia's statements are material, exculpatory,

not cumulative, and not available from any other source.  <u>See</u> <u>United States v. LaHue</u>, 261 F.3d at

1015.  The Court looks to whether Garcia's statements are material.  Thus, Cordova's proffered

testimony does not meet the "material" requirement.  <u>United States v. LaHue</u>, 261 F.3d at 1015.

Cordova argues that Garcia's statement that he did not ask Cordova to kill Dix is material, because

it bears on an essential element of his conviction -- whether there was a murder-for-hire arrangement. See Supplemental Brief at 6. The Court agrees. If Garcia, under a grant of immunity, testifies at a new trial, the jury can consider the statement for its truth and decide how to interpret it and how much weight to give it. Their decisions could change the case's outcome -- the jury could disregard Montoya's testimony, believe Garcia's testimony, decide that there was no murder-for-hire arrangement, which would result in an acquittal of the VICAR charge. Garcia's statement that he did not ask Cordova to kill Dix, therefore, is material.

The Court next determines whether Garcia's statements are cumulative. See Cumulative, Black's Law Dictionary (11th ed. 2019)(defining cumulative as "[a]dditional, heaping up"). Garcia's statement that he did not ask Cordova to kill Dix could be construed as contravening previous testimony that states or implies Cordova and Garcia had a murder-for-hire arrangement. Because Garcia's statement detracts from, instead of adding to, the narrative that Cordova and Garcia had a murder-for-hire arrangement, the statement is not cumulative.

The Court next decides whether Garcia's statement is exculpatory. Exculpatory testimony "clear[s] or tend[s] to clear [the defendant] from guilt." Exculpatory, Black's Law Dictionary (11th ed. 2019). Cordova argues that Garcia's statements exonerate Cordova, because they "negat[e] the murder-for-hire purpose element of the VICAR count, expressly found by the jury." Supplemental Brief at 8. Although the Court disagrees with Cordova that Garcia's statement exonerates Cordova, it at least tends to clear him from guilt, because the statement implies that Cordova and Garcia did not have a murder-for-hire contract. Exculpatory has no modifier compelling the Court to require a complete clearing of guilt, so that it tends to clear Cordova from guilt is sufficient. Thus, Garcia's statement is exculpatory.

The majority approach -- and the test that the Court concludes the Tenth Circuit will adopt -- next requires the Court to examine the evidence Cordova presents to determine whether the United States' denial of immunity to Garcia is a deliberate attempt to distort the fact-finding process. Cordova does not argue that, if the United States does not grant immunity in a new trial, the United States would be deliberately distorting the fact-finding process. See generally Supplemental Brief at 6-8. Instead, in his Supplemental Brief, Cordova argues that, because the United States granted immunity to Montoya, its principal witness, the United States must also grant immunity to Garcia. See Supplemental Brief at 8. Cordova reasons that the United States must grant Garcia immunity, because Garcia's statements "exonerate[] Cordova by negating the murder-for-hire purpose element of the VICAR count," which renders the immunization statutes "unconstitutional *as applied* to Cordova." Supplemental Brief at 8 (emphasis in original). Cordova is making a fairness argument, without any allegations of intentional wrongdoing on the United States' part. Thus, Cordova provides no facts to support his contention that the United States is engaging in deliberate distortion of the fact-finding process. See United States v. LaHue, 261 F.3d at 1015 (concluding that the district court did not abuse its discretion by declining to grant use immunity to defense witnesses, in part because the "defendants provided no facts to support their claim that the government engaged in a deliberate attempt to distort the fact-finding process"). Cordova, therefore, does not carry his heavy burden of demonstrating that the United States deliberately did not grant use-immunity to Garcia to distort the fact-finding process.

Moreover, the United States has reason to deny a grant of immunity to Garcia that has nothing to do with attempting to distort the fact-finding process. The United States, the defendants, and the Court worked hard to put on a full and fair trial. The United States knows that, if it grants

Cordova immunity, this trial would be upheaved and the work undone. Thus, the United States could decide to deny a grant of an immunity for a statement that is merely impeaching with little impact to avoid an entirely new trial that likely will have the same outcome -- and this decision would not be based on a desire to distort the fact-finding process.

**B.      UNDER THE PLAIN TEXT OF THE NINTH CIRCUIT'S APPROACH, THE COURT CONCLUDES THAT THE UNITED STATES' SELECTIVE USE OF IMMUNITY DOES NOT DEPRIVE CORDOVA OF HIS DUE PROCESS RIGHTS.**

The United States Court of Appeals for the Ninth Circuit has articulated its own use-immunity test. <u>See</u> <u>United States v. Straub</u>, 538 F.3d 1147, 1162 (9th Cir. 2008). If the Tenth Circuit instead decides to adopt the test that the Ninth Circuit has stated, the outcome would be different. The Ninth Circuit's test lessens the burden defendants carry. William F. Johnson & Jennifer K. Kim, <u>Defense Witness Immunity: The Time Has Come in the 9th Circuit – Will it Catch On?</u> at 3, 24 Andrews White-Collar Crime Reporter 1 (2010). Rather than focusing on whether the United States intended to distort the fact-finding process, the Ninth Circuit focuses on the whether the United States' "conduct had the *effect* of distorting the fact-finding process." William F. Johnson & Jennifer K. Kim, <u>Defense Witness Immunity: The Time Has Come in the 9th Circuit -- Will it Catch On?</u> at 3. The Ninth Circuit first assesses whether "'the witness's testimony would have been relevant.'" <u>United States v. Straub</u>, 538 F.3d at 1157 (quoting <u>William v. Woodford</u>, 384 F.3d 567, 600 (9th Cir. 2004)) . The Ninth Circuit "describes the relevant requirement as 'minimal.'" <u>United States v. Straub</u>, 538 F.3d at 1157 (quoting <u>William v. Woodford</u>, 384 F.3d at 600).

> Either the prosecution intentionally caused the witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process or the prosecution granted immunity to a government witness

> but denied immunity to a defense witness who directly contradicted the government witness, and this denial had the effect of distorting the fact-finding process.

United States v. Straub, 538 F.3d at 1162.

First, the Court determines whether Cordova's proffered testimony meets the "'minimal'" relevancy requirement. United States v. Straub, 538 F.3d at 1157 (quoting William v. Woodford, 384 F.3d at 600). The Ninth Circuit has concluded that the proffered testimony could be relevant, because it "raise[s] credibility questions about a key prosecution witness." United States v. Straub, 538 F.3d at 1157 (citing United States v. Westerdahl, 945 F.2d 1083, 1086 (9th Cir. 1991)). Cordova's proffered testimony, which states that Garcia did not ask Cordova to kill Dix, is inconsistent with Montoya's testimony that stated that Garcia asked Cordova and Montoya to "see if they could take care of" killing Dix. Supplemental Brief at 8 (citing Montoya Trial Excerpts at 3). Because Cordova's proffered testimony is inconsistent with Montoya's testimony, Cordova's proffered testimony raises questions about Montoya, a key prosecution witness. Thus, Cordova's proffered testimony meets the relevancy requirement.

The Court moves to the Ninth Circuit approach's second prong. The Court already has decided, supra, that Cordova has not demonstrated that the United States has the intent of distorting the fact finding process, so the Court evaluates whether Cordova has demonstrated that the United States has denied immunity to a witness who directly contradicts the United States' witness and that the United States' denial of immunity will have the effect of distorting the fact-finding process. See United States v. Straub, 538 F.3d at 1162. First, the Court assesses whether Garcia's testimony would directly contradict Montoya's testimony. Were the Court to apply the Ninth Circuit approach without using the Ninth Circuit's interpretation, the Court would require Garcia's testimony to be in opposition to Montoya's testimony. Montoya testified that Garcia told Cordova,

in Montoya's presence, that he wanted Cordova to show Montoya places that Dix frequented and that he wanted them to "see if we couldn't handle it together." Montoya Trial Excerpts at 3. Montoya clarified that "handle" meant killing Dix. Montoya Trial Excerpts at 4. Thus, Garcia asked Cordova and Montoya to see if they could handle killing Dix. This statement is not directly contradictory to Garcia's statement that he never asked Cordova to kill Dix, because the jury could conclude that these two statements are consistent. For instance, the jury could easily imagine a situation in which, after Garcia asked Cordova and Montoya to see if they could handle Dix, Cordova told Garcia he was not able to handle murdering Dix and, thus, Garcia did not ask him to murder Dix. Or the jury could conclude, as the Court concluded supra, that Garcia and Cordova could have an implicit agreement that they never verbalized and thus, Garcia never needed to explicitly ask Cordova to kill Dix. The jury would not need even to speculate, however, because the plain language of the two statements "Garcia asked if Montoya and Cordova could handle Dix' murder" and "Garcia did not ask Cordova to kill Dix" contains no contradictions. Thus, under a plain language interpretation, the Court would conclude that Garcia's testimony does not contradict Montoya's testimony.

If the Court was applying the Ninth Circuit's approach the way the Ninth Circuit has interpreted its approach, the Court would conclude that Garcia's statement is in direct contradiction to Montoya's testimony. The Ninth Circuit's interpretation of "directly contradict" is a loose one -- the defendant's witness' testimony need not be the negation of the United States' witness' testimony to qualify as directly contradictory. See United States v. Straub, 538 F.3d at 1162. Instead, the Ninth Circuit has held that direct contradictions occur "where witnesses offer differing accounts of factual circumstances." United States v. Wilkes, 744 F.3d 1101, 1105 (9th Cir. 2014).

Montoya testified that Garcia told Montoya's presence, that he wanted Cordova to show Montoya places Dix frequented and he wanted them to "see if we couldn't handle it together." Montoya Trial Excerpts at 3. Montoya clarified that "handle" meant killing Dix. Montoya Trial Excerpts at 4. Thus, Garcia asked Cordova and Montoya to see if they could handle killing Dix. In contrast, Garcia told the FBI that "he never asked Cordova to murder Dix." May 8 302 at 2. These are differing factual accounts of factual circumstances and, thus, in direct contradiction according to the Ninth Circuit's interpretation.

Under the Ninth Circuit's approach, it is immaterial that the jury could interpret the statements in a way that would make them no longer contradictory. See United States v. Straub, 538 F.3d at 1164. In United States v. Straub, the Ninth Circuit rejected the district court's decision that, because the defendant may have been joking, bragging, or lying when he said he shot someone, testimony that he said he shot someone did not directly contradict testimony that said he confessed to shooting someone. See United States v. Straub, 538 F.3d at 1163. Although the Ninth Circuit acknowledged that these interpretations were reasonable, the district court erred in finding the statements not contradictory, because the statements, "if believed by the jury, could also support a finding that [the United States' witness] lied on the stand and possibly [that the United States' witness] was the shooter." United States v. Straub, 538 F.3d at 1163. The jury could interpret Garcia's statement to mean that he never asked Cordova explicitly -- the agreement between them was understood. That facial interpretation, if the jury believes that interpretation, could result in a finding that Montoya lied on the stand and that Cordova did not have a murder-for-hire arrangement with Garcia. Because the "proffered testimony need only support (as opposed to compel) a finding by the jury that it was 'directly contradictory,'" Garcia's statement,

which supports a finding that contradicts Montoya's murder-for-hire testimony, is directly contradictory under the Ninth Circuit approach. United States v. Straub, 538 F.3d at 1163 (quoting William v. Woodford, 384 F.3d at 600). The Court thus concludes that, under the Ninth Circuit approach, the United States selective-immunization would render the trial sufficiently unfair, because Cordova's proffered testimony directly contradicts the United States' witness' testimony, and thus he would be entitled to an acquittal, should the United States choose not to immunize Garcia.

### C. UNDER THE THIRD CIRCUIT'S APPROACH, THE COURT CONCLUDES THAT THE UNITED STATES' SELECTIVE USE OF IMMUNITY DOES NOT DEPRIVE CORDOVA OF HIS DUE PROCESS RIGHTS.

The United States Court of Appeals for the Third Circuit has its own five-part selective- immunity test. See Gov't of Virgin Islands v. Smith, 615 F.2d 964, 972 (3d Cir. 1980), abrogated on other grounds by United States v. Quinn, 728 F.3d 243 (3d Cir. 2013). The Third Circuit has the following requirements for the defendant: "'[1] [I]mmunity must be properly sought in the district court; [2] the defense witness must be available to testify; [3] the proffered testimony must be clearly exculpatory; [4] the testimony must be essential; and [5] there must be no strong governmental interests which countervail against a grant of immunity.'" United States v. Quinn, 728 F.3d at 262 (quoting Gov't of Virgin Islands v. Smith, 615 F.2d at 972). The Court addresses each factor in turn.

The Court looks at the first factor, whether immunity was properly sought in the district court. See United States v. Quinn, 728 F.3d at 262. There is no dispute that Cordova has brought this request in the federal district court. Thus, the Court concludes that Cordova's proffered testimony meets the first factor.

The Court next looks at the second factor, which is that the defense witness must be available to testify. See United States v. Quinn, 728 F.3d at 262. Garcia was unavailable in the last trial to testify only because he invoked his Fifth Amendment privilege against self-incrimination. The Court disregards the invocation of the Fifth Amendment privilege for this analysis, because this analysis is to determine whether Garcia will be immunized for his statements, which would minimize the self-incrimination concerns. If the Court compelled the United States to grant Garcia immunity for these statements, there is nothing in the record that suggests that Garcia would be unavailable to testify. Thus, the Court concludes that Cordova satisfies the second factor.

The Court looks at the third factor, which is whether Cordova's proffered testimony is "clearly exculpatory." United States v. Quinn, 728 F.3d at 262. The word "clearly" heightens the defendant's burden. The testimony must unambiguously exonerate or tend to exonerate the defendant. The Third Circuit has concluded that testimony that is "'at best, speculative,' 'severely impeached' by the witness's prior inconsistent statement(s), ambiguous on its face, or 'even if believed, would not in itself exonerate [the defendant],' is not clearly exculpatory." United States v. Quinn, 728 F.3d at 262 (quoting United States v. Ammar, 714 F.2d 238, 251 n.8 (3d Cir. 1983); United States v. Perez, 280 F.3d 318, 348 (3d Cir. 2002); United States v. Lowell, 649 F.2d 950, 965 (3d. Cir 1981)(emphasis omitted)(alteration in United States v. Quinn)). Moreover, to be clearly exculpatory, the testimony must relate to more than "*only* the credibility of the United States' witness." United States v. Mike, 655 F.3d 167, 173 (3d Cir. 2011)(quoting Gov't of Virgin Islands v. Smith, 615 F.3d at 972 (emphasis added in United States v. Mike)). Cordova's proffered testimony makes it more likely that he will be exonerated, because the jury could have construed

Garcia's statement that Garcia did not ask Cordova to kill Dix to mean that there was no murder-for-hire arrangement between Garcia and Cordova. But the jury also could interpret Garcia's statement to mean that he never explicitly asked Cordova to kill Dix, but that there was an unspoken or implied murder-for-hire arrangement between Garcia and Cordova. Both interpretations are plausible and only one interpretation -- the latter interpretation -- has significant evidentiary support. See United States v. Quinn, 728 F.3d at 263 (concluding that testimony was not exculpatory, because it would be "overwhelmed by evidence of [the defendant's guilt]'). The record shows that Garcia and Cordova used coded language to discuss Dix' murder, see May 8 302 at 2; May 10 302 at 1, which means that they could have used similarly coded language to enter into a murder-for-hire arrangement without Garcia's explicit request. Moreover, there is other evidence in the record that supports that Garcia and Cordova had a murder-for-hire arrangement. Accordingly, even if the jury believed the facial statement -- that Garcia did not ask Cordova to kill Dix -- they could still conclude that there was a murder-for-hire arrangement. Thus, Garcia's statement does not, in itself, exonerate Cordova. See United States v. Lowell, 649 F.2d at 965. Thus, with two plausible interpretations of the testimony available, only one of which has evidentiary support, the Court cannot conclude soundly that the testimony is clearly exculpatory.

The Court next looks at the fourth factor, which is whether the testimony is essential. The testimony is a piece of evidence that relates to the defense's theory -- Cordova should have been acquitted of the VICAR charge, because there was no murder-for-hire arrangement between Garcia and Cordova. Cordova's right to present a meaningful defense, see United States v. Quinn, 728 F.3d 243, 251 (3d Cir. 2013), is compromised when a piece of evidence relevant to a foundational

component of the defense's theory is omitted. Thus, the Court concludes that the testimony is essential to Cordova presenting a full defense, because his defense omitted a piece of testimony that may have been helpful. Nevertheless, the testimony was not essential, because he was still able to present a meaningful defense without the testimony -- the testimony was mere conjecture. Regardless, because the testimony is not clearly exculpatory, the testimony does not satisfy the Third Circuit's approach. The Court follows the Third Circuit's lead in not evaluating the fifth prong after concluding that the defendant did not bear the burden, because the Third Circuit wants to "avoid[] scrutinizing the Government's prosecutorial decisions unless necessary to do so." United States v. Quinn, 728 F.3d at 263. The Court agrees that to scrutinize unnecessarily the United States' prosecutorial decision would undermine Congressional intent to provide the United States the "'exclusive'" authority to balance obtaining information with undermining their prosecutorial strategy.[14] United States v. Quinn, 728 F.3d at 263 (quoting United States v. Doe, 465 U.S. 605, 616-17 (1984)). Thus, the Court concludes that Cordova's proffered testimony does not compel the Court to acquit Cordova if the United States refuses to immunize Cordova.

> **D.      THE TENTH CIRCUIT WOULD AND SHOULD ADOPT THE MAJORITY APPROACH.**

When the Tenth Circuit elects to adopt a defense-witness-immunity approach, it should choose the majority approach, which is the standard that it has referenced, instead of the Ninth Circuit's approach or the Third Circuit's approach. The majority approach has the highest burden for defendants. See William F. Johnson and Jennifer K. Kim, Defense Witness Immunity: The

---

[14]Moreover, another examination of the prosecutorial decision-making process would be unnecessarily intrusive in light of the Court's earlier analysis, supra, of why the United States might deny a grant of immunity.

Time has Come in the 9th Circuit -- Will it Catch On?, 2010 WL 697368, at *1 (stating that the majority approach is "considerably higher than that of the 9th Circuit"). The majority approach best balances the defendant's ability to present an effective defense and due process under the Fourteenth Amendment of the United States Constitution while respecting Congressional intent to leave immunity exclusively to the Executive Branch.

The Constitution instructs the Executive Branch to "faithfully execute[]" the laws, U.S. Const. art. II, § 3, and thus the Executive Branch has "broad discretion to enforce" those laws. United States v. Serrano, 406 F.3d at 1217 (quoting United States v. Armstrong, 517 U.S. 456, 464 (1996)(internal quotations omitted in United States v. Serrano). Congress facilitated this execution by enacting the Immunity Witness Act, 18 U.S.C. §§ 6001-05, which authorizes the United States to compel a witness to testify by granting them use immunity. See 18 U.S.C. §§ 6002-03. Congressional intent is plain -- the Executive Branch has broad discretion to immunize witnesses to better enforce the laws. Thus, the Court must place a heavy burden on the defendant to avoid disturbing that power unless necessary to avoid a due process violation. See United States v. LaHue, 261 F.3d at 1015. A violation of a constitutional right necessitates disrupting that power. The defendant, however, must come forth with sufficient evidence to justify the Court peering into prosecutorial decision-making. The majority of Courts of Appeals have limited the situations in which they will impose consequences for the United States deciding not to immunize a defense witness, realizing Congress' intent. To expand the scope of judicial consequences for the United States' refusal to immunize a defense witness, "proponents [of use immunity for defense witnesses] must address their arguments to Congress, not the courts." United States v. Lenz, 616 F.2d 960, 962-63 (6th Cir. 1980).

Scholars and other Courts of Appeals have argued that the burden need not be so high, because a lower burden, such as the Third Circuit's approach or the Ninth Circuit's approach, would better equalize the power disparity between the United States and the defendant. Nathaniel Lipanovich, Resolving the Circuit Split on Defense Witness Immunity: How the Prosecutorial Misconduct Test has Failed Defendants and What the Supreme Court Should Do About It, 91 Tex. L. Rev. 175, 189-90 (2012). The Court disagrees that such a measure is necessary. A trial is not meant to be an equal proceeding, but rather a fair proceeding. A defendant will rarely have the resources to match the United States' resources, but a proceeding can still be fair. A trial is structured to account for imbalances between the parties and make the proceedings as fair as possible. Many of those structures take the form of burdens on the United States. For instance, the United States cannot address a defendant's decision not to testify, and courts instruct juries not to read into that decision. See United States v. Rahseparian, 231 F.3d 1267, 1272, 1276 n.3 (10th Cir. 2000). Notably, the United States has the burden of proof -- a "defendant can prevail without presenting any evidence at all, while the prosecution must convince the jury beyond a reasonable doubt of defendant's guilt." Nathaniel Lipanovich, Resolving the Circuit Split on Defense Witness Immunity: How the Prosecutorial Misconduct Test has Failed Defendants and What the Supreme Court Should Do About It, 91 Tex. L. Rev. at 189-90. Retaining the exclusive authorization to immunize witnesses provides the United States with the opportunity to obtain information, information that the defendant's right not to testify may hinder them from getting otherwise.

Motions for new trials are "generally disfavored," and courts grant new trials with "extreme caution." Matthew B. Jager, United States v. Griffin: Can a Convicted Codefendant's Exculpatory Testimony Be Newly Discovered Evidence on a Defendant's Rule 33 Motion for a New Trial?, 37

Am. J. Trial Advocacy 421, 423 (2013).  To protect against new trial motions resulting from codefendants collaborating to exonerate each other after trial, courts do not characterize a former codefendant's exculpatory testimony, if the former codefendant originally chose to not testify and if the defendant was aware of the testimony, as newly discovered evidence.  See United States v. Muldrow, 19 F.3d at 1339 ("If a former codefendant who originally chose not to testify subsequently comes forward and offers testimony exculpating a defendant, the evidence is not newly discovered if the defendant was aware of the proposed testimony before trial.")(citing United States v. DiBernardo, 880 F.2d 1216, 1224-25 (11th Cir. 1989); United States v. Metz, 652 F.2d 478, 480 (5th Cir. 1981)).  If the Court adopted the Ninth Circuit's approach or the Third Circuit's approach, this lower burden on defendants could result in an undermining of the protections that courts have put in place regarding cooperative perjury.  This burden would allow a co-conspirator who has taken a plea agreement to reveal suddenly, after trial, evidence that exonerates his or her conspirator.

Under the Third Circuit's Approach or the Ninth Circuit's approach, the defendant would need only a little foresight and cooperation to get either an acquittal or a grant of immunity to exculpate himself or herself.  In the case at hand, it is not difficult to see how that might work.  Cordova, Montoya, and Garcia may be cooperating with each other.  They could agree that Montoya would take the original plea deal that immunizes him.  He then exculpates himself and puts the blame on Cordova.  After trial, Garcia exculpates Cordova, in direct contravention of Montoya's testimony. Now Montoya and Garcia both benefit from the immunity and plea deals they received from the United States in exchange for providing information to the United States and Cordova gets a new trial.  To illustrate how this hypothetical would work under a less

burdensome approach, the Court looks at both the Third Circuit's approach and the Ninth Circuit's approach.  Under the Third Circuit's approach, Garcia would need only to make his testimony as directly contradictory to Montoya's as possible and as essential as possible for the court to reach the balancing test, which requires a strong interest to outweigh a grant of immunity.  See United States v. Quinn, 728 F.3d at 262 (requiring the testimony to meet a five factor test: (i) immunity is sought in district court; (ii) the defense witness must be available; (iii) the testimony is "clearly exculpatory"; (iv) the testimony is "essential"; and (v) there are "no strong governmental interests which countervail against a grant of immunity").  The United States Court of Appeals for the Second Circuit described cooperative perjury in a decision denying use immunity to the defense witness:

> Co-defendants could secure use immunity for each other, and each immunized witness could exonerate his co-defendant at a separate trial by falsely accepting sole responsibility for the crime, secure in the knowledge that his admission could not be used at his own trial for the substantive offense. The threat of a perjury conviction, with penalties frequently far below substantive offenses, could not be relied upon to prevent such tactics.

United States v. Turkish, 623 F.2d 769, 775 (2d Cir. 1980).  Had Garcia stated "I had no agreement, explicit or implicit, with Cordova for him to kill Dix, nor did I provide any consideration to Cordova for killing anyone," that testimony, as rehearsed as it may be, could compel a district court in the Third Circuit to acquit Cordova or force the United States to grant Garcia immunity.

Under the Ninth Circuit's test, the codefendants face even fewer obstacles. All the defendant must show, after meeting the relevancy requirement, is that the proffered testimony "directly contradict[s]" the United States' witness.  United States v. Straub, 538 F.3d at 1162.  Thus, a co-defendant need negate only a relevant piece of the United States' witness' testimony to meet the standard.  Of course, the defendant also must demonstrate that the denial of immunity has

the effect of distorting the fact-finding process, but a defendant should not find it too difficult to conjure a sufficiently contradictory and exculpatory statement that would distort the fact-finding process. Moreover, if the co-defendant selects an important piece of information from the defendant's witness' testimony and negates it, it is difficult to see how courts following the Ninth Circuit approach could avoid granting a new trial. Thus, collaborative co-conspirators could, with a little coordination, compel the court to either acquit Cordova or grant Garcia immunity to testify under the Ninth Circuit approach.[15] The Ninth Circuit's approach would permit an exception for the disfavor of granting new trials to swallow that rule by allowing cooperative perjury to suffice as grounds for a new trial.

Moreover, the majority approach still provides redress when the United States deliberately abuses immunity to distort the fact-finding process while also according with the presumption of prosecutorial regularity. See United States v. LaHue, 261 F.3d at 1015. The presumption of prosecutorial regularity compels courts to "presume that [prosecutors] have properly discharged their official duties" in selective immunity cases. United States v. Deberry, 430 F.3d at 1299 (quoting United States v. Armstrong, 517 U.S. at 465)(alteration in United States v. Deberry). As discussed supra, the Court concludes that the absence of a presumption would "'chill law

---

[15]Garcia's counsel contends that Garcia renounced affiliation with SNM during an FBI interview in which he sought entry to a gang drop-out program. See March 11 Tr. at 29:22-24 (Sirignano). The implication is that Garcia would not have collaborated with Cordova and Montoya, because they are no longer part of the same gang. The Court is reluctant to accept this conclusion. This conclusion is based on speculation -- Garcia's counsel admitted she was not present during the interview in which Garcia allegedly renounced the SNM and she does not provide any evidence that this renouncement occurred. See March 11 Tr. at 29:20-22 (Sirignano). Moreover, entry into a gang drop-out program may not mean a member has renounced the gang. Entering a gang-drop out program is a way for gang members to get new targets by finding out who may be betraying the gang.

enforcement by subjecting the prosecutor's motives and decisonmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy,'" United States v. Deberry, 430 F.3d at 1299 (quoting United States v. Armstrong, 517 U.S. at 465), and the Court concludes the presumption also should apply to use-immunity claims. The only standard that fully accords with that presumption is the majority approach. The majority approach presumes proper prosecutorial discharge and allows consequence only when that presumption is overcome by evidence that the United States deliberately distorted the fact-finding process. In contrast, the Third Circuit's approach and the Ninth Circuit's approach do not presume proper prosecutorial discharge of duties. Under the Third Circuit's approach and the Ninth Circuit's approach, the defendant needs to show only that the United States' actions have "the *effect* of distorting the fact finding process." Defense Witness Immunity at 3 (emphasis in Defense Witness Immunity). Accordingly, a United States prosecutor can discharge his or her duties properly but still face the defendant's acquittal or the Court's compulsion of a grant of use immunity under these approaches. Thus, the Third Circuit's approach and the Ninth Circuit's approach do not accord with the presumption of prosecutorial regularity. Moreover, not only does the majority approach presume prosecutorial regularity, it still respects the defendant's right to due process by providing a mechanism for defendants to demonstrate prosecutorial misconduct. See United States v. Deberry, 430 F.3d at 1299. If a defendant can show that the United States deliberately distorted the fact-finding process, the Court can redress the harm by giving the United States the choice of providing grant immunity or watching the Court acquit the defendant. See United States v. LaHue, 261 F.3d at 1014. Thus, the Court concludes that the Tenth Circuit should adopt the majority approach to use immunity for defense witnesses.

**IT IS ORDERED** that (i) the Defendant Anthony Cordova's Ex Parte Motion for New Trial, filed August 14, 2019 (Doc. 1108)("Motion"); (ii) the Ex Parte Supplemental Brief in Support of Ex Parte Rule 33 (B)(1) Motion for New Trial [Doc. 1108], filed September 11, 2019 (Doc. 1120)("Supplemental Brief"); and (iii) the oral motion for a new trial, made at the September 16, 2019 sentencing hearing are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew M. Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Theresa M. Duncan
Duncan Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

*Attorneys for Defendant Anthony Ray Baca*

Christopher W. Adams
The Law Office of Christohper W. Adams, P.C.
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

*Attorney for Defendant Manuel Jacob Armijo*

Louis E. Lopez, Jr.
Louis Lopez Law -- Attorney at Law
El Paso, Texas

*Attorney for Defendant Frederico Munoz*

Donald F. Kochersberger, III
Business Law Southwest, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Sergio Loya Rodriguez*

Susan Burgess-Farrell
Barry G. Porter
Burgess & Porter Law, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

--and--

R. Scott Reisch
Reisch Law Firm, LLC
Denver, Colorado

    *Attorneys for Defendant Vincent Garduño*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

    *Attorney for Defendant Mandel Lon Parker*

James Baiamonte
Law Office of James P. Baiamonte Esq.
Albuquerque, New Mexico

--and--

Ahmad Assed
Ahmad Assed & Associates
Albuquerque, New Mexico

    *Attorneys for Defendant Daniel Archuleta*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for Defendant Daniel Sanchez*

Marcia A. Morrissey
Law Office of Marcia A. Morrissey
Santa Monica, California

--and--

Gregory M. Acton
Acton Law Firm P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Anthony Cordova*

Scott Moran Davidson
The Law Office of Scott M. Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

      *Attorneys for Defendant Arturo Arnulfo Garcia*